UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division


In re ZETIA (EZETIMIBE)
ANTITRUST LITIGATION

                                    MDL No. 2:18-md-2836


THIS DOCUMENT RELATES TO:
All Direct Purchaser Actions


REPORT AND RECOMMENDATION

# Table of Contents

I.   Statement of the Case....................................1

II.  Analysis...............................................5

 A.  Rule 23(a) ...........................................8

  1.  Numerosity ..........................................8

   a.  Size of the Class .................................10

    i.  Retailer Plaintiffs .............................13

    ii. Subsidiaries ....................................14

    iii. Brand-Only Purchasers ..........................16

    iv. Idiosyncratic Purchasers ........................28

   b.  Practicability of Joinder .........................32

  2.  Commonality ........................................45

  3.  Typicality .........................................47

  4.  Adequacy ...........................................53

   a.  FWK ...............................................53

   b.  RDC ...............................................59

    i.  Deferred Prosecution Agreement ..................60

    ii. Chapter 11 Bankruptcy Filing ....................62

  5.  Ascertainability ...................................74

 B.  Rule 23(b) ..........................................75

    1.   Predominance ........................................ 75

       a.  Violation of Antitrust Laws ....................... 77

       b.  Antitrust Impact .................................. 79

       c.  Measurable Damages ................................ 86

    2.   Superiority ......................................... 88

  C.   Rule 23(g) ........................................... 92

III.   Conclusion and Recommendation ......................... 92

IV.  Review Procedure........................................ 93

Before the court are Direct Purchaser Plaintiffs' ("DPPs")[1] Motion for Class Certification, ECF No. 735, and Motion to Modify Their Class Definition, ECF No. 812. Defendants Merck[2] and Glenmark[3] oppose the first motion but not the second. For the reasons explained in greater detail below, I recommend that the court GRANT the Motion to Modify and GRANT IN PART the Motion for Class Certification.

## I.   Statement of the Case

The allegations underlying this multidistrict litigation have been set forth in great detail by this court in previous opinions.[4] I therefore provide only a brief summary here. DPPs allege that Merck and Glenmark entered into an unlawful reverse payment

---

[1] The named DPPs are FWK Holdings, LLC ("FWK"); Rochester Drug Co-Operative, Inc. ("RDC"); and Cesar Castillo, Inc. ("Cesar Castillo").

[2] "Merck" consists of Merck & Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC.

[3] "Glenmark" consists of Glenmark Pharmaceuticals Limited and Glenmark Pharmaceuticals Inc., USA, the latter incorrectly identified as Glenmark Generics Inc., USA.

[4] In re Zetia (Ezetimibe) Antitrust Litig., No. 2:18-md-2836, 2019 WL 6122017, at *1-3 (E.D. Va. Oct. 15, 2019), R. & R. adopted as modified, 2019 WL 6977405 (E.D. Va. Dec. 20, 2019); In re Zetia (Ezetimibe) Antitrust Litig., No. 2:18-md-2836, 2019 WL 1397228, at *1-10 (E.D. Va. Feb. 6, 2019), R. & R. adopted as modified, 400 F. Supp. 3d 418 (E.D. Va. 2019).

settlement agreement,[5] which resulted in artificially inflated prices for the brand drug Zetia (ezetimibe) and its generic equivalents.  DPPs' Am. Consolidated Class Action Compl. ("DPPs' Am. Compl.")  ¶¶ 1-7, 184-221 (ECF Nos. 253-1 (sealed), 315 (public)).  Specifically, Glenmark, a generic drug manufacturer, agreed to refrain from launching the market's first generic version of Zetia – a blockbuster drug manufactured by Merck – for a period of roughly five years, providing Merck between $5.7 and $8.3 billion in additional Zetia sales.  Id. ¶¶ 4, 193, 220-21.  In exchange, Merck agreed to drop patent infringement claims against Glenmark and to abstain from introducing its own generic version of Zetia (an "Authorized Generic") during the initial 180-day exclusivity period following Glenmark's generic entry, ensuring Glenmark's sole-generic-provider status.  Id. ¶¶ 4-5, 193, 198, 201.  This type of agreement is referred to as a "No Authorized Generic" or "No-AG" agreement.  Id. ¶¶ 4, 193.  And in this case, according to DPPs, Defendants' No-AG agreement resulted in an $800 million payment to Glenmark and supracompetitive purchase prices for both brand and generic Zetia.  Id. ¶¶ 4, 6-7, 226, 270. Defendants vigorously dispute this characterization of the settlement.

---

[5] See FTC v. Actavis, 570 U.S. 136, 140-41 (2013) (describing reverse payment settlement agreement).

2

On November 18, 2019, DPPs, one of three plaintiff groups, moved to certify the following proposed class:

> All persons or entities in the United States and its territories that purchased Zetia or generic Zetia in any form directly from Merck, Glenmark/Par [Pharmaceutical, Inc.], or any agents, predecessors, or successors thereof from July 1, 2012 until June 11, 2017. Excluded from the proposed Class are defendants Merck, Glenmark and Par, and their officers, directors, management, employees, parents, subsidiaries, or affiliates, and the government of the United States and all agencies thereof, and all state or local governments and all agencies thereof.

DPPs' Mot. Class Certification 1 (ECF No. 735); see DPPs' Mem. Supp. Mot. Class Certification ("DPPs' Mem. Supp. Mot. Certify") 2-3 (ECF Nos. 736 (public), 740 (sealed)).

On December 20, 2019, this court held that the direct purchaser rule announced in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), barred DPPs from pursuing damages stemming from direct purchases of ezetimibe from Par Pharmaceutical, Inc. ("Par"), which had entered into an exclusive distribution agreement with Glenmark to market the Glenmark generic. Zetia, 2019 WL 6977405, at *14-19. That ruling necessarily excludes from the class definition such purchases.

On January 17, 2020, DPPs moved to modify their class definition as stated below:

> All persons or entities in the United States and its territories that purchased Zetia or generic Zetia in any form directly from Merck, Glenmark/Par, or any agents, predecessors, or successors thereof from November 15, 2014 until June 11, 2017. Excluded from the proposed

3

> Class are defendants Merck, Glenmark and Par, and their
> officers, directors, management, employees, parents,
> subsidiaries, or affiliates, and the government of the
> United States and all agencies thereof, and all state or
> local governments and all agencies thereof.

DPPs' Mot. Modify Class Definition 2 (ECF No. 812); see DPPs' Mem.
Supp. Mot. Modify Class Definition 1 ("DPPs' Mem. Supp. Mot.
Modify") 1 (ECF No. 813).  The only change in the proposed modified
definition is a two-year reduction in the class period, which
decreases the number of proposed class members from seventy to
sixty-five.  DPPs' Mem. Supp. Mot. Modify 2.  As apparent, the
proposed definition still includes claims relating to direct
purchases of ezetimibe from Par.[6]

Defendants oppose class certification, arguing that DPPs
cannot satisfy several Federal Rule of Civil Procedure 23
requirements, namely, numerosity, typicality, adequacy, and
predominance.  See Defs.' Mem. Opp'n DPPs' Mot. Class Certification
("Defs.' Opp'n") 2 (ECF Nos. 819 (public), 822 (sealed)).  Although
they do not oppose DPPs' motion to modify the class definition,
Defendants maintain that the "proposed modification underscores
DPPs' inability to satisfy the numerosity requirement."  Defs.'

---

[6] In their Reply, DPPs recognize the effect of the court's prior
ruling, but they maintain a reference to Par in the class
definition to preserve arguments on appeal.  DPPs' Reply Mem. Supp.
Mot. Class Certification ("DPPs' Reply") 1 n.4 (ECF Nos. 871
(public), 875 (sealed)).  On March 6, 2020, the court approved a
settlement between DPPs and Par, dismissing Par as a defendant.
ECF No. 898.

Joint Resp. DPPs' Mot. Modify Class Definition 1 (ECF No. 842). The court heard oral argument on the motions on May 1, 2020.

After reviewing the parties' extensive briefing, expert evidence, and arguments on the motions, I conclude that DPPs and their proposed class definition, as modified by DPPs and further modified in accordance with the court's prior ruling (i.e., the exclusion of claims arising from ezetimibe purchases from Par), satisfy the requirements of Rule 23. Thus, this report recommends that the court grant DPPs' motion for class certification.

## II.  Analysis

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)).  A party seeking to invoke this exception must "affirmatively demonstrate [its] compliance" with the requirements of Federal Rule of Civil Procedure 23. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); see also Brown v. Transurban USA, Inc., 318 F.R.D. 560, 566 (E.D. Va. 2016) (stating that the party seeking class certification must prove each Rule 23 requirement by a preponderance of the evidence).

At the same time, "the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." Id. (quoting Wal-Mart

5

Stores, Inc., 564 U.S. at 350-51).  This analysis may require "the court to probe behind the pleadings before coming to rest on the certification question."  Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982).  And it often "overlap[s] with the merits of the plaintiff's underlying claim."  Comcast Corp., 569 U.S. at 33-34 (quoting Wal-Mart Stores, Inc., 564 U.S. at 351).  To the extent the court must resolve disputes between the parties' experts in order to determine whether a particular class certification requirement has been satisfied, see In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 324 (3d Cir. 2008) (noting that such resolution, when necessary, is reserved for the court), any "determination that an expert's opinion is persuasive or unpersuasive on a Rule 23 requirement does not preclude a different view at the merits stage of the case," id. ("Rigorous analysis need not be hampered by a concern for avoiding credibility issues; as noted, findings with respect to class certification do not bind the ultimate fact-finder on the merits.").

Here, DPPs have moved to modify their class definition, and Defendants do not object.  Although Rule 23(c)(1)(C) permits courts to alter or amend (before final judgment) a prior order that granted or denied class certification, Fed. R. Civ. P. 23(c)(1)(C); accord Henderson v. Corelogic Nat'l Background Data, LLC, No. 3:12-cv-97, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2016); Milbourne v. JRK Residential Am., LLC, No. 3:12-cv-861, 2016 WL 1071571, at *3-

6

4, *8 (E.D. Va. Mar. 15, 2016), this court has not yet ruled on class certification.

Nevertheless, in that same spirit, the court may permit a party to amend its class definition prior to a class certification ruling, just as the court itself may modify the definition upon consideration of a motion for class certification, when the result is a better-pled class definition.  See Weisfeld v. Sun Chem. Corp., 84 F. App'x. 257, 259 (3d Cir. 2004) ("Despite failing to revise his complaint, Weisfeld sought to narrow the definition of the class in his motion for class certification. . . .  The District Court considered this revised class definition in its analysis, and we will do the same." (citing Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993))); Abdeljalil v. Gen. Elec. Capital Corp., 306 F.R.D. 303, 306 (S.D. Cal. 2015) (permitting the plaintiff to narrow the class definition on a motion for class certification); Charron v. Pinnacle Grp. N.Y. LLC, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("A district court is not bound by the class definition proposed in the complaint, and is empowered to carve out an appropriate class." (internal quotation marks omitted)).

In light of this discretion and Defendants' lack of opposition, I recommend that the court grant DPPs' Motion to Modify Their Class Definition, ECF No. 812, and thus will use the amended

proposed class definition, further modified by the exclusion of ezetimibe purchases from Par, in this analysis.[7]

## A.    Rule 23(a)

Rule 23(a) spells out four prerequisites to class certification: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Furthermore, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) (quoting Hammond v. Powell, 462 F.2d 1053, 1055 (4th Cir. 1972)). Courts often refer to this implicit requirement as "ascertainability." Id.; see, e.g., Soutter v. Equifax Info. Servs., LLC, 307 F.R.D 183, 196 (E.D. Va. 2015).

### 1.    Numerosity

The numerosity prong requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Fourth Circuit has held that "[n]o specified

---

[7] Granting this motion does not require DPPs to further amend their consolidated complaint. See Henderson, 2016 WL 4611571, at *4.

number is needed to maintain a class action." Brady v. Thurston Motor Lines, 726 F.2d 136, 145 (4th Cir. 1984). Generally, classes consisting of forty or more members are considered sufficiently large that joinder is presumed to be impracticable. Am. Sales Co., LLC v. Pfizer, Inc., No. 2:14-cv-361, 2017 WL 3669604, at *6 (E.D. Va. July 28, 2017), R. & R. adopted, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017); In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 337 (D. Md. 2012).

Conversely, it is widely accepted that a class of less than twenty members is insufficiently numerous to satisfy Rule 23(a)(1). See, e.g., In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 421 F. Supp. 3d 12, 46-47 (E.D. Penn. 2019) (noting that "a class of fifteen to twenty is likely too small to meet the numerosity requirement" (citing In re Modafinil Antitrust Litig., 837 F.3d 238, 250 (3d Cir. 2016))); In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 202 (S.D.N.Y. 2018) ("For classes with fewer than twenty members, however, joinder is generally deemed practical." (citing cases)); see also 5 William B. Rubenstein, Newberg on Class Actions § 3:12 (5th ed. 2019 update) ("As a general guideline . . . a class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder.").

Classes with between twenty and forty members require the court to closely scrutinize the practicability of joinder. See

Ansari v. N.Y. Univ., 179 F.R.D. 112, 114 (S.D.N.Y. 1998); see also 5 William B. Rubenstein, Newberg on Class Actions § 3:12 (5th ed. 2019 update) ("Courts considering certification of classes numbering in the gray area between 20 and 40 are guided by a series of impracticality factors beyond numbers alone.").

That being said, in the antitrust context in particular, courts have repeatedly certified classes encompassing anywhere between twenty and forty members. See, e.g., Am. Sales Co., 2017 WL 3669604, at *9-10 (certifying class of thirty-two members); Mylan Pharms., Inc. v. Warner Chilcott Pub. Ltd. Co., No. 12-3824, 2014 WL 631031, at *2 (E.D. Penn. Feb. 18, 2014) (twenty-three members); In re Prograf Antitrust Litig., No. 1:11-cv-10344, 2013 WL 2395083, at *1 (D. Mass. Apr. 23, 2013) (twenty-five members); In re Wellbutrin XL Antitrust Litig., No. 08-2431, 2011 WL 3563385, at *3 (E.D. Pa. Aug. 11, 2011) (thirty-three members); Meijer, Inc. v. Warner Chilcott Holdings Co. III., Ltd., 246 F.R.D. 293, 306 (D.D.C. 2007) (thirty members).

### a.   Size of the Class

DPPs first asserted that the modified proposed class consisted of sixty-five members. DPPs' Mem. Supp. Mot. Modify 2. However, this number included class members with claims arising from direct ezetimibe purchases from Par - claims this court found barred by the direct purchaser rule. See Zetia, 2019 WL 6977405, at *14-19. As DPPs now recognize, twenty-three of the original

seventy proposed class members purchased only generic Zetia from
Par.   See DPPs' Reply 1 & n.4; see also Defs.' Opp'n 8 & n.3.
Those twenty-three members are thus excluded from the class,
bringing the number of proposed class members to forty-seven.
DPPs' modified class definition shortening the class period
further reduces the proposed class by five members, thus totaling
forty-two members.[8]

Defendants first contest DPPs' ability to establish
numerosity by arguing that several subgroups of class members
should be excluded from the class outright or disregarded for
purposes of the numerosity inquiry.   According to Defendants'
calculation, DPPs' proposed class includes no more than twenty-
three members – nearly half of the forty-two proffered by DPPs.
Defs.' Opp'n 6.  First, Defendants note that the proposed modified
class includes seven retailer plaintiffs that have brought their
own suits.   Id. at 9.  Because these plaintiffs intend to proceed
independently regardless of the court's decision with respect to

_____

[8] Because the modified class definition differs from the original
class definition only with respect to commencement of the class
period – beginning November 15, 2014, instead of July 1, 2012 –
the five members excluded by the modified definition must have
purchased only brand Zetia from Merck as Glenmark did not launch
a generic version until December 12, 2016.  Therefore, the twenty-
two members excluded by the court's previous judgment are in
addition to the five members excluded by the modified proposed
class definition.

DPPs' motion for class certification, Defendants urge the court to disregard those seven entities "when considering whether the numerosity standard is met and joinder is practicable." Id. Excluding the seven retailer plaintiffs would reduce the class size to thirty-five.

Second, Defendants argue that six additional entities should be excluded from the class because they are subsidiaries of other class members, reducing the number of class members to twenty-nine. Id. at 10.

Next, Defendants argue that the court should exclude from the class the five members that purchased only brand Zetia during the class period, which includes three of the subsidiaries mentioned above. Id. at 11-13. According to Defendants, these "brand-only" purchasers would not have received higher discounts after generic entry and thus suffered no injury. Id. at 12-13.

Finally, Defendants seek to exclude four other members that their expert, Bruce Strombom, Ph.D., classifies as "idiosyncratic" purchasers - members that made so few purchases of the drug that "no reasonable assumptions can be made about" whether they suffered any injury due to delayed generic entry. Id. at 13-14; Strombom Decl. ¶¶ 47-56 (ECF Nos. 821 (public), 824 (sealed)). Thus, Defendants aver, DPPs' proposed class includes at most twenty-three members, all of whom could be practically joined in this

action.  Defs.' Opp'n 14-15.  I address each of these arguments in
turn.

### i.   Retailer Plaintiffs

First, Defendants argue that the court should not consider in
its numerosity analysis the seven retailer plaintiffs - Walgreen
Co.; The Kroger Co.; Albertsons Companies, Inc.; HEB Grocery
Company L.P.; Rite Aid Corporation; Rite Aid Hdqtrs. Corp.; and
CVS Pharmacy, Inc. - because they are pursuing their claims
independently from the class.  Id. at 9.  There is no dispute that
the retailer plaintiffs are properly included in the proposed class
definition.  "Under Rule 23, individuals are considered class
members until they opt out of the suit, and the mere possibility
that members of a potential class may choose to opt out in the
future is not enough to preclude a finding of numerosity."
MacNamara v. City of New York, 275 F.R.D. 125, 142 (S.D.N.Y. 2011)
(citations and internal quotation marks omitted).  This is so even
if such members have "filed suits on their own behalf." Id.  In
this case, however, it is also beyond dispute that the seven
retailer plaintiffs will opt out of the class.   Indeed, the
retailer plaintiffs have separately pursued this litigation from
the outset and have already opted out of DPPs' settlement with
Par.  See ECF No. 898, at 2.  And DPPs conceded during oral argument
that the retailer plaintiffs would opt out of any certified class
and thus should not be included in the class number when evaluating

13

practicability of joinder.  Mot. Certify Hr'g Tr. ("Hr'g Tr.")
8:23-10:11 (ECF No. 930).  This report, therefore, does not
consider the retailer plaintiffs in its numerosity analysis,
reducing the class to thirty-five members.

### ii.  Subsidiaries

Defendants next argue that six members – Bellco, Smith Medical
Partners, Valley Wholesale, Harvard Drug, Burlington Drug, and H.
D. Smith - should be excluded from the proposed class because they
are subsidiaries of other members.  Defs.' Opp'n 10-11, 10 n.6.
They should not.  Indeed, the court rejected this same argument in
American Sales Co., 2017 WL 3669604.  In that case, the defendants
urged the court to exclude five subsidiaries from the class on the
ground that it constituted impermissible "double-count[ing]."  Id.
at *6.  However, the court noted that the defendants' own sales
data demonstrated that those subsidiaries had made "independent
purchases" of the drug Celebrex and thus "suffered independent
injury."  Id. at *8.  Consequently, those subsidiaries were
properly included as separate class members.  Id.  The court made
clear that "[u]nless there is evidence that Plaintiffs are trying
to artificially inflate the number of class members, subsidiaries

should be considered as potential class members to vindicate their own antitrust injury."[9] Id. (citing Modafinil, 837 F.3d at 251).

The same reasoning applies in this case. Here, the six subsidiaries were identified by Merck's sales data, meaning that they made independent purchases of Zetia. See Strombom Decl. Ex. 2; see also Sobol Decl. Ex. 1 ("Leitzinger Decl."), ¶ 8 & Ex. 8 (ECF Nos. 737-1 (public), 741-1 (sealed)). No evidence suggests that DPPs' inclusion of these subsidiaries is an attempt to artificially inflate the number of class members. Defendants say that DPPs have acted arbitrarily in their treatment of subsidiaries in that they have counted some subsidiaries as separate entities while combining others with their respective parent companies. Defs.' Opp'n 10. However, DPPs' counsel explained in oral argument their justification for doing so. The subsidiaries that DPPs combined with their parents no longer exist as separate entities; the subsidiaries that DPPs counted separately, on the other hand, still do. Hr'g Tr. 14:4-15:12. This treatment is entirely consistent with the foregoing precedent. These six subsidiaries

---

[9] Relying on American Sales Co.'s reasoning, several courts have likewise concluded that subsidiaries that have suffered an independent injury should be counted as separate class members. See In re Niaspan Antitrust Litig., 397 F. Supp. 3d 668, 677 (E.D. Penn. 2019); In re Loestrin 24 Fe Antitrust Litig., No. 1:13-md-2472, 2019 WL 3214257, at *10 (D.R.I. July 2, 2019); Namenda, 331 F. Supp. 3d at 207; In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-md-2503, 2017 WL 4621777, at *5 (D. Mass. Oct. 16, 2017).

are alleged to have suffered independent injuries and are thus properly counted as separate class members.  See Am. Sales Co., 2017 WL 3669604, at *8.

### iii.  Brand-Only Purchasers

Defendants further claim that five members – Caribe Rx, Eveready Wholesale Drug, Bellco, Harvard Drug, and Smith Medical Partners[10] – are brand-only purchasers and likely "would not have bought generic Zetia if it had become available earlier."  Defs.' Opp'n 12 & n.7.  Therefore, the only way to prove that these entities sustained injury, according to Defendants, is to show that those class members would have paid less for Zetia by receiving increased discounts once generic Zetia entered the market.  Id.  However, because "none of those class members did receive such additional discounts, there is no basis . . . to infer that they paid an overcharge at all."  Id. at 12 (emphasis omitted).  In any event, demonstrating that brand-only purchasers suffered injury, either because they would have purchased generic Zetia had it been available sooner or because they would have

---

[10] Because this report rejects Defendants' argument that the latter three entities should be excluded from the class based on their subsidiary status, I will consider Defendants' alternative argument that they should be excluded because they are brand-only purchasers.  See Defs.' Opp'n 12 & n.7; Strombom Decl. ¶ 34 & n.42.

received increased discounts on brand Zetia, "will require individualized proof."[11]   Id. at 2.

DPPs respond that four of these five entities - Caribe Rx, Eveready Wholesale Drug, Bellco, and Harvard Drug - "never had a chance to buy a less expensive generic" because, although they purchased brand Zetia during the class period, they stopped purchasing ezetimibe altogether before actual generic entry on December 12, 2016.  DPPs' Reply 6.  DPPs rely on Defendants' own sales data, which include the date of each entity's last Zetia purchase: Eveready Wholesale Drug, June 2015; Bellco, October 2015; Harvard Drug, December 2016; and Caribe Rx, December 2016. See Strombom Decl. Ex. 2.  Because Merck's sales data show only the month of purchase, it is unclear whether Harvard Drug's and Caribe Rx's last Zetia purchases occurred before or after generic entry on December 12, 2016; but DPPs assume that the sale occurred before generic entry.   See DPPs' Reply 6; Sobol Decl. Ex. 33 ("Leitzinger Rebuttal Decl."), ¶ 9 (ECF Nos. 872-1 (public), 875-1 (sealed)).  Consequently, these four entities' "lack of generic purchases reveals nothing about the likelihood that they would have converted some of their brand volumes into generics had the

---

[11] As with the idiosyncratic purchasers discussed below, Defendants' arguments in this respect implicate the predominance requirement.

option to do so been available when they bought those brand volumes." Leitzinger Rebuttal Decl. ¶ 9. Rather, DPPs' expert, Jeffrey Leitzinger, Ph.D., opines that but for Defendants' alleged anticompetitive behavior – that is, had generic entry occurred sooner – these brand-only purchasers almost certainly would have replaced at least some of their brand purchases with lower-priced generic purchases. Leitzinger Decl. ¶¶ 36-37; Leitzinger Rebuttal Decl. ¶ 12.

Dr. Leitzinger relies on four sources of "common evidence" for this contention. The first involves "literature and prior studies showing that generic competition (both generally and from AGs) results in prices that are substantially below the brand's prices and that the vast majority – often upwards of 90 percent – of the brand prescription base is typically converted to generics along with those lower prices." Leitzinger Decl. ¶ 23; see id. ¶¶ 25, 28 (citing FTC studies finding that generics sell, on average, at a price 85 percent lower than brand price and capture between 72 and 85 percent of brand's sales in the first six months and 90 percent in the first year). Generally, the generic discount relative to brand prices increases significantly as the number of

generic competitors increases – typically, up until the fifth or sixth generic competitor.[12]  Id. ¶ 26.

Brand manufacturers commonly respond to robust generic competition by launching an AG.  Id. ¶ 29.  A 2011 FTC study determined that the presence of an AG drove down generic prices by 7 to 14 percent.  Id. ¶ 27.  Additionally, generic competition may cause brand manufacturers to lower brand price.  Id. ¶ 29 (citing FTC study concluding that brand price decreased between 4 and 11 percent after generic entry).

Internal generic penetration models and forecasts from Merck, Glenmark, and Par also support Dr. Leitzinger's assertion.  "These forecasts predict steep generic discounts and widespread generic conversion similar to the results attributed generally to generic competition in the literature."  Id. ¶ 31.  One Merck forecast, for example, predicted the generic would sell at a 45 percent discount on the brand price with one generic competitor, and then at a 70 percent discount upon AG entry.  Id. ¶ 32.  Another internal Merck document assumed that brand Zetia would retain roughly 30 percent of all ezetimibe sales volume in the first six months of generic entry, and that by the second year, generic sales would account for 97 percent of ezetimibe purchases.  Id.  Internal

---

[12] After that point, the generic price is only marginally affected, if at all, by the entry of additional generic competitors.  See Leitzinger Decl. ¶¶ 26, 58 n.78; see also Strombom Decl. ¶ 49 n.68.

forecasts by Glenmark and Par showed similar results.  See id. ¶ 33 (Par predicting discounts of 30 percent with one generic competitor, 50 percent with two generic competitors, and 90 percent with five generic competitors, and predicting 85 percent generic penetration rate in one year); id. ¶ 34 (Glenmark forecasting 42 percent discount with one generic competitor and 94 percent discount with five generic competitors, as well as a 95 percent generic penetration rate in three months).

The third source of evidence relates to the class members' role as intermediaries in the pharmaceutical industry.  Id. ¶¶ 23, 39, 42.  Specifically, "because class members are intermediaries in the chain of pharmaceutical distribution, there is no reason to think that any class member – whether a wholesaler or retailer – exclusively served a small enough fraction of the prescription base such that the class member would not benefit from generic competition."  DPPs' Mem. Supp. Mot. Certify 26 (citing Leitzinger Decl. ¶¶ 23, 39).

The final source of evidence upon which Dr. Leitzinger relies to demonstrate that these putative class members suffered injury is the actual Zetia sales experience.  He notes that during Glenmark's six-month exclusivity period, even with just one generic competitor, the average generic price discount on the brand wholesale acquisition cost ("WAC") was 50 percent.  Id. ¶ 36.  In June 2017, five more generics entered, increasing the average

generic discount to 97 percent.  Id. & Ex. 4.  The average discount on WAC that Merck provided for brand Zetia also increased from 9 percent[13] to 19 percent. Id. ¶ 36 & Ex. 6.  Dr. Leitzinger's report further shows that within one year of generic entry, generic Zetia accounted for more than 90 percent of Zetia prescriptions, reaching 99 percent by mid-2018.  Id. ¶ 36 & Ex. 5.

Aside from this data, Dr. Leitzinger analyzed data specific to other class members.  For example, thirty class members purchased ezetimibe both before and after generic entry (i.e., purchased brand Zetia before generic entry and purchased brand and/or generic Zetia after generic entry).  DPPs' Mot. Certify Hr'g Presentation ("DPPs' Presentation") 12 (ECF No. 927-1 (sealed)) (citing Leitzinger Decl. ¶ 43).  Of those members, twenty-nine converted at least some of their brand purchases to generic Zetia, id., and "directly experienced larger discounts off the brand WAC as a result," Leitzinger Decl. ¶ 43.  According to DPPs, this evidence, combined with the other sources of common evidence described above, strongly indicates that the four members that stopped purchasing ezetimibe altogether before generic entry - Caribe Rx, Eveready Wholesale Drug, Bellco, and Harvard Drug –

---

[13] In his trial report, Dr. Leitzinger revised this to 10 percent. See Sobol Decl. Ex. 34 ("Leitzinger Trial Report"), ¶ 40 & Ex. 9 (ECF Nos. 872-2 (public), 875-2 (sealed)).

would have substituted at least some of their brand purchases for generic had generic been available sooner.  DPPs' Reply 6-7.

Dr. Leitzinger also reports that after generic entry, twenty-seven entities continued to purchase at least some brand Zetia. Leitzinger Decl. ¶ 44.  More than half of those entities, including the fifth brand-only purchaser at issue here, Smith Medical Partners, received higher discounts on those purchases as a result of generic competition.  Id.; Leitzinger Rebuttal Decl. ¶ 13 & n.13.  This evidence is critical for two reasons, according to DPPs.  First, it demonstrates that Smith Medical Partners suffered injury because, having received higher discounts on brand Zetia in the actual world, it would have received those discounts sooner in the but-for world with earlier generic entry.  DPPs' Reply 6 n.27. Second, in the unlikely event that the other four brand-only purchasers would not have substituted at least some of their brand purchases with generic, they likely would have received increased discounts on the brand price on at least some of their purchases. Leitzinger Rebuttal Decl. ¶ 13.

DPPs' evidence is sufficient to include the five brand-only purchasers in the class.  With respect to the first four brand-only purchasers, Defendants' expert, Dr. Strombom, argues that a more individualized assessment of these specific entities is necessary in order to determine whether they would have purchased generic Zetia had it been available earlier, and thus whether they

should be included in the class.  See Strombom Decl. ¶ 35 ("Dr.
Leitzinger has not conducted any analysis to attempt to understand
why these entities stopped buying any form of Zetia.").  Notably,
though, Dr. Strombom offers only generalized and conclusory
statements on this very point.  Although he proffers many "reasons
why wholesalers may only purchase brand pharmaceuticals and never
purchase generic pharmaceuticals,"[14] id. ¶ 36 (emphasis added), at
this stage, these theories cannot be tested with respect to these
four entities because their last purchase of ezetimibe (in any
form) occurred before generic entry.  Nonetheless, Defendants
maintain that "there is good reason to presume that [these
entities] would not have bought generic ezetimibe if it had become
available earlier."  Defs.' Opp'n 12.

Without more, the court should not exclude these four entities
simply because they stopped purchasing Zetia before the actual
date of generic entry.  That fact alone does not affirmatively
demonstrate that these entities would not have purchased generic
Zetia had it been available earlier.  See Leitzinger Rebuttal Decl.

---

[14] "For example, many retailers purchase brand drugs through
wholesalers but purchase generic drugs directly from
manufacturers.  As a result, smaller wholesalers may not have
received any orders for generic Zetia or may have chosen not to
carry it.  Additionally, smaller wholesalers may receive orders
for generic Zetia but may not be able to purchase it at a
competitive price in order to make a sufficient profit on the
product."  Id. ¶ 36.

¶ 9 ("Logically, the failure by a market participant to exercise an option it didn't have provides no information about its likely behavior had that option been available."). To the contrary, in addition to general generic competition research and Defendants' and Par's own forecasts, DPPs' evidence regarding actual Zetia experience shows that during Glenmark's six-month exclusivity period, the average generic price discount on WAC was 50 percent. Leitzinger Decl. ¶ 36. With six generic competitors in mid-2017, that discount increased to 97 percent. Id. & Ex. 4. By mid-2018, generic Zetia accounted for 99 percent of Zetia prescriptions. Id. ¶ 36 & Ex. 5.

Moreover, of the thirty class members that purchased ezetimibe both before and after generic entry, twenty-nine converted at least some of their brand purchases to lower-priced generic Zetia. DPPs' Presentation 12; Leitzinger Decl. ¶ 43. This common evidence is sufficient for a reasonable juror to conclude that Caribe Rx, Eveready Wholesale Drug, Bellco, and Harvard Drug were injured by the alleged anticompetitive conduct – that is, that they would have substituted at least some of their brand purchases for lower-priced generic purchases had generic been available sooner.

Dr. Strombom's speculative reasons for why these entities would not have purchased generic Zetia in the but-for world is insufficient at this stage to overcome DPPs' evidence. Cf.

_Namenda_, 331 F. Supp. 3d at 209 ("Defendants are not entitled to the benefit of [the] doubt when the very reason we cannot know the answer to [whether certain entities would have purchased generic had it been available earlier] is because of [Defendants'] alleged wrongdoing."). Nor will individualized inquiries concerning injury as to these four brand-only purchasers at trial predominate over such common evidence. _See In re Intuniv Antitrust Litig._, No. 1:16-cv-12653, 2019 WL 4645502, at *10 (D. Mass. Sept. 24, 2019) (finding that common issues of law and fact predominated even though class included a few members that stopped purchasing brand Intuniv before generic version became available because they "might well have elected to purchase generic Intuniv had it become available when they were in the market for Intuniv"); _see also Loestrin 24 Fe_, 2019 WL 3214257, at *15 ("The prospect that a handful of identifiable class members may be uninjured is not a barrier to class certification.").

Unlike the other four putative members, Smith Medical Partners continued to purchase only brand Zetia after generic entry until its final purchase in June 2018. Strombom Decl. Ex. 2. But that does not necessarily mean that the company suffered no injury. As Defendants concede, DPPs can establish injury if they can demonstrate that the price Smith Medical Partners paid for brand Zetia "would have been lower if generics had entered the market [earlier]." Defs.' Opp'n 12.

Indeed, in <u>American Sales Co.</u>, this court declined to exclude from the class six entities that had made brand-only purchases before and after generic entry not because they would have substituted brand purchases with generic, but because the plaintiffs' evidence showed that they would have paid less for the brand drug due to generic competition:

> Defendants next contend that purchasers who only bought brand-name Celebrex and did not buy generic substitutes after they entered the market should be excluded because there is no evidence they would have purchased generic celecoxib in the but-for world where generic entry was not delayed.  In other words, because the evidence suggests these buyers only bought brand-name Celebrex, they were not overcharged because they would not have purchased the generics at lower prices no matter when they entered the market.  But Plaintiffs have alleged, and their evidence tends to show, that brand-name Celebrex decreased in price significantly following generic entry.  As a result, brand-only purchasers who bought Celebrex during the delay period . . . would have suffered overcharges as a result of delayed generic entry.  If generics entered the market in May 2014, the purchases made in the six months after this date would have been at a lower price <u>due to larger discounts offered on brand-name Celebrex after generic entry</u>.

2017 WL 3669604, at *9 (emphasis added) (citations omitted).

Here, Dr. Leitzinger's summary of Zetia sales in the actual world found that "the average discount given by Merck on brand Zetia purchases after generic entry increased to 19 percent" from 9 percent (or 10 percent).[15]  Leitzinger Decl. ¶ 36 & Ex. 6; <u>see</u>

---

[15] <u>See</u> Leitzinger Trial Report ¶ 40 & Ex. 9.

also Leitzinger Rebuttal Decl. ¶ 13 ("[G]eneric competition led to increased discounts in the average prices paid by the majority of Class members on their remaining Zetia purchases."). In the but-for world, therefore, Dr. Leitzinger concludes that "the Zetia purchases that would have continued with generics available to buyers would have occurred at more favorable prices." Leitzinger Decl. ¶ 37.

Defendants seek to distinguish American Sales Co., arguing that "brand-only Zetia purchasers did not receive increased discounts."[16] Defs.' Opp'n 13. Dr. Strombom takes issue with Dr. Leitzinger's use of "Class-wide average prices for brand Zetia before and after generic entry to infer that all, or almost all, putative Class members pay lower brand prices (relative to WAC) after generic entry." Strombom Decl. ¶ 40. According to Dr. Strombom, using an average price can be misleading where, as here, a small percentage of the class is responsible for the majority of the brand purchases. Id. In this case, three wholesalers - AmerisourceBergen, Cardinal Health, and McKesson (the "Big Three") - made over 95 percent of the brand purchases during the class period. Id. & n.55. Moreover, Dr. Strombom points out that, according to Dr. Leitzinger's own analysis, only 56 percent of

---

[16] This argument is aimed generally at Caribe Rx and Eveready Wholesale Drug, not Smith Medical Partners. See Defs.' Opp'n 11-13.

brand purchasers, before and after generic entry, obtained increased discounts, meaning that 44 percent did not.  Id. ¶ 41.

While Dr. Leitzinger's damages model does rely on averages, he expressly states that, based on Merck's transaction data, Smith Medical Partners did in fact obtain increased discounts after generic entry.  Leitzinger Rebuttal Decl. ¶ 13 n.13.  Although there is a dispute as to whether Smith Medical Partners or its parent, H. D. Smith, actually received these increased discounts, see Strombom Decl. ¶ 59, such dispute should not preclude Smith Medical Partners' membership in the class at this stage.  Cf. Niaspan, 397 F. Supp. 3d at 686 (finding that potential need for limited "additional individualized evidence" to determine whether two purported brand-only purchaser class members suffered injury did not defeat class certification).  Because DPPs' evidence is sufficient for reasonable jurors to conclude that all five brand-only purchasers were injured, those members should be included in the class and any analysis of practicability of joinder.

### iv.  Idiosyncratic Purchasers

Finally, Defendants seek to exclude four members - A.F. Hauser Inc., Cesar Castillo, Henry Schein, and Paragon Enterprises Inc. - with "idiosyncratic purchase patterns."  Strombom Decl. ¶ 47; Defs.' Opp'n 13-14.  In other words, each member's purchasing behavior was too sporadic to support any reasonable assumption regarding injury using classwide proof.  See Defs.' Opp'n 13-14

("It is impossible to guess the basis for these individual entities' purchasing behavior, much less to presume, as Dr. Leitzinger does, that they would have made generic purchases if generic ezetimibe had been available earlier."); see also Strombom Decl. ¶¶ 52-53 (noting that Paragon and A.F. Hauser made so few brand purchases that "it cannot be assumed" that they would have purchased generic had it been available earlier, and suggesting that brand Zetia may have been preferred in any event).

If anything, Defendants claim, the limited evidence suggests that these members suffered no injury. For example, Defendants note that A.F. Hauser, Cesar Castillo, and Henry Schein did not purchase generic Zetia until "long after generic entry."[17]   Defs.' Mot. Certify Hr'g Presentation ("Defs.' Presentation") 16-17 (ECF Nos. 927-2 (sealed), 940-2 (public)); see Strombom Decl. ¶¶ 49-51 (noting that Cesar Castillo did not purchase generic Zetia until January 2019, Henry Schein did not purchase generic until more than a year after generic entry, and A.F. Hauser did not purchase until October 2017). This, Defendants claim, suggests that "earlier generic entry would not have led to earlier generic

---

[17] Dr. Strombom initially claimed the same about Paragon, stating in his report that Paragon did not purchase generic until February 2018. Strombom Decl. ¶ 51. However, the parties agree this was error and acknowledge that Paragon first purchased generic in February 2017. See DPPs' Reply 5; Leitzinger Rebuttal Decl. ¶ 18; Hr'g Tr. 50:9-51:1.

purchases."[18]   Defs.' Opp'n 14; Strombom Decl. ¶¶ 49-51, 55. Moreover, Dr. Strombom concludes that because none of the idiosyncratic purchasers received increased discounts on brand purchases after generic entry, they would not have received such discounts in the but-for world.   Strombom Decl. ¶ 55; see Defs.' Presentation 16.

DPPs respond that "the quantity of purchases is irrelevant to the fact of [antitrust] impact" and that the jury is entitled to determine whether these entities would have substituted at least some of their brand Zetia purchases with generic Zetia had the generic version been available earlier.   DPPs' Reply 5.

Although DPPs are correct that antitrust impact, or injury, imposes no minimum purchase requirement beyond a single overcharge,[19] I do not understand Defendants' argument to be that

---

[18] Defendants have gone as far as suggesting that Cesar Castillo's purchase of generic Zetia in January 2019 – two years after generic entry – was due to the ongoing litigation as opposed to a legitimate business purpose. Defs.' Opp'n 14; Strombom Decl. ¶ 49; Defs.' Presentation 17; Hr'g Tr. 52:1-17.   But apart from the timing, Defendants have provided no evidence in support of that assertion.   By contrast, Cesar Castillo's Rule 30(b)(6) witness, Luis Vazquez, testified that the purchase coincided with favorable pricing for generics.   Sobol Decl. Ex. 47, at 31:3-11, 55:9-13 (ECF Nos. 872-15 (public), 875-5 (sealed)).

[19] See In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015) ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage." (citation omitted)); see also In re Rail Freight Fuel Surcharge Antitrust Litig., 292 F. Supp. 3d 14, 136 (D.D.C. 2017) ("[E]ven if many class members were

these putative members suffered no injury simply because they made only a few purchases.   Rather, Defendants' argument is aimed at predominance.   That is, due to the small amount of purchases, it is difficult to guess these entities' behavior in the but-for world – and thus whether they would have sustained any injury – without conducting individualized assessments.   <u>See</u> Defs.' Opp'n 14 ("[T]he necessity of individual inquiry into the facts surrounding the miniscule number of purchases of these prospective class members would be necessary to even speculate as to whether they paid overcharges."); Hr'g Tr. 51:10-14 (The simple point here, Your Honor . . . is that when somebody makes a small purchase like that, you cannot infer, without individualized inquiry, that they would have substituted generic for it.").

Nonetheless, Defendants do not persuade me to exclude these four putative members from the class largely for the reasons discussed with regard to the brand-only purchasers.   It is undisputed that each idiosyncratic member purchased brand Zetia during the delay period and that each member purchased generic Zetia after generic entry.   <u>See</u> Strombom Decl. ¶ 48 & Ex. 2.   In

---

able to avoid an overcharge on some, or even many, transactions through negotiations or because of other factors, they are still victims of the alleged price-fixing conspiracy and proper class members if they paid a supra-competitive price on a single transaction." (quoting <u>In re Air Cargo Shipping Servs. Antitrust Litig.</u>, No. 06-md-1175, 2014 WL 7882100, at *45 (E.D.N.Y. Oct. 15, 2014))).

combination with DPPs' common evidence regarding the decrease in brand price in response to generic competition, a jury could reasonably find that these putative members suffered an overcharge because they would have substituted at least some of their brand purchases with lower-priced generic Zetia had the generic been available sooner.   As with the brand-only purchasers, any individualized inquiry with regard to these four members at trial would not predominate over the evidence common to all class members.  See Intuniv, 2019 WL 4645502, at *10 ("Even if Defendants intend to argue at trial that a handful of the forty-eight class members did not suffer any antitrust impact because they would not have paid less for brand Intuniv or purchased generic Intuniv if it had been available, common issues of law and fact would still predominate.").   Thus, these members should also be included in the class when considering practicability of joinder.

### b.   Practicability of Joinder

With thirty-five members, the proposed class falls just short of the forty generally required for the presumption of impracticability and into the "gray area" requiring further analysis.  See Am. Sales Co., 2017 WL 3669604, at *6; Ansari, 179 F.R.D. at 114-15.  "Among other factors that courts will consider are judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, and geographic dispersion of class members."  Am. Sales

Co., 2017 WL 3669604, at *9; accord Ansari, 179 F.R.D. at 114-15

(listing factors); 5 William B. Rubenstein, Newberg on Class

Actions § 3:12 (5th ed. 2019 update) (same).   Consideration of

these factors in this case reveals that joinder of all thirty-five

members is impracticable.

    First, both judicial economy and geographic dispersion favor

the class action over joinder.   The proposed class consists of

thirty-five members spread across multiple states and Puerto Rico,

Leitzinger Decl. Ex. 9, and the members all claim injury from the

same alleged anticompetitive conduct.   Ordinarily, these facts

would weigh heavily in favor of rendering joinder impracticable,

see Am. Sales Co., 2017 WL 3669604, at *10, but Defendants argue

not so here because this case is proceeding as an MDL, thereby

"ensur[ing] efficiency and avoid[ing] the risk of duplicative

actions or inconsistent liability." Defs.' Opp'n 17; see also id.

at 21 (asserting that the risk of individual suits across the

country "is mitigated by the fact that the MDL panel has

centralized the cases in this Court").   However, this argument

overlooks the fact that the United States Judicial Panel on

Multidistrict Litigation centralized these proceedings in this

court for the purpose of presiding over pretrial matters only.[20]

---

[20] Pursuant to 28 U.S.C. § 1407(a), the Judicial Panel on
Multidistrict Litigation may transfer civil actions pending in
different judicial districts that "involv[e] one or more common

Transfer Order (ECF No. 1); Conditional Transfer Order (ECF No. 2); see also Pretrial Order No. 1, at 2 (ECF No. 20) ("This consolidation, however, does not constitute a determination that the actions should be consolidated for trial."). As a result, if class certification is denied, and barring settlement or any other disposition, plaintiffs that individually filed elsewhere and whose cases were transferred to this court for pretrial matters would return to the court of filing for trial. See 28 U.S.C. § 1407(a) ("Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated."); see generally Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998).

Moreover, courts in similar MDL proceedings consistently find that judicial economy and geographic dispersion weigh in favor of class certification. See Suboxone, 421 F. Supp. 3d at 46-47; Niaspan, 397 F. Supp. 3d at 677-79; Loestrin 24 Fe, 2019 WL 3214257, at *8, *10; In re Lidoderm Antitrust Litig., No. 14-md-2521, 2017 WL 679367, at *13-14 (N.D. Cal. Feb. 21, 2017); In re Nexium (Esomeprazole) Antitrust Litig., 296 F.R.D. 47, 52-53 (D.

---

questions of fact" to a single district "for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a).

Mass. 2013); In re K-Dur Antitrust Litig., No. 2:01-cv-1652, 2008 WL 2699390, at *3-4 (D.N.J. Apr. 14, 2008).

With that in mind, I too conclude that judicial economy and geographic dispersion of class members strongly support certification of the class. Indeed, proceeding through joinder in this case carries the prospect of several "individual plaintiffs represented by dozens of different attorneys," Niaspan, 397 F. Supp. 3d at 677, creating a high risk of complications resulting from ineffective coordination, see Wellbutrin XL, 2011 WL 3563385, at *3. See also Am. Sales Co., 2017 WL 3669604, at *10 ("[G]eographic dispersion regularly weighs in favor of an impracticability finding."); Lidoderm, 2017 WL 679367, at *14 ("The wide geographic dispersion of the DPPs also weighs against joinder."); Milbourne v. JRK Residential Am., LLC, No. 3:12-cv-861, 2014 WL 5529731, at *5 (E.D. Va. Oct. 31, 2014) ("[N]ationwide dispersion makes joinder of all plaintiffs an unwieldy prospect.").

Joinder would also constitute inefficient expenditure of judicial resources. As the court and the parties are well aware, this case is extremely complex and has produced an immense amount of discovery. The parties' numerous discovery disputes have required frequent court intervention. And though the bulk of discovery has concluded, Defendants would be entitled to further discovery if all DPPs were joined to the suit. See Modafinil, 837

35

F.3d at 257 (noting that proceeding by joinder means that "each plaintiff would be subject to discovery, whereas the defendants would have to show a greater need for discovery from unnamed plaintiffs in a class action" (citing Clark v. Universal Builders, Inc., 501 F.2d 324, 340-41 (7th Cir. 1974))).  If history is any indication, the court will again be called to wade into the discovery disputes that are almost certain to arise.  See Wellbutrin XL, 2011 WL 3563385, at *3 (finding that discovery complications "would be greatly increased if all direct purchasers were joined").

Furthermore, declining to certify the class could potentially result in multiple individual trials (for those members that proceed with individual actions), which will essentially involve the same theories of liability and largely the same evidence.  In such circumstances, proceeding in a class action is preferred as it greatly conserves judicial resources.  Am. Sales Co., 2017 WL 3669604, at *10; see also Solodyn, 2017 WL 4621777, at *5 (finding that judicial economy favors certification where "all putative class members seek damages stemming from the same allegedly illegal activity" (citing Am. Sales Co., 2017 WL 3669604, at *9-10)); Soutter, 307 F.R.D at 218 ("[E]ven if just a fraction of the class members were to bring individual suits, the adjudication of the common issues in a single proceeding would be more efficient than the separate adjudication of individual claims."); Nexium, 296

F.R.D. at 53 ("[J]udicial economy would best be served by certifying the Direct Purchaser class, primarily because all putative class members seek damages stemming from the same, identical transactions."); Meijer, Inc., 246 F.R.D. at 307 ("[T]he interest of judicial economy is clearly served by resolving the complex common issues raised by the instant action in a single action, rather than [multiple] individual actions.").

The remaining impracticability factors also favor certification, but only slightly. DPPs argue that, absent a class action, several members will be deterred from asserting their claims because they have "negative value claims." DPPs' Reply 7-8; Leitzinger Rebuttal Decl. ¶¶ 44-46. That is to say that the cost of litigation exceeds the expected amount of recovery. Consequently, these members lack the financial incentive to pursue their claims.[21]

Thomas Sobol of Hagens Berman Sobol Shapiro LLP, counsel for named Plaintiff FWK and interim lead counsel for the putative DPP class, estimates non-recoverable expert fees[22] of $3 million, with

---

[21] Economic feasibility is frequently considered in connection with Rule 23(b)(3)'s superiority requirement. 6 William B. Rubenstein, Newberg on Class Actions § 20:36 (5th ed. Dec. 2019 update); see, e.g., Namenda, 331 F. Supp. 3d at 220.

[22] See W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 88-97 (1991) (holding that a prevailing plaintiff cannot recover expert fees under a fee shifting statute unless the statute expressly provides for the recovery of expert fees, and suggesting that the Clayton

a total litigation price tag of somewhere between $3.7 and $4
million. Sobol Decl. ¶ 6 (ECF No. 872); DPPs' Reply 7-8. Sobol
bases this conclusion "on estimates of the anticipated expert fees
made at the outset of this case, the nearly $1 million in expert
expenses already incurred, and [his] experience with the cost of
litigation and trials of similar actions." Sobol Decl. ¶ 6; see
also Leitzinger Rebuttal Decl. ¶ 41 & n.49 (noting that in a
similar pharmaceutical antitrust class action in which Sobol's
firm served as co-lead counsel, expert fees were approximately
$2.97 million, with total expenses of approximately $3.7 million
(citing In re Nexium (Esomeprazole) Antitrust Litig., 1:12-md-
02409 (D. Mass. 2015), ECF Nos. 1580, 1582-1)). With that
baseline, Dr. Leitzinger concludes that "13 of 35 Class members[23]
would not find it worthwhile to proceed with a 100 percent expected
chance of success and trebling and 17 of them would not find it
worthwhile to proceed with a 50 percent chance of success."
Leitzinger Rebuttal Decl. ¶ 44; see also id. Ex. 3 (finding that

---

Act does not allow recovery of expert fees); La. Power & Light Co.
v. Kellstrom, 50 F.3d 319, 332-33 (5th Cir. 1995) (holding, in
light of Casey, that expert fees are not recoverable under the
Clayton Act); see also Barber & Ross Co. v. Lifetime Doors, Inc.,
810 F.2d 1276, 1282 (4th Cir. 1987) (noting that had Congress
intended for expert fees to be recoverable under the Clayton Act,
it would "have specifically authorized such recovery").

[23] This number excludes the seven retailer plaintiffs as well as
entities that purchased only generic Zetia from Par during the
class period. Leitzinger Rebuttal Decl. ¶ 44.

38

thirteen members have estimated overcharges of less than $3 million after trebling).

Defendants note, however, that Dr. Leitzinger's analysis improperly assumes that, in the absence of class certification, each member would pursue its claims individually instead of jointly, where the costs of litigation would be shared.  Defs.' Opp'n 19; see Modafinil, 837 F.3d at 258-59 ("While it may be uneconomical for [small] claims to be pursued in individual litigation, there has been no showing that it would be uneconomical for [members with small claims] to be individually joined as parties in a traditional lawsuit."); In re AndroGel Antitrust Litig., No. 1:09-md-2084, 2018 WL 3424612, at *3 (N.D. Ga. July 16, 2018) ("As joined parties, no individual plaintiff will bear the costs of those experts completely on their own.").

Defendants also state that several putative members are large companies with substantial claims and adequate resources to pursue such claims, either individually or jointly, if class certification is denied – especially the Big Three, who account for 97 percent of all class purchases and each have claims of more than $1 billion before trebling.  Defs.' Opp'n 18-19; Strombom Decl. ¶¶ 72-74 & Ex. 4; see also Defs.' Presentation 20 (asserting that fourteen class members "claim supposed treble damages over $10 million").  And to the extent "a small portion of the putative class" finds it uneconomical to litigate, that should not preclude

39

the court from finding joinder practicable "because the potential benefit to the small claimants is small." Id. at 20 (citing Modafinil, 837 F.3d at 259; AndroGel, 2018 WL 3424612, at *3).

These arguments ignore not only the text of Rule 23(a)(1), which requires a finding that "joinder of all members is impracticable," not "some" or "nearly all," Fed. R. Civ. P. 23(a)(1) (emphasis added), but also the aim of Rule 23 itself, namely "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights," Amchem Prods., Inc., v. Windsor, 521 U.S. 591, 617 (1997) (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)); see also Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 426 (4th Cir. 2003) (noting that class actions "provide access to the courts for those with claims that would be uneconomical if brought in an individual action").

That being said, DPPs' negative value claim evaluation is only modestly persuasive. To be sure, DPPs' estimated expert witness costs of $3 million and their assertion that several members have trebled claims below that amount are fair approximations. But as Defendants point out, DPPs assume, without any evidence, that absent a class action, these smaller claimants would sue individually and thus bear the entire cost of litigation. Cf. Solodyn, 2017 WL 4621777, at *6 (finding that DPP class provided persuasive evidence that "[t]he competitive relationship

among some class members serve[d] as a significant business obstacle to joinder" (internal quotation marks omitted)).  It is true that, for some members, even proceeding through joinder can entail substantial costs.  See Modafinil, 837 F.3d at 257 ("Though joinder is certainly more economical for most plaintiffs than pursuing the case alone, it is often still uneconomical for an individual with a negative value claim to join a lawsuit.").  Nonetheless, "DPPs offer no assessment as to [whether] expert costs could be economically shared through joinder."[24]  Niaspan, 397 F. Supp. 3d at 678.  Accordingly, this financial factor does not significantly inform the practicability assessment here.

Aside from members' financial ability and incentive, DPPs have offered other evidence that smaller members might not pursue their claims, either individually or jointly, due to a fear of retaliation.  Courts have recognized the hazard that some direct

_____

[24] It is not uncommon for courts to consider only the costs of proceeding individually rather than considering possible cost-sharing.  See, e.g., Applegate v. Formed Fiber Techs., LLC, No. 2:10-cv-473, 2012 WL 3065542, at *5 n.6 (D. Me. July 27, 2012) (explaining that the "relatively small size of each plaintiff's claim would discourage many . . . from pursuing claims individually" (emphasis added)); see also 6 William B. Rubenstein, Newberg on Class Actions § 20:36 (5th ed. Dec. 2019 update) ("Courts sometimes consider whether it would be economically feasible for each member to individually pursue her own claim." (emphasis added)); cf. Ballard v. Blue Shield of S. W. Va., Inc., 543 F.2d 1075, 1080 (4th Cir. 1976) (analyzing numerosity in antitrust class action and noting that "discovery would be repetitive and unduly expensive if the parties engage in individual suits" (emphasis added)).

purchasers face in the absence of class certification – they can sue directly and risk endangering ongoing business relationships with their suppliers; or they can forego legal action and recover nothing. See Ill. Brick Co., 431 U.S. at 746 ("We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers."); Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l., Ltd., 247 F.R.D. 253, 273 n.6 (D. Mass. 2008) ("Distributor class members may be reluctant to bring actions against manufacturers, and thus 'a class action may be the only practical method for resolving their claims.'" (quoting In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 386 (S.D.N.Y. 1996))); see also 6 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 18.41 (4th ed. 2002) ("Class actions perform an important function in cases where individual franchisees or purchasers are reluctant to sue because they fear economic reprisal." (citing cases)). But see Niaspan, 397 F. Supp. 3d at 678 ("DPPs do not provide any evidence . . . that participation through joinder sparks greater fear of retaliation than does participation through a class action.").

In support of their fear-of-retaliation assertion, DPPs provide evidence as to what happened after the decisions of Modafinil, where the Third Circuit decertified a class of twenty-two members because the district court had not properly explained

why joinder was impracticable, 837 F.3d at 252-60, and AndroGel,
where a Georgia district court denied certification of a class of
thirty-three members on the ground that joinder was practicable,
2018 WL 3424612, at *2-4.  With regard to the former, "nearly one
third of the former class members did not proceed, including three
former class members who submitted declarations explaining they
would not proceed because they could not jeopardize their business
relationship with suppliers.[25]   This occurred despite a prior
class settlement with three of five defendants for $512 million."
DPPs' Reply 10 (footnotes omitted) (citing Sobol Decl. Exs. 37-39
(ECF Nos. 872-5, -6, -7)).

Since the AndroGel decision, "[o]ver half of the former absent
class members have not filed individual cases, even though [the]
plaintiffs' claims survived summary judgment."  DPPs' Reply 10-11
(footnotes omitted) (citing Sobol Decl. Exs. 40-41 (ECF Nos. 872-
8, -9); In re AndroGel Antitrust Litig. (No. II), No. 1:09-md-
2084, 2018 WL 2984873 (N.D. Ga. June 14, 2018) (summary judgment
opinion)).   DPPs say the likely reason for this is that "small
wholesalers fear retaliation from suppliers."   Id. at 11.

---

[25] Those three members appear also to be putative members in this
case.  See Leitzinger Rebuttal Decl. Ex. 3 (listing class members).
Compare Sobol Decl. Ex. 38 (ECF No. 872-6) (listing Capital
Wholesale Drug, Prescription Supply Inc., and Dakota Drug
Company), with id. Ex. 37 (ECF No. 872-5) (listing members that
intended to proceed to trial, which did not include Capital
Wholesale Drug, Prescription Supply Inc., or Dakota Drug Company).

DPPs also point to a similar pharmaceutical antitrust action, Rochester Drug Co-Operative, Inc. v. Braintree Laboratories, 796 F. Supp. 2d 560, 563-64 (D. Del. 2011), in which RDC, a named plaintiff in this case, and Louisiana Wholesale Drug Company, Inc. ("LWD"), a putative class member in this case, actually suffered retaliation from a brand drug manufacturer due to their bringing antitrust claims against it.  DPPs' Mem. 13 & n.56; DPPs' Reply 11 & nn.57-58.   Indeed, the district court in that case observed, "[T]here is no dispute that defendant at bar terminated its business relationship with plaintiffs specifically as a result of plaintiffs' pursuit of litigation."[26]   Braintree Labs., 796 F. Supp. 2d at 567 (footnote omitted).

Although DPPs' evidence of possible retaliation is somewhat persuasive, its effect is limited because there has been no showing that any member in this case would refrain from prosecuting its claims in the absence of class certification out of fear of retaliation or would in fact suffer retaliation if it persisted in the litigation.  See Niaspan, 397 F. Supp. 3d at 678 ("DPPs do not provide any evidence that the putative class members in this case fear retaliation." (citing Cephalon, Inc., 2017 WL 3705715, at *10)).

---

[26] DPPs also note that the plaintiffs obtained "a preliminary injunction on the condition that plaintiffs post a $750,000 bond." DPPs' Reply 11 (citing Sobol Decl. Ex. 42 (ECF No. 872-10)).

After careful examination of all the relevant factors, I conclude that considerations of judicial economy and geographic dispersion dictate a finding that joinder of all thirty-five class members in the DPPs' proposed class would be impracticable.  See Niaspan, 397 F. Supp. 3d at 677-79; Loestrin 24 Fe, 2019 WL 3214257, at *8, *10; Am. Sales Co., 2017 WL 3669604, at *9-10; Nexium, 296 F.R.D. at 52-53; Wellbutrin XL, 2011 WL 3563385, at *3-4; Meijer, Inc., 246 F.R.D. at 305-07.

2.  Commonality

Rule 23(a)(2) requires that questions of law or fact be common to the class.  "A common question is one that can be resolved for each class member in a single hearing" and does not "turn[] on a consideration of the individual circumstances of each class member."  Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006).  In other words, the named plaintiffs must "demonstrate that the class members 'have suffered the same injury'" and that their claims "depend upon a common contention." Wal-Mart Stores, Inc., 564 U.S. at 349-50 (quoting Falcon, 457 U.S. at 157).  "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id. at 350.  So long as DPPs make this showing, factual differences among the class members' claims are generally of no

45

concern. Stanley v. Cent. Garden & Pet. Corp., 891 F. Supp. 2d 757, 770 (D. Md. 2012) ("Factual differences among class members will not necessarily preclude certification 'if the class members share the same legal theory.'" (citing Mitchell-Tracey v. United Gen. Title Ins. Co., 237 F.R.D. 551, 557 (D. Md. 2006))); see also Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982) ("[E]very member of the class need not be in a situation identical to that of the named plaintiff [to establish commonality].").

In the antitrust context, commonality is often readily satisfied because allegations of conspiracy or monopolization normally constitute a "central or single overriding issue . . . sufficient to establish a common question." Brown v. Cameron-Brown Co., 92 F.R.D. 32, 38 (E.D. Va. 1981) (internal quotation marks omitted) (citing 4 Herbert B. Newberg, Newberg on Class Actions § 7514 (1977)); see also Meijer, Inc., 246 F.R.D. at 300 ("[N]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." (quoting In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 27 (D.D.C. 2001))).

Defendants do not contest commonality, which is plainly satisfied in this case. Here, DPPs allege that they were injured as a result of Defendants' unlawful conspiracy to delay the entry

46

of generic Zetia.  DPPs' Am. Compl. ¶¶ 1-7, 184-214.  Defendants sharply dispute those claims.  The trial to resolve these disputes will involve complex evidence involving the patents underlying the original litigation, the other economic factors bearing on Defendants' settlement, and the impact of that settlement on the market prices for brand and generic Zetia.  As this court and others have held, such issues easily qualify as common questions of law and fact under Rule 23(a)(2) in direct purchaser class actions.  See Niaspan, 397 F. Supp. 3d at 679; Loestrin 24 Fe, 2019 WL 3214257, at *11; In re Lamictal Indirect Purchaser & Antitrust Consumer Litig., No. 12-cv-995, 2018 WL 6567709, at *4 (D.N.J. Dec. 12, 2018); Solodyn, 2017 WL 4621777, at *3 n.4; Am. Sales Co., 2017 WL 3669604, at *10; Wellbutrin XL, 2011 WL 3563385, at *4.  Accordingly, DPPs satisfy the commonality requirement.

  3. Typicality

  The typicality prong requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality and commonality requirements are similar, as "[b]oth serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected."  Falcon, 457 U.S. at 157 n.13.  But the typicality requirement specifically ensures that named class representatives

47

are appropriately part of the class and "possess the same interest and suffer the same injury as the class members." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 338 (4th Cir. 1998); see also Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006) ("The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so goes the claims of the class.'" (quoting Broussard, 155 F.3d at 340)). Typicality therefore requires the named plaintiffs to demonstrate "(1) that their interests are squarely aligned with the interests of the class members and (2) that their claims arise from the same events and are premised on the same legal theories as the claims of the class members." Jeffreys v. Commc'ns Workers of Am., 212 F.R.D. 320, 322 (E.D. Va. 2003).

In antitrust cases, the typicality requirement is "particularly likely" to be satisfied. 6 William B. Rubenstein, Newberg on Class Actions § 20:40 (5th ed. Dec. 2019 update). Indeed, in such cases, "all of the plaintiffs' claims will arise out of the same course of conduct (the alleged conspiracy) and be based on the same legal theory (an unlawful restraint of trade resulting in supracompetitive prices)." Id. Consequently, "the proposed class representative's claims will be typical of those of the rest of the class." Id.; see also In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998) ("[T]ypicality in the antitrust context will be established by plaintiffs and all

48

class members alleging the same antitrust violations by the defendants.").

In this case, DPPs allege that they and the putative class members suffered injury due to Defendants' alleged agreement to delay the entry of generic Zetia. DPPs' Am. Compl. ¶¶ 1-7, 184-214. Their claims are based on the same course of events and legal theories and thus rise and fall together. This satisfies typicality. See Intuniv, 2019 WL 4645502, at *6 (finding typicality requirement satisfied in pay-for-delay case because "the DPPs bring antitrust claims that arise from the same allegedly anticompetitive conduct that vests the absent class members with like claims"); Am. Sales Co., 2017 WL 3669604, at *11 (typicality satisfied where "both the representative Plaintiffs and the proposed class members all claim that they suffered overcharges as a result of [the defendants'] conduct which delayed generic entry into the market"); In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 304 (E.D. Mich. 2001) (finding representative plaintiffs' claims typical of the class "because each is a direct purchaser, or assignee of a direct purchaser, of Cardizem CD, and each claims that they were forced to pay an artificially inflated price for their purchases as a result of Defendants' illegal conduct").

Of the three named plaintiffs, Defendants argue that Cesar Castillo's claims are atypical of the class because "it is subject to a unique defense." Defs.' Opp'n 28 (citing In re LIBOR-Based

Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 550
(S.D.N.Y. 2018) (finding typicality requirement unsatisfied where
named plaintiff "remain[ed] subject to the unique defense that its
claims where not validly assigned to it")); see also Ostrof v.
State Farm Mut. Auto. Ins. Co., 200 F.R.D. 521, 529 (D. Md. 2001)
("[W]here a purported class representative is subject to a unique
defense that cannot be asserted against other members of the class
(other than minor discrepancies), typicality may be lacking.").
According to Defendants, Cesar Castillo "is effectively a brand-
only purchaser; it purchased generic ezetimibe on a single occasion
[from a wholesaler], well after filing this litigation and more
than two years after generic entry." Defs.' Opp'n 28. In
addition, Cesar Castillo "received higher discounts on its brand
purchases before generic entry than it did after generic entry,"
suggesting that it would not have paid less if generic entry had
occurred sooner. Id. Consequently, Cesar Castillo is likely
uninjured and thus fails the typicality requirement.[27] Id.

I disagree with Defendants. The quantity of purchases is
irrelevant to typicality. See Meijer, Inc., 246 F.R.D. at 301; In
re Potash Antitrust Litig., 159 F.R.D. 682, 691 (D. Minn. 1995)
(stating that typicality does not hinge on "the fact that members

---

[27] Defendants also argue that Cesar Castillo fails the adequacy
requirement for the same reason. Id.

purchase differing quantities and pay different prices"). "Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." Playmobil, 35 F. Supp. 2d at 242. Accordingly, the circumstances surrounding the claims of the named plaintiffs and the claims of class members need not be indistinguishable in every respect. Deiter, 436 F.3d at 467; see also In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 185 (D.N.J. 2003) (finding typicality undefeated by "[p]otential differences in the individual class members' transactions"); In re Catfish Antitrust Litig., 826 F. Supp. 1019, 1036 (N.D. Miss. 1993) ("[T]here is nothing in Rule 23(a)(3) which requires the named plaintiffs to be clones of each other or clones of the class members."). Rather, "as long as the substance of the claim is the same as it would be for other class members, then the claims of the named plaintiffs are not atypical." In re Vitamins Antitrust Litig., 209 F.R.D. 251, 261 (D.D.C. 2002).

Here, Cesar Castillo alleges the same injury as the rest of the class – that Defendants' illegal conduct caused it to incur overcharges on ezetimibe purchases. Consequently, the company and the class share the same "interest in producing proof in relation to the existence, scope, duration, and effect of [the] alleged conspiracy," which is sufficient to satisfy Rule 23(a)(3).

51

6 William B. Rubenstein, <u>Newberg on Class Actions</u> § 20:40 (5th ed. Dec. 2019 update).

In any event, "the presence of a unique defense will not . . . destroy typicality [unless it] will skew the focus of the litigation and create a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." <u>Meijer, Inc.</u>, 246 F.R.D. at 302 (alterations in original) (internal quotation marks omitted) (quoting <u>Cardizem CD</u>, 200 F.R.D. at 304-05); <u>see also</u> 6 William B. Rubenstein, <u>Newberg on Class Actions</u> § 20:39 (5th ed. Dec. 2019 update) (noting that a unique defense destroys typicality "only if that defense threatens to become the focus of the litigation"). And the issues Defendants raise here – whether, but for the alleged anticompetitive conduct, Cesar Castillo would have converted brand purchases to generic sooner or would have paid less for brand Zetia - involve factual issues related to proving injury that would not be so consuming as to skew the focus of the case. <u>See</u> Sebo v. Rubenstein, 188 F.R.D. 310, 316 (N.D. Ill. 1999). Indeed, the trial will largely focus on evidence related to Defendants' conduct and its effect on the ezetimibe market – evidence common to the class.[28]

---

[28] For the same reasons, Defendants' related adequacy argument as to Cesar Castillo lacks merit.

4.  Adequacy

Rule 23(a) requires that the parties representing the proposed class be able to "fairly and adequately . . . protect the interests" of all members of the class.  Fed. R. Civ. P. 23(a)(4).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent."  Amchem Prods., Inc., 521 U.S. at 625 (citing Falcon, 457 U.S. at 157 n.13).  In order for a conflict to defeat class certification, "that conflict must be fundamental."  Gunnells, 348 F.3d at 430.  That is to say that the conflict "must be more than merely speculative or hypothetical," but rather must "go to the heart of the litigation."  Id. at 430-31.

Here, Defendants contest adequacy with respect to FWK and RDC, arguing that FWK is a shell company that lacks independence from class counsel, and that RDC has a history of dishonest criminal conduct and, due to its recent Chapter 11 bankruptcy filing, has conflicting duties to the class members and its creditors.  I address each in turn.

a.  FWK

Defendants first argue that FWK is an inadequate class representative because it is merely a litigation vehicle with no independence from DPP class counsel.  Defs.' Opp'n 22-25.  FWK was formed in 2016 for the purpose of purchasing the antitrust claims of pharmaceutical wholesaler Frank W. Kerr Co., which filed for

53

bankruptcy the same year.  DPPs' Mem. Supp. Mot. Certify 18; Defs.'
Opp'n 23-24; see also Dusseault Decl. Ex. 3, at 22:7-12 (ECF Nos.
820-3 (public), 823-3 (sealed)).   FWK's sole member is Michael
Stahelin, a longtime friend of Joseph Vanek – one of the lawyers
representing  FWK  in  this  case  -  and  is  managed  by  Thomas
Kolschowsky.  DPPs' Mem. Supp. Mot. Certify 18; Defs.' Opp'n 23-
24; see also Dusseault Decl. Ex. 4, at 10:1-8, 45:15-46:17 (ECF
Nos. 820-4 (public), 823-4 (sealed)).  Kolschowsky testified that
FWK has no employees or office space (other than record storage in
a building owned by Stahelin Enterprises LP, an entity also owned
by  Stahelin)  and  engages  in  no  business  other  than  "pursuing
antitrust  claims  pursuant  to  the  assignment  that  [it]  obtained
from Frank Kerr in bankruptcy."  Dusseault Decl. Ex. 3, at 20:13-
22:24.

     Apparently, Vanek is largely responsible for FWK's formation,
having devised the idea himself and approached Stahelin to serve
as its owner.  DPPs' Mem. Supp. Mot. Certify 18; Defs.' Opp'n 23-
24.   Vanek even helped finance FWK's purchase of Frank W. Kerr
Co.'s antitrust claims, DPPs' Mem. Supp. Mot. Certify 18; Defs.'
Opp'n 23-24; Dusseault Decl. Ex. 6 (ECF Nos. 820-6 (public), 823-
6 (sealed)), though DPPs state that he has since been repaid, DPPs'
Mem. Supp. Mot. Certify 19.  According to Defendants, even though
a  third-party  individual,  Kolschowsky,  "manages"  FWK,  "this
manager  is  simply  an  employee  of  Stahelin  Properties,  Mr.

Stahelin's real estate business." Defs.' Opp'n 24. Thus, the argument goes, FWK enjoys no independence from Stahelin and, consequently, Vanek, thus preventing FWK from serving as an adequate class representative in this class action. Id.

For support, Defendants point to Intuniv, 2019 WL 4645502, a recent pay-for-delay case in which a Massachusetts district court found that FWK was not an adequate class representative essentially for the same reason. See id. at *7-8 ("Considering the close relationship between FWK and class counsel and the Court's assessment that FWK is not engaged in meaningful supervision of this case, the Court is unable to conclude the FWK has shown that it is an adequate representative plaintiff."). Specifically, the court noted that Kolschowsky spent "approximately one hour a week on work connected with FWK"; had never "reviewed a budget for the litigation or responded to a discovery request"; and provided deposition testimony that illuminated his unfamiliarity with important issues related to the litigation. Id. at *7.

The Intuniv court also took issue with Vanek and Stahelin's "close business and personal relationship," finding that it "create[d] significant doubts about whether FWK could or would engage in an arm's length discussion about attorney fees with class counsel." Id. at *8. More specifically, FWK's asserted share of aggregate damages only amounted to 0.3 percent of the total aggregate damages, yet Vanek's law firms – Vanek, Vickers & Masini,

P.C. and Sperling & Slater, P.C. – had entered into a "referral agreement with Hagens Berman Sobol Shapiro LLP [lead class counsel] that guaranteed Mr. Vanek's firms 10% of Hagens Berman's total fees in this matter." Id. at *7-8. The court, therefore, dismissed FWK as a class representative, finding that "the personal, financial, and business relationship between FWK, FWK-associated individuals, and class counsel [was] simply too entangled . . . particularly considering that [FWK was] not engaged in meaningful supervision of the litigation." Id. at *8.

Defendants assert that the present case is no different. Defs.' Opp'n 23. Vanek and Stahelin still have a close relationship, and it even appears that Vanek's firms entered into a similar 10 percent referral agreement with Hagens Berman Sobol Shapiro LLP, lead counsel and interim class counsel for the proposed DPP class in this case. See Dusseault Decl. Exs. 7-8 (ECF Nos. 820-7, -8 (public), 823-7, -8 (sealed)).

Although DPPs disagree with Intuniv's holding on this point, DPPs nonetheless contend that this case is sufficiently distinguishable as to render FWK an adequate class member. DPPs' Mem. Supp. Mot. Certify 18-20; DPPs' Reply 15-19. I agree that the record in this case satisfactorily demonstrates FWK's adequacy to serve as class representative. First, that FWK is a shell company or "litigation vehicle" with assigned claims does not alone render it inadequate as a class representative. Cf. Nexium, 296

F.R.D. at 53 ("Ample precedent exists for the proposition that assignees can be adequate class representatives."); In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 102 (E.D.N.Y. 2012) (finding that entity's "status as an assignee" did not prevent it from "joining or representing the class" (citing Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 103 (2d Cir. 2007))). Indeed, even the court in Intuniv did not rest its adequacy decision on that basis. See 2019 WL 4645502, at *7-8. Rather, the test is whether the proposed representative is able to "fairly and adequately . . . protect the interests" of all members of the class. Fed. R. Civ. P. 23(a)(4). And with respect to FWK in this case, that test is satisfied.

Unlike Intuniv, there is no evidence in this case that either FWK or Stahelin have any current or prospective financial dealings with any of class counsel, including Vanek. Indeed, DPPs assert that Vanek has been repaid in full for financing FWK's antitrust claims assignment. Cf. Intuniv, 2019 WL 4645502, at *7 ("Although . . . a close relationship between a class representative and class counsel is not necessarily problematic, a conflict arises where the class representative and class counsel have become so financially entangled that the interests of the class representative could be perceived to differ from the interests of the class.").

In addition, DPPs have provided sufficient evidence demonstrating FWK's independence from Stahelin and class counsel. Kolschowsky testified that as manager of FWK, he has "complete autonomy" with respect to its operations, which includes the ability to overrule Stahelin. Sobol Decl. Ex. 22, at 17:3-22 (ECF Nos. 737-22 (public), 741-21 (sealed)). He also testified that although he had spoken with Stahelin a few times to give "[g]eneral update[s]" on the status of the litigation, he, Kolschowsky, was responsible for all litigation-related decisions – including the decision to serve as class representative – and had never consulted Stahelin regarding such decisions. Id. at 130:16-131:21. He also recognized the duties incumbent on class representatives.[29] Id. at 142:2-143:3.

Kolschowsky's deposition testimony further illustrates FWK's active involvement in and familiarity with this litigation. At the time of his deposition, Kolschowsky had devoted between twenty and thirty hours serving as named plaintiff (and an additional fifteen hours for the deposition). Id. at 130:2-15, 162:23-163:12. Not only has he endeavored to gain a thorough understanding of Frank W. Kerr's business dealings, id. at 161:10-162:22, but he

---

[29] Additionally, under Rule 23(e), the court must approve any potential settlement, further ensuring protection of the interests of the class. See Berry v. Schulman, 807 F.3d 600, 612 (4th Cir. 2015).

has also read all the pleadings in this litigation and frequently discusses the case with counsel, id. at 126:3-127:4.  See Gariety v. Grant Thornton, LLP, 368 F.3d 356, 370 (4th Cir. 2004) (holding that district court did not abuse discretion in finding adequacy satisfied where the class representative had demonstrated his involvement and understanding of the litigation).  And despite deposing Kolschowsky with the clear intent of demonstrating FWK's inadequacy, Defendants do not rely on his testimony to establish any alleged detachment from the proceedings.

I am thus satisfied that FWK would adequately represent the class.  Indeed, FWK "share[s] common objectives and the same factual and legal positions" and has the "same interest in establishing [Defendants'] liability." Gunnells, 348 F.3d at 431. Any perceived conflict stemming from Vanek's hand in forming FWK or his personal friendship with Stahelin does not, in my view, amount to a "fundamental" conflict that "go[es] to the heart of the litigation." Gunnells, 348 F.3d at 430-31.  To the contrary, under Kolschowsky's independent management, FWK appears to be "engaged in meaningful supervision of this case," Intuniv, 2019 WL 4645502, at *8, and poised to fairly represent the interests of the class.  FWK, therefore, satisfies the adequacy requirement.

      b.   RDC

Defendants next argue that RDC is an inadequate class representative considering RDC's recent deferred prosecution

agreement with the United States and the fact that it has just filed for Chapter 11 bankruptcy. Defs.' Opp'n 25-28; Defs.' Suppl. Br. Opp'n DPPs' Mot. Class Certification ("Defs.' Suppl. Opp'n") 1-4 (ECF No. 904).[30] As explained below, however, neither renders RDC inadequate to serve as a class representative in this case.

### i.   Deferred Prosecution Agreement

Less than two years after this court found RDC to be an adequate class representative in American Sales Co., 2017 WL 3669604, at *12-13, the U.S. Attorney for the Southern District of New York and the U.S. Drug Enforcement Agency brought charges against RDC and two of its executives related to unlawful distribution of controlled substances. See Dusseault Decl. Ex. 11 (ECF No. 820-11). The charges against RDC resulted in a deferred prosecution agreement ("DPA") whereby RDC admitted to engaging in unlawful conduct for the purpose of achieving financial gain, agreed to pay a $20 million fine, and agreed to three years' independent supervision. See id.; Dusseault Decl. Ex 12 (ECF No. 820-12). DPPs do not dispute these facts, but they assert that the DPA and related conduct "bear[] no relationship to the class

---

[30] On April 1, 2020, Defendants sought leave to file a supplemental opposition brief devoted to the issue of RDC's bankruptcy filing, ECF No. 901. On April 2, 2020, DPPs sought leave to respond to Defendants' supplemental brief, ECF No. 902. The court granted both requests on April 3, 2020, ECF No. 906.

claims" and are thus irrelevant to the adequacy determination. DPPs' Reply 13-14. They also point out that even the court in Intuniv found RDC an adequate class representative despite these events. See 2019 WL 4645502, at *8-9 ("Given the history of RDC, the Court views this to be a close call. Ultimately, however, the Court accepts RDC as an adequate representative. RDC is under new management, its conduct in this case to date seems conscientious, and there is no obvious credibility issue that will impinge on its ability to adequately represent the class.").[31]

Although "[t]he honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry," Harris v. Vector Mktg. Corp., 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (alteration in original) (citations omitted), that inquiry focuses on "improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit," Gortat v. Capala Bros., Inc., 257 F.R.D. 353, 364 (E.D.N.Y. 2009) (emphasis added); see also 6 William B. Rubenstein, Newberg on Class Actions § 20:41 (5th ed. Dec. 2019 update) (noting that adequacy requirement may be endangered where "there exist

---

[31] The District Court for the Southern District of New York in In re Namenda Antitrust Litigation, No. 1:15-cv-7488 (S.D.N.Y. Aug. 2, 2019), ECF No. 859, similarly rejected an attempt to disqualify RDC as a class representative, concluding that the DPA "does not bear on the issues that are to be tried." See Sobol Decl. Ex. 43 (ECF No. 872-11).

serious questions about the class representative's credibility and this personal characteristic is somehow relevant to the litigation"). As the court in <u>Intuniv</u> found, the DPA and related conduct are not disqualifying because they do not directly bear on the issue of whether RDC can serve as an adequate class representative in this case. <u>See</u> 2019 WL 4645502, at *9. Rather, the evidence indicates that RDC, which has served as class representative in recent cases other than <u>Intuniv</u>,[32] is likewise suitable to serve as class representative in this litigation.

### ii.   Chapter 11 Bankruptcy Filing

On March 12, 2020, RDC filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Western District of New York.  DPPs' Resp. Defs.' Suppl. Opp'n ("DPPs' Resp.") 1 (ECF No. 910); DPPs' Resp. Ex. A ("Kinney Decl."), ¶ 2 (ECF No. 910-1); Defs.' Suppl. Opp'n 1; Defs.' Suppl. Opp'n Ex. C ("Kinney Chapter 11 Decl."), ¶ 6 (ECF No. 904-3); <u>In re Rochester Drug Co-Operative, Inc.</u>, No. 2:20-bk-20230 (Bankr. W.D.N.Y. Mar. 12, 2020), ECF No. 1.  According to John Kinney, RDC's interim Chief Executive Officer and Chief Financial Officer, "RDC remains in possession of its assets and continues to manage and operate its business as a debtor

---

[32] <u>See, e.g.</u>, <u>Niaspan</u>, 397 F. Supp. 3d at 680-81; <u>Namenda</u>, 331 F. Supp. 3d at 205.

in possession."[33]  Kinney Decl. ¶ 3; accord Kinney Chapter 11 Decl. ¶ 8 ("The Debtor remains in possession of its assets and continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.").

Defendants claim that these new facts are fatal to RDC's capacity to serve as class representative for two primary reasons. First, the bankruptcy proceeding will preoccupy RDC's attention, preventing it from actively supervising this litigation.  Defs.' Suppl. Opp'n 1.  Second, RDC's status as a debtor-in-possession creates a conflict of interests between the duties owed to RDC's creditors – which include both Merck and Glenmark – and the duties owed to the class.  Id. at 1-2.  DPPs refute both claims, asserting that the bankruptcy proceeding will not detract from RDC's ability to serve as an adequate class representative in this case, and that RDC's duties as a debtor-in-possession actually coincide, rather than conflict, with its duties as a class representative. DPPs' Resp. 4-7.

Beginning with Defendants' claim that the bankruptcy proceeding "ensures that RDC will be 'preoccupied with its own legal problems,'" Defs.' Suppl. Opp'n 1 (quoting In re Network

---

[33] "[F]or purposes of Chapter 11 bankruptcies, a 'debtor-in-possession' is a debtor who remains in possession of the pre-petition assets and administers them for the benefit of the creditor body pursuant to 11 U.S.C. § 1107."  In re Se. Hotel Props. Ltd. P'ship, 99 F.3d 151, 152 n.1 (4th Cir. 1996).

Assocs., Inc. Sec. Litig., 76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999)), DPPs have provided sufficient evidence showing just the opposite.  Kinney attests that RDC, having served several times as class representative in similar direct purchaser actions, "understands its fiduciary duty to the proposed class" and "recognizes the importance of cases enforcing purchasers' and consumers' rights to timely access to generic drugs." Kinney Decl. ¶ 5.  In addition, RDC claims approximately $40.5 million in trebled damages in this case, which gives RDC every incentive to "[v]igorously prosecut[e] this suit." Id. ¶ 6.  Consequently, despite the bankruptcy proceeding, RDC "continue[s] to monitor the status of this case through periodic reports from class counsel." Id. ¶ 11.

RDC has also taken several measures to ensure that the bankruptcy proceeds in "an efficient and effective manner," including "assembl[ing] outside firms to guide [RDC] through the bankruptcy process," such that the proceeding will not hinder RDC's role as class representative but will "preserv[e] and maximiz[e] the value of RDC's estate." Id. ¶¶ 7-9; see also id. ¶ 9 (stating that the bankruptcy actually provides RDC's management "more time, not less, to supervise Class counsel in this case" due to a New Jersey facility closure and the fact that "RDC is only shipping orders to customers, and is no longer receiving orders from vendors").  Moreover, as DPPs note, "RDC has already performed the

most time-intensive aspects of this case, including producing discovery and sitting for a deposition. And it is prepared to attend and testify at trial." DPPs' Resp. 5 (citing Kinney Decl. ¶ 11).

Defendants point only to the fact of bankruptcy for the proposition that RDC "cannot plausibly perform a significant role in supervising class counsel in this action." Defs.' Suppl. Opp'n 4. But this does not overcome DPPs' convincing proffer that RDC remains committed to serving as class representative and has taken certain steps to safeguard its role as such. It bears mention too that RDC has extensive experience as a class representative in pharmaceutical antitrust cases, having served in several over the past decade. See, e.g., Niaspan, 397 F. Supp. 3d at 680-81; Namenda, 331 F. Supp. 3d at 205; Am. Sales Co., 2017 WL 3669604, at *12-13; Lidoderm, 2017 WL 679367, at *15; Teva Pharms. USA, Inc. v. Abbott Labs., 252 F.R.D. 213, 226-27 (D. Del. 2008).

Defendants further argue that RDC's duties as a debtor-in-possession "present a serious risk of conflict with the duties it would have as a class representative to represent the interests of all class members." Id. at 1-2. A Chapter 11 debtor-in-possession "is a fiduciary and owes the same duties as a trustee." In re J.T.R. Corp., 958 F.2d 602, 604 (4th Cir. 1992). Among these is "the duty to protect and conserve the property in his possession for the benefit of creditors." Ford Motor Credit Co. v. Weaver,

680 F.2d 451, 461 (6th Cir. 1982); see also In re IPofA W. Oaks
Mall, LP, No. 07-33649, 2007 WL 3223295, at *3 (Bankr. E.D. Va.
Oct. 29, 2007) (noting that debtors-in-possession owe a fiduciary
duty to "maximize the Debtors' estates for the benefits of the
Debtors' creditors"). Additionally, the debtor-in-possession has
"an obligation to refrain from self-dealing, to avoid conflicts of
interests and the appearance of impropriety, [and] to treat all
parties to the case fairly." In re Massenburg, 554 B.R. 769, 776
(D. Md. 2016) (citation omitted); accord In re Bowman, 181 B.R.
836, 843 (Bankr. D. Md. 1995); see also J.T.R. Corp., 958 F.2d at
605 ("The debtor-in-possession [must] not act in his own interests,
but rather in the interests of the creditors.").

Defendants claim that the duties that RDC now owes as a
debtor-in-possession conflict with its duties to the rest of the
class. For this proposition, Defendants rely on two cases, Dechert
v. Cadle Co., 333 F.3d 801 (7th Cir. 2003), and In re Merrill Lynch
& Co., Inc. Research Reports Securities Litigation, 375 B.R. 719
(S.D.N.Y. 2007). The former case involved a Fair Debt Collection
Practices Act class action and a class representative, Oyler, that
had declared Chapter 7 bankruptcy. Dechert, 333 F.3d at 802.
After the trustee of Oyler's estate substituted himself for Oyler
as the sole class representative, the district court certified the
class. Id. In an opinion written by Judge Posner, the Seventh
Circuit vacated certification, finding that the trustee was an

inadequate representative due to a conflict of interest in the trustee's dual role as representative of the estate and the class. Id. at 802-04.  The court explained,

> It might seem that the conflict of interest in this case between the trustee in bankruptcy and the members of the class (other than the estate in bankruptcy) is inherent in class actions because a named plaintiff cannot be assumed to have the same interest in the litigation as the unnamed class members.  So what difference does it make whether the named plaintiff is a trustee in bankruptcy?  The difference is that in the usual class action the named plaintiff is a nominal party and the real party is the lawyer for the class.  The lawyer has no reason to favor the named plaintiff over the rest of the class members.  When the named plaintiff is a fiduciary, however, he cannot just "go along" with the class lawyer.  He has a duty to seek to maximize the value of his claim, and this duty may collide with his fiduciary duty as class representative (if he is permitted to be the class representative) to represent all members of the class equally.  Such a collision is especially likely in a case in which the fiduciary is a trustee in bankruptcy, because class-action litigation tends to be protracted yet the Bankruptcy Code requires the trustee to complete his work expeditiously.

Id. at 803.  The court also noted an additional conflict of interest in that the defendant was affiliated with a creditor to the estate that the trustee represented, thereby making the defendant an indirect creditor of the trustee.  Id. at 803-04.

However, the court expressly refused to "lay down a flat rule that a trustee in bankruptcy (or, what is the equivalent, a debtor in possession) can never be a class representative."  Id. at 803. Instead, the court suggested that it may be appropriate in cases where "the expected recovery of individual class members is

substantial and only a fiduciary is available to be the class representative." Id.

In Merrill Lynch & Co., a New York district court relied on Dechert in ruling that a trustee of a Chapter 7 bankrupt estate could not serve as a class representative due to "an insuperable and impermissible conflict of interests" between his duties to the class and his duties to the estate's creditors, which included the defendant:

> In this case, Holbrook's duties to the creditors of the Estate would collide jarringly with his duties to the members of the class. This is because, as Trustee of the Estate, Holbrook would have an obligation to represent the interests of Merrill Lynch, as a creditor of the Estate (indeed, as the creditor with the single largest unsecured claim against Dabit); at the same time, as a class representative, Holbrook would have a duty to the class to prosecute the instant claims against Merrill Lynch, as the defendant in this case. Thus, were he to be substituted as named plaintiff, Holbrook would be called upon to work both sides of the street in this case.

375 B.R. at 727. The court noted an additional conflict, highlighted in Dechert, between the trustee's "obligation to liquidate the property of the Estate expeditiously" and "the class's interest in continuing to prosecute what [was] already a protracted lawsuit." Id.

Noting the Seventh Circuit's refusal to establish a blanket rule against trustees serving as class representatives, the plaintiff in Merrill Lynch & Co. attempted to distinguish Dechert, arguing, in part, that it expected recovery of "millions of

68

dollars." Id. at 728. The district court, however, held that
even if the plaintiff had a substantial claim, "there ha[d] been
no showing that the Trustee [was] the only available class
representative." Id.; see Dechert, 333 F.3d at 803 (stating that
it may be appropriate for a trustee to serve as class
representative in cases where "the expected recovery of individual
class members is substantial and only a fiduciary is available to
be the class representative" (emphasis added)).

Here, Defendants argue that RDC cannot serve as a class
representative because it has the same conflicting duties as the
would-be class representatives in Dechert and Merrill Lynch & Co.
Defendants further contend that this conflict is compounded given
they are both creditors of RDC. Merck and Glenmark possess
unsecured claims against RDC in the approximate amounts of $5
million and $175,000, respectively. DPPs' Resp. 6 n.30; Defs.'
Suppl. Opp'n 1 & Ex. B.[34]

DPPs respond that "RDC's status as debtor-in-possession is in
complete harmony with its duties as a class representative: RDC
must maximize the value of its claims, and in doing so maximize

---

[34] Merck has sought leave to amend its Answer to assert a setoff
defense against RDC. See Def. Merck's Mot. Leave File Am. Answer
(ECF No. 922); Def. Merck's Mem. Supp. Mot. Leave File Am. Answer
(ECF Nos. 923 (public), 925 (sealed)). This motion was referred
to me on June 1, 2020, and I address it in a separate Report and
Recommendation also issued today.

the values of all direct class members' claims." DPPs' Resp. 1. They distinguish both Dechert and Merrill Lynch & Co., arguing neither one supports disqualification here for a number of reasons. Id. at 7-10.

As an initial matter, the Chapter 11 proceeding does not automatically render RDC, a debtor-in-possession, an inadequate class representative. See, e.g., De Stefan v. Frito-Lay, Inc., No. SACV 10-0112, 2011 WL 13176229, at *5 (C.D. Cal. June 6, 2011) ("Courts have never held that bankruptcy filing automatically renders an otherwise appropriate class representative inadequate."); Wanty v. Messerli & Kramer, P.A., No. 05-cv-0350, 2006 WL 2691076, at *1 (E.D. Wis. Sept. 19, 2006) ("The fact that the plaintiffs filed for bankruptcy . . . does not demonstrate that their interests are different from those of the class or that their potential recovery from [the defendant] is so much less than other potential class members that they do not have as strong of an incentive to litigate this action."). Even Dechert refused to "lay down a flat rule that a trustee [or debtor-in-possession] can never be a class representative." 333 F.3d at 803.

Additionally, there are a few notable differences between this case and Dechert and Merrill Lynch & Co. Perhaps the most significant difference is that the present case involves a Chapter 11 restructuring plan versus the Chapter 7 liquidation bankruptcies in the other two cases. Trustees in Chapter 7

70

bankruptcies owe a duty not owed by trustees in the Chapter 11 context: the duty to "close [the] estate expeditiously." 11 U.S.C. § 704(a)(1); accord Dechert, 333 F.3d at 803; Merrill Lynch & Co., 375 B.R. at 727; see 11 U.S.C. § 1106 (identifying duties of Chapter 11 trustees). Though not dispositive, this focus on expedience in the Chapter 7 setting factored into inadequacy findings in both cases.

Next, important to the Dechert court's analysis was the fact that "[t]he named plaintiff in a class action usually has only a small stake in the action" such that "very few of the benefits of settling the class action or prosecuting it to judgment would be received by the trustee (which is to say the creditors)."[35] Dechert, 333 F.3d at 802. Here, however, RDC's $40.5 million claim – though comparatively small to the class's total alleged damages of nearly $5 billion[36] – is certainly substantial. Indeed, according to filings with the United States Bankruptcy Court for the Western District of New York, RDC's current asset-to-liability ratio is $112 million to $113 million. In re Rochester Drug Co-Operative, Inc., No. 2:20-bk-20230 (Bankr. W.D.N.Y. Mar. 27,

---

[35] In fact, it appears that the entire class in that case stood to gain damages of no more than $8,000. See Dechert, 333 F.3d at 802.

[36] See Leitzinger Trial Report ¶¶ 10(a), 55.

2020), ECF No. 105, at 1.   And while Merck and Glenmark have unsecured claims against RDC and are thus creditors – a point of emphasis in Dechert and Merrill Lynch & Co. – Defendants' combined unsecured claims make up approximately 6 percent of RDC's total unsecured claims, and less than 5 percent of RDC's total liabilities.   Id. at 1, 83 (claim 3.325), 114 (claim 3.480); cf. Merrill Lynch & Co., 375 B.R. at 723-24 (noting that Merrill Lynch held the trustee's "largest unsecured claim"); DPPs' Resp. Ex. B (ECF No. 910-2, at 5) (bankruptcy court records showing that Merrill Lynch held over $5 million of the estate's approximately $7.5 million in total unsecured claims).

Even assuming that RDC's claim in this case is substantial, Defendants argue that this case still does not fall within the exception identified in Dechert because "there has been no showing that [RDC] is the only available class representative."   Defs.' Suppl. Opp'n 3 (alteration in original) (quoting Merrill Lynch & Co., 375 B.R. at 728).   True enough, perhaps, but there is likely no entity with the same depth of experience.   As previously stated, the company has a long record of successful service as class representative in several generic suppression class actions, including those resulting in three of the largest settlements in recent history, Hr'g Tr. 29:6-12; see In re Namenda Direct Purchaser Antitrust Litig., No. 15-cv-7488 (S.D.N.Y. 2020), ECF Nos. 947, 948 ($750 million); King Drug Co. of Florence, Inc. v.

72

Cephalon, Inc., No. 2:06-cv-1797 (E.D. Penn. 2015), ECF Nos. 795-1, 780 ($512 million); La. Wholesale Drug Co. Inc. v. Abbott Labs., No. 05-cv-340 (D. Del. 2009), ECF Nos. 529, 543 ($250 million).

Although it is a close call, because of the differences between this case and Dechert and Merrill Lynch & Co.; RDC's strong interest in vindicating its fairly substantial $40.5 million claim; Defendants' comparatively small value of unsecured claims against RDC; and RDC's proven history of serving as an adequate class representative in similar class actions, I find that RDC is an adequate class representative in this case despite its ongoing Chapter 11 bankruptcy proceeding. See Wanty, 2006 WL 2691076, at *1.

For the foregoing reasons, DPPs have established that named Plaintiffs FWK, RDC, and Cesar Castillo will fairly and adequately protect the interests of the class, satisfying Rule 23(a)(4).[37]

---

[37] Although Rule 23(a)(4) by its express terms deals only with the adequacy of the "representative parties," Fed. R. Civ. P. 23(a)(4) (emphasis added), the Supreme Court noted in Amchem Products, Inc. that the adequacy requirement "also factors in competency and conflicts of class counsel," 521 U.S. at 626 n.20 (emphasis added). Accordingly, several courts have addressed the adequacy of class representatives and class counsel in tandem. See, e.g., London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1253 (11th Cir. 2003) (noting that the Rule 23(a)(4) adequacy requirement "applies to both the named plaintiff and counsel" (quoting Amchem Prods., Inc., 521 U.S. at 626 n.20)). In 2003, however, Congress enacted Rule 23(g), which specifically outlines factors for courts to consider in assessing the adequacy of class counsel. See Fed. R. Civ. P. 23(g) advisory committee's note to 2003 amendment ("Until now, courts have scrutinized proposed class counsel as well as the class

5.   <u>Ascertainability</u>

In addition to the express requirements of Rule 23, DPPs must also demonstrate that the proposed class members are "readily identifiable," or "ascertainable," "in reference to objective criteria." <u>EQT Prod. Co.</u>, 764 F.3d at 358.   To satisfy this requirement, "[t]he plaintiffs need not be able to identify every class member at the time of certification.   But '[i]f class members are impossible to identify without extensive and individualized fact-finding or "mini-trials," then a class action is inappropriate.'"   <u>Id.</u> (quoting <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d 583, 593 (3d Cir. 2012)).   Put differently, DPPs must "define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." <u>Krakauer</u>, 925 F.3d at 658 (alteration in original) (quoting <u>EQT Prod. Co.</u>, 764 F.3d at 358).

As demonstrated by the foregoing discussion, DPPs' proposed class is not only ascertainable, but already ascertained.   Each member is known and their purchasing history already documented in

---

representative under Rule 23(a)(4)."); <u>accord</u> <u>Bell v. Brockett</u>, 922 F.3d 502, 510 (4th Cir. 2019) (noting that "Rule 23(a)(4) sets out the requirement of adequate class representatives" while "Rule 23(g) . . . address[es] the requirements regarding class counsel").   Accordingly, I will address separately the adequacy of class counsel pursuant to Rule 23(g) below.

discovery produced by Defendants.  See Strombom Decl. Exs. 2, 4;
see also Leitzinger Decl. Exs. 8-9; Leitzinger Rebuttal Decl. Ex.
3.  Thus, the ascertainability requirement poses no barrier to
class certification here.

**B.   Rule 23(b)**

In addition to the Rule 23(a) requirements, DPPs must
demonstrate that the class action fits within one of the provisions
of Rule 23(b).  Here, DPPs proceed under Rule 23(b)(3), which
requires findings that (1) "the questions of law or fact common to
class members predominate over any questions affecting only
individual members," and (2) "that a class action is superior to
other available methods for fairly and efficiently adjudicating
the controversy."  Fed. R. Civ. P. 23(b)(3).

**1.   Predominance**

Under Rule 23(b)(3), common questions of law or fact "must
predominate over any questions affecting only individual members."
Fed. R. Civ. P. 23(b)(3).  This is a separate and "more stringent"
requirement than Rule 23(a)'s commonality requirement.  Thorn, 445
F.3d at 319 (quoting Lienhart v. Dryvit Sys., Inc., 255 F.3d 138,
146 n.4 (4th Cir. 2001)); cf. Fed. R. Civ. P. 23(a)(2) (requiring
only the presence of common questions of law or fact).
Predominance of common questions over individual issues ensures
that the "proposed class[] [is] sufficiently cohesive to warrant

adjudication by representation." Amchem Prods., Inc., 521 U.S. at 623.

To be clear, the predominance inquiry "is not simply a matter of counting common versus noncommon questions and checking the final tally." Soutter, 307 F.R.D. at 214. Rather, the court "compares the quality of the common questions to those of the noncommon questions." Id. (emphasis added); see also Stillmock v. Weis Mkts., Inc., 385 F. App'x 267, 273 (4th Cir. 2010) (describing the predominance test as "qualitative rather than quantitative" (citing Gunnells, 348 F.3d at 429)). Accordingly, DPPs are not required to prove that each element of their claims is susceptible to classwide proof, but only that "common questions predominate over any questions affecting only individual [class] members." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013) (alteration in original) (quoting Fed. R. Civ. P. 23(b)(3)); see also Namenda, 331 F. Supp. 3d at 204 ("'[I]ndividual questions need not be absent' in order to certify a class under Rule 23(b)(3); the text of Rule 23(b)(3) itself contemplates that such questions will be present." (quoting Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 81 (2d Cir. 2015))); Soutter, 307 F.R.D. at 214 ("If the 'qualitatively overarching issue' in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues." (citing Ealy v. Pinkerton Gov't Servs., 514 F. App'x 299, 305 (4th Cir. 2013))).

To succeed on their claims at trial, DPPs must establish the following elements: (1) a violation of the antitrust laws, (2) individual injury, or antitrust impact, and (3) measurable damages.  See 15 U.S.C. § 15; Am. Sales Co., 2017 WL 3669604, at *13.  Defendants contest predominance only with respect to antitrust impact.  A review of DPPs' evidence demonstrates that common questions of fact and law predominate over any individualized issues for each element of DPPs' antitrust claims.

a.   Violation of Antitrust Laws

With respect to proving that Defendants committed antitrust violations, common issues of law and fact clearly predominate over individual issues.  In this case, DPPs allege that Merck and Glenmark "violated Section[] 1 of the Sherman Act by entering into an unlawful reverse payment agreement that restrained competition in the market for Zetia and its generic equivalents, and Section 2 of the Sherman Act by engaging in a conspiracy to monopolize by entering into the reverse payment agreement."  DPPs' Mem. Supp. Mot. Certify 22 n.104; see DPPs' Am. Compl. ¶¶ 1-7, 184-214.  Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."  15 U.S.C. § 1.  Thus, to establish a violation of Section 1 of the Sherman Act, DPPs must establish "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable

77

restraint of trade." Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002).

Under Section 2, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person . . . to monopolize any part of the trade" is guilty of an offense and subject to penalties. 15 U.S.C. § 2. Conspiracy to monopolize entails the following elements: (1) concerted action; (2) a specific intent to achieve an unlawful monopoly; and (3) commission of an overt act in furtherance of the conspiracy. Advanced Health-Care Servs., Inc. v. Radford Cmty Hosp., 910 F.2d 139, 150 (4th Cir. 1990).

In seeking to prove that Defendants violated Sections 1 and 2 of the Sherman Act by entering into the reverse payment settlement agreement, DPPs will necessarily rely on evidence of Defendants' conduct in connection with that agreement, including the terms of the agreement itself, and other evidence related to market conditions. See Sobol Decl. Ex. 32, at 2-3 (ECF No. 737-32). As many courts - including this one - have recognized, such evidence is common to the class, for if each member pursued its claims individually, it would rely on the same evidence to prove the alleged antitrust violations. See Suboxone, 421 F. Supp. 3d at 53; Namenda, 331 F. Supp. 3d at 215; Am. Sales Co., 2017 WL 3669604, at *13-14; Wellbutrin XL, 2011 WL 3563385, at *6. Moreover, proving the alleged anticompetitive conduct "does not

78

depend on any legal issue unique to a particular class member."
Am. Sales Co., 2017 WL 3669604, at *14; see also Wellbutrin XL,
2011 WL 3563385, at *6 (noting that "issues of relevant market,
monopoly power, and exclusionary conduct . . . focus on the
defendants' conduct rather than individual class members");
Meijer, Inc., 246 F.R.D. at 308 (stating that proof of alleged
antitrust violations "relates solely to Defendants' conduct" and
"will not vary among class members." (internal quotation marks
omitted) (quoting Lorazepam, 202 F.R.D. at 29)).  Accordingly,
common issues of law and fact predominate with respect to proving
violations of the Sherman Act.

    b. Antitrust Impact

   The Clayton Act permits only those who have suffered injury
"by reason of anything forbidden in the antitrust laws" to bring
suit for treble damages.  15 U.S.C. § 15(a).  Accordingly, DPPs
must establish through common evidence that they were injured by
Defendants' anticompetitive conduct.  "[Antitrust] impact often is
critically important for the purpose of evaluating Rule 23(b)(3)'s
predominance requirement because it is an element of the claim
that may call for individual, as opposed to common, proof."
Hydrogen Peroxide, 552 F.3d at 311.  "To show antitrust impact,
there must be sufficient evidence to show that the class members
suffered some damage as a result of [Defendants'] alleged antitrust
violation."  Am. Sales Co., 2017 WL 3669604, at *14 (internal

quotation marks omitted) (citing E.I. du Pont Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 441 (4th Cir. 2011)). But at the class certification stage, DPPs need only "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." Hydrogen Peroxide, 552 F.3d at 311-12.

As discussed in detail above, DPPs offer several sources of common evidence that they claim demonstrate antitrust impact on a classwide basis. Such evidence consists of "extensive empirical economic research concluding that generics quickly replace brands at substantially lower prices, with generic prices falling even further as the number of generic competitors increase"; "forecasts and other documents prepared by Merck, Glenmark and non-party generic manufacturers concluding that generic Zetia would follow this same pattern, quickly capturing most brand sales at lower prices, with generic prices falling as the number of generic competitors increases"; and actual sales experience, which demonstrates that "prices fell for virtually all class members after generic entry, either from substitution of the cheaper generic for the brand, and/or getting increased discounts on the generic when there were six generics on the market instead of one." DPPs' Mem. Supp. Mot. Certify 25-26; see also Leitzinger Decl. ¶¶ 23-47. Several courts in other direct purchaser class actions have found substantially similar evidence sufficient to satisfy

the predominance requirement.   See Intuniv, 2019 WL 4645502, at *9-11; Niaspan, 397 F. Supp. 3d at 682-88; Loestrin 24 Fe, 2019 WL 3214257, at *12-15; Solodyn, 2017 WL 4621777, at *7-8; Am. Sales Co., 2017 WL 3669604, at *14-15; Meijer, Inc., 246 F.R.D. at 308-10.

Defendants' assertions that individual issues would predominate focus largely on their numerosity arguments that the brand-only purchasers and idiosyncratic purchasers should not be included in the class, either because those members suffered no injury or because establishing injury is impossible without individualized inquiry.   See Defs.' Opp'n 29-30.   As discussed above, however, DPPs' common evidence is sufficient for reasonable jurors to conclude that these members paid overcharges as a result of Defendants' alleged conduct.   And any individualized inquiry regarding those purchasers at trial will not overwhelm the proceedings.   See Intuniv, 2019 WL 4645502, at *10; Niaspan, 397 F. Supp. 3d at 686; Loestrin 24 Fe, 2019 WL 3214257, at *15; see also Namenda, 331 F. Supp. 3d at 204 ("'[I]ndividual questions need not be absent' in order to certify a class under Rule 23(b)(3)." (quoting Sykes, 780 F.3d at 81)).   Accordingly, DPPs have provided evidence of antitrust impact common to the class that will predominate over any individualized issues.

After the parties submitted their briefing, Defendants filed a notice of supplemental authority, ECF No. 911, directing the

court's attention to the Third Circuit's recent decision in In re
Lamictal Direct Purchaser Antitrust Litigation, 957 F.3d 184 (3d
Cir. 2020).  In that case, the district court certified a class of
direct purchasers alleging the same type of unlawful reverse
payment settlement agreement alleged in this case but involving
the anti-epilepsy drug Lamictal (lamotrigine).  Id. at 187-88.
The defendants GlaxoSmithKline ("GSK") (brand manufacturer) and
Teva Pharmaceuticals ("Teva") (generic manufacturer) appealed the
district court's ruling only with respect to the members that had
purchased the generic drug from Teva.  Id. at 188-90.  The
defendants argued that the plaintiffs had failed to demonstrate
that common issues predominated over individualized issues because
the plaintiffs' proffered proof relied on the use of averages,
which overlooked the fact that up to a third of the class paid no
more, or even less, for the generic drug than they would have
absent the defendants' No-AG agreement.[38]  Id. at 192-93.  Agreeing
with the defendants, the Third Circuit vacated the district court's
class certification order and remanded, instructing the district
court to conduct a more rigorous analysis concerning the
appropriateness of averages in that case.  Id. at 193-95.

---

[38] The plaintiffs' expert in that case, Dr. Russell Lamb, is also
the End-Payor Plaintiffs' expert in the present action.

Defendants argue that Lamictal highlights the flaw of Dr. Leitzinger's antitrust impact analysis as the "common" evidence he proposes also relies on averages, masking the fact that some members may have been uninjured by the alleged anticompetitive conduct.  See Defs.' Presentation 30-31.

Having reviewed Lamictal, I nonetheless conclude that DPPs have satisfied the predominance requirement.  As an initial matter, Defendants do not contend that Lamictal stands for the proposition that averages are never permissible. Defs.' Presentation 31; Hr'g Tr. 59:24-60:4; see also Lamictal, 957 F.3d at 194.  Indeed, courts in other direct purchaser actions have found the predominance requirement satisfied with respect to antitrust impact over the defendants' similar objection to the use of averages.  See, e.g., Loestrin 24 Fe, 2019 WL 3214257, at *4-5; Nexium, 296 F.R.D. at 57-58.

Moreover, Lamictal arises out of facts materially different than those in the present case.  Significant to the defendants' argument in that case was the existence of a unique contracting strategy involving a "nuance in the anti-epilepsy drug market." 957 F.3d at 189.  Although GSK acknowledged that its reverse payment settlement agreement with Teva prevented GSK from launching an AG, GSK "had long been concerned about the effectiveness" of an AG because doctors appeared reluctant to change their patients' epilepsy medication, such that "those who

started patients on brand Lamictal would be less inclined to switch them to a lower-price generic once one launched." Id.  In order to compete with Teva once it launched what GSK assumed would be a lower-priced generic, GSK developed a contracting strategy whereby it would offer targeted pharmacies "significant discounts and rebates if they agreed to sell brand Lamictal instead of Teva's generic version." Id.  However, Teva discovered GSK's plan before launching its generic version.   Id.   As a result, Teva "preemptively lowered its lamotrigine prices in order to compete." Id. (emphasis added).

The Third Circuit found that the district court's predominance analysis overlooked this key fact, which tended to show that those entities that purchased the generic drug during Teva's six-month exclusivity period did not sustain overcharges. That is to say that even if GSK had launched an AG the same day Teva launched its generic version, the price of the generic version would not have been any lower than what those purchasers paid in the actual world because Teva had preemptively lowered its generic price to compete with GSK.  This reality was detrimental to the plaintiffs' theory of liability, which, "at least with respect to those entities that purchased lamotrigine from Teva during the six-month period, [was] premised on the principle that, on average, the price of a generic is lower when there are two generics rather than just one." Id.  Nonetheless, the district court never

considered "the effect of GSK's Contracting Strategy on each Direct Purchaser." Id. at 193.

During oral argument in this case, Defendants' counsel attempted to liken this case to Lamictal, arguing that "Merck also engaged in an aggressive contracting strategy" of offering "significant discounts," which essentially had the same effect as an AG in driving down prices. Hr'g Tr. 61:16-62:16. Thus, even if Merck had launched an AG in the but-for world, the generic price would have been the same, and any attempt to prove otherwise would require individualized inquiry. However, this "contracting strategy" – which Defendants never raised in their briefs – simply does not compare to the one extensively litigated in Lamictal. Defendants have not presented any evidence that this case likewise involves some "nuance" in the market for ezetimibe, or any other persuasive evidence as to why the use of averages would be inappropriate here.

Furthermore, in Lamictal, the district court's failure to consider the contracting strategy resulted in the possibility that as many as twenty-five of the thirty-three generic-only purchasers suffered no injury (nearly one-third of the class). 957 F.3d at 192-193. Prior to the Third Circuit's ruling, Defendants' predominance argument in this case was aimed at the five brand-only purchasers and four idiosyncratic purchasers identified above. And as this report has already concluded, DPPs' common

evidence is sufficient for a jury to conclude that those nine members suffered injury, and that such evidence would predominate over any individualized issues.  The Third Circuit's decision in Lamictal, which presented a very different factual background than this case, does not alter this conclusion.  As a result, DPPs have established that "the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." Hydrogen Peroxide, 552 F.3d at 311-12; see Intuniv, 2019 WL 4645502, at *9-11; Niaspan, 397 F. Supp. 3d at 682-88; Loestrin 24 Fe, 2019 WL 3214257, at *12-15; Solodyn, 2017 WL 4621777, at *7-8; Am. Sales Co., 2017 WL 3669604, at *14-15; Meijer, Inc., 246 F.R.D. at 308-10.

### c.   Measurable Damages

Finally, DPPs must demonstrate that "damages can be reliably measured on a class-wide basis."  Am. Sales Co., 2017 WL 3669604, at *15 (citing Comcast Corp., 569 U.S. at 35).  To be clear, DPPs are "not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis."  Wellbutrin XL, 2011 WL 3563385, at *14.  And that methodology must be consistent with the purported theory of liability.  See Comcast Corp., 569 U.S. at 35.  Assuming an appropriate model is put forth, "the need for some individualized determinations" is not fatal to class certification.  Nexium, 777

F.3d at 21; see also Am. Sales Co., 2017 WL 3669604, at *16 ("The fact that individualized inquiry may be necessary to allocate those damages will not defeat class certification." (citing Cardizem CD, 200 F.R.D. at 348)).

Here, DPPs offer Dr. Leitzinger's "formulaic approach to measure Class-wide overcharges," which relies only on evidence common to the class and requires no individualized inquiries. Leitzinger Decl. ¶¶ 51, 62. Dr. Leitzinger begins with developing "benchmarks" for but-for world market performance based on "actual experience at a market-wide level drawn from data produced by Defendants and other manufacturers or from their collective projections about the impact of generic competition on prices." Id. ¶ 51. More specifically, using the actual sales experience following generic entry, Dr. Leitzinger calculates the generic penetration rate, the average generic discount relative to the brand price, and the average brand discount resulting from generic competition. Id. ¶¶ 50-51, 54-60; DPPs' Mem. Supp. Mot. Certify 29. He then "backcasts" those benchmarks to the delay period to estimate brand and generic purchases (i.e., prices and quantities) in the but-for world, allowing him to calculate aggregate overcharges during the delay period and after generic entry on a

classwide basis.[39]  Leitzinger Decl. ¶¶ 49-51, 55-61; DPPs' Mem. Supp. Mot. Certify 29.

Courts in other delayed generic entry cases have approved of Dr. Leitzinger's same basic methodology.  See, e.g., Loestrin 24 Fe, 2019 WL 3214257, at *15-16; Am. Sales Co., 2017 WL 3669604, at *15-16; Lidoderm, 2017 WL 679367, at *12; Wellbutrin XL, 2011 WL 3563385, at *14-16; K-Dur, 2008 WL 2699390, at *14-15; Meijer, Inc., 246 F.R.D. at 310-13.  In light of this and the fact that Defendants do not contest this issue, DPPs have met their burden of demonstrating that damages can be reliably measured on a classwide basis.

Having shown that evidence common to the class predominates over any individualized issue with respect to each element of their claims, DPPs have satisfied the predominance requirement.

2.  Superiority

Finally, DPPs must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This "superiority" requirement ensures that proceeding by class action

---

[39] Dr. Leitzinger's damages model accounts for "how different determinations by the jury of the but-for entry dates would affect overcharges," Leitzinger Decl. ¶¶ 66-67, and it permits him to easily identify and remove overcharges attributable to the retailer plaintiffs as well as generic Zetia purchases from Par, Leitzinger Rebuttal Decl. ¶¶ 22-23.

will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." Amchem Prods., Inc., 521 U.S. at 615. To determine whether DPPs have satisfied this requirement, the court "must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." Stillmock, 385 F. App'x at 274 (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1779 (3d ed. 2005)).

To help guide the court's analysis, Rule 23 provides a list of four, non-exhaustive factors: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3); see also Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment (stating that the four factors are non-exhaustive).

Defendants do not contest superiority in their opposition brief. However, they devote one slide of their forty-four-slide presentation to the issue, arguing, for example, that those individual members with large claims "have a strong interest in controlling the prosecution of separate actions" and that "[m]anaging a class action will introduce difficulties given the need for individualized inquires." See Defs.' Presentation 32.

Even considering Defendants' late superiority challenge, a comparison of a class action to its possible alternatives overwhelmingly demonstrates that a class action is the superior means of adjudicating DPPs' claims. First, "the presence of large claimants in a proposed antitrust class and the possibility that some of them might proceed on their own does not militate against class certification." Cardizem CD, 200 F.R.D. at 325 (quoting Paper Sys., Inc. v. Mitsubishi Corp., 193 F.R.D. 601, 605 (E.D. Wis. 2000)). Indeed, "the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high." Amchem Prods., Inc., 521 U.S. at 617. Moreover, the evidence discussed above shows that the class also includes several members with fairly small claims such that they would have little to no interest in "litigating separate actions . . . that would be both complex and expensive." 6 William B. Rubenstein, Newberg on Class Actions § 20:54 (5th ed. Dec. 2019 update). Consequently, "class resolution will ensure that all affected and properly certified

class members are able to pursue valid antitrust claims where they might otherwise be financially prevented from doing so." Am. Sales Co., 2017 WL 3669604, at *17.

In addition, as noted above, this case involves complex issues of law and fact common to the class and which predominate over individual issues. Accordingly, proceeding as a class action is not only manageable, but also "provides the opportunity for an efficient resolution of these substantial issues for the entire class in a single forum." Meijer, Inc., 246 F.R.D. at 314; see also Cardizem CD, 200 F.R.D. at 326 ("[P]roceeding with this consolidated multi-district litigation as a class action will achieve economies of both the litigants' and the Court's time, efforts and expense."). It substantially mitigates the risk of several individual actions and, consequently, "the specter of inconsistent adjudications." Meijer, Inc., 246 F.R.D. at 314; see also Stillmock, 385 F. App'x at 275 (observing that "class certification promotes consistency of results, giving [the defendant] the benefit of finality and repose" (citing Gunnells, 348 F.3d at 429)).

Accordingly, a class action is the superior means of adjudicating DPPs' claims. This finding is consistent with the holdings of other courts in similar cases. See Am. Sales Co., 2017 WL 3669604, at *17 ("Although class litigation departs from the general rule that individuals pursue their claims

91

individually, in the complex context of delayed generic entry the benefits of Rule 23 have been widely recognized." (citing cases)); In re Flonase Antitrust Litig., 284 F.R.D. 207, 234 (E.D. Penn. 2012) ("I agree with the vast majority of district courts that in a delayed generic entry case such as this, class action treatment is superior to other available methods of adjudication.").

## C.   Rule 23(g)

Lastly, DPPs seek to confirm Hagens Berman Sobol Shapiro LLP ("Hagens Berman") as lead counsel for the class.  DPPs' Mot. Class Certification 1; DPPs' Mem. Supp. Mot. Certify 21.   Pursuant to Rule 23(g), the court previously appointed Hagens Berman as lead counsel and interim class counsel for the proposed DPP class, Pretrial Order No. 3, at 1-2, 4-5 (ECF No. 105), as well as lead counsel for the Par Settlement Class, see R. & R. 6 (ECF No. 668); Order 4 (ECF No. 711) (adopting report and recommendation).  Given the court's previous finding that Hagens Berman has the "necessary expertise, resources, and experience to represent" the DPPs, Pretrial Order No. 3, at 2, I recommend that the court confirm Hagens Berman has lead counsel for the DPP class in accordance with Rule 23(g).

## III. Conclusion and Recommendation

For the foregoing reasons, I recommend that the court GRANT DPPs' Motion to Modify Their Class Definition, ECF No. 812.   I also recommend that the court GRANT IN PART DPPs' Motion for Class

Certification, ECF No. 735, by further amending the modified class definition to exclude entities that purchased only generic Zetia from Par, in accordance with the court's previous order, and certify a class of thirty-five direct purchasers.

### IV. Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

93

based on such findings and recommendations.   Thomas v. Arn, 474

U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984);

United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

June 18, 2020

94