**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**In re ZETIA (EZETIMIBE)**
**ANTITRUST LITIGATION**

**MDL No. 2:18-md-2836**

**THIS DOCUMENT RELATES TO:**
**All End-Payor Actions**

**REPORT AND RECOMMENDATION**

## Table of Contents

I.  Statement of the Case ....................................... 1

II. Analysis ................................................... 6

  A.  Rule 23(a) ............................................... 9

    1.  Numerosity ........................................... 10

    2.  Commonality .......................................... 12

    3.  Typicality ........................................... 15

    4.  Adequacy ............................................. 17

    5.  Ascertainability ..................................... 19

  B.  Rule 23(b) ............................................... 38

    1.  Predominance ......................................... 38

      a.  Uninjured Class Members ........................... 40

      i.  Injury and Damages: Separate Considerations ....... 45

      ii. TPPs that "Ceased Operations" Before May 2015 ..... 50

      iii. Brand Loyalists .................................. 52

      iv. Increased Premiums ............................... 54

      v.  Copayments, Rebates, and Formulary Placement ...... 55

        1. TPPs Covering Zetia on Tier 3 ..................... 58

        2. TPPs Covering Zetia on Tier 4 or Higher ........... 60

        3. Medicare Part D Plans ............................. 62

      b.  Measurable Damages ................................. 66

      c.  State Law Variations ............................... 70

    2.  Superiority ......................................... 81

  C.  Rule 23(g) ............................................. 83

III.   Conclusion and Recommendation ......................... 83

IV.   Review Procedure ...................................... 84

Before the court are End-Payor Plaintiffs' ("EPPs")[1] Motion for Class Certification and Appointment of Class Representatives and Class Counsel, ECF No. 729, and Motion for Leave to Modify and Limit their Class Definition, ECF No. 809. Defendants Glenmark[2] and Merck[3] oppose the Motions. For the reasons explained in greater detail below, I recommend that the court GRANT both Motions.

## I.    Statement of the Case

The allegations underlying this multidistrict litigation have been set forth in great detail by this court in previous opinions.[4] I therefore provide only a brief summary here. EPPs allege that

---

[1] The named EPPs seeking class certification are the City of Providence, Rhode Island; International Union of Operating Engineers Local 49 Health and Welfare Fund; Painters District Council No. 30 Health & Welfare Fund; Philadelphia Federation of Teachers Health & Welfare Fund; Sergeants Benevolent Association Health & Welfare Fund; The Uniformed Firefighters' Association of Greater New York Security Benefit Fund; The Retired Firefighters' Security Benefit Fund of the Uniformed Firefighters' Association; and United Food and Commercial Workers Local 1500 Welfare Fund.

[2] "Glenmark" consists of Glenmark Pharmaceuticals Limited and Glenmark Pharmaceuticals Inc., USA, the latter incorrectly identified as Glenmark Generics Inc., USA.

[3] "Merck" consists of Merck & Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC.

[4] In re Zetia (Ezetimibe) Antitrust Litig., No. 2:18-md-2836, 2019 WL 6122017, at *1-3 (E.D. Va. Oct. 15, 2019), R. & R. adopted as modified, 2019 WL 6977405 (E.D. Va. Dec. 20, 2019); In re Zetia (Ezetimibe) Antitrust Litig., No. 2:18-md-2836, 2019 WL 1397228, at *1-10 (E.D. Va. Feb. 6, 2019), R. & R. adopted as modified, 400 F. Supp. 3d 418 (E.D. Va. 2019).

Merck and Glenmark entered into an unlawful reverse payment settlement agreement,[5] which resulted in artificially inflated prices for the brand drug Zetia (ezetimibe) and its generic equivalents. EPPs' Am. Consolidated Class Action Compl. ("EPPs' Am. Compl.") ¶¶ 1-7, 184-222 (ECF No. 130). Specifically, Glenmark, a generic drug manufacturer, agreed to refrain from launching the market's first generic version of Zetia – a blockbuster cholesterol-controlling drug manufactured by Merck – for a period of roughly five years, providing Merck between $5.7 and $8.3 billion in additional Zetia sales. Id. ¶¶ 4, 193, 197, 210-16. In exchange, Merck agreed to drop patent infringement claims against Glenmark and to abstain from introducing its own generic version of Zetia (an "authorized generic") during the initial 180-day exclusivity period following Glenmark's generic entry, ensuring Glenmark's sole-generic-provider status. Id. ¶¶ 4-5, 193, 196, 217-22. This type of agreement is referred to as a "no-authorized-generic" or "No-AG" agreement. Id. ¶¶ 4, 84. And in this case, according to EPPs, Defendants' No-AG agreement resulted in an $800 million payment to Glenmark and supracompetitive purchase prices for both brand and generic Zetia.

---

[5] See FTC v. Actavis, Inc., 570 U.S. 136, 140-41 (2013) (describing reverse payment settlements).

Id. ¶¶ 4, 6-7, 221, 267, 273-74.   Defendants vehemently dispute
this characterization of the settlement.

Here, EPPs, one of three sets of plaintiffs, seek to certify
a proposed class of third-party payors ("TPPs") consisting of self-
insured health and welfare plans or insurers that indirectly
purchased and/or provided reimbursement for their members'
purchases of Zetia and its generic equivalents.  The proposed class
encompasses claims under the antitrust, consumer protection,
and/or unjust enrichment laws of twenty-eight states, the District
of Columbia, and Puerto Rico.[6]

After filing their Motion for Class Certification, EPPs
sought leave to modify their class definition.    The initial
definition provides as follows:

> All Third-Party Payor entities that, for consumption by
> their members, employees, insureds, participants, or
> beneficiaries, and not for resale, indirectly purchased,
> paid and/or provided reimbursement for some or all of
> the purchase price of Zetia or its AB-rated generic
> equivalents in any form, that was sold through a retail
> pharmacy, including mail-order pharmacies and long-term
> care pharmacies, in Alabama, Arizona, California,
> District of Columbia, Florida, Hawaii, Illinois, Iowa,
> Kansas, Maine, Michigan, Minnesota, Mississippi,
> Nebraska, Nevada, New Hampshire, New Mexico, New York,
> North Carolina, North Dakota, Oregon, Puerto Rico, Rhode
> Island, South Dakota, Tennessee, Utah, Vermont,
> Virginia[,] West Virginia and Wisconsin from July 1,
> 2012 through November 18, 2019.

The following entities are excluded from the Class:

---

[6] See Zetia, 2019 WL 1397228, at *39 (Exs. A, B).

3

a. Defendants and their subsidiaries and affiliates;

b. All federal and state governmental entities except for cities, towns, municipalities or counties with self-funded prescription drug plans;

c. All entities who purchased Zetia or generic Zetia for purposes of resale or directly from Defendants or their affiliates;

d. Fully-insured health plans (i.e., health plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members); and

e. Pharmacy benefit managers.

EPPs' Mot. Class Certification 1-2; EPPs' Mem. Supp. Mot. Class Certification ("EPPs' Mem. Supp. Mot. Certify") 8 (ECF Nos. 730 (public), 734 (sealed)).

EPPs now propose the following modified class definition:

All Third-Party Payor entities ("TPPs") within the Brand Subclass or the Generic Subclass defined herein that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Zetia or its AB-rated generic equivalents in any form, that was sold through a retail pharmacy, including mail-order pharmacies and long-term care pharmacies, in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia[,] West Virginia and Wisconsin from November 15, 2014 (the "but-for generic entry date") through November 18, 2019.

Brand Subclass: TPPs that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of brand Zetia purchased between the but-for generic entry date and December 11, 2016, inclusive.

4

Excluded from the Brand Subclass are Optum Health Part D Plans, Silverscript Part D Plans, Emblem Health Part D, Humana Part D Plans, Optum Health Managed Care Plans, and any TPPs that used one of these plans or OptumRx as its pharmacy benefits manager ("PBM") during this subclass period.

Generic Subclass: TPPs that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic ezetimibe purchased between the generic entry date (December 12, 2016) and November 18, 2019, inclusive.

General Exclusions: The following entities are excluded from both subclasses:

a. Defendants and their subsidiaries and affiliates;

b. All federal and state governmental entities except for cities, towns, municipalities or counties with self-funded prescription drug plans;

c. All entities who purchased Zetia or generic Zetia for purposes of resale or directly from Defendants or their affiliates;

d. Fully-insured health plans (i.e., health plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members); and

e. Pharmacy benefit managers.

EPPs' Mot. Modify Class Definition 2-3 ("EPPs' Mot. Modify"); EPPs' Mem. Supp. Mot. Modify Class Definition ("EPPs' Mem. Supp. Mot. Modify") 2-3 (ECF No. 810). This new proposed class definition shortens the class period by two years and reduces the number of class members by excluding (1) certain entities and brand purchases before generic entry and (2) all brand purchases after generic entry. Id. at 3. In addition, EPPs' economic expert estimates

that the modified definition would reduce EPPs' claimed damages by approximately 50 percent. Id.

Defendants oppose class certification, primarily arguing that EPPs cannot satisfy the ascertainability and predominance requirements of Federal Rule of Civil Procedure 23. Defs.' Mem. Opp'n to EPPs' Mot. Class Certification ("Defs.' Opp'n Mot. Certify") 11-12 (ECF Nos. 829 (public), 833 (sealed)). Additionally, Defendants argue that EPPs' proposal to modify the class definition is futile because it fails to cure the defects noted by Defendants in their opposition to EPPs' Motion for Class Certification. Defs.' Mem. Opp'n to EPPs' Mot. Modify Class Definition ("Defs.' Opp'n Mot. Modify") 3 (ECF Nos. 854 (public), 857 (sealed)). The court heard expert witness testimony on May 1, 2020 ("May Hr'g"), ECF Nos. 931 (sealed), 987 (public), and oral argument on July 7, 2020 ("July Hr'g"), ECF No. 1014.

After reviewing the parties' extensive briefing, expert evidence, and arguments on the Motions, I conclude that EPPs and their modified proposed class definition satisfy the requirements of Rule 23. Thus, this report recommends that the court certify a class of end payors pursuant to EPPs' modified class definition.

## II. Analysis

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)

6

(quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)).   A party seeking to invoke this exception must "affirmatively demonstrate [its] compliance" with the requirements of Federal Rule of Civil Procedure 23.   Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); see also Brown v. Transurban USA, Inc., 318 F.R.D. 560, 566 (E.D. Va. 2016) (stating that the party seeking class certification must prove each Rule 23 requirement by a preponderance of the evidence).

At the same time, "the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) (quoting Wal-Mart Stores, Inc., 564 U.S. at 350-51).  This analysis may require "the court to probe behind the pleadings before coming to rest on the certification question." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982).   And it often "overlap[s] with the merits of the plaintiff's underlying claim." Comcast Corp., 569 U.S. at 33-34 (quoting Wal-Mart Stores, Inc., 564 U.S. at 351).  To the extent the court must resolve disputes between the parties' experts in order to determine whether a particular class certification requirement has been satisfied, see In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 324 (3d Cir. 2008) (noting that such resolution, when necessary, is reserved for the court), any "determination that an expert's opinion is persuasive or

7

unpersuasive on a Rule 23 requirement does not preclude a different view at the merits stage of the case," id. ("Rigorous analysis need not be hampered by a concern for avoiding credibility issues; as noted, findings with respect to class certification do not bind the ultimate fact-finder on the merits.").

Here, EPPs seek leave to modify their class definition, which Defendants oppose as futile because, in their view, the modified class definition suffers the same deficiencies as the original. Although Rule 23(c)(1)(C) permits courts to alter or amend a prior order that granted or denied class certification before final judgment is entered, Fed. R. Civ. P. 23(c)(1)(C); accord Henderson v. CoreLogic Nat'l Background Data, LLC, No. 3:12-cv-97, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2016); Milbourne v. JRK Residential Am., LLC, No. 3:12-cv-861, 2016 WL 1071571, at *3-4, *8 (E.D. Va. Mar. 15, 2016), this court has not yet ruled on class certification.

Nevertheless, in that same spirit, the court may permit a party to amend its class definition prior to a class certification ruling, just as the court itself may modify the definition upon consideration of a motion for class certification, when the result is a better-pled class definition. See Weisfeld v. Sun Chem. Corp., 84 F. App'x. 257, 259 (3d Cir. 2004) ("Despite failing to revise his complaint, Weisfeld sought to narrow the definition of the class in his motion for class certification. . . . The

8

District Court considered this revised class definition in its analysis, and we will do the same." (citing Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993))); Abdeljalil v. Gen. Elec. Capital Corp., 306 F.R.D. 303, 306 (S.D. Cal. 2015) (permitting the plaintiff to narrow the class definition on a motion for class certification); Charron v. Pinnacle Grp. N.Y. LLC, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("A district court is not bound by the class definition proposed in the complaint, and is empowered to carve out an appropriate class." (internal quotation marks omitted)).

Here, Defendants do not raise any procedural defenses to modification – they only assert that modification is futile because it fails to remedy the inadequacies in the original class definition. Thus, in order to resolve EPPs' Motion to Modify, this report's analysis focuses on EPPs' modified class definition to determine whether it meets the requirements for certification under Rule 23.[7]

## A.  Rule 23(a)

Rule 23(a) spells out four prerequisites to class certification: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the

---

[7] This fact does not require amendment of the consolidated complaint.  See Henderson, 2016 WL 4611571, at *4.

representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).   Furthermore, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'"   EQT Prod. Co., 764 F.3d at 358 (quoting Hammond v. Powell, 462 F.2d 1053, 1055 (4th Cir. 1972)).   Courts often refer to this implicit requirement as "ascertainability."   Id.; see, e.g., Soutter v. Equifax Info. Servs., LLC, 307 F.R.D 183, 196 (E.D. Va. 2015).

### 1.   Numerosity

The numerosity prong requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  The Fourth Circuit has held that "[n]o specified number is needed to maintain a class action." Brady v. Thurston Motor Lines, 726 F.2d 136, 145 (4th Cir. 1984). Generally, classes consisting of forty or more members are considered sufficiently large that joinder is presumed to be impracticable.   Am. Sales Co., LLC v. Pfizer, Inc., No. 2:14-cv-361, 2017 WL 3669604, at *6 (E.D. Va. July 28, 2017), R. & R. adopted, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017); In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 337 (D. Md. 2012).

To establish numerosity, EPPs cite their expert reports, which state that "Class members purchased, paid, and/or provided

10

reimbursement for millions" of brand and generic Zetia prescriptions, EPPs' Mem. Supp. Mot. Certify 9 (citing Buchman Decl. Ex. 2 ("Lamb Decl."), ¶ 25 n.54 (ECF Nos. 730-3 (public), 734-2 (sealed)) (stating that between July 2012 and March 2019, "there were approximately 33.26 million branded Zetia prescriptions and 12.66 million generic ezetimibe prescriptions prescribed to insured patients in the retail channel" and that TPP class members "would have purchased, paid, and/or provided reimbursement for some or all of the cost of these prescriptions")), and that "in 2016 alone, there were over 27,000 employer-sponsored health plans in the United States that were not fully insured," id. (citing Buchman Decl. Ex. 13 ("Craft Decl."), ¶ 11 (ECF No. 730-14)). EPPs thus assert that "common sense dictates that the number of Class members far exceeds forty TPPs." Id. (citing In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998)).

Given EPPs' uncontested evidence, I am satisfied that the class is sufficiently numerous as to render joinder impracticable. See In re Loestrin 24 FE Antitrust Litig., 410 F. Supp. 3d 352, 397 (D.R.I. 2019) (numerosity satisfied when plaintiffs proffered that TPP class included at least forty members "in light of the fact that there were approximately 24,534 employer-sponsored health plans in the United States in 2012").

11

2.  Commonality

Rule 23(a)(2) requires that questions of law or fact be common to the class.  "A common question is one that can be resolved for each class member in a single hearing" and does not "turn[] on a consideration of the individual circumstances of each class member."  Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006).  In other words, the named plaintiffs must "demonstrate that the class members 'have suffered the same injury'" and that their claims "depend upon a common contention."  Wal-Mart Stores, Inc., 564 U.S. at 349-50 (quoting Falcon, 457 U.S. at 157).  "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id. at 350.  So long as EPPs make this showing, factual differences among the class members' claims are generally of no concern.  Stanley v. Cent. Garden & Pet. Corp., 891 F. Supp. 2d 757, 770 (D. Md. 2012) ("Factual differences among class members will not necessarily preclude certification 'if the class members share the same legal theory.'" (citing Mitchell-Tracey v. United Gen. Title Ins. Co., 237 F.R.D. 551, 557 (D. Md. 2006))); see also Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982) ("[E]very member of the class need not be in a situation identical to that of the named plaintiff [to establish commonality].").

12

In the antitrust context, commonality is readily satisfied because allegations of conspiracy or monopolization normally constitute a "central or single overriding issue . . . sufficient to establish a common question." Brown v. Cameron-Brown Co., 92 F.R.D. 32, 38 (E.D. Va. 1981) (internal quotation marks omitted) (citing 4 Herbert B. Newberg, Newberg on Class Actions § 7514 (1977)); see also Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 246 F.R.D. 293, 300 (D.D.C. 2007) ("[N]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).").

In this case, commonality, which Defendants do not contest, is easily satisfied. Here, EPPs allege that they were injured as a result of Defendants' unlawful conspiracy to delay the entry of generic Zetia. EPPs' Am. Compl. ¶¶ 1-7, 184-222. To prove their claims, EPPs identify several sources of evidence common to the class. Evidence related to the alleged conspiracy itself comes from Merck and Glenmark documents and witnesses involved with the underlying patent litigation and subsequent settlement. This evidence bears on common questions related to the motivations for settlement and its effect on the market for ezetimibe. With respect to damages, EPPs' common evidence consists of (1) actual experience of brand and generic Zetia following generic entry,

which, according to EPPs, shows that brand sales "quickly converted" to generic sales and thus demonstrates that earlier generic entry would have led to significantly lower prices; (2) academic literature and studies analyzing the effects of generic competition in pharmaceutical markets, which consistently show that generic drugs enter the market at a lower price than the brand (and further decrease in price as additional generic manufacturers enter the market) and quickly capture more than 50 percent of the market share; and (3) Defendants' internal documents and forecasts, which establish that Defendants expected generic Zetia entry to likewise enter at a discount on the brand price and quickly capture a large portion of the brand base. Lamb Decl. ¶¶ 36-62.

Several courts in similar delayed generic entry class actions have found that such allegations and evidence involve common questions of law and fact in accordance with Rule 23(a)(2). See, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig., No. 18-md-2819, 2020 WL 2555556, at *5-6 (E.D.N.Y. May 5, 2020); Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms., Inc., 333 F.R.D. 390, 403-04, 409-12 (M.D. Tenn. 2019); In re Flonase Antitrust Litig., 284 F.R.D. 207, 217, 221 (E.D. Penn. 2012). I too find that the claims of the putative class, which are based on Defendants' alleged anticompetitive conduct regarding the market for ezetimibe, "present important

14

common questions sufficient to satisfy the commonality requirement
of Rule 23(a)(2)." Meijer, Inc., 246 F.R.D. at 300.

3. Typicality

The typicality prong requires a showing that "the claims or
defenses of the representative parties are typical of the claims
or defenses of the class." Fed. R. Civ. P. 23(a)(3). The
typicality and commonality requirements are similar, as "[b]oth
serve as guideposts for determining whether . . . the named
plaintiff's claim and the class claims are so interrelated that
the interests of the class members will be fairly and adequately
protected." Falcon, 457 U.S. at 157 n.13. But the typicality
requirement specifically ensures that named class representatives
are appropriately part of the class and "possess the same interest
and suffer the same injury as the class members." Broussard v.
Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 338 (4th Cir.
1998); see also Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th
Cir. 2006) ("The essence of the typicality requirement is captured
by the notion that 'as goes the claim of the named plaintiff, so
goes the claims of the class.'" (quoting Broussard, 155 F.3d at
340)). Typicality therefore requires the named plaintiffs to
demonstrate "(1) that their interests are squarely aligned with
the interests of the class members and (2) that their claims arise
from the same events and are premised on the same legal theories

15

as the claims of the class members." Jeffreys v. Commc'ns Workers of Am., 212 F.R.D. 320, 322 (E.D. Va. 2003).

In antitrust cases, the typicality requirement is "particularly likely" to be satisfied. 6 William B. Rubenstein, Newberg on Class Actions § 20:40 (5th ed. Dec. 2019 update). Indeed, in such cases, "all of the plaintiffs' claims will arise out of the same course of conduct (the alleged conspiracy) and be based on the same legal theory (an unlawful restraint of trade resulting in supracompetitive prices)." Id. Consequently, "the proposed class representative's claims will be typical of those of the rest of the class." Id.; see also Playmobil, 35 F. Supp. 2d at 241 ("[T]ypicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants.").

In support of this requirement, the named class representatives argue that their claims and the proposed TPP class members' claims "arise from the same course of conduct, namely, Defendants' anticompetitive scheme to delay the availability of generic Zetia," which caused the named and absent TPP class members "to suffer the same injury - paying supra-competitive prices for Zetia and its AB-rated generic equivalent." EPPs' Mem. Supp. Mot. Certify 13. As a result, "[t]he claims are based upon common legal theories: conspiracy in restraint of trade and monopolization." Id.

16

EPPs satisfy typicality for the same reasons they satisfy commonality. That is to say that by executing the alleged reverse payment settlement agreement, Defendants unlawfully caused EPPs and absent TPP class members to pay overcharges for ezetimibe. Thus, the named and absent class members' claims "are based largely on identical legal theories and focus heavily on Defendants' course of conduct." Vista Healthplan, Inc. v. Cephalon, Inc., No. 2:06-cv-1833, 2015 WL 3623005, at *14 (E.D. Penn. June 10, 2015); accord Flonase, 284 F.R.D. at 218; In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 138 (E.D. Penn. 2011).

### 4.   Adequacy

Rule 23(a) requires that the parties representing the proposed class be able to "fairly and adequately . . . protect the interests" of all members of the class. Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prod., Inc., v. Windsor, 521 U.S. 591, 625 (1997) (citing Falcon, 457 U.S. at 157 n.13). In order for a conflict to defeat class certification, "that conflict must be fundamental." Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003). In other words, the conflict "must be more than merely speculative or hypothetical," but rather must "go to the heart of the litigation." Id. at 430-31.

17

EPPs have likewise satisfied the adequacy requirement. Here, EPPs' interests are aligned with the putative TPP class members because all their claims depend on the same alleged anticompetitive conduct by Defendants, resulting in the same injury - paying overcharges for ezetimibe. Naturally, "they have the same interest in establishing [Defendants'] liability." Gunnells, 348 F.3d at 431; see also Momenta Pharms., Inc., 333 F.R.D. at 405 (holding that named end-payor plaintiffs' "interests are aligned with the putative class members because they all possess the same interests and have suffered the same alleged injury i.e., they have each allegedly paid more for generic enoxaparin than they would have paid absent the alleged conspiracy"); Flonase, 284 F.R.D. at 207 ("Each class member purchased and/or reimbursed for fluticasone propionate at some point during the Class Period at a supracompetitive price. Each class members holds a strong common interest in establishing [the defendant's] liability for these alleged overcharges.").

I cannot identify, and Defendants do not assert, any fundamental conflicts rendering any of the named class representatives inadequate. Accordingly, I find that EPPs have met the Rule 23(a)(4) adequacy requirement.[8]

---

[8] Although Rule 23(a)(4) by its express terms deals only with the adequacy of the "representative parties," Fed. R. Civ. P. 23(a)(4) (emphasis added), the Supreme Court noted in Amchem Products, Inc.

5. Ascertainability

In addition to the express requirements of Rule 23, EPPs must also prove that the proposed class members are "readily identifiable," or "ascertainable," "in reference to objective criteria." EQT Prod. Co., 764 F.3d at 358. To satisfy this requirement, "[t]he plaintiffs need not be able to identify every class member at the time of certification. But '[i]f class members are impossible to identify without extensive and individualized fact-finding or "mini-trials," then a class action is inappropriate.'" Id. (second alteration in original) (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 593 (3d Cir. 2012)). Put differently, the named plaintiffs must "define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular

---

that the adequacy requirement "also factors in competency and conflicts of class counsel," 521 U.S. at 626 n.20 (emphasis added). Accordingly, several courts have addressed the adequacy of class representatives and class counsel in tandem. See, e.g., London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1253 (11th Cir. 2003) (noting that the Rule 23(a)(4) adequacy requirement "applies to both the named plaintiff and counsel" (quoting Amchem Prods., Inc., 521 U.S. at 626 n.20)). In 2003, however, Congress enacted Rule 23(g), which outlines factors for courts to consider in assessing the adequacy of class counsel. See Fed. R. Civ. P. 23(g) advisory committee's note to 2003 amendment ("Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4)."); accord Bell v. Brockett, 922 F.3d 502, 510 (4th Cir. 2019). Accordingly, I will address separately the adequacy of class counsel pursuant to Rule 23(g) below.

individual is a member' at some point." Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 658 (4th Cir. 2019) (alteration in original) (quoting EQT Prod. Co., 764 F.3d at 358).

Here, EPPs assert that under their modified proposed class definition, class members can be identified in reference to objective criteria: (1) TPP purchases of brand and/or generic Zetia (2) within applicable states (3) during discrete time periods. EPPs' Reply Mem. Supp. Mot. Modify Class Definition ("EPPs' Reply Supp. Mot. Modify") 10 (ECF Nos. 884 (sealed), 887 (public)); see also EPPs' Mem. Supp. Mot. Certify 15. They argue the same with respect to the class exclusions. EPPs' Reply Supp. Mot. Modify 10. Defendants do not appear to contest those assertions, but they contend that EPPs are unable to demonstrate an administratively feasible method of identifying class members. Defs.' Opp'n Mot. Certify 28-29; Defs.' Opp'n Mot. Modify 24-29.

On this point, EPPs rely on the declarations and testimony of Laura Craft. Craft is the president of OnPoint Analytics, Inc., "an economical, statistical, and financial consulting firm specializing in data analytics for complex litigation," including pharmaceutical antitrust litigation. Craft Decl. ¶ 2. According to Craft, both class members and those excluded from the class are easily ascertainable through data maintained by pharmacy benefit

20

managers ("PBMs").[9] Id. ¶¶ 5, 29. TPPs "often contract with PBMs who negotiate purchases and process prescriptions on their behalf" and "employ mechanisms to promote generic substitution." Lamb Decl. ¶ 18. Consequently, PBMs "maintain detailed purchase data on prescription drug claims, including payment amounts, coverage and plan characteristics." EPPs' Mem. Supp. Mot. Certify 16 (citing Craft Decl. ¶¶ 17-21). EPPs have submitted declarations from a handful of the largest PBMs, most of which were filed in connection with other end-payor antitrust litigation, confirming that such data exist.[10] See Buchman Decl. Exs. 15, 16, 17, 18, 19,

_____

[9] Although Craft notes that the same data can be obtained from pharmacies and TPPs, id. ¶¶ 5, 15, her methodology relies on PBM data as the primary data source, see id. ¶ 21; Buchman Reply Decl. Ex. 3 ("Craft Rebuttal Decl."), ¶ 10 (ECF Nos. 886-4 (public), 885-3 (sealed)) ("There is no need to rely on pharmacy data in this case given the proposed Class consists solely of TPPs who themselves have records of their Zetia/ezetimibe purchases and who hire PBMs as their claims adjudication agents who retain detailed, accurate, and comprehensive data.").

[10] According to Defendants, the court cannot take judicial notice of the declarations filed in other cases. Defs.' Mot. Certify Hr'g Ascertainability Presentation ("Defs.' Ascertainability Presentation") 15 (ECF Nos. 1020 (sealed), 1021-2 (public)) (citing Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001)). As a preliminary matter, the language that Defendants quote from Lee - "With respect to Plaintiff's citation to a declaration in another case, documents filed in other cases are of no assistance to Plaintiff, as the Court cannot take judicial notice of the truth of facts set forth in filings in other cases" - does not appear anywhere in that opinion. Moreover, in Lee, a case with no binding effect on this court, the Ninth Circuit found that a district court erred in taking judicial notice of disputed facts on a motion to dismiss. See 250 F.3d at 688-89. Here, Defendants do not dispute the factual assertions in the PBM

20 (ECF No. 730-16, -17, -18, -19, -20, -21); EPPs' Notice of
Filing Ex. 5 ("Schaper Decl.") (ECF No. 939-5); see also Craft
Decl. ¶ 23 (identifying various data retention incentives).

Although there are more than forty PBMs, only about half
handle claims adjudication. Craft Rebuttal Decl. ¶ 8; accord May
Hr'g Tr. 132:7-133:6. Moreover, of those PBMs that perform claim
adjudication, the seven largest PBMs process the vast majority of
prescriptions. See Craft Decl. ¶¶ 17-20 (explaining that of all
U.S. retail prescriptions, the top seven PBMs processed 78 percent
in 2011, 89 percent in 2015, 92 percent in 2016, and 96 percent in
2017). Thus, according to Craft, nearly all of the relevant data
is in the hands of a small number of entities.

EPPs propose obtaining the relevant data from PBMs through
subpoenas, if necessary, noting this practice in similar end-payor
actions. See EPPs' Reply Mem. Supp. Mot. Class Certification
("EPPs' Reply Supp. Mot. Certify") 19 & n.32 (ECF Nos. 885
(sealed), 886 (public)); see also May Hr'g Tr. 134:13-137:23.
Because the data would come from multiple sources, Craft explains

---

declarations; rather, they argue that those assertions do not lend
support to EPPs' ascertainability arguments. See Defs.'
Ascertainability Presentation 15. Accordingly, Lee is inapposite.
In any event, Defendants do not dispute that the court may properly
consider the declaration of Steven Schaper, Caremark L.L.C.'s
senior vice president of employer sales, submitted specifically
for the present litigation, ECF No. 939-5, which largely mirrors
the other PBM declarations.

that OnPoint must first standardize the relevant data fields to employ consistent terminology.  Craft Decl. ¶¶ 6-7; Craft Rebuttal Decl. ¶¶ 15-16; May Hr'g Tr. 91:4-14.  Craft says that this process is "particularly easy in the pharmaceutical industry because the specific types of data reported are already standard and the field and variable names, although they may differ from one data set to another, usually have an obvious interpretation."[11]  Craft Decl. ¶ 7; Craft Rebuttal Decl. ¶ 15; see also Craft Rebuttal Decl. ¶¶ 21-22 (noting the ease of standardizing named EPPs' data and that doing so with PBM data "would likely be even easier"); May Hr'g Tr. 91:15-23 ("I want to make clear here that this data is very easy to work with . . . and I can assure you that the field names remain standardized, simple to understand.").  This high degree of standardization, Craft says, is due in large part to the Health Insurance Portability and Privacy Act's ("HIPPA") required use of the National Council for Prescription Drug Programs ("NCPDP") Telecommunication Standards for the electronic submission and processing of prescription drug transactions since 2003.  Craft Decl. ¶ 26; see id. ¶ 27 (describing identifying data collected pursuant to NCPDP standards).  These standards, which

---

[11] To the extent any data field or variable name is ambiguous, however, "a simple 'data dictionary' (a record maintained by virtually all companies deploying large data-intensive technology systems) provides clarification and allows the data to be standardized."  Craft Decl. ¶ 7.

ensure secure and uniform information exchange and are employed by the entire retail pharmaceutical sector, require the use of certain data fields, which enable EPPs to identify each class member and "link individual transactions to them." Craft Decl. ¶¶ 25-28; see also Schaper Decl. ¶ 6 ("Caremark maintains records by which Clients and a Client's members can be identified for purchases of Zetia or its generic equivalents that Caremark adjudicates on behalf of its Clients."); ¶ 9 (confirming that Caremark's "data is generally maintained in an industry standard format created by the [NCPDP]" and listing the various data fields). Although there have been several updates to these standards since 2003, "not all of which may have been implemented by every PBM and pharmacy," Craft avers that such "updates have nothing to do with the core data elements relevant to this case" and thus "have no impact on the identification, injury or damage assessment for proposed Class Members." Craft Rebuttal Decl. ¶ 17; see id. Ex. B (clarifying standards updates).

Additionally, each drug product in the United States is identified by a unique ten-digit code, known as the National Drug Code ("NDC"), which is "universally used by pharmacies and insurers in the United States to communicate with each other about exactly what drug product is being dispensed to a patient." Craft Decl. ¶ 24. The NDC "embeds details about the specific product including the identity of the manufacturer (or labeler)"; and because brand

and generic drugs have different NDCs, a data query can easily distinguish brand and generic purchases. Id.; see also May Hr'g Tr. 88:16-89:14.

After standardizing the data fields, OnPoint would then merge the datasets, eliminate any duplicates and data errors, and compile a list of class members and the corresponding purchase amounts. Craft Decl. ¶ 6; Craft Rebuttal Decl. ¶ 16; May Hr'g Tr. 91:24-92:19. And even under EPPs' modified class definition, Craft states that she can straightforwardly exclude non-class members using the same PBM data in combination with Defendants' own sales data. Craft Decl. ¶ 29; Craft Rebuttal Decl. ¶ 27, May Hr'g Tr. 107:25-108:11. Craft notes that the "process is manageable and can be carried out programmatically," Craft Decl. ¶ 6.

Defendants and their expert, Donald Dietz, take several issues with Craft's methodology and the ease with which she claims she can employ it. For example, Defendants point to Craft's own statements that she has never "compile[d] every PBM data source into a single master database," May Hr'g Tr. 112:8-14; see also id. at 112:18-24 (Craft testifying that she has "never been involved in a case where all seven [major] PBMs have all produced their transactional data"). Additionally, Dietz asserts that attempting to collect the data in the first instance would be extremely difficult given the number of entities in possession of the data as well as such entities' respective data retention

25

policies and potential unwillingness to produce the data.   Dietz Decl. ¶¶ 30-42 (ECF Nos. 831 (public), 835 (sealed)).   And even if Craft could obtain all the relevant data, Defendants assert, efforts to standardize the data, identify class members, and exclude non-members – particularly, fully-insured health plans, federal and state government entities, and certain Medicare Part D plans – as Craft posits would likewise prove difficult, if not prohibitive, as discussed more fully below.   Id. ¶¶ 43-78. Finally, Defendants argue that due to the presence of several exclusions in the modified class definition, EPPs cannot identify such exclusions programmatically but would have to engage in individualized inquiries to ascertain class membership.   Defs.' Opp'n Mot. Modify 25-26 (citing Vista Healthplan, Inc., 2015 WL 3623005).

As an initial matter, it is not necessary that a plaintiff demonstrate the proposed methodology has previously been employed; indeed, the methodology for ascertaining class members in any given case is arguably unique and has never previously been employed. Rather, the test is whether the proposed methodology is "administratively feasible."   Krakauer, 925 F.3d at 658; see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 421 F. Supp. 3d 12, 72 (E.D. Penn. 2019) ("The proposed method for identifying class members must be 'administratively feasible,' meaning that 'identifying class members is a manageable

26

process that does not require much, if any individual factual inquiry.'" (quoting Carrera v. Bayer Corp., 727 F.3d 300, 307-08 (3d Cir. 2013))).  Moreover, EPPs have adequately shown that the PBM data can be procured and standardized to identify class members.  As Craft explains, and Dietz concedes, only half of the approximately forty PBMs performs claim adjudication and thus possesses the relevant data.  Craft Rebuttal Decl. ¶ 8; May Hr'g Tr. 132:7-133:6.  Despite Dietz's various claims to the contrary, see Dietz Decl. ¶¶ 30, 32-33, this data could be obtained through subpoenas in the event PBMs resisted sharing it voluntarily.[12] Indeed, similar subpoenas have issued in other end-payor actions,[13] a fact unknown to Dietz at the time he prepared his expert report, May Hr'g Tr. 134:25-137:23.

Moreover, in addition to her declarations, Craft repeatedly and credibly testified that she has extensive experience – sixteen years' worth – working with PBM data and health insurance data

---

[12] EPPs note that the proposed class members are PBM clients and that there is no reason to suspect that PBMs would be hostile to their efforts to obtain a recovery, see July Hr'g Tr. 130:9-22, particularly since the sought data relates only to TPPs and thus does not implicate personal identifying information of consumers, see Craft Rebuttal Decl. ¶ 11.

[13] See, e.g., Mahoney v. Endo Health Sols., Inc., No. 15-cv-9841 (S.D.N.Y Nov. 21, 2016), ECF No. 97, at 3; In re Relafen Antitrust Litig., No. 01-cv-12239, 2004 U.S. Dist. LEXIS 29834, at *17-19 (D. Mass. Nov. 24, 2004).

generally, and that she commonly performs the type of data analysis she proposes in the course of her work at OnPoint.[14] May Hr'g Tr. 85:24-86:1, 91:15-23, 112:8-17; see July Hr'g Tr. 32:11-17, 127:18-128:6; see also Craft Decl. ¶¶ 2, 4, 7; Craft Rebuttal Decl. ¶¶ 15, 21-23. In fact, her purported methodology was recently deemed adequate to satisfy ascertainability in another pharmaceutical antitrust end-payor action. See Loestrin 24 FE, 410 F. Supp. 3d at 399-400.

Defendants, however, point to a contrary decision by a Pennsylvania district court, In re Niaspan Antitrust Litigation, No. 13-md-2460, 2020 WL 2933824 (E.D. Pa. June 2, 2020). Defs.' Notice Suppl. Authority (ECF No. 965); July Hr'g Tr. 99:19-102:6. In Niaspan, Craft's methodology was deemed insufficient to establish ascertainability primarily with respect to various class exclusions. 2020 WL 2933824, at *16-19. But there are several important differences between Niaspan and this case. Most importantly, the proposed class in Niaspan included TPPs and consumers. And the court's ascertainability determination hinged, in large part, on its finding that the plaintiffs had failed to provide sufficient evidence that they could identify and exclude from the consumer subclass certain uninjured consumers, namely,

---

[14] By contrast, Dietz testified that he lacks expertise in computer hardware, computer software, storage systems, and data aggregation. May Hr'g Tr. 131:18-132:6.

"flat co-payors" and brand loyalists. Id. at *19, *26. Here, however, EPPs' proposed class definition does not include consumers. Thus, the complications identified by the Niaspan court with respect to identifying and excluding those categories of unharmed class members are not present in this case.

The court in Niaspan also expressed doubt as to whether the plaintiffs could identify and exclude federal and state governmental entities with self-funded plans and fully-insured plans. Id. at *18. But the circumstances giving rise to that doubt are likewise absent in this case. For example, with respect to identifying federal and state entities, the end payors in Niaspan merely argued that the "federal and government agencies are facially obvious" from their name; but the court credited the defendants' evidence that "such plans are not necessarily facially obvious." Id. at *18. Without more, the court concluded that the end payors had failed to set forth a suitable methodology for identifying those entities. Id. In so doing, the court distinguished Loestrin 24 FE, where the end-payor plaintiffs "made specific assurances that self-funded government plans would be removed from the data by PBMs rather than merely identified by name." Id.; see Loestrin 24 FE, 410 F. Supp. 3d at 401 ("With respect to state and federal governmental entities, the EPPs will request that the PBMs remove federal and state plans from their dataset and, in addition, OnPoint will be able to identify them by

29

name."). Although Craft reasserts in this case that one can typically determine whether an entity is a governmental entity by the name alone, Craft Decl. ¶ 31; Craft Rebuttal Decl. ¶ 30, she also proposes that the PBMs themselves identify such entities rather than OnPoint, Craft Decl. ¶ 31 ("In the course of requesting data from the PBMs, these plans could be specifically flagged."). Craft persuasively testified that PBMs "absolutely know" which of its clients are federal or state entities and thus would be able to point them out to EPPs. May Hr'g Tr. 105:17-106:1; see also Craft Decl. ¶ 31 ("PBMs are fully aware of which plans are government funded."); Craft Rebuttal Decl. ¶ 30 ("[I]t would be foolish to suggest that PBMs do not know whether they are contracting with the U.S. government or a state, as opposed to a private entity."). Whether PBMs actually remove such entities from the datasets produced to EPPs or simply "flag" those entities during data production, EPPs have proffered an administratively feasible method of identifying and excluding such plans.

I am also satisfied that Craft's methodology can identify and exclude fully-insured plans.[15] In Niaspan, the end payors proposed

---

[15] Fully-insured plans are those plans that purchase a group health insurance policy from a third-party insurer that "assumes financial responsibility for the covered health benefit claims of the plan's participants and the associated administrative costs." Craft Decl. ¶ 33. In such circumstances, the insurer, rather than the plan sponsor, is considered the TPP for purposes of the class exclusion. Id.; accord May Hr'g Tr. 102:1-13.

identifying fully-insured plans by using Form 5500s, 2020 WL 2933824, at *18, which health benefit plans submit to the IRS each year and which "require[] the plan to identify each source of funding it uses to pay benefits," Craft Decl. ¶ 34. Here, however, Craft has consistently represented that, while data from Form 5500s "can serve as a cross-check," Craft Decl. ¶ 34, the PBM data alone can readily identify fully-insured plans, Craft Decl. ¶ 33; Craft Rebuttal Decl. ¶ 34; May Hr'g Tr. 104:8-11. To elaborate, recall that in the context of fully-insured plans, the insurer acts as the TPP, not the plan sponsor. Craft Decl. ¶ 33. Craft explains,

> Since the insurance carrier . . . is responsible for administering the claims, the PBM it contracts with would maintain complete data on all of the plan members' pharmaceutical transactions. The PBMs' data identifies both the insurance carrier and the plan sponsor, which are identified by the Plan ID and Group ID, respectively. Therefore, for every fully insured plan, the PBM could simply list the insurance carrier (which is a class member) and not the fully insured plan sponsor (which is not a class member).

Craft Decl. ¶ 33; accord Craft Rebuttal Decl. ¶¶ 31-33; May Hr'g Tr. 102:14-103:6.

Because EPPs' proposed class does not include consumers and EPPs have squarely addressed the other points of concern in Niaspan, that case is distinguishable and does not warrant a finding against ascertainability here.[16]

---

[16] Two other points also bear mention here. First, the Niaspan court noted its concern that the methodology proposed by Craft

Defendants also raise the issue of "mixed-funded" plans, plans that "provide some health benefits using its own self-funding, while providing other health benefits using an insurance company as an underwriter (fully insured)," Dietz Decl. ¶ 58, and claim that such plans, if they fall within the class definition at all, cannot be identified programmatically. See Defs.' Opp'n Mot. Certify 29; Dietz Decl. ¶¶ 59, 61. Dietz points out that according to the 2016 Form 5500 data, the Department of Labor characterized roughly 4,100 plans as being mixed-funded plans. Dietz Decl. ¶ 60.

Craft concedes that mixed-funded plans "may add some complexity to interpretation of IRS Form 5500 data," but, as discussed above, Craft does not intend to use Form 5500 data to identify fully-insured plans. Craft Rebuttal Decl. ¶ 34. Instead, she intends to rely on the PBM data, which will clearly indicate whether a particular plan is fully-insured or self-insured. Id.

---

"would be prohibitively expensive," citing evidence from another pay-for-delay case out of Massachusetts that obtaining the relevant pharmaceutical records would cost $18 million. See 2020 WL 2933824, at *19. In this case, however, there has been no showing regarding the cost of obtaining PBM data; therefore, that factor does not inform this report's analysis. Second, the court in Niaspan, according to EPPs' counsel, did not hear live testimony from Craft but instead relied, in part, on a four-and-a-half-page report authored by Craft. July Hr'g Tr. 124:4-23. In this case, Craft prepared exhaustive and detailed reports totaling nearly sixty pages. And her live testimony demonstrated not only her extensive knowledge and experience regarding PBM data, but also that she has the analytical tools to carry out, in an administratively feasible way, what she proposes.

("[A] plan sponsor that purchases health (medical claims) insurance for its employees, but self-insures its prescription drug benefits will have two entirely distinct plans in the PBM data.").

Finally, in the amended class definition, EPPs delineate two subclasses, a brand subclass and a generic subclass. EPPs' Mot. Modify 2. EPPs expressly exclude from the brand subclass "Optum Health Part D Plans, Silverscript Part D Plans, Emblem Health Part D, Humana Part D Plans, Optum Health Managed Care Plans, and any TPPs that used one of these plans or OptumRx as its [PBM] during this subclass period." Id.

As to these exclusions, Defendants make specific arguments only as to two (any TPPs that used OptumRx as its PBM and Emblem Health Part D plans) and a more general argument that the "laundry list" of exclusions defeats ascertainability. Defs.' Opp'n Mot. Modify 3, 25-29. To support these arguments, Defendants rely on the supplemental report of their economic expert, Dr. James Hughes. First, Dr. Hughes concludes that the exclusion of TPPs that used OptumRx as their PBM during the subclass period "cannot be accomplished without individualized inquiry." Hughes Suppl. Decl. ¶ 20 (ECF Nos. 856 (public), 859 (sealed)). Underlying this conclusion is the fact that "OptumRx has merged with and acquired a number of entities over time, including during the proposed subclass period." Id. Consequently, questions arise as to whether

33

certain TPPs should be excluded from the class if they used a PBM that was later acquired by OptumRx and as to whether EPPs can identify and exclude those transactions involving TPPs that "relied on OptumRx as their PBM for only a portion of the class period." Defs.' Opp'n Mot. Modify 27; see also Hughes Suppl. Decl. ¶ 21.

Dr. Hughes notes a similar issue with respect to the exclusion of Emblem Health Part D plans. Hughes Suppl. Decl. ¶ 22. According to him, Emblem Health and the City of New York entered into a partnership in February 2016 whereby Emblem Health offered coverage to city and union employees. Id. Assuming this partnership results in the exclusion of New York City plans, "it would create an additional layer of complex individualized inquiry that requires looking into which time periods the various transactions occurred and assessing whether they indeed resulted in any injury arising out of the alleged delay in generic entry." Defs.' Opp'n Mot. Modify 28 (citing Hughes Suppl. Decl. ¶ 22).

Craft persuasively rebuts these contentions. First, she states that notwithstanding the numerous PBMs that OptumRx has acquired, "[t]he identifier of the PBM by whom the claim was processed is an indelible field in the data and can be sorted programmatically in a single search." Craft Rebuttal Decl. ¶ 38. Moreover, Craft has reliably explained that identifying and excluding Emblem Health Part D plans, and Part D plans generally,

34

is a process made possible through analyzing and manipulating data from the Center for Medicare and Medicaid Services ("CMS"). Craft Rebuttal Decl. ¶¶ 27, 39; May Hr'g 101:11-25. Craft reports that CMS publishes monthly enrollment reports for Medicare plans, which can be used to identify any Part D plans. Craft Rebuttal Decl. ¶ 27; May Hr'g Tr. 101:17-25; see also Craft Rebuttal Decl. ¶ 39 (describing the process as "a straightforward data query" requiring no "individual inquiry") & Exs. E, F, G (screenshots of 2016 Medicare enrollment report data for Silverscript, Emblem, and Humana). And as to Emblem Health specifically, Craft makes clear that nothing about Emblem Health's partnership with New York City would prohibit or complicate the process of identifying and excluding Emblem Health Part D plans. See Craft Rebuttal Decl. ¶ 39.

Defendants make a broader argument that the sheer number of exclusions in the amended class definition "ha[s] only ratcheted up the complexity of the individualized inquiries that will be necessary to ascertain class membership." Defs.' Opp'n Mot. Modify 26. On this point, Defendants rely on Vista Healthplan, Inc., 2015 WL 3623005. There, another Pennsylvania district court declined to certify a class of end payors with a class definition

containing eight specific exclusions,[17] in part, because the plaintiffs failed to satisfy the ascertainability requirement. Id. at *9-13.  Defendants portray the ruling as hinging on the plaintiffs' "need for structured, multi-stepped, individualized fact-finding process" to identify class members.  Defs.' Opp'n Mot. Modify 25-26 (citing Vista Healthplan, Inc., 2015 WL 3623005, at *11 n.14).  A closer review of that decision, however, reveals that it was much more encompassing and stemmed from the named plaintiffs' utter lack of demonstrated ability to identify class members.  According to the opinion, the plaintiffs had produced next to no evidence that they could locate, obtain, and utilize identifying data, and their own expert readily admitted that he had no methodology to ascertain class members.  Vista Healthplan, Inc., 2015 WL 3623005, at *10 & n.13.  The court rejected the plaintiffs' argument that they were not required at the class certification stage to make such showings.  Id. at *10.  As discussed above, however, through Craft's testimony, EPPs have not only established the existence and location of the identifying data, but they have also put forth a detailed approach to utilizing that data to ascertain class members.  In my view, the efficacy of

---

[17] Of the eight exclusions, three involved consumers.  Id. at *4. The other five resemble exclusions in EPPs' amended class definition.   See id. (defendants, certain government entities, entities that purchased the drug directly from defendants or for purposes of resale, fully-insured plans, and certain PBMs).

that methodology is not diminished by the exclusions in the modified class definition. While it is true that such exclusions may warrant additional analysis, "[t]he number of 'steps' in the process and the time and effort required have no bearing" on whether the class is ascertainable. Soutter, 307 F.R.D. at 197 (citing Dunnigan v. Metro Life. Ins. Co., 214 F.R.D. 125, 136 (S.D.N.Y. 2003)). What matters is that the named plaintiffs offer an administratively feasible method for identifying class members in reference to objective criteria. Id. ("The individualized fact-finding giving rise to mini-trials that defeat ascertainability are those requiring determinations on the merits – not an administrative review to determine whether an objective element of a class definition is met."). EPPs have done that here.[18]

For the foregoing reasons, EPPs' amended class definition is based on objective criteria, and EPPs have set forth an administratively feasible method for ascertaining class members.

---

[18] Defendants do not contest EPPs' ability to identify entities encompassed by the other exclusions, namely (1) PBMs, which are easily identifiable, and, according to Craft, do not fall within the class definition to begin with; (2) Defendants and their affiliates, which can be identified by Defendants; and (3) entities that made direct purchases or purchased ezetimibe for purposes of resale, which can be identified using Defendants' own data. See Craft Decl. ¶¶ 30, 35-38.

**B.   Rule 23(b)**

In addition to the Rule 23(a) requirements, EPPs must demonstrate that the class action fits within one of the provisions of Rule 23(b).   Here, EPPs proceed under Rule 23(b)(3), which requires findings that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).

1.   Predominance

Under Rule 23(b)(3), common questions of law or fact "must predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).   This is a separate and "more stringent" requirement than Rule 23(a)'s commonality requirement.   Thorn, 445 F.3d at 319 (quoting Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 n.4 (4th Cir. 2001)); cf. Fed. R. Civ. P. 23(a)(2) (requiring only the presence of common questions of law or fact). Predominance of common questions over individual issues ensures that the "proposed class[] [is] sufficiently cohesive to warrant adjudication by representation."   Amchem Prods., Inc., 521 U.S. at 623.

To be clear, the predominance inquiry "is not simply a matter of counting common versus noncommon questions and checking the final tally."   Soutter, 307 F.R.D. at 214.   Rather, the court

"compares the quality of the common questions to those of the noncommon questions." Id. (emphasis added); see also Stillmock v. Weis Mkts., Inc., 385 F. App'x 267, 273 (4th Cir. 2010) (describing the predominance test as "qualitative rather than quantitative" (citing Gunnells, 348 F.3d at 429)). Accordingly, EPPs are not required to prove that each element of their claims is susceptible to classwide proof, but only that "common questions predominate over any questions affecting only individual [class] members." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013) (alteration in original) (quoting Fed. R. Civ. P. 23(b)(3)); see also Namenda, 331 F. Supp. 3d at 204 ("'[I]ndividual questions need not be absent' in order to certify a class under Rule 23(b)(3); the text of Rule 23(b)(3) itself contemplates that such questions will be present." (quoting Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 81 (2d Cir. 2015))).

As previously mentioned, EPPs assert claims under various antitrust, consumer protection, and unjust enrichment statutes. The parties agree that central to these claims are proving a violation of the antitrust laws, injury (or impact), and measurable damages. See EPPs' Mem. Supp. Mot. Certify 21; EPPs' Reply Supp. Mot. Certify 16; Defs.' Opp'n Mot. Certify 13. Accordingly, to satisfy the predominance requirement, EPPs must demonstrate that these elements can be proven on a classwide basis. See Restasis, 2020 WL 2555556, at *8; Momenta Pharms., Inc., 333 F.R.D. at 406;

Wellbutrin XL, 282 F.R.D. at 139.  Here, Defendants do not contest EPPs' ability to satisfy the predominance requirement with respect to proving antitrust violations.   Indeed, allegations of antitrust-violative conduct tend to focus on the defendants' conduct rather than evidence specific to individual class members and thus can be proven using evidence common to the class. Restasis, 2020 WL 2555556, at *8; Momenta Pharms., Inc., 333 F.R.D. at 407.  Defendants' predominance challenges instead relate to the presence of uninjured class members, measuring damages on a classwide basis, and variations among state laws.

a.   Uninjured Class Members

Defendants argue that EPPs' evidence of classwide impact is insufficient to meet their predominance burden because the class definition includes many uninjured class members, and the individualized inquiry necessary to identify and eliminate those uninjured members will predominate over common questions.  Defs.' Opp'n Mot. Certify 13-15 (citing In re Asacol Antitrust Litig., 907 F.3d 47 (1st Cir. 2018); In re Rail Freight Fuel Surcharge Antitrust Litig., 934 F.3d 619 (D.C. Cir. 2013)).  Such challenges are commonly addressed "through the lens of predominance, asking whether the differences among the class members are so great that individual adjudication subsumes the class-wide issues." Krakauer, 925 F.3d at 658.

40

The Fourth Circuit has not yet defined a precise standard for determining what number or proportion of uninjured class members would defeat certification.  See id. at 659.  In Asacol, the First Circuit reviewed the various circuit precedents on this issue, which "strikes at the heart of the competing considerations raised by some class actions."  907 F.3d at 51.  In that case, the court reversed certification of a class of end-payor antitrust plaintiffs where the district court concluded that approximately 10 percent of the class was uninjured by the defendants' conduct, and where the plaintiffs' proposed mechanism for identifying those uninjured members was fraught with individualized considerations and would deny the defendants their Seventh Amendment and due process rights.  Id. at 51-58.  The D.C. Circuit reached a similar result in Rail Freight, 934 F.3d at 623-27 (rejecting a class containing approximately 2,000 uninjured class members (about 13 percent of the class) where plaintiffs could not identify a mechanism for "segregat[ing] the uninjured from the truly injured").  In both cases, certification failed because a subset of class members was not harmed by the antitrust conduct alleged. In the case of Asacol, that subset was made up of consumers of the drug who, according to the evidence, would have remained loyal to the brand and thus were not harmed by delayed generic entry.  907 F.3d at 46-47, 54.

41

Defendants argue that the Fourth Circuit has "endorsed" both Asacol and Rail Freight, relying on a collegial reference in Krakauer to "well-reasoned opinions from our sister circuits," 925 F.3d at 659. Defs.' Opp'n Mot. Certify 2, 14-15. But as Defendants also acknowledge, the facts of Krakauer gave no occasion to opine on "[t]he question of how best to handle uninjured class members." 925 F.3d at 659; see Defs.' Opp'n Mot. Certify 15 n.10. And the "well-reasoned opinions" endorsed by the panel in Krakauer also included the Seventh Circuit's decision in Kleen Products v. International Paper Co., 831 F.3d 919 (7th Cir. 2016), which reached a somewhat different, though equally well-reasoned result. Krakauer, 925 F.3d at 658; see Kleen Prods., 831 F.3d at 927 ("While we have no quarrel with the proposition that each and every class member would need to [prove at least some impact] in order . . . to recover, we have not insisted on this level of proof at the class certification stage."); see also Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1137 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct."). Indeed, as the panel itself wrote in Krakauer, "The entire notion of predominance implies that the plaintiffs' claims need not be identical."  925 F.3d at 658.  A class can meet the predominance requirement "even though other important matters will have to be tried separately."  Id. (quoting Tyson Foods, Inc. v. Bouaphakeo,

42

136 S. Ct. 1036, 1045 (2016)); see also Messner v. Northshore Univ.
HealthSystem, 669 F.3d 802, 823 (7th Cir. 2012) ("[S]ome class
members' claims will fail on the merits if and when damages are
decided, a fact generally irrelevant to the district court's
decision on class certification.").

Although the Fourth Circuit has left for another day the
precise contours of the inquiry necessary to address uninjured
class members at class certification, the parties agree that a
class should not be certified "if it is apparent that it contains
a great many persons who have suffered no injury at the hands of
the defendant," Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 677
(7th Cir. 2009). See EPPs' Mem. Supp. Mot. Certify 26; Defs.'
Opp'n Mot. Certify 15 n.11. Defendants prefer to phrase the burden
more stringently, limiting class certification to those cases
where common proof demonstrates that all or substantially all class
members suffered injury. Defs.' Opp'n Mot. Certify 15 & n.11
(citing Asacol, 907 F.3d at 56-57; Rail Freight, 725 F.3d at 252;
Denny v. Deutsche Bank AG, 443 F.3d 253, 264 (2nd Cir. 2006)).
Under either of these measures, the purpose of the predominance
inquiry into uninjured class members is the same. The First
Circuit in Asacol put it well:

> The aim of the predominance inquiry is to test whether
> any dissimilarity among the claims of class members can
> be dealt with in a manner that is not inefficient or
> unfair. Inefficiency can be pictured as a line of
> thousands of class members waiting their turn to offer

43

> testimony and evidence on individual issues. Unfairness is equally well pictured as an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise individual challenges on those issues.

907 F.3d at 51-52 (citation and internal quotation marks omitted). When large numbers of class members can only establish injury through individual proof, the resulting inefficiency defeats predominance. And it is no answer to inefficiency to presume injury without reliable classwide evidence and thus deny the defendants the right to raise potentially meritorious defenses.

EPPs have presented evidence that the alleged antitrust conduct caused the members of the putative class to suffer antitrust injury, and that injury can be measured by classwide evidence of the aggregate damages suffered by the class. Defendants' expert, Dr. Hughes, attempts to show that even under the amended class definition, the putative class still fails this predominance inquiry because "a great many" class members, are uninjured by the alleged antitrust conduct. His supplemental report and hearing presentation identified six categories of allegedly uninjured class members and suggests that separating the uninjured from the injured cannot be accomplished without extensive (and inefficient) individualized evidence. Hughes Suppl. Decl. ¶¶ 26-48; see also Hughes Mot. Certify Hr'g Presentation ("Hughes Presentation") 6 (ECF Nos. 928-2 (sealed), 940-3 (public)). And to permit such a class to go forward,

44

according to Defendants, would deprive them of their right to "challeng[e] the claims of individual, uninjured class members." Defs.' Opp'n Mot. Certify 14; July Hr'g Tr. 61:16-63:3, 91:21-92:3.

EPPs, through their own expert, Dr. Russell Lamb, dispute Dr. Hughes' evidence on all six categories of allegedly uninjured members. Dr. Lamb argues that Dr. Hughes' opinions inflate the number of allegedly uninjured class members by confusing individual health plans with TPPs; focusing on individual prescription transactions in a narrow window of the class period; and ignoring valid assumptions underlying EPPs' classwide model of damages in the but-for world. See generally Buchman Reply Decl. Ex. 1 ("Lamb Reply Decl.") (ECF Nos. 885-1 (sealed), 886-2 (public)); EPPs' Suppl. Mem. Supp. Mot. Certify Ex. A ("Lamb Suppl. Decl.") (ECF Nos. 945-1 (sealed), 949-1 (public)). By accounting for these flawed assumptions, Dr. Lamb claims that EPPs can demonstrate through classwide evidence that all or substantially all class members suffered an antitrust injury.

i.   Injury and Damages: Separate Considerations

Before addressing the parties' arguments on each of these categories of allegedly uninjured class members, however, I must first address the parties' disagreement over the proof necessary to demonstrate that class members suffered an antitrust injury. EPPs argue that an antitrust injury is shown by payment of a single

overcharge, regardless of whether that overcharge is later offset. EPPs' Reply Supp. Mot. Certify 6, 10 (citing In re Nexium Antitrust Litig., 777 F.3d 9, 27, 28 n.23 (1st Cir. 2015) ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show – as a legal and factual matter – impact or fact of damage.")).

Several pharmaceutical antitrust cases have followed the First Circuit's reasoning in Nexium to reach the same conclusion. See, e.g., Niaspan, 2020 WL 2933824, at *22-23; Loestrin 24 FE, 410 F. Supp. 3d at 404-05; In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-md-2503, 2017 WL 4621777, at *17-18 (D. Mass. Oct. 16, 2017). But as Defendants note, these cases applied a long-established tenet of federal antitrust law. Defendants argue this federal precedent is bound up in the Supreme Court's decision in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 491-94 (1968), which prevented antitrust defendants from raising the defense that plaintiffs were unharmed because they passed on the overcharge to end purchasers, and its corollary case, Illinois Brick v. Illinois, 431 U.S. 720, 732-47 (1977), which restricted federal antitrust claims exclusively to direct purchasers. Because EPPs' class is made up of indirect purchasers raising antitrust claims under state law, where such claims are expressly permitted, Defendants contend that antitrust injury under these state laws must be shown by each class member's

46

net damages rather than evidence of a single overcharge.  Defs.'
Suppl. Mem. Opp'n to Mot. Class Certification ("Defs.' Suppl. Opp'n
Mot. Certify") 8-9 (ECF Nos. 954 (public), 956 (sealed)); see also
July Hr'g Tr. 51:7-55:22; Defs.' Mot. Certify Hr'g Presentation
16-17 (ECF Nos. 940-5 (public), 944-1 (sealed)).

The overwhelming weight of authority rejects Defendants'
position.  See, e.g., In re Thalomid & Revlimid Antitrust Litig.,
No. 14-6997, 2018 WL 6573118, at *14 (D.N.J. Oct. 30, 2018)
(holding later recovered damages are "irrelevant to the question
of impact"); Solodyn, 2017 WL 4621777, at *15 (observing that class
members reimbursed for a portion of the overcharge "still
experienced antitrust injury in the form of an overcharge, although
the amount of damages may require adjustment"); In re Lidoderm
Antitrust Litig., No. 14-md-2521, 2017 WL 679367, at *21-23 (N.D.
Cal. Feb. 21, 2017) (finding that class members "injured as of the
date they paid the overcharges").  Defendants complain that these
cases all followed the First Circuit's Nexium decision, which they
argue "is based on a flawed analysis of injury and inapplicable
federal precedent."  Defs.' Suppl. Opp'n Mot. Certify 8.  But, as
the Eastern District of Pennsylvania recently observed, "the
purpose of the antitrust injury requirement is to prove that the
theory of unlawful conduct, i.e. the theory of liability, was in
fact responsible for causing harm to plaintiffs."  In re Niaspan
Antitrust Litig., 397 F. Supp. 3d 668, 689 (E.D. Pa. 2019).  This

47

is an element of the claim, necessary to confer Article III standing. At class certification, EPPs must be able to demonstrate that all or substantially all members of the putative class suffered some injury fairly traceable to the conduct the defendants. See Denney, 443 F.3d at 264-65 (finding each member of the class suffered injury-in-fact thus satisfying Article III standing). That being said, offsets that have the effect of mitigating the injury do bear on the calculation of damages. Nexium, 777 F.3d at 27; Lidoderm, 2017 WL 679367, at *21 ("That is not to say that the rebates are irrelevant; they are relevant to damages and, if large enough, to class membership."). And because damages is also a component of the antitrust claims, and some end purchasers may suffer no damage when downstream offsets are considered, EPPs must still define class membership so as to limit the number indirect purchasers that experienced no net injury.

I follow this line of cases reasoning that antitrust injury occurs at the moment the overcharge is incurred. A single overcharge establishes that any particular TPP rightfully claims injury from the alleged anticompetitive conduct. Niaspan, 2020 WL 2933824, at *22. But the "predominance requirement applies to damages as well, because the efficiencies of the class action mechanism would be negated if '[q]uestions of individual damage calculations . . . overwhelm questions common to the class.'" In re Modafinil Antitrust Litig., 837 F.3d 238, 260 (3d Cir. 2016)

48

(alterations in original) (quoting Comcast, 569 U.S. at 34). The determination as to whether class members suffered net damages may depend in part on individualized proof as long as EPPs identify an administratively feasible method of identifying such members, which is "protective of [D]efendants' Seventh Amendment and due process rights." Asacol, 907 F.3d at 52. But at the class certification stage, even substantial variation in damages rarely defeats predominance. Nexium, 777 F.3d at 21. EPPs must produce reliable classwide proof to demonstrate the fact of injury for each class member as well as a reliable method for excluding on a classwide basis transactions that produced no overcharge on the antitrust theory alleged. See Lidoderm, 2017 WL 679367, at *24-25 ("[I]n estimating aggregate damages plaintiffs have shown how purchases attributable to class members who were not damaged can be excluded on a classwide basis." (emphasis omitted)). If they do so, questions regarding the apportionment of those damages ordinarily will not defeat predominance. See id. at *25 (noting post-judgment claims procedures allow the defendants to "test a class member's purported entitlement to damages and to apportion damages appropriately between class members"). With both these standards in mind, I consider Defendants' various theories of "uninjured" class members.

49

ii.  TPPs that "Ceased Operations" Before May 2015

Dr. Hughes' supplemental report contends that approximately 100,000 class members were uninjured because they ceased doing business by May 2015, which, according to Dr. Hughes' calculations, was before generic prices would have dropped enough in the but-for world to give rise to damages.  Hughes Presentation 6 (citing Hughes Suppl. Decl. ¶¶ 26-27 & Ex. 7); see also May Hr'g Tr. 56:15-57:15.  This opinion relies on the Form 5500 data reported by the Department of Labor.  The Form 5500 data, however, is ordinarily reported by health plans, not TPPs.  According to Dr. Lamb, 90 percent of small employers offer fully-insured prescription drug plans, meaning they utilize an insurance company or other TPP to administer the plan and pay benefits.  Lamb Suppl. Decl. ¶¶ 6-7.  Any fully-insured plan is, by definition, not a class member.  While some self-insured health plans may be TPPs, Dr. Hughes' data on this point is not confined to self-insured plans.  And even if it were, it would still overstate the number of affected class members because a single self-insured employer might offer its members several different health plans.  By treating health plans as synonymous with TPPs, Dr. Hughes vastly overstates the potential size of the class.  Correspondingly, his estimate of uninjured class members under this theory is also vastly overstated.  The same error renders his statement about the number of health plans that ceased operation before May 2015 irrelevant for purposes of

50

determining antitrust impact.  TPPs, which are included in the amended class definition, frequently sponsor multiple plans, and the fact that any particular plan stopped filing reports after May 2015 does not demonstrate that the TPP sponsor of that plan did not continue in business beyond that date.[19]  Lamb Suppl. Decl. ¶ 7.

In addition, Dr. Hughes' calculations regarding uninjured plans are premised on a contested but-for generic price.  His report states that his spreadsheet prices are based on "Dr. Lamb's calculation of Zetia and but-for generic ezetimibe prices, simply adjusted in order to correct for three errors made by Dr. Lamb." Hughes Suppl. Decl. ¶ 26.  But these alleged "errors" that Dr. Hughes "corrected" are in reality only Dr. Hughes' contrary opinions on various disputed issues, including the expected levels of cost-sharing with individual consumers and government payors and the but-for generic price as it approached the marginal cost of production.  See Lamb Reply Decl. ¶¶ 82-86.  The admissibility of Dr. Lamb's testimony has not been challenged at the

---

[19] Dr. Hughes' calculation of 100,000 uninjured class members in this category is confounding in other respects.  He appears to have derived this estimate by multiplying the percentage of plans that stopped filing Form 5500s after May 2015 (approximately 5 percent) by the total number of Form 5500s filed during the entire class period (about 2.2 million).  See Hughes Presentation 7. Because plans filed multiple Form 5500s during the class period, this calculation is meaningless and thus irrelevant to the question of uninjured class members.

certification stage, and his opinions on these issues are adequate to rebut Dr. Hughes' assertion that the class includes large numbers of uninjured TPPs in this category.

### iii. Brand Loyalists

Dr. Hughes also opines that certain class members could be uninjured because they would have continued to buy only brand Zetia even after generic entry. Hughes Decl. ¶¶ 79-85 (ECF Nos. 832 (public), 836 (sealed)). Brand-loyal consumers have been an obstacle to certification in other putative end-payor classes. See, e.g., Niaspan, 2020 WL 2933824, at *16-28; Vista Healthplan, Inc., 2015 WL 3623005, at *21. Those cases determined that in some instances of delayed generic entry, there is a significant percentage of individual consumers who would remain loyal to the brand even after generic entry. If consumers never intended to buy the generic, they suffer no antitrust injury by delayed generic competition. This presents a predominance problem because although it is clear that certain consumers are brand loyal, they are difficult, if not impossible, to identify without individualized inquiry. Asacol, 907 F.3d at 51-54.

As previously discussed, however, the EPP class in this case does not include consumers. And courts facing the issue of brand-loyal TPPs have universally concluded that it is "highly unlikely" that "institutional payors were uninjured even if some of their

52

members are brand-loyal." <u>Loestrin 24 FE</u>, 410 F. Supp. 3d at 402 (quoting <u>Solodyn</u>, 2017 WL 4621777, at *18).[20]

Dr. Hughes' attempts to overcome this obvious issue by focusing on the possibility that very small health plans might have only a single brand-loyal plan member taking Zetia. But his calculations are not persuasive. As with his argument related to health plans ceasing operation prior to May 2015, he has conflated data regarding health plans with TPPs. Because these very small health plans would likely have only one or two members in the plan taking brand Zetia, Dr. Hughes opines that such small plans should be assumed to be brand loyalists to the same extent as individual consumers. Hughes Decl. ¶ 84. But many TPPs sponsor multiple plans. As a result, Dr. Hughes' estimate of the number of very small plans significantly overstates the number of very small TPPs and, therefore, the potential number of affected uninjured class

---

[20] The issue of brand-loyal consumers neatly illustrates the difference between injury-in-fact and damages. A brand-loyal consumer never sustains antitrust injury because they would not have bought generic no matter when it entered the market. <u>See</u> <u>Asacol</u>, 907 F.3d at 53-54; <u>Niaspan</u>, 2020 WL 2020 WL 2933824, at *26. In those cases that rejected certification on this ground, it was not sufficient for the end payors to simply produce classwide proof that permitted them to accurately estimate brand retention and then remove such purchases from their aggregate damages model. Absent classwide proof of which consumers were brand loyalists, those classes potentially included large numbers of claimants who suffered no antitrust injury at all and thus could not demonstrate impact. By contrast, institutional payors like those in the EPP class in this case can easily show impact given their volume of affected transactions.

members. In addition, the plan data Dr. Hughes relies upon includes all health plans (e.g., dental and vision plans), not just those providing prescription drug benefits. Lamb Suppl. Decl. ¶ 6.

Accounting for these critical facts reveals that the number of TPPs that would be expected to serve only brand-loyal Zetia users is likely extremely small or nonexistent. Moreover, evidence that certain purchasers within any TPP would have remained loyal to the brand may be addressed during trial without resorting to individualized inquiry or overwhelming common issues. See Restasis, 2020 WL 2555556, at *18; Lidoderm, 2017 WL 679367, *19. Dr. Lamb provided such an alternate damages calculation, concluding that it would lower classwide damages by only 0.2 percent. Lamb Reply Decl. ¶ 102.

### iv. Increased Premiums

In both his original and supplemental declarations, Dr. Hughes asserts that large numbers of TPP class members could have avoided injury by passing on the increased costs of prescription Zetia through increased premiums charged to their members. Hughes Decl. ¶¶ 86-91; Hughes Suppl. Decl. ¶¶ 46-48. He points to general data suggesting that health insurers pass on the higher cost of benefits in the form of higher premiums. Hughes Decl. ¶ 90 & Ex. 14 (chart demonstrating correlation between rising medical benefit expenses and insurance premiums). But this data - derived from

54

only four large insurers – says nothing about the cost of
prescription drugs generally, much less the cost of any single
drug such as Zetia.   Dr. Lamb points to internal Merck documents
suggesting that prescription drug costs as a whole account for
approximately 10 percent of the total healthcare costs that drive
premium increases.   Lamb Reply Decl. ¶ 39.   Moreover, as these
premiums are set in advance based on aggregate expected increases,
there is no way to trace any premium increase to the alleged
overcharge paid for brand or generic Zetia during the class period.
Id.   Thus, Defendants have not demonstrated that EPPs' proposed
class includes any uninjured class members under this theory.

v.   Copayments, Rebates, and Formulary Placement

The last three overlapping categories of allegedly uninjured
class members identified by Dr. Hughes all relate to the complex
nature of the pharmaceutical distribution chain.   Because class
members' eventual cost of prescription drugs is offset by consumer
copayments, manufacturer rebates, and government support under
Medicare Part D, Dr. Hughes argues that many class members would
have paid more for generic Zetia despite the price decreases
generally expected from generic competition.   Hughes Decl. ¶¶ 42-
78.   Even after the amended class definition, Dr. Hughes contends
many members are uninjured as a result of these contributions
absorbing a larger portion of cost of the brand drug after generic
entry.   Hughes Suppl. Decl. ¶¶ 26-42.

Analyzing these arguments requires a general understanding of the pharmaceutical distribution chain and the role played by TPPs, PBMs, consumers, and the government. Experts for both sides described the complex market for prescription drugs and the interplay among these various contributors to the overall cost of pharmaceuticals. Hughes Decl. ¶¶ 21-40; Lamb Decl. ¶¶ 17-19. The proposed class here includes only TPPs, which consist of commercial insurers, self-funded employers, and union health and welfare plans. Hughes Decl. ¶ 31; Lamb Decl. ¶ 18. These TPPs generally work with PBMs to manage pharmacy benefits for their members. Hughes Decl. ¶ 33; Lamb Decl. ¶ 18. While there are thousands of TPPs, there are just over forty PBMs and the vast majority of claims are managed by just seven. Craft Decl. ¶¶ 17-20; Craft Rebuttal Decl. ¶ 8; May Hr'g Tr. 132:7-133:2. Among the functions served by PBMs is formulary design, under which PBMs advise TPPs on the placement of prescription drugs into various preferred or non-preferred tiers. Hughes Decl. ¶¶ 33-34; Lamb Decl. ¶ 18. Tier placement affects the allocation of the eventual cost of prescription drugs in several ways. Preferred, or lower tier placement (i.e., Tier 1 or Tier 2), results in lower consumer copayments and thus higher sales volume. In order to obtain favorable formulary placement, brand drug manufacturers commonly offer PBMs and TPPs rebates, which reduce the effective costs that TPPs pay for brand prescription drugs. Hughes Decl. ¶ 37; Lamb

Decl. ¶ 54. In addition to this pricing structure, certain government-subsidized plans, namely Medicare Part D plans, subsidize the cost of prescription drugs at varying rates, depending on the amount of prescription drugs purchased by individual consumers insured under each plan. See Hughes Decl. ¶¶ 68-72.

The remaining three categories of allegedly uninjured class members advanced by Dr. Hughes involved calculations that he claims demonstrate that certain tier placement and rebate payments would render the cost of brand Zetia less than the cost of generic for significant portions of the class period. As a result, Dr. Hughes opines that many TPPs that placed Zetia on higher tiers in their formulary would have been uninjured during significant portions of the class period because higher consumer copayments and manufacturer rebates would more than offset the lower but-for generic price.

With respect to these overlapping claims, EPPs' proposed amended class definition implicitly concedes Defendants' primary argument - at least as it relates to damages. By amending the definition to exclude certain Medicare Part D plans, as well as TPPs utilizing particular PBMs that pay high rebates, EPPs acknowledge that large rebates on the brand drug, and small consumer copayments for the generic drug, blunt the price effect of delayed generic entry and may result in zero damages for certain

government-subsidized plans and plans receiving high manufacturer rebates on the brand drug. But after accounting for those plans in the amended class definition (and correspondingly .reducing their damages estimate), Dr. Lamb states that all or substantially all of the remaining class members suffered the same antitrust impact and sustained net positive damages as a result of Defendants' conduct. Lamb Reply Decl. ¶¶ 40-58; Lamb Suppl. Decl. ¶¶ 8-22. He faults Dr. Hughes' continued attack as focused too narrowly on individual transactions in a small window of the class period and argues that even though some individual transactions might not result in an overcharge, all or substantially all TPP class members under the modified class definition suffered net injury after considering all the relevant transactions during the class period. Lamb Reply Decl. ¶¶ 61-68. With this background in mind, I address each of these remaining uninjured class member disputes in turn.

### 1.    TPPs Covering Zetia on Tier 3

Dr. Hughes contends that many TPPs covering Zetia on formulary Tier 3 or higher would suffer no net injury absent Dr. Lamb's assumption that Merck would have launched an authorized generic in the but-for world. That is, absent generic competition (from an AG or other generic manufacturer), the price for the generic would have remained sufficiently high to leave large numbers of TPPs uninjured by delayed generic competition. Hughes Decl. ¶¶ 60,

58

105, 148(c); Hughes Suppl. Decl. ¶¶ 34-36 & Ex. 15. And according to Dr. Hughes, Dr. Lamb's assumption that Merck would have launched an AG in the but-for world is "speculative." Hughes Suppl. Decl. ¶ 33.

But this assumption, which supports Dr. Lamb's calculation of the generic price in the but-for world, is no more or less speculative than EPPs' allegations of antitrust liability in general. The core issue for trial in this case is EPPs' claim that Defendants' settlement of patent litigation in 2010 effected an unlawful reverse payment. The terms of that alleged reverse payment included Merck's promise not to launch an AG. It will, of course, be EPPs' burden to prove these allegations. But that is a merits inquiry that does not bear directly on the predominance question presented by this particular claim of uninjured class members. There is no dispute that all of the plaintiff groups will attempt to prove the terms of the No-AG agreement by evidence that is common to all plaintiffs – not just the proposed EPP class. At this stage, it is sufficient to note that Plaintiffs have pled sufficient facts to plausibly allege a No-AG agreement and that those facts are common to the class and present no issues of individualized proof. Accordingly, Dr. Hughes' opinion that Zetia's placement on Tier 3 or higher would produce large numbers of uninjured class members is based on an assumption not warranted by the record. At the class certification stage, EPPs are entitled

to calculate the but-for price based on the theory of the case they intend to prove.   See Suboxone 421 F. Supp. 3d at 63-65 (finding Dr. Lamb's damages model "reliable" and satisfactory under the predominance requirement).

## 2.   TPPs Covering Zetia on Tier 4 or Higher

With respect to a narrower subset of TPPs that placed Zetia on formulary Tier 4 or higher, Dr. Hughes opines that manufacturer rebates and other cost sharing would leave them uninjured during large portions of the class period. Hughes Suppl. Decl. ¶¶ 28-31 & Ex. 9.   As with Dr. Hughes' other calculations, however, Dr. Lamb has pointed to assumptions underlying Dr. Hughes' interpretations of the data that undermine his opinions on this group of allegedly uninjured TPPs. Most importantly, the estimated rebates used in Dr. Hughes' calculations are average rebates based on Merck's data for rebates paid to TPPs for Zetia in 2015. Hughes Suppl. Decl. ¶ 29 & Ex. 9 (estimating average rebates between 14 percent and 30 percent during the 26-month brand/generic class period).   But actual rebate amounts vary depending in part upon formulary placement, with the higher rebates paid to secure a lower tier placement.   Lamb Suppl. Decl. ¶¶ 19-20 (isolating Dr. Hughes' hearing presentation examples to show that rebates paid by Merck on those transactions varied between 5 percent and 7 percent when Zetia was on non-preferred tiers).   Dr. Lamb also cites Merck's sales material indicating that rebates were intended for TPPs and

PBMs that placed Zetia on preferred tiers and opines that TPPs with Zetia on Tier 4 likely received minimal or no rebates. Lamb Suppl. Decl. ¶¶ 20-22. Dr. Hughes acknowledged as much in his original report. Hughes Decl. ¶ 37 n.50 ("[I]t is common for manufacturers of branded drugs to offer rebates in exchange for better formulary placement."). Yet in his opinion on this category of allegedly uninjured TPPs, Dr. Hughes assumes that TPPs' the cost of brand Zetia would be reduced by both higher rebates and higher copayments. By assuming higher consumer copayments associated with the non-preferred Tier 4 and average rebates (inflated by the larger rebates paid to TPPs offering a lower tier placement), Dr. Hughes understates the degree of antitrust injury sustained by TPPs with Zetia on Tier 4.

Moreover, even applying the rebates and copayments from Dr. Hughes' estimates, his calculations purporting to define large numbers of uninjured class members are limited to a portion of the class period ending prior to the actual date of generic entry. The price differential increased significantly during the later months of this period as generic competition increased. The result of this increased competition is that TPPs making consistent purchases throughout the period would still suffer net harm even using Dr. Hughes' rebate data. To the extent Dr. Hughes argues that certain plans may have ceased operation before damages

accrued, his analysis is based on the same methodology of counting health plans, which says nothing about TPPs that make up the class.

### 3.   Medicare Part D Plans

The amended class definition includes significant changes to address Dr. Hughes' argument that many Medicare Part D plans would suffer no net damages.  Cost sharing under Medicare Part D plans varies according to how much any particular consumer pays for all of their prescription medications.  Hughes Decl. ¶ 68.   Part D plans typically consist of four phases.  Id.; May Hr'g Tr. 47:16-25.   In the first phase, called the deductible phase, consumers pay for all costs of the drug until they reach the annual deductible fixed by the plan.  Hughes Decl. ¶ 69.  Both Dr. Lamb and Dr. Hughes agree that during this deductible phase, individual transactions do not produce any overcharge to the TPP.   Id. ¶ 76(i); Lamb Suppl. Decl. ¶ 11.  As a result, Dr. Lamb's damages model excludes such purchases from the calculation of classwide damages.  Lamb Decl. ¶ 11.

After the deductible phase, consumers enter the initial coverage phase where the TPPs share the cost of prescription medicine with consumer copayments and a government subsidy.  Hughes Decl. ¶ 70; May Hr'g Tr. 47:19-22, 48:1-8.   Once the total prescription costs for an individual reach the liability limit for the year, consumers enter the coverage gap phase, also known as the "doughnut hole."   Hughes Decl. ¶ 71; May Hr'g Tr. 47:19-24.

During this phase of coverage, costs are divided primarily between the consumer and the TPP, with certain manufacturer discounts usually paid in the form of rebates.  Hughes Decl. ¶ 71.  Finally, if an individual consumer's costs proceed beyond the next defined threshold, consumers enter the catastrophic phase where government subsidies again defray a large portion of the costs.  Id.; May Hr'g Tr. 74:19-25.

Although Dr. Lamb disagrees with Dr. Hughes' calculations on specific class member transactions, the changes made in EPPs' amended class definition effectively concede that Dr. Hughes' methodology uncovered a genuine concern regarding Part D plans that sustained no net damages.  The amendment removed from the class those Part D plans using one of the major PBMs to negotiate formulary placement and rebates.  In doing so, Dr. Lamb states that Part D plans remaining in the class are those whose manufacturer rebates in the initial coverage phase are 20 percent or less.[21]  Lamb Suppl. Decl. ¶ 4 (citing Hughes Presentation 5). By so limiting the class, the amendment ensures that these remaining members can demonstrate not only impact, but also that they suffered net positive damages.

---

[21] Dr. Lamb's estimate of the rebate percentage was based on Merck's data relating to rebates that it actually paid.  Lamb Suppl. Decl. ¶ 4 (citing Hughes Presentation 5); July Hr'g Tr. 13:10-24.

Notwithstanding the amendment, Defendants claim that many Part D plans suffered no net damage. Defs.' Opp'n Mot. Modify 19-21. However, Dr. Hughes' attempts to demonstrate how any individual Part D plan would be uninjured rely on assumptions related to patient copayments for the brand and generic in the initial coverage phase that Dr. Lamb has shown are not consistent with the record evidence. For example, Dr. Hughes' calculation of injury in the initial coverage period depends upon the member copayment being only $1.00, which was derived from the median copayment for all generic drugs on the preferred generic tier. Hughes Suppl. Decl. ¶¶ 39-40; Lamb Suppl. Decl. ¶¶ 12-14. But as Dr. Lamb notes, certain generics are placed on higher tiers and this was the case for generic ezetimibe when it entered the market. Lamb Suppl. Decl. ¶ 14. The median copayment from consumers on these higher tiers, namely, Tier 3 and Tier 4, was $38.00 and $80.00, respectively. Id. Dr. Lamb calculated a weighted average copayment based upon the number of covered lives included in the Part D plans with ezetimibe on higher tiers. Id. His calculations show that the weighted average consumer copay was equal to approximately 22 percent of the total generic cost, whereas Dr. Hughes' estimated $1.00 copay equaled less than one percent of the generic cost. Id. I am persuaded by Dr. Lamb's analysis that consumer copayments in the initial coverage phase would have been significantly higher than Dr. Hughes' estimates and that his

64

opinions regarding large numbers of uninjured class members based on the unreasonably low copayment is therefore not reliable.

With respect to transactions during the coverage gap, or doughnut hole, Dr. Lamb agrees with Dr. Hughes that TPPs reimbursing Zetia purchases during this phase would not result in an overcharge. Dr. Lamb addressed these offsets in his calculation of classwide damages. Lamb Suppl. Decl. ¶ 15. But the fact that certain transactions during the coverage gap did not produce an overcharge does not mean that TPPs reimbursing or paying these claims suffered no net damages. At the rebate levels expected to be paid to TPPs in the amended class definition, Dr. Lamb's analysis credibly demonstrates that the substantial damages in the initial coverage phase more than offset any negative damages resulting during the coverage gap.

Finally, with respect to the catastrophic phase, Dr. Lamb disputes Dr. Hughes' calculation of rebates, citing industry literature that establishes that the government reimburses TPPs for 80 percent of the net cost of prescriptions during this phase. Id. ¶ 16. That net cost is calculated after application of rebates and other discounts from the manufacturer. Id.

Importantly, even accepting Dr. Hughes' calculations regarding all the various individual transactions affected by tier placement and rebates, he has not identified any putative class member that suffered no net damage on all transactions. Dr. Lamb

demonstrated that the individual transactions that Dr. Hughes selected for criticism were atypical, and that examining all the transactions in the same or neighboring months proved net positive damages among the named class members addressed in the examples. Lamb Reply Decl. ¶¶ 62-63; Lamb Suppl. Dec. ¶¶ 19-20. And it is undisputed that TPPs within the amended class definition all allege the same antitrust injury alleged in the consolidated complaint. EPPs have thus met their burden to show antitrust impact as to all or substantially all members of the class through common evidence. The individual net damages issues remaining after the amendment do not present any individualized issues that would overwhelm common issues and defeat predominance - a result similar to that reached in numerous other end-payor actions brought on behalf of TPPs. See, e.g., Restasis, 2020 WL 2555556, at *24-26; Solodyn, 2017 WL 4621777, at *18; Lidoderm, 2017 WL 679367, at *23.

### b. Measurable Damages

EPPs must also demonstrate that "damages can be reliably measured on a class-wide basis." Am. Sales Co., 2017 WL 3669604, at *15 (citing Comcast Corp., 569 U.S. at 35). To be clear, EPPs are "not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." Wellbutrin XL, 282 F.R.D. at 144. And that methodology must be consistent with the purported theory of

66

liability. See Comcast Corp., 569 U.S. at 35. Assuming an appropriate model is put forth, "the need for some individualized determinations" is not fatal to class certification. Nexium, 777 F.3d at 21.

To demonstrate measurable damages, EPPs propose Dr. Lamb's "benchmark" methodology, which "compar[es] the price that arose as a result of the alleged misconduct with the price for that product during some other period of time in which pricing was not affected by the alleged anticompetitive conduct." Lamb Decl. ¶ 63; accord May Hr'g Tr. 24:19-25:2. To accomplish this, Dr. Lamb uses data on retail prescriptions compiled by the IQVIA National Prescription Audit database as well as Merck's transaction-level and rebate data. Lamb Decl. ¶¶ 9 & n.5, 64-66. With this data, Dr. Lamb calculates the but-for generic price (which, when compared with the actual brand and generic prices, determines the amount of the overcharge) and generic penetration rate (which is based in part on the actual generic penetration rate and penetration rates of similar drugs facing loss of exclusivity). Id. ¶¶ 71-72, 74-76. Next, Dr. Lamb determines (1) the but-for generic volume by multiplying the but-for generic penetration rate by the actual total volume of ezetimibe (brand plus generic), and (2) the but-for brand volume by multiplying the difference between 100 percent and the generic penetration rate (1 – generic penetration rate) by the actual total volume. Id. ¶ 77. After accounting for some

adjustments, id. ¶¶ 78-79, Dr. Lamb then computes classwide damages suffered by (1) class members that purchased brand Zetia in the actual world but would have purchased a lower-priced generic had it been available ("brand-generic" or "B-G" damages) by multiplying the overcharge by the difference of actual brand volume and but-for brand volume; and (2) class members that purchased generic Zetia in the actual world but would have paid less had generic entry occurred sooner ("generic-generic" or "G-G" damages) by multiplying the overcharge by the actual generic volume. Id. ¶¶ 70-71, 76-77; May Hr'g Tr. 25:3-26:9.

To calculate unjust enrichment damages, Dr. Lamb simply takes the difference of Merck's profits in the actual world and what Merck's profits would have been in the but-for world, the latter taking into account but-for brand sales and but-for authorized generic sales. Lamb Decl. ¶ 82; May Hr'g Tr. 26:10-16. Similar to the classwide antitrust damages discussed above, Dr. Lamb utilizes IQVIA National Prescription Audit and National Sales Perspectives data as well as Merck's own sales data to estimate Merck's but-for Zetia and authorized generic profits. Lamb Decl. ¶¶ 83-90; May Hr'g Tr. 26:17-20. After making some adjustments, Dr. Lamb is then able to calculate the amount by which Merck was allegedly unjustly enriched. Lamb Decl. ¶ 91; May Hr'g Tr. 26:22-27:6.

Defendants argue that Dr. Lamb's damages methodology offers only "generalized" classwide proof because it calculates damages in the aggregate, which ignores the need to "trac[e] payments through complex, multilevel distribution chains." Defs.' Opp'n Mot. Certify 24-25. Thus, Defendants argue, Dr. Lamb does not explain how damages would be allocated to class members – an exercise that would "require extensive individualized inquiries." Id. at 25.

Despite Defendants' arguments, I am satisfied that EPPs have demonstrated a reliable method of calculating damages on a classwide basis. To begin with, "[a]ntitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate." In re Cardizem CD Antitrust Litig., 200 F.R.D. 326, 348 (E.D. Mich. 2001). They need only "show that a reliable method is available to prove damages on a class-wide basis." Wellbutrin XL, 282 F.R.D. at 144. And the damages methodology proposed by Dr. Lamb has been deemed sufficiently reliable to meet that classification in other pharmaceutical antitrust end-payor class actions. See, e.g., Restasis, 2020 WL 2555556, at *26-28; Loestrin 24 FE, 410 F. Supp. at 389-95; Flonase, 284 F.R.D. at 232-34; Cardizem CD, 200 F.R.D. at 347-51. Furthermore,

> while the claims administration process will include
> individualized damages calculations, many of the
> questions relevant to the damages distribution will be

69

answered through common proof. The entire process depends on the extensive and particularized data created in the pharmaceutical industry that reveals the number of prescriptions purchased by each consumer and how much each end-payor paid for each prescription. These common components will significantly narrow the scope of individualized damages calculations, which will likely involve simple arithmetic.

Restasis, 2020 WL 2555556, at *26; see also Flonase, 284 F.R.D. at 233. Accordingly, common issues predominate with respect to classwide damages calculations.

### c. State Law Variations

Defendants also argue that EPPs "have failed to show that the individualized nature of the variations among the state laws under which they purport to proceed will not predominate." Defs.' Opp'n Mot. Certify 26. Because the class encompasses claims relating to purchases of the drug in twenty-eight states, the District of Columbia, and Puerto Rico, the court must determine which states' laws apply to these purchases. Although not extensively briefed, this inquiry is necessary at the class certification stage because EPPs bear the burden of showing that common issues would predominate over any variations among the applicable state laws. See Restasis, 2020 WL 2555556, at *28; Vista Healthplan, Inc., 2015 WL 3623005, at *33. EPPs contend that the state in which the purchase occurred supplies the applicable law. I agree.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. See Klaxon Co. v. Stentor Elec.

70

Mfg. Co., 313 U.S. 487, 496 (1941).  "Where a transferee court presides over several diversity actions consolidated by the multidistrict litigation panel, the choice of law rules applied are that of each jurisdiction in which the transferred actions were originally filed." In re Section 1031 Exchange Litig., 716 F. Supp. 2d 415, 421 (D.S.C. 2010); accord In re Panacryl Sutures Prods. Liab. Cases, 263 F.R.D. 312, 318 (E.D.N.C. 2009).  The present proceedings involve end-payor actions originally filed in California, Massachusetts, New York, and Virginia.  Thus, for each action, the court must apply the corresponding state's choice-of-law rules.  For California, New York, and Massachusetts, it is well established that the law of the state in which the drug was purchased applies to EPPs' claims. A review of Virginia's choice-of-law rules reveals the same.

"California and New York courts employ variations o[f] the same choice-of-law analysis - the 'government interest test.'" Restasis, 2020 WL 2555556, at *29 (citing Mazza v. Am. Honda Motor Co., 666 F.3d 581, 594 (9th Cir. 2012); In re Grand Theft Auto Video Game Consumer Litig., 251 F.R.D. 139, 147, 150 (S.D.N.Y. 2008)).  Under that test, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has

ᵇ

71

the greatest interest in regulating behavior within its borders."[22] Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 72, 612 N.E.2d 277, 280 (1993); accord McCann v. Foster Wheeler LLC, 48 Cal. 4th 68, 87-88, 225 P.3d 516, 527 (2010). The Eastern District of New York recently performed a detailed choice-of-law analysis of the government interest test pursuant to New York and California law in Restasis – multidistrict litigation also involving pharmaceutical antitrust allegations by end payors – and concluded that "the state of purchase provides the appropriate substantive law for . . . class members' claims." 2020 WL 2555556, at *29 (citing Mazza, 666 F.3d at 594; Grand Theft Auto, 251 F.R.D. at 147, 150). I see no reason to depart from that court's well-reasoned analysis.

Massachusetts follows "a flexible or 'functional choice of law approach,' under which courts consider 'the interests of the parties, the States involved, and the interstate system as a

---

[22] Because EPPs' claims sound in tort rather than breach of contract, I look to the applicable choice-of-law rules governing tort claims. See Restasis, 2020 WL 2555556, at *30 (considering similar state claims in pharmaceutical antitrust end-payor action as tort claims for choice-of-law analysis); In re Relafen Antitrust Litig., 221 F.R.D. 260, 277-79 (D. Mass. 2004) (same); Buchanan v. Doe, 246 Va. 67, 71, 431 S.E.2d 289, 291 (1993) (defining "tort" in Virginia as "any civil wrong or injury; a wrongful act"); see also Wellbutrin XL, 282 F.R.D. at 135 ("[A]ntitrust violations are essentially tortious acts." (quoting Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 547 (1983) (Marshall, J., dissenting))).

whole.'" Relafen, 221 F.R.D. at 277 (quoting Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631, 473 N.E.2d 662, 668 (1985)). As the Massachusetts Supreme Court has acknowledged, this test is similar to the significant relationship test of the Restatement (Second) of Conflict of Laws § 6(2) (1971). See generally Bushkin Assocs., Inc., 393 Mass. at 631-39, 473 N.E.2d at 668-72; see also Watkins v. Omni Life Sci., Inc., 692 F. Supp. 2d 170, 174 (D. Mass. 2010) ("Under Massachusetts choice-of-law rules, tort claims are governed by the law of the state in which the injury occurred, unless another state has a more significant relationship to the underlying cause of action."). In Relafen, another end-payor action alleging unlawful generic suppression, the District of Massachusetts analyzed this functional approach and found that Massachusetts law "would select the various states in which [the] purchases were made." 221 F.R.D. at 277-78; see also Restasis, 2020 WL 2555556, at *30 (analyzing the significant relationship test under Texas law and concluding that "consideration of the factors as a whole and in the context of this case indicates that [the] place of purchase – that is, where he or she was injured by overpaying – has the most significant contacts or relationships with the particular issue"). This report follows Relafen's analysis.

Unlike the other three states, I am not aware of any case where a court has analyzed and applied Virginia's choice-of-law

rules in a pharmaceutical antitrust class action like this one. "Virginia applies the lex loci delicti, the law of the place of the wrong, to tort actions." Milton v. IIT Research Inst., 138 F.3d 519, 521 (4th Cir. 1998) (citing Jones v. R.S. Jones & Assocs., Inc., 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993); Buchanan v. Doe, 246 Va. 67, 70-71, 431 S.E.2d 289, 291 (1993)). The place of the wrong is considered "the place where the last event necessary to make an actor liable for an alleged tort takes place, even if the actor has no control over the location of that last event." Insteel Indus., Inc. v. Costanza Contracting Co., 276 F. Supp. 2d 479, 486 (E.D. Va. 2003) (citing Quillen v. Int'l Playtex, Inc., 789 F.2d 1041, 1044 (4th Cir. 1986)). Here, the last event necessary to establish liability was the purchase of the drug, when the alleged injury occurred. Accordingly, Virginia would likewise apply the substantive law of the states in which the purchases occurred. Cf. id. at 488 (applying North Carolina law to claim for unfair and deceptive trade practices because last events necessary for liability - paying invoice containing misrepresentations - occurred in North Carolina).[23]

---

[23] Although it is not addressed by either side, this report also follows Restasis' reasonable approach to mail-order prescriptions and "treat[s] the place of receipt of mailed drugs as the place of purchase." 2020 WL 2555556, at *31.

In light of the foregoing, EPPs' various state law claims are thus governed by the laws of the thirty jurisdictions identified in their modified class definition. After extensively litigated motions practice, the court dismissed a number of state claims. See Zetia, 2019 WL 1397228, at *39 (Exs. A, B). The dismissed claims had been attacked individually for lack of support in the facts pled or a failure by EPPs to meet elements of recovery required on the theories asserted. See generally id. at *22-39. EPPs' remaining claims arise under the antitrust laws of twenty-four states, the District of Columbia, and Puerto Rico; the consumer protection laws of twelve states; and the unjust enrichment laws of twenty-five states and the District of Columbia. Id. at *39 (Exs. A, B).

As a general matter, "[t]he need to apply multiple states' laws . . . does not necessarily defeat class certification." Solodyn, 2017 WL 4621777, at *19. Indeed, courts commonly certify end-payor classes seeking to recover for delayed generic competition under the laws of multiple states. See, e.g., Restasis, 2020 WL 2555556, at *28-34 (certifying end-payor class asserting claims under thirty-one jurisdictions); Solodyn, 2017 WL 4621777, at *19-20 (forty jurisdictions); In re Nexium (Esomeprazole) Antitrust Litig., 297 F.R.D. 168, 175-76 (twenty-six jurisdictions). In such cases, the plaintiffs demonstrated not that the various laws were identical in every respect, but

75

that the variations among them could be dealt with in a manageable way that does not overwhelm issues common to the class. See Solodyn, 2017 WL 4621777, at *20 ("EPPs have provided a compilation of state laws at issue here and highlighted the substantial similarities in the language among states and between state and federal antitrust provisions." (citation omitted)); Lidoderm, 2017 WL 679367, at *27 (noting that any significant differences "can be readily accommodated on a special verdict form or through other mechanisms routinely employed in complex litigations like this one"); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 315 (3d Cir. 1998) (observing that "relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit").

Here, EPPs argue that any variations among the relevant state laws are minor and do not defeat predominance. Specifically, EPPs claim

> each of the applicable state antitrust statutes mirrors the federal antitrust laws, contains a federal harmonization provision, and/or has been interpreted in harmony with federal law. The consumer protection statutes, modeled from Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), have been interpreted to permit recovery for anticompetitive, unfair or unconscionable conduct, and Plaintiffs' claims under these statutes are premised on the same unlawful conduct as their antitrust

claims.[24]    Further, Plaintiffs' unjust enrichment
claims are premised on the same alleged facts and will
be proven using the same evidence as their antitrust and
consumer protection claims.

EPPs' Mem. Supp. Mot. Certify 21 (citations omitted); see also

EPPs' Reply Supp. Mot. Certify 14-15.   EPPs have submitted a

compilation of the relevant state antitrust and consumer

protection statutes as well as interpretative case law, which

emphasizes the significant similarities among themselves and in

relation to their federal counterparts.[25]   EPPs' Mem. Supp. Mot.

Certify Ex. 14 (ECF No. 730-15); see Gariety v. Grant Thornton,

LLP, 368 F.3d 356, 370 (4th Cir. 2004).   They have also proposed

a trial plan that not only groups common elements but also calls

for the use of a special verdict form for any state-specific

issues.   See EPPs' Mem. Supp. Mot. Certify Ex. 21 (ECF No. 730-

22).

    Defendants assert that "there are meaningful differences

among the various state laws that EPPs rely upon," but they point

to only three states of the remaining claims that allegedly require

some comparatively heightened showing.   Defs.' Opp'n Mot. Certify

---

[24] See also FTC v. Cement Inst., 333 U.S. 683, 694 (1948) (observing
that "all conduct violative of the Sherman Act may likewise come
within the unfair trade practice prohibitions of the Trade
Commission Act").

[25] Indeed, courts often remark about such similarities.   See, e.g.,
Restasis, 2020 WL 2555556, at *8 n.8; Relafen, 221 F.R.D. at 275,
278.

27.     According to Defendants, "'the indirect purchaser statutes of . . . Michigan[] and Minnesota require a somewhat stronger and more precise showing of individual impact' than other state statutes." Id. (alterations in original) (quoting In re Dig. Music Antitrust Litig., 321 F.R.D. 64, 99 (S.D.N.Y. 2017)). They also claim that Michigan and Arizona "provide for treble damages only upon a showing that a defendant's violation was 'flagrant.'" Id. (quoting Dig. Music, 321 F.R.D. at 99); see Ariz. Rev. Stat. § 44-1408(B); Mich. Comp. Laws § 445.778(2). As an obstacle to a finding of predominating common issues, these arguments are unconvincing. First, the court in Restasis, after careful analysis, rejected the precise argument Defendants make here (including the supporting case law) with respect to showing individual impact under the laws of Michigan and Minnesota, "discern[ing] no heightened standard, explicit or implicit." 2020 WL 2555556, at *31-32. After reviewing the relevant state laws, I find Restasis' reasoning on this issue persuasive and also conclude that Michigan and Minnesota do not present individualized considerations with respect to impact.

Second, assuming arguendo that the three states identified by Defendants impose some additional burden of proof with respect to liability and/or damages and thus present individualized issues, such variations are immaterial and pose no risk of overtaking the overwhelming common evidence expected to be presented in this case.

They are easily addressed through the use of a special verdict form, see Lidoderm, 2017 WL 679367, at *27, which EPPs' trial plan specifically anticipates, see EPPs' Mem. Supp. Mot. Certify Ex. 21.

Defendants also make a general averment that EPPs have not demonstrated that common issues will predominate over variations among the applicable unjust enrichment laws. See Defs.' Opp'n Mot. Certify 22-23. While it is true that the compilation of state laws that EPPs provide does not examine unjust enrichment statutes, the court has already conducted a detailed review of EPPs' unjust enrichment claims (as well as the other state claims) and disposed of several. See generally Zetia, 2019 WL 1397228, at *22-39. For the remaining claims, the court has already determined that the allegations supporting the antitrust and consumer protection claims are also sufficient to establish unjust enrichment.[26] And Defendants have not raised any issues with respect to the laws

---

[26] Furthermore, courts have recognized the extensive similarities among various state unjust enrichment laws. See In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 64 F. Supp. 3d 665, 703 (E.D. Pa. 2014) ("While it is true that the elements of unjust enrichment vary state by state, 'almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit.'" (quoting In re Flonase, 692 F. Supp. 2d 524, 541 (E.D. Pa. 2010))); see also Flonase, 284 F.R.D. at 219 & n.11 (noting similarities of unjust enrichment laws and observing that the plaintiffs "will utilize the same operative evidence to establish" liability despite minor differences).

governing the remaining unjust enrichment claims that would defeat predominance.[27]   Cf. Zetia, 400 F. Supp. 3d at 441 ("Defendants do not point to any specific material differences in jurisdictions' requirements for unjust enrichment claims that warrant consideration, other than those already raised before the Magistrate Judge.").

Defendants may, of course, raise such issues on summary judgment and attempt to dispose of additional claims.   But at present, EPPs have demonstrated that common issues predominate over any variations among the various antitrust, consumer protection, and unjust enrichment state laws.

Having shown that evidence common to the class predominates over individualized issues with respect to uninjured class members, classwide damages, and state law variations, EPPs have satisfied the predominance requirement.

---

[27] EPPs assert unjust enrichment claims under the laws of twenty-six jurisdictions.   Of those jurisdictions, there are only two – Alabama and Vermont – whose laws do not also provide the basis for antitrust or consumer protection claims.   See Zetia, 2019 WL 1397228, at *39 (Exs. A, B).   Defendants have not pointed to anything in the unjust enrichment laws of Alabama or Vermont that would defeat predominance as to class members seeking to recover for purchases in those two states.

## 2.  Superiority

Finally, EPPs must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This "superiority" requirement ensures that proceeding by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences."  Amchem Prods., Inc., 521 U.S. at 615.  To determine whether EPPs have satisfied this requirement, the court "must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." Stillmock, 385 F. App'x at 274 (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1779 (3d ed. 2005)).

To help guide the court's analysis, Rule 23 provides a list of four, non-exhaustive factors: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the

litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3); see also Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment (stating that the four factors are non-exhaustive).

Defendants do not appear to contest superiority requirement; nonetheless, I find that it is met here. Indeed, given the need to prove essentially identical facts, proceeding in a class action here is significantly more efficient than proceeding individually, which "would waste judicial resources and leave all parties vulnerable to unfair inconsistences." Flonase, 284 F.R.D. at 234; see also Wellbutrin XL, 282 F.R.D. at 145 (finding class resolution of EPP claims was superior to individual actions, which "would require duplicative, expensive litigation . . . at enormous expense to the parties and judicial economy"). Additionally, as stated above, potential variations among state laws will not render the case unmanageable. Thus, as courts consistently find in such cases, EPPs have satisfied the superiority requirement. See Flonase, 284 F.R.D. at 234 (agreeing with "the vast majority of district courts" in delayed generic entry cases that "class action treatment is superior to other available methods of adjudication"); see also Momenta Pharms., Inc., 333 F.R.D. at 414.

C.    **Rule 23(g)**

Lastly, EPPs seek to confirm Motley Rice LLC and Miller Law LLC as co-lead class counsel, and Furniss, Davis, Rashkind and Saunders, PC as liaison counsel for the class.   EPPs' Mot. Class Certification 2; EPPs' Mem. Supp. Mot. Certify 29.   Pursuant to Rule 23(g), the court previously appointed Motley Rice LLC and Miller Law LLC as co-lead counsel and interim co-class counsel for the proposed EPP class, emphasizing their "years of experience litigating similar cases across the country and extensive knowledge of the applicable law from that experience."   Pretrial Order No. 3, at 1-2, 5-10 (ECF No. 105).   The court also appointed Alan B. Rashkind and James A. Cales, III, of Furniss, Davis, Rashkind and Saunders, PC as local counsel for the EPP class.   Id. at 9.   Given the court's previous finding that these law firms and attorneys have the "necessary expertise, resources, and experience to represent" the EPP class, id. at 2, as well as counsel's consistent performance in litigating the case thus far, I recommend that the court confirm Motley Rice LLC and Miller Law LLC as co-lead class counsel and Furniss, Davis, Rashkind and Saunders, PC as local counsel for the EPP class, in accordance with Rule 23(g).

## III. Conclusion and Recommendation

For the foregoing reasons, I recommend that the court GRANT EPPs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, ECF No. 729, and GRANT EPPs'

Motion for Leave to Modify and Limit their Class Definition, ECF No. 809, and certify the class as set forth therein.

### IV.   Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.   Thomas v. Arn, 474

U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984);

<u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

---------------- /s/
Douglas E. Miller
United States Magistrate Judge
---------------------------------

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

August 13, 2020

85