IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK VIRGINIA

| | |
|---|---|
| IN RE ZETIA (EZETIMIBE) ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MDL No. 2:18-md-2836 |

## MEMORANDUM ORDER

This Memorandum Order examines two expert opinions related to the terms of a patent Settlement Agreement underlying this class action antitrust case. Plaintiffs moved to exclude the opinions as unreliable and not helpful to the finder of fact. As set out below, I conclude the expert, Dr. Mark Robbins ("Robbins") -- who is designated to testify extensively on other topics -- lacks an adequate basis to testify on these two points and therefore GRANT Plaintiffs' motion to partially limit his testimony.

As set forth in detail elsewhere,[1] the case involves allegations that Merck[2] and Glenmark[3], a generic drug

---

[1] In re Zetia (Ezetimibe) Antitrust Litig., No. 2:18-md-2836, 2019 WL 6122017, at *1-3 (E.D. Va. Oct. 15, 2019), R. & R. adopted as modified, 2019 WL 6977405 (E.D. Va. Dec. 20, 2019); In re Zetia (Ezetimibe) Antitrust Litig., No. 2:18-md-2836, 2019 WL 1397228, at *1-10 (E.D. Va. Feb. 6, 2019), R. & R. adopted as modified, 400 F. Supp. 3d 418 (E.D. Va. 2019).

[2] "Merck" consists of Merck & Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC.

manufacturer, entered into an agreement to delay Glenmark introducing a generic version of Merck's cholesterol medication Zetia. Mem. in Supp. re Mot. to Exclude Portions of Proposed Testimony of Dr. Mark Robbins 3 (ECF No. 1056, at 8) ("Pls.' Mem."). The terms of the agreement allowed Glenmark to enter the market with its generic in December 2016, which was approximately four months before the Zetia patent expired. Plaintiffs also allege Merck agreed not to compete with Glenmark by introducing its own generic version of Zetia (an "Authorized Generic" or "AG") during the initial 180 days of exclusivity Glenmark was entitled to as the first to file an Abbreviated New Drug Application under paragraph IV (a "paragraph IV ANDA"). Id. Plaintiffs describe this agreement as a "no Authorized Generic" or "no-AG" agreement and offer experts to opine that "absent the no-AG provision, it would have been economically rational for both Merck and Glenmark to enter into an alternative settlement with an earlier entry date." Id. In other words, Plaintiffs contend that without the extra profit Glenmark anticipated earning by having the generic market to itself during exclusivity, the company would have insisted on an earlier entry date as compensation for settling the patent suit.

---

[3] "Glenmark" consists of Glenmark Pharmaceuticals Limited and Glenmark Pharmaceuticals Inc., USA, the latter incorrectly identified as Glenmark Generics Inc., USA.

Correspondingly, Plaintiffs assert Merck would have been motivated to agree to an earlier entry date had it retained the ability to launch an AG and compete with the generic during the period of exclusivity.

The evidence disclosed during discovery includes correspondence and emails between Merck and Glenmark relating to the negotiations which led to the Settlement Agreement and dismissal of the patent litigation. These documents suggest that the terms requested by Glenmark early in the negotiations included a six month period of early entry and, what is described in a Robbins' deposition exhibit as "No AG for Zetia." Robbins Dep. Ex. 2, Ezetimibe Settlement Chart (ECF No. 1086-39). The exhibit, an email from Glenmark executive Vijay Soni ("Soni"), includes a summary of offers and counter offers the parties exchanged in 2010. Eventually the parties agreed on the shorter period of early entry and certain language related to generic exclusivity, which forms the core of matters in dispute. Plaintiffs claim this language is the no-AG agreement Soni initially demanded. Defendants claim the language does not restrict Merck's right to compete with the generics or launch its own AG, and thus the agreement does not contain the no-AG provision Soni requested in his opening demand.

Based on his disclosed expert report, Robbins, an expert on generic launch timing, was retained "to provide opinions

3

concerning the development and approval process of pharmaceutical products, and the ability (or lack thereof) of Glenmark and other generic manufacturers to commercially launch a generic version of Zetia." Robbins Rep. ¶ 13 (ECF No. 1091-14, at 8). But he was also asked to respond to certain aspects of Plaintiffs' experts' reports, including proffered testimony by attorney Shashank Upadhye ("Upadhye"). Id. Upadhye interprets the Merck/Glenmark Settlement Agreement to contain a no-AG agreement based on the "custom and usage of the pharmaceutical industry." Id. ¶ 181 (ECF No. 1091-14, at 71) (citing Upadhye Rep. ¶ 2 (ECF No. 1033-1, at 5)). Robbins also offers a somewhat unrelated opinion that the parties would not have agreed to an earlier entry date in a but-for world without the challenged conduct. Id. ¶ 74, n.52 (ECF No. 1091-14, at 29).

Plaintiffs do not assert that Robbins is not qualified to testify as a generic launch timing expert in this litigation. Indeed, Robbins, who has worked in the pharmaceutical industry for more than thirty years, holds both a Ph.D. in Pharmacology from the University of Minnesota Medical School and a J.D. from St. Louis University School of Law. Id. ¶¶ 4-5 (ECF No. 1091-14, at 5). From 1998 until 2011, Robbins worked at Usher-Smith Laboratories, a major pharmaceutical company, where he initially served as General Counsel and Vice President of Legal and

4

Regulatory Affairs and later as the Chief Scientific Officer and Executive Vice President of Legal, Scientific and Technical Operations. Id. ¶ 7 (ECF No. 1091-14, at 6). While at Usher-Smith, Robbins oversaw patent and antitrust litigation, including Paragraph IV patent cases. Id. ¶ 8 (ECF No. 1091-14, at 6-7). Since 2011, Robbins has been the President and CEO of Kodiak Strategic Consultants, LLC, where he consults pharmaceutical companies on regulatory and legal matters. Id. ¶ 5 (ECF No. 1091-14, at 5-6). He also presently serves as an adjunct professor at the University of Minnesota Medical School in the Department of Pharmacology and at the University of Minnesota College of Pharmacology in the Department of Experimental and Clinical Pharmacology, where he lectures on "pharmaceutical company start ups, the drug development process, pharmaceutical patent and antitrust matter, and pharmaceutical licensing." Id. ¶ 6 (ECF No. 1091-14, at 6).

Plaintiffs also do not challenge the majority of Robbins' testimony, which is primarily directed to the timing of generic launch and when Glenmark and other generic drug manufacturers would have been able to enter the market under various but-for scenarios. Rather, Plaintiffs' joint motion seeks to exclude the two narrow -- and somewhat disconnected -- opinions offered by Robbins on the nature of restrictions on generic competition in the Merck/Glenmark Settlement Agreement, and the parties'

hypothetical alternative negotiation. Pls.' Mem. 1-3 (ECF No. 1056, at 6-8). First, Robbins refutes Upadhye's opinion that the Settlement Agreement would have been understood to contain a no-AG provision based on the custom and practice of the pharmaceutical industry (the "contract interpretation opinion"). Robbins Rep. ¶ 181 (ECF No. 1091-14, at 71) (citing Upadhye Rep. ¶ 2 (ECF No. 1033-1, at 5)). Second, Robbins opines that he disagrees with the "Plaintiffs' allegation that the parties would have agreed to an earlier entry date in a but-for world without the challenged conduct" (the "causation opinion"). Id. ¶ 74, n.52 (ECF No. 1091-14, at 29).

Plaintiff's motion challenging these two opinions is fully briefed and the parties appeared by counsel for oral argument on June 28, 2021. After reviewing the record, including the parties' briefing, Robbins' Expert Report, and Robbins' deposition, as well as hearing the parties' oral arguments, I find that Robbins' contract interpretation opinion is inadmissible, as the opinion of Upadhye to which it responds, has also been excluded. Robbins' causation opinion is also inadmissible, as his analysis does not consider a negotiation untainted by the anticompetitive conduct alleged, and would serve merely to bolster the Defendants' factual contention that Merck and Glenmark did not include a no-AG provision in the final Settlement Agreement language.

6

## I. <u>STANDARD OF REVIEW</u>

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. <u>United States v. Wilson</u>, 484 F.3d 267, 274-75 (4th Cir. 2007). Under the Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In other words, expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 260 (4th Cir. 1999) (citing <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 592 (1993)). The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to

analyze "whether the opinion is relevant to the facts at issue." Id.; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S. at 597)); Oglesby v. General Motors Corp., 190 F.3d 244, 249-50 (4th Cir. 1999) ("[A] district judge, considering a proffer of expert testimony under Federal Rule of Evidence 702 -- whether based on scientific, technical, or other knowledge -- [the court] must, in determining its admissibility, ensure that the evidence is 'not only relevant, but reliable.'" (quoting Daubert, 509 U.S. at 589)).  That is, "a reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." Oglesby, 190 F.3d at 250 (4th Cir. 1999) (citing Daubert, 509 U.S. at 590, 592-93).  "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Daubert, 509 U.S. at 592 n.10).

Thus, the District Court serves as a gatekeeper to assess whether the proffered evidence is reliable and relevant. Kumho Tire Co., 526 U.S. at 141.  But the gatekeeper function does not

require that the Court "determine that the proffered expert testimony is irrefutable or certainly correct" because expert testimony is "subject to testing by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596).

There is no "mechanistic test for determining the reliability of an expert's proffered testimony; on the contrary, 'the test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" Peters-Martin v. Navistar Int. Trans. Corp., 410 Fed. Appx. 612, 617 (4th Cir. 2011) (quoting United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007)).

In this case, Robbins' testimony is not strictly scientific in nature, but rather experiential. As the Fourth Circuit noted in Wilson, "experiential expert testimony . . . does not 'rely on anything like a scientific method.'" Wilson, 484 F.3d at 274 (quoting Fed. R. Evid. 702). As a result, it is not characterized by "falsifiability, or refutability, or testability" like purely scientific testimony. Id. (quoting Daubert, 509 U.S. at 593). Nevertheless, the court's gatekeeping role "is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field.'" Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 200 (4th Cir. 2001) (citing Kumho Tire, Co., 526 U.S. at 152). Therefore, courts must still require an experiential expert to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Wilson, 484 F.3d at 274 (quoting Fed. R. Evid. 702 Advisory Committee Note) (alterations in original).

## II. ANALYSIS

### A. Robbins' Contract Interpretation Opinion Is Not Helpful to the Trier of Fact.

Federal courts have held that "experts cannot testify as to conclusions of law, and an interpretation of a contract is a conclusion of law. Specifically, the Fourth Circuit has found that whether a party breached a contract, as well as the proper interpretation of a contract, are 'question[s] of law,' and an expert cannot give an opinion as to the legal obligations of parties under a contract." Donnert v. Feld Entertainment, Inc., No. 1:13-cv-40, 2013 WL 12097618, at *3 (E.D. Va. Nov. 8, 2013) (quoting Forrest Creek Associates, Ltd. v. McLean Sav. And Loan Ass'n, 831 F.2d 1238 (4th Cir. 1987)); see also Hopeman Bros., Inc. v. Cont'l Cas. Co., No. 4:16-cv-187, 2018 WL 4169282, at *14 (E.D. Va. Jan. 12, 2018) ("In the Fourth Circuit, (and in

10

other circuits), it is well-established that it is typically improper for a court to rely on expert testimony for the purposes of interpreting certain terms and/or clauses of a contract." (quotation marks and citation omitted)).

Here, Plaintiffs assert that Robbins offers impermissible contract interpretation. Pls.' Mem. 11-14 (ECF No. 1056, at 16-19). For example, Plaintiffs highlight that Robbins, both in his report and his deposition, acknowledges that he is basing his opinion on the face of the agreement. Id. at 11-12 (ECF No. 1056, at 16-17) (citing Robbins Rep. ¶¶ 185-86 (ECF No. 1091-14, at 72-73); Robbins Dep. 61:13-62:25 (ECF No. 1086-40, at 3-4)). Thus, Plaintiffs allege that "Dr. Robbins is not explaining specialized terminology or technical language, nor is he providing information about industry usage or custom, which is sometimes permissible. Rather, he offers his opinion as to what he believes the 'plain language of the settlement' contract means 'on its face' or, as he puts it, what it 'appears to mean.'" Id. at 13 (ECF No. 1056, at 18). Plaintiffs also allege that in doing so, Robbins does not utilize his expertise in the areas of pharmaceutical marketing and business strategy. Id.

Robbins' interpretation of the Merck/Glenmark Settlement Agreement is offered in response to Plaintiffs' expert Upadhye, who also sought to opine on the Settlement Agreement's language.

11

Upadhye described his opinions as explaining how an industry participant would interpret its terms. Specifically, Upadhye sought to testify that an industry participant would understand the Settlement Agreement to contain a no-AG provision. Robbins' testimony counters this argument, and Defendants acknowledge that if Upadhye is excluded then Robbins need not offer his responsive testimony.[4] Defs.' Mem. in Opp'n re Mot. to Exclude Proposed Testimony of Mark Robbins 17 (ECF No. 1136, at 20) ("Defs.' Opp'n"); see also Defs.' Reply to Resp. to Mot. to Exclude Proposed Expert Testimony of Att'y Shashank Upadhye 4 n.2 (ECF No. 1189, at 9)("Dr. Robbins' opinion that Mr. Upadhye's opinions are wrong is moot if Mr. Upadhye's opinions are excluded."). By separate Order -- and largely following the same arguments asserted against Robbins' contract interpretation opinion -- the Court has excluded Upadhye's testimony on this topic. Robbins' responsive testimony is therefore likewise excluded.

---

[4] Specifically, Plaintiffs state that "[i]f the Court grants Defendants' motion to exclude Mr. Upadye and Plaintiffs do not contend at trial that an industry participant would understand this challenged provision to be a "no-AG' provision, then Dr. Robbins' responsive testimony on the specific point of what the settlement agreement appears to allow Merck to do would no longer be necessary." Defs.' Opp'n 17 (ECF No. 1136, at 20). The Court does not here address what additional testimony may be offered at trial. However, Plaintiffs assert that "Mr. Upadhye is the purchasers' only expert who opines on whether the Settlement Agreement would be interpreted in accordance with custom and usage of the pharmaceutical industry as containing a no-AG provision." Pls.' Reply 12 n.30 (ECF No. 1187, at 16).

**B. Robbins' Causation Opinion Is Not Helpful to the Trier of Fact and Not Reliably Based on his Expertise or Experience.**

Plaintiffs assert that Robbins' opinion that Merck and Glenmark would not have agreed to an entry date earlier than the six months Glenmark initially proposed should be excluded as: (1) his opinion is based on an improper opinion about Glenmark's state of mind, (2) his opinion is based on a flawed analysis that does not fit the causation inquiry, and (3) his opinion is based on improper credibility determinations of Defendants' witnesses. Pls.' Mem. 6-11 (ECF No. 1056, at 11-16); see also Pls.' Reply to Mot. to Exclude Portions of the Proposed Testimony of Dr. Mark Robbins 2-11 (ECF No. 1187, at 6-15) ("Pls.' Reply"). With respect to Plaintiffs' causation opinion argument, the Court agrees that Robbins does not provide an analysis free of anticompetitive conduct, and his opinion would not be helpful to the trier of fact. Moreover, Defendants claim that Robbins is simply interpreting the negotiation record does not provide sufficient ground for his opinion.[5]

To establish causation in an antitrust case, an expert must isolate the effect of the antitrust violation. See, e.g., Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc., 850 F.2d 1286, 1306 (8th Cir. 1988) ("At base, an antitrust plaintiff's

---

[5] Because the Court concludes that Robbins' causation opinion does not provide a benchmark free of the anticompetitive conduct at issue -- the no-AG agreement -- the Court does not reach Plaintiffs' additional arguments.

damages should reflect the difference between its performance in a hypothetical market free of all antitrust violations and its actual performance in the market infected by the anticompetitive conduct."); <u>Blades v. Monsanto Co.</u>, 400 F.3d 562, 569 (8th Cir. 2005) ("To establish antitrust impact, an expert is 'required to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anti-competitive.'" (quoting <u>Concord Boat Corp. v. Brunswick Corp.</u>, 207 F.3d 1039, 1055 (8th Cir. 2000))); <u>Exhaust Unlimited, Inc. v. Cintas Corp.</u>, 223 F.R.D. 506, 513 (S.D. Ill. 2004) ("To establish impact, an expert must 'construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive.'" (quoting <u>Sample v. Monsanto Co.</u>, 218 F.R.D. 644, 650 (E.D. Mo. 2003))); <u>Apotex, Inc. v. Cephalon, Inc.</u>, 321 F.R.D. 220, 236 (E.D. Pa. 2017) ("When recreating a but-for world to establish antitrust damages, a plaintiff must create a world 'characterized by the absence of the . . . challenged practices.'" (quoting <u>Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.</u>, 247 F.R.D. 156, 165 (C.D. Cal. 2007))). In this case, part of the anti-competitive conduct alleged is Merck's agreement not to compete with Glenmark by launching an AG during the period of exclusivity. Robbins' causation opinion does not provide an analysis that isolates this alleged antitrust violation.

Robbins' opinion regarding causation is contained in a single footnote in his seventy-five page report.[6] In this footnote, Robbins opines, in passing, that he disagrees with Plaintiffs' economic experts that Merck and Glenmark would have agreed to an earlier entry date in the but-for world. His opinion is purportedly based on "testimony and documents," and

_____

[6] The footnote, in full, reads:

> To be clear, I do not concede or agree that Glenmark would have won the Glenmark Litigation or that the parties would have agreed to an earlier entry date than they did in the actual world. I understand that Merck expert Robert Armitage will offer an opinion that Merck had a very high level of probability of winning the Glenmark Litigation. With respect to Plaintiffs' allegation that the parties would have agreed to an earlier entry date in a but-for world without the challenged conduct, I disagree. The testimony and documents reflect that Glenmark's opening demand was six months of early entry, and that Glenmark understood that the six month figure would be negotiated down. See 10/16/19 Deposition of Vijay Soni ("Soni Depo.") at 107:13-108:5, 228:21-229:8, 241:15-242:22; GLENMARK-ZETIA-0034970; GLENMARK-ZETIA-00281992. Based on my experience as a General Counsel in the pharmaceutical industry, once such a demand is made, it serves as a "bookend" for future negotiations and both parties understand that any ultimate settlement would be less early entry. Moreover, while Vijay Soni of Glenmark testified that Merck expressly informed him that it would not agree to a no-AG provision, he did not respond to that position by demanding an earlier entry date. See Soni Depo. at 109:7-21, 112:7-113:5; GLENMARK-ZETIA-00304970. To the contrary, the evidence reflects that there was no connection in the negotiations between the entry date on the one hand and any request for a no-AG provision on the other. See 10/15/19 Deposition of Timothy Hester ("Hester Depo.") at 58:11-58:24, 76:7-23; 10/18/19 Deposition of Paul Matukaitis ("Matukaitis Depo.") at 229:6-23; 11/26/19 Deposition of Lisa Jakob ("Jakob Depo.") at 288:2-8; 10/24/19 Deposition of Lawrence Brown ("L. Brown Depo.") at 259:10-21; Soni Depo. at 228:3-20. Under such circumstances, and based on my experience, a reasonable brand company would not agree to an entry date earlier than the first demand, and instead would expect the agreement to reflect a compromise with significantly less early entry than was first demanded.

Robbins Rep. ¶ 74 n.52 (ECF No. 1091-14, at 29).

on his experience as general counsel in the pharmaceutical industry. He relies on this experience to opine that an initial offer -- of the type described in the Soni email -- serves as a "bookend" from which the parties would negotiate downward. Robbins Rep. ¶ 74 n.52 (ECF No. 1091-14, at 29). Because Glenmark initially demanded only six months of early entry, Robbins opines that "both parties under[stood] that any ultimate settlement would be less early entry." Id. Plaintiffs assert that Robbins' "analysis does not produce a benchmark free from the effects of anticompetitive conduct," as he relies on Glenmark's initial offer, which included a no-AG agreement among other terms. Pls.' Mem. 9 (ECF No. 1056, at 14). Defendants, in contrast, assert that Robbins has offered an opinion based on a "but-for" world that removes the alleged anticompetitive conduct -- he simply disagrees as to whether the parties would have agreed to an earlier date without the challenged conduct. Defs.' Opp'n 6 (ECF No. 1136, at 9). Defendants' argument is unpersuasive.

Here, Robbins attempts to use Glenmark's initial offer as the benchmark for his brief analysis of the causation question. Relying on his experience as an attorney, he opines that Glenmark would not have expected to increase its opening demand by requesting a longer period of early entry. But Glenmark's opening demand did not consist merely of a demand for six months

16

early entry.   It also included other forms of compensation --
notably a no-AG agreement for Zetia.[7]   Pls.' Mem. 4-5 (ECF No.
1056, at 9-10) (citing Robbins Dep. Ex 2, Ezetimibe Settlement
Chart (ECF No. 1086-39)).   Thus, Robbins' benchmark is not free
of the allegedly anti-competitive conduct in question -- nor
does Robbins in any way account for the no-AG agreement included
in the opening demand.   He simply ignores the initial proposal
for a no-AG agreement, as well as multiple other terms proposed
by Glenmark in their offer.

    Defendants attempt to defend Robbins' opinion by asserting
that Plaintiffs' argument that Glenmark would have demanded
earlier entry without the no-AG agreement is "entirely
speculative and unsupported."   Defs.' Opp'n 4 (ECF No. 1136, at
10).   In contrast, Robbins bases his analysis on the "facts and
the record," including the testimony of Glenmark's chief
negotiator Soni and the negotiation history between Merck and
Glenmark -- specifically, the fact that Glenmark never requested

---

[7] According to the summary in the Soni email, Glenmark's initial
settlement demand, in full, included the following terms:

- "6 months early entry (means effective 12 months exclusivity)"
- "Modest attorneys fee 20 M"
- "AG for Tamozolomide"
- "NO AG for Zetia"
- "Desloratadine launch few weeks earlier than others"
- "Clause to ensure early entry if someone else challenges '721
  [patent]"

Robbins Dep. Ex 2, Ezetimibe Settlement Chart (ECF No. 1086-39).

more than six months early entry. Id. at 7-8 (ECF No. 1136, at 10-11).

Even if it were the case that there is no testimony or documentation to support Plaintiffs' hypothetical earlier entry date, an issue which the Court is not reaching here, this would not be surprising, as such an analysis addresses a but-for world, rather than the one in which the parties were acting. In re AndroGel Antitrust Litig. (No. II), No. 09-md-2084-TWT, 2018 WL 2984873, at *17 (N.D. Ga. June 14, 2018) (noting that requiring direct evidence that the Defendants ever negotiated a different date "would be an almost impossible standard to require of Plaintiffs, given that this is a but-for scenario"); United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA, 296 F. Supp. 3d 1142, 1190 (N.D. Cal. 2017) ("Because this case is set in a but-for world, it is not surprising that no evidence shows that defendants were contemplating anything other than the actual Settlement."). Furthermore, both parties have identified economic experts to opine about the hypothetical but-for world, and Defendants' criticism of Plaintiffs' experts' opinions does nothing to support Robbins' causation opinion, which is not based on economics but purportedly on his experience litigating patent disputes and negotiating their settlement.

Defendants also point to Soni's testimony and the negotiation history between Merck and Glenmark, including the

fact that Glenmark also initially included an authorized generic for Temozolomide, which was unambiguously not included in the final agreement. Defs.' Opp'n 7 n.4 (ECF 1136, at 10). Defendants reason that because there "is no evidence that Glenmark took the position that Merck's refusal to agree to that term justified an earlier entry date" this is further evidence that Glenmark would not have demanded an earlier entry if the request for the no-AG provision related to Zetia was removed. Id. Defendants' reliance on the subsequent history of negotiations as support for Robbins' opinion testimony is unconvincing. It does not establish that Robbins' negotiation benchmark is free of anticompetitive conduct. Nor does it address the fundamental defect that his testimony regarding negotiated settlement provides no support for his causation opinion unless he can fully account for the anti-competitive conduct alleged. And rather than account for the anticompetitive conduct alleged, Robbins simply asserts that Glenmark understood its "six month figure would be negotiated down" and that "there was no connection in the negotiations between the entry date on the one hand and any request for a no-AG provision on the other." He based this conclusion on the testimony of Defendants' witnesses and the parties' negotiation history. Robbins Rep. ¶ 74 n.52 (ECF No. 1091-14, at 29); Robbins Dep. 145:2-7 (ECF No. 1086-40, at 9) (asserting that he

19

did not see any evidence the no-AG provision drove the timeline); id. 148:5-12 (ECF No. 1086-40, at 10) ("From what I saw, I don't think there was any basis to think there could have been an earlier entry date."). These assertions do not establish that Robbins' hypothetical, which is based on Glenmark's initial offer that included a no-AG proposal for Zetia, is free of anticompetitive conduct.

Lastly, Robbins points to the fact that Glenmark never requested more than six months earlier entry as support for his assertion that an earlier entry would not have occurred in a but-for world without a no-AG agreement. Of course, this assumes the Settlement Agreement eventually reached does not include a no-AG agreement. If -- as Plaintiffs' allege -- Glenmark received the allegedly illegal promise it asked for in its opening demand it would have no reason to raise its request for a longer period of earlier entry. But the relevant question on antitrust causation is whether companies in Merck's and Glenmark's position would have agreed to an earlier entry date without the no-AG agreement, not whether they did not do so in the real world in the presence of the anticompetitive conduct alleged. See In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018) (permitting a witness to testify that "'it would have been economically rational for both parties' to enter into a no-payment settlement in a but-for

20

world by specific dates, not that they necessarily <u>would have</u>");
<u>United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA</u>,
296 F. Supp. 3d 1142, 1188 (N.D. Cal. 2017) (allowing an expert
to "opine that in his view the parties would have been
rationally motivated to agree to settlement allowing . . . early
entry by specific dates"). In sum, Robbins' causation footnote
does not provide an economic analysis free of the challenged
conduct. And the presence of language restricting generic
competition for Zetia in the Settlement Agreement undermines the
only basis for his opinion which is consistent with the legal
experience he relies upon. Accordingly, Robbins' causation
opinion does not meet the standard for admissibility under Rule
702 and should be excluded. It bears mention too that, aside
from Robbins' singular footnote, Defendants have retained their
own economic expert to challenge the opinions of Plaintiffs'
experts on the hypothetical but-for worlds underlying the claim
of delayed generic entry. Thus, excluding Robbins' testimony on
this subject does not prevent Defendants from presenting their
own economic argument on the issue of early entry, nor does it
limit factual testimony from any witnesses involved in the
actual negotiation whose credibility will be determined by a
jury.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion to Exclude Portions of the Proposed Testimony of Mark Robbins, ECF No. 1055 and ECF No. 1072, namely Robbins' interpretation of the Merck/Glenmark Settlement Agreement and Robbins' opinion that Merck and Glenmark would not have agreed to an entry date more than six months early.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

August 17, 2021