**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

In re:
**ZETIA (EZETIMIBE) ANTITRUST
LITIGATION**

**MDL NO. 2:18md2836**

**OPINION**

This matter comes before the court on the Report and Recommendation entered by Magistrate Judge Douglas E. Miller on January 25, 2022, ECF No. 1480 ("R&R"), and the Direct Purchaser Plaintiffs'[1] ("DPPs") Objections thereto, ECF No. 1494 ("Objections"). For the reasons explained below, the court **ADOPTS IN FULL** the findings and recommendations set forth in the Magistrate Judge's Report and Recommendation; **OVERRULES** DPPs' Objections; and **DENIES** DPPs' Renewed Motion for Class Certification ("Motion"), ECF No. 1354.

**I. BACKGROUND**

The court will briefly review the facts and procedural history key to understanding DPPs' Objections and the court's analysis.[2]

---

[1] FWK Holdings, LLC, Rochester Drug Cooperative, Inc., and Cesar Castillo, Inc. are the named DPPs which seek to represent a proposed class of similarly situated unnamed plaintiffs.

[2] The court **ADOPTS** in full the Magistrate Judge's recitation of the relevant background and need not repeat it here. See R&R at 2-24. Unless otherwise specified, the factual background and procedural history outlined below are drawn from this portion of the R&R.

DPPs allege that that the Merck and Glenmark defendants' ("Defendants")[3] entered into an unlawful and anticompetitive agreement to resolve their earlier patent dispute concerning the cholesterol-reducing drug ezetimibe. The proposed class consists largely of prescription drug wholesale purchasers and distributors (or their assignees) who allegedly overpaid for Zetia, Merck's branded version of the drug. DPPs claim that the unlawful agreement delayed market entry of generic ezetimibe, forcing them to purchase Zetia from Merck at artificially inflated prices. They seek damages for the overpayment caused by Defendants' allegedly monopolistic behavior.

The undersigned referred DPPs' first motion for class certification, ECF No. 735, to Magistrate Judge Douglas E. Miller for a report and recommendation on February 25, 2020. ECF No. 888. Judge Miller recommending certifying the class. In re Zetia (Ezetimibe) Antirtust Litig. [Zetia I], No. 2:18-md-2836, 2020 WL 3446895, at *5 (E.D. Va. June 18, 2020). On August 21, 2020, the court adopted this recommendation and granted DPPs motion. In re Zetia (Ezetimibe) Anitrust Litig. [Zetia II], 481 F. Supp. 3d 571, 579 (E.D. Va. 2020). Shortly thereafter, Defendants appealed, and

---

[3] The Merck Defendants ("Merck") consist of Merck & Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC. The Glenmark Defendants ("Glenmark") consist of Glenmark Pharmaceuticals, Ltd. and Glenmark Pharmaceuticals Inc., USA, the latter incorrectly identified as Glenmark Generics Inc., USA.

the Fourth Circuit vacated and remanded the certification Order, concluding that this court erred by "improperly look[ing] to the impracticability of individual suits rather than joinder," when assessing whether the class was "so numerous that joinder of all members is impracticable" under Federal Rule of Civil Procedure 23(a)(1). See FWK Holdings, LLC v. Merck & Co. (In re Zetia (Ezetimibe) Antitrust Litig.) [Zetia III], 7 F.4th 227, 232, 236 (4th Cir. 2021).[4]

The circuit court explained that "on remand, the district court should consider whether judicial economy favors either a class action or joinder." Id. at 235 (citing In re Modafinil Antitrust Litig. [Modafinil], 837 F.3d 238, 254 (3d Cir. 2016)). It also noted that DPPs made "no showing that it would be uneconomical for [smaller claimants] to be individually joined," id. at 236 (quoting Modafinil, 837 F.3d at 259), and that they "must bring to bear some evidence" to make this showing. Id. Because the remand was limited to the issue of numerosity, the parties' submissions, Judge Miller's R&R, and this Memorandum Order explore only that aspect of the Rule 23 analysis.

---

[4] The full case cite at this juncture is In re Zetia (Ezetimibe) Antirtust Litig. [Zetia I], No. 2:18-md-2836, 2020 WL 3446895, at *5 (E.D. Va. June 18, 2020), adopted by In re Zetia (Ezetimibe) Anitrust Litig. [Zetia II], 481 F. Supp. 3d 571, 579 (E.D. Va. 2020), vacated and remanded by FWK Holdings, LLC v. Merck & Co. (In re Zetia (Ezetimibe) Antitrust Litig.) [Zetia III], 7 F.4th 227, 232 (4th Cir. 2021)

DPPs filed the instant Motion on September 24, 2021, ECF No. 1354, along with a Memorandum in Support, ECF No. 1355. They move the court to certify the following class of plaintiffs:

> All persons or entities in the United States or its territories that purchased Zetia in any form directly from Merck, or any agents, predecessors, or successors thereof from November 15, 2014 until June 11, 2017. Excluded from the proposed Class are defendants Merck, Glenmark and Par, and their officers, directors, management, employees, parents, subsidiaries, or affiliates, and the government of the United States and all agencies thereof, and all state or local governments and all agencies thereof.

ECF No. 1354 at 2.[5] DPPs also request to serve as class representatives. Id. Along with their Motion, DPPs filed five (5) declarations, including those of Rachel A. Downey ("Downey"), DPPs' counsel; Charlie Empson ("Empson"), Director of Finance and Accounting at Pharmacy Buying Association, Inc. ("PBA"), a proposed class member; the Honorable Shira A. Scheindlin ("Scheindlin"), a retired United States District Judge; and Rafael Emmanuelli ("Emmanuelli"), co-owner of Caribe Rx Services, Inc. ("Caribe"), another proposed class member.[6] Empson, Emmanuelli,

---

[5] Seven retailer plaintiffs separately litigating their claims are excluded from this class. See infra Part IV.A.

[6] ECF No. 1357 ("Downey Declaration"); ECF No. 1358 ("Empson Declaration"); ECF No. 1359 ("Scheindlin Declaration"); ECF No. 1360 ("Emmanuelli Declaration").

and Scheindlin were later deposed by Defendants for the purpose of explaining the contents of their declarations.[7]

Following these depositions, Defendants filed a Response in Opposition to DPPs' Motion on October 22, 2021. ECF No. 1379. DPPs replied on October 28, 2021. ECF No. 1385. On November 8, 2021, the undersigned referred the Motion to Judge Miller for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). ECF No. 1418. Judge Miller held a hearing on the Motion on January 4, 2022, ECF No. 1458, and issued the R&R on January 25, 2022, ECF No. 1480.

The Magistrate Judge recommends denying DPPs' Motion because they "have not met their burden to establish that 'the class is so numerous that joinder of all members is impracticable.'" R&R at 27 (quoting Fed. R. Civ. P. 23(a)(1)). DPPs filed their Objections on February 8, 2022, ECF No. 1494, and Defendants filed their Response on February 22, 2022, ECF No. 1516. Having been fully briefed, DPPs' Motion and Objections are ripe for disposition.

## II. STANDARD OF REVIEW

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the court, having reviewed the record in its entirety, must make a _de novo_ determination of those portions of the R&R to which the parties have specifically objected. Fed. R. Civ.

---

[7] _See_ ECF No. 1386-1 ("Emmanuelli Deposition"); ECF No. 1386-2 ("Empson Deposition"); ECF No. 1386-4 ("Scheindlin Deposition").

P. 72(b). Objections "must be made 'with sufficient specificity so as reasonably to alert the district court of the true ground of the objection.'" Scott v. Virginia Port Authority, No. 2:17-cv-176, 2018 WL 1508592, at *2 (E.D. Va. Mar. 27, 2018) (Jackson, J.) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)). "Objections must also respond to specific errors in the report and recommendation because general or conclusory objections are not proper. General or conclusory objections are the equivalent of a waiver" Id. (internal citation omitted) (citing Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982)). If any other rule applied, "judicial resources would be wasted and the district court's effectiveness based on help from magistrate judges would be undermined." See Midgette, 478 F.3d at 622.

For unchallenged portions, the court "must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note). The court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to him with instructions. 28 U.S.C. § 636(b)(1).

### III. LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named

6

parties only.'" <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 348 (quoting <u>Califano v. Yamasaki</u>, 442 U.S. 682, 700-701 (1979)). Litigants unlock this exception "only if" they satisfy the four requirements of Rule 23(a). Fed. R. Civ. P. R. 23(a). "'A party seeking class certification must affirmatively demonstrate his compliance with the Rule,' and must do so with 'evidentiary proof.'" <u>Zetia III</u>, 7 F.4th at 234 (internal citations omitted) (quoting <u>Wal-Mart Stores</u>, 564 U.S. at 350, and then <u>Comcast Corp v. Behrend</u>, 569 U.S. 27, 33 (2013)). This includes the requirement that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

When the proposed class includes between twenty (20) and forty (40) members, "'all the circumstances of the case should be taken into consideration' in evaluating the impracticability of joinder." <u>See</u> <u>Zetia III</u>, 7 F.4th at 234 (quoting <u>Ballard v. Shield of S.W. Va., Inc.</u>, 543 F.2d 1075, 1080 (4th Cir. 1976)). Some of the relevant factors include "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, [and] the geographic dispersion of class members." <u>See</u> <u>id.</u> at 234 (quoting <u>Modafinil</u>, 837 F.3d at 253). In his <u>Zetia III</u> concurrence, Judge Niemeyer identified four non-exhaustive considerations pertinent to the judicial economy factor: "docket management," "courtroom space and correlated staffing," "the differential in costs of discovery

between a class action and an action with many joined parties," and "the ability to identify class members." 7 F.4th at 240-41 (Niemeyer, J., concurring).

Ultimately, parties "must do more than simply show that litigating as a class - rather than joinder - would offer marginal economic benefits." Id. at 235 n.6. Though the movant need not show that joinder is impossible, it must "bring to bear some evidence" demonstrating that "'it would be uneconomical for [smaller claimants] to be individually joined as parties in a traditional lawsuit.'" Id. at 235 n.6, 235-36 (quoting Modafinil 837 F.3d at 259). Nevertheless, evidence of "some parties being economically unmotivated to litigate via joinder" does not necessarily demand certification, see id. at 236 n.7, as courts "must still determine whether, considering all the other relevant factors," certification is warranted, Modafinil, 837 F.3d at 259 (cited at Zetia III, 7 F.4th at 236 n.7).

### IV. OBJECTIONS

Though DPPs represent that they "lodge[] no objection to much of the R&R," they argue that "several missteps . . . require this Court to reject it." Objs. at 7. Upon de novo review of the record and DPP's Objections to the R&R, these Objections are **OVERRRULED**. While the R&R more than adequately explains why DPPs failed to satisfy their burden under Rule 23's numerosity requirement, and

8

therefore why certification is not appropriate here, the court will address the key aspects of DPPs' Objections in more detail.

## A. Size of Putative Class

As a preliminary issue, DPPs object to the number of class members the Magistrate Judge considered in his analysis of their Motion. Objs. at 13. While the R&R's analysis was based on a putative class size of thirty-five (35), DPPs argue that "the class technically [had] 42 members," and explain that "since the R&R issued, they have learned of three more assignee class members, making the analysis relevant for a class of 38 (and a technical total of 45)." Id. DPPs represent that Wegmans; Meijer, Inc.; and Giant Eagle, Inc. hold claims assigned by McKesson Corporation relating to McKesson's purchase of Zetia that it later resold to the trio. ECF Nos. 1495, 1496. Each of the three entities acquired their claims in either 2018 or 2020. Id.

The court first observes that at this stage in the proceedings, it is unhelpful to muddy the waters by drawing a distinction between a "technical total" number of class members and the total "relevant" for the court's analysis. See Objs. at 13. The R&R assessed a thirty-five (35) member proposed class because it is well-settled that the seven retailer plaintiffs should not be considered for purposes of analyzing whether the putative class satisfies the requirements of Rule 23(a). See id. (noting these "seven likely opt-outs"); see also Zetia III, 7 F.4th at 238

9

(noting that DPPs "did not appeal the thirty-five member class"). Indeed, DPPs concede this point in their Memorandum in Support of the Motion. See ECF No. 1355 at 12 n.29.

Still, DPPs also argue that the court should now review their Objections as if their prosed class numbers thirty-eight (38) to account for the three (3) newly-discovered entities. Objs. at 13. The issue of proposed direct purchaser class size has been contested since at least November 2019, when DPPs filed their first certification motion. See ECF No. 735. The parties have had ample opportunity and incentive to investigate the existence of potential class members since that time. The court also notes that two of the three entities identified held their claims at the time the first certification motion was filed, and the third received its assignment in June 2020. ECF Nos. 1495, 1496. Yet, DPPs provide no justification for bringing these three entities to the court's attention in February 2022, over two years after the court first considered the DPP class certification issue, and in the unusual procedural posture of objections to a magistrate judge's report and recommendation.

In any event, the court recognizes that "as part of its obligation to determine de novo any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate." See United States v. George, 971 F.2d 1113,

10

1118 (4th Cir. 1992) (emphasis added). However, the decision to consider new evidence that an objecting party presents "rests within the sound discretion of the district court." Doe v. Chao, 306 F.3d 170, 183 n.9 (4th Cir. 2002).

The court declines DPPs unexplained eleventh-hour invitation to receive new evidence. DPPs offer no meaningful justification for their untimely discovery of three new potential class members, more than two (2) years after they first moved for class certification, and over eighteen (18) months after the latest identified assignment occurred. Accordingly, the court will not exercise its discretion to consider the new declarations, ECF Nos. 1495, 1496, and will assess DPPs' Objections using the same putative class size that Judge Miller considered: thirty-five (35).

## B. Impracticability Standard

DPPs next argue that the R&R applies an erroneous standard for assessing whether joinder of all potential class members is "impracticable" in this case. Objs. at 14-22. Though they concede that the "R&R's legal standard section correctly states the law," id. at 15 n.46, they submit that the Magistrate Judge applied an incorrect standard in his analysis, requiring DPPs to demonstrate that plaintiffs are incapable of joining. See id. at 15.

According to DPPs, application of this erroneous incapability standard caused the Magistrate Judge to "discard[]" evidence

concerning "the ordinary, practical burdens of litigation in assessing whether businesses with small claims and little (if any) litigation experience" are likely to join as plaintiffs in this case. See id. at 15. DPPs represent that "[c]ourts over the years [have] treat[ed] 'impracticable' as, simply, not practical." See id. at 14. Yet, how "[c]ourts over the years" have applied the Rule 23(a)(1) standard is far less instructive than how the Fourth Circuit assessed, and directed this court to assess, the issue in this case. See Zetia III, 7 F.4th at 233-36. Judge Miller faithfully applied Rule 23(a)(1), paying close attention to the Fourth Circuit's directives.

DPPs suggest that an inapt dictionary definition of "impracticable" cited in the R&R serves as the foundation for the erroneous standard: "incapable of being performed or accomplished by the means employed or at command." Objs. at 15 (citing R&R at 54 n.43 (quoting Impracticable, Webster's Ninth New Collegiate Dictionary (1989))). This definition is entirely consistent with Zetia III's teachings and is not employed by the Magistrate Judge to "discard[]" relevant evidence, as DPPs allege. See Objs. at 15-16.

On its face, the cited definition does not establish the standard DPPs suggest. It does not conflate "impracticable" with "incapable of completion," but instead qualifies the incapability prerequisite with "by the means employed or at command." See R&R

at 54 n. 43. This comports with the Fourth Circuit's admonition that DPPs must "do more than simply show that litigating as a class – rather than joinder – would offer marginal economic benefits," to satisfy their burden under Rule 23(a)(1). <u>Zetia III</u>, 7 F.4th at 235 n.6. DPPs instead must bring to bear evidence demonstrating that economic roadblocks would make joinder difficult, though not necessarily impossible, with the resources ordinarily available to proposed class members. <u>See</u> <u>Modafinil</u>, 837 F.3d at 259 (district courts should consider whether "it would be <u>uneconomical</u> for . . . class members to be individually joined as parties in a traditional lawsuit").

The record also does not bear out the results that DPPs allege flow from this definition. Judge Miller hardly used it to concoct his own "incapable" or "economic impossibility" standard and "discard[]" evidence from his assessment. <u>See</u> Objs. at 15, 18. Contrary to DPPs assertion, <u>see id.</u> at 17, the R&R considers the Emmanuelli and Empson declarations, as well as the behavior of absent proposed class members in similar litigation, R&R at 54-59.[8]

However, the R&R explains that "a business's preference to abstain from litigation is minimally probative, unless it is rooted in the economic consequences of doing so." R&R at 56. This is

---

[8] DPPs argue that Judge Miller should have afforded more weight to certain aspects of this other-case evidence. The court takes this matter up below. <u>See</u> <u>infra</u> Part IV.D.4.

entirely consistent with the Fourth Circuit's instruction to this court on remand to assess whether DPPs "br[ought] to bear some evidence" that "'it would be <u>uneconomical</u> for [smaller claimaints] to be individually joined.'" <u>Id.</u> at 235-36 (emphasis added) (quoting <u>Modafinil</u>, 837 F.3d at 259). The court, therefore, concludes that the R&R does not improperly discard evidence that some proposed class members are unlikely to participate in a joinder action against Defendants. <u>See</u> Objs. at 15-16. Instead, the R&R explains why what little DPPs offered cannot compensate for the dearth of economic evidence in the record.

As explained below, neither Emmanuelli nor Empson conducted any meaningful cost-benefit analysis to assess the likely economic effect of suing Defendants before signing their declarations. <u>See</u> <u>infra</u> Part IV.D.2. Indeed, neither declarant had done any significant investigation into the value of their employer's claims <u>in this case</u>, making it difficult to assess whether "litigating as a class - rather than joinder - would offer" more than "marginal economic benefits." <u>See</u> <u>Zetia III</u>, 7 F.4th at 235 n.6. In sum, the R&R applied the correct legal standard for assessing impracticability of joinder under Rule 23(a)(1).

### C. Consideration of Relative Size of Claims

DPPs next object to the R&R's purported adoption of a "new factor . . . that assesses how much of the claim would survive by joining some, but not all, members." Objs. at 19-20. In the R&R,

Judge Miller observes that "there is little danger that denying class certification here will result in Defendants escaping liability" simply because Defendants allegedly "illegal behavior is spread thinly across many parties." See R&R at 60. DPPs note that Judge Miller found "'significant' for Rule 23(a)(1) analysis," the fact that proposed class members would likely pursue 95% of the total value of putative DPP class claims through joinder. See id. at 20 (quoting R&R at 59-60). They also point out that the R&R referenced other plaintiffs' groups challenging Defendants' allegedly anticompetitive activity. See id. (referencing R&R at 60-61). In DPPs' view, it was improper for the court to consider these issues when analyzing whether they made the showing demanded under Rule 23(a)(1). See id. at 20-21, 20 n. 68. The court disagrees.

When the proposed class contains between twenty and forty members, "'all the circumstances of the case should be taken into consideration' in evaluating the impracticability of joinder." Zetia III, 7 F.4th at 234 (quoting Ballard, 543 F.2d at 1080). And "some parties being economically unmotivated to litigate via joinder is only one of many factors to consider in making an impracticability of joinder consideration." Id. at 236 n.7 (citing Modafinil, 837 F.3d at 259) (contrasting this proposition to an "assumption that if even one party [is] unmotivated to litigate their small-value claims, Rule 23(a)(1) is satisfied because

joinder of 'all members' would then be impracticable" (quoting Fed. R. Civ. P. 23(a)(1))).

An important purpose of the class vehicle is to "allow private actors, who would otherwise be deterred from pursuing their insubstantial claims, to assist in the enforcement of the law and deter harmful behavior by defendants." See In re Nat'l Prescription Opiate Litig., 976 F.3d 664 (6th Cir. 2020) (citing Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980)). Accordingly, when analyzing whether DPPs' thirty-five (35) member proposed class should be certified, it was proper to examine, as one factor among many, whether denying certification would permit allegedly wrongful conduct to go unpunished.

Indeed, this is hardly a novel consideration. As the R&R points out, the Third Circuit in Modafinil also considered the potential ramifications for deterrence when applying the numerosity standard in a similar pharmaceutical antitrust case. See R&R at 60-61 (citing Modafinil, 837 F.3d at 258). Therefore, noting that a large percentage of the proposed class members' claims are likely to be pursued through joinder, and that similar claims addressing the same wrongdoing are also being pursued by other plaintiffs, was not error. Instead, it reflected the Magistrate Judge's consideration of an important purpose the class vehicle serves.

16

### D. Putative Class Members' Ability and Motivation to Join

When discussing the proposed class members' ability and motivation to litigate, the Fourth Circuit in Zetia III explained that DPPs "must do more than simply show that litigating as a class - rather than joinder - would offer marginal economic benefits," that it saw "little evidence in the record to support this point," and that it "expect[ed] that the district court [would] require [DPPs] to adduce such evidence on remand to establish impracticability." 7 F.4th at 235 n.6. DPPs argue that they have now satisfactorily developed the record, and that the "supplemental evidence reinforces that the class action mechanism is necessary to protect the interests of the smaller putative class members . . . ." Objs. at 23. However, DPPs' showing on this point fails to satisfy their burden under the clarified numerosity standard outlined in Zetia III.

#### 1. Legitimate Business Considerations

DPPs argue that the "R&R incorrectly limits the ability and motivation factor to an out-of-pocket test and thereby disregards substantial evidence of legitimate business considerations why class members will not join." Objs. at 24. The undersigned finds no error in the Magistrate Judge's assessment of the evidence on this issue.

The R&R considered Empson and Emmanuelli's declarations and depositions, as well as the empirical evidence contained in the

Downey Declaration concerning proposed class members' litigation history. R&R at 49-56 (consideration of Empson and Emmanuelli's statements); id. at 56-59 (discussion of empirical evidence). When addressing the two proposed class members' statements, the R&R explains that "[a]n accurate understanding of the potential recovery is critical to understanding the motivation to litigate." Id. at 50. The court agrees entirely with this common-sense statement. As noted elsewhere in this Memorandum Order, see infra Part IV.D.2., and in the R&R at 49-50, neither declarant had investigated or otherwise learned of the potential size of their employers' potential recovery in this case before signing their declarations. How can a business accurately assess its motivation to join an ongoing lawsuit without examining how much it stands to gain? Abstract statements concerning "business judgment" carry limited weight when the declarants have done little to meaningfully inform that judgment with an understanding of the facts of this case. It therefore was not error to find that the declarations failed to shoulder the weight DPPs argue they should.

The court also agrees with the R&R's assessment of the empirical evidence offered. This consists of Downey's statistical analysis concerning "which, how often, and in what circumstances the putative Zetia direct purchaser class members . . . file or join class action and/or individual (non-class-action) antitrust cases to vindicate their rights," as well as how entities not

involved in this litigation behaved in similar cases. ECF No. 1357 ¶¶ 1, 16-25. Specifically, Downey reviews how direct-purchaser litigants moved forward following denial of class certification in in two earlier pharmaceutical antitrust cases. Id. ¶¶ 16-25.

The court will not recount every detail of the R&R's review of this evidence.[9] However, the court notes that "more than fifty percent of the putative class members here that were present" in the two analogous earlier cases "prosecuted their claims" following denial of certification. R&R at 57. Furthermore, the court agrees, as a general matter, that "the fact that some putative class members 'did not pursue litigation in a different case' does not prove 'that they would find it economically impracticable to pursue eight-figure claims in this case.'" R&R at 58 (quoting ECF No. 1469 at 6-7).

At bottom, the court finds that the R&R assigned the appropriate weight to each aspect of the evidence DPPs presented concerning why business judgment may counsel against joining this litigation following denial of class certification.

---

[9] With one exception discussed below concerning the weight assigned to an aspect of this evidence, see infra Part IV.D.4., DPPs do not object to the Magistrate Judge's recitation of this statistical analysis as set forth in the Background section of the R&R. See Objs. at 13. This information is later relied upon in the analysis DPPs challenge.

## 2. Relative Claim Size

DPPs argue that by "replacing 'all members' with 'the majority of damages,' the R&R treats as uniformed the absent class members that came forward in support of class certification." Objs. at 26. This allegedly caused Judge Miller to "supplant[] [his] economic judgment for that of the class members simply because the latter exercised their conservative business judgment in deciding whether to join ongoing, complex federal litigation." Id. The court disagrees.

As explained elsewhere in this Memorandum Order, Judge Miller appropriately considered that certain proposed class members likely would not join as plaintiffs if certification is denied, see infra Part IV.D.4, and that the bulk of claim value would likely be pursued in a joined action, see supra Part IV.C. Moreover, Empson and Emmanuelli's failure to examine their employer's potential recoveries in this case influences the court's assessment of their declarations, just as it did the Magistrate Judge's.

In their declarations, Empson and Emmanuelli made representations that PBA and Caribe were concerned about "the burdens and expense of discovery, especially relative to what [they] understand is the relatively small size of [their] individual claim[s]." ECF No. 1358 ¶ 6; ECF No. 1360 ¶ 3. In the economic impracticability inquiry, the word "relative" carries

20

significance. However, neither declaration reflected a thoughtful comparison of costs of joining the instant litigation to the potential upside for each potential plaintiff.

The R&R correctly observes that neither individual "investigated the values of their respective claims before signing their declarations." R&R at 49. Empson later explained that he believed, without researching the specific purchases at issue here, that PBA's recovery would be similar to the $10,000 to $15,000 received in earlier cases. ECF No. 1386-2 at 11, 20 (34:9-25, 71:10-15). He later explained that PBA would have to "seriously consider" joining the suit if PBA's claim was much larger. Id. at 12 (38:4-40:5). Emmanuelli simply conceded that he had "no idea" how much Caribe's claim was worth when he signed his declaration, submitting that Caribe did not have the "capacity" to "get involved in this case," though he had not assessed the potential cost of joining the suit. See ECF No. 1386-1 at 15, 18, 20 (51:24-53:18, 62:3-6, 71:14-18).

These statements do more than show that Emmanuelli and Empson had not learned of DPPs' expert's damages calculations. They also illustrate that the pair had done nothing meaningful to review their own records to assess Caribe or PBA's potential recovery before declaring that they "likely" would not pursue their claims through joinder. ECF No. 1358 ¶ 4; ECF No. 1360 ¶ 3. Under these circumstances, concluding that the declarations, in combination

with the rest of the record, failed to demonstrate "that putative class members lack <u>economic</u> motivation to litigate Zetia claims" absent class certification was entirely appropriate. <u>See</u> R&R at 48.

### 3. Fear of Retaliation

According to DPPs, the "R&R improperly dismisses absent class members' fear of retaliation" by Defendants. Objs. at 27. They argue that that Judge Miller's analysis "downplays evidence," such as the Empson Declaration, "showing that class members are reluctant to file or join litigation against their suppliers with whom they have ongoing business relationships . . . ." <u>Id.</u> However, given the evidence presented in this case, the R&R correctly concludes that "the risk of retaliation has little probative value." <u>See</u> R&R at 47.

Though Empson explained his worry that joining as a named plaintiff could jeopardize his relationship with Defendants, even he represented that a substantial potential recovery could overcome his fear. <u>See</u> ECF No. 1386-2 at 15-16 (51:22-57:15). Yet, immediately after explaining this, he also conceded that he did not know what PBA could recover in this case. <u>See</u> <u>id.</u> at 16 (57:16-18).

The R&R also points out that there is no evidence of Defendants retaliating against customers who sued them in other cases, though "several unnamed putative class members, a named

class member, and several individual opt-out plaintiffs have previously sued Merck as named plaintiffs . . . ." R&R at 46 (footnotes omitted) (citing ECF No. 1381 ¶¶ 5-9). Indeed, Jim Curotto, Merck Sharp & Dohme Corporation's Vice President of Account Management for Global Human Health, U.S. Market, declared the following under oath:

> Merck has not disrupted the supply of products or taken any retaliatory action in any way because of the filing of any antitrust lawsuits against Merck by distributors or pharmacies in the past nor will it do so because of the filing of any lawsuits against Merck in this Zetia matter.

> Indeed, to my knowledge, Merck has never disrupted the supply of products or taken any retaliatory action in any way against any customer because of the filing of any lawsuit against Merck. It would not be in Merck's best interest to take such action as it could negatively impact the supply of pharmaceutical products to patients.

ECF No. 1381 ¶¶ 8-9; see also R&R at 46 (discussing this declaration). Glenmark Pharmaceuticals Incorporated, USA's Senior Vice President and Head of Commercial Operations, Dmitrey Kuznetsov, made similar representations on his employer's behalf. See ECF No. 1382 ¶¶ 4-5.

Even if DPPs had offered evidence of Defendants retaliating against customers who sued them in the past, there is little to suggest that class certification would prevent future retaliation here. Litigating as absent class members would do little to shield absent members of the proposed class, as Defendants already know

23

who they are. See R&R at 47. Accordingly, the court concludes that the R&R appropriately assessed DPPs' retaliation concerns. See id.

### 4. Allegedly Unattainable Standard

DPPs argue that the "R&R's analysis implies that only three forms of evidence are probative to the ability and motivation factor." Objs. at 29. They explain that adopting this framework "would be to endorse a nearly impossible-to-satisfy burden of proving impracticability of joinder for gray-area direct purchaser classes." Id. at 31.

DPPs identify the first consideration in this analysis as "a calculation of the value of each class member's claim minus the costs of joinder." Id. at 29. They argue that this "will always result in a positive number, and a non-negative result has little predictive value in terms of a class member's willingness to join." Id. They point to a proposed class member that stands to recover 0.000006% of the ultimate recovery to demonstrate that some plaintiffs may stand to recover so little that, no matter how costs are shared, they would not have sufficient motivation to join in the litigation. See id. DPPs further represent that "myriad unknown and unquantifiable variables . . . could dramatically affect" any cost-value estimate. Id. at 29-30. This critique misses the broader point: even for those with larger potential claims, DPPs did not compare their value to "the pro-rata share of costs in a joined action." R&R at 49. That a small sect of the proposed class may be

unmotivated to litigate, no matter the cost of joinder, does not demonstrate that providing evidence of this comparison, generally, was unnecessary.

Nevertheless, Judge Miller addressed the very issue DPPs suggest he overlooked, explaining that their "evidence is sufficient to show that those who would recover the smallest shares," such as the example plaintiff, "would not likely join the case." R&R at 59. He then cited the Modafinil passage noted in Zetia III, explaining that some potential plaintiffs' lack of economic motivation to join is not necessarily outcome-determinative. Id. at 60 (citing Modafinil, 837 F.3d at 259). On this record, where plaintiffs offered no meaningful evidence comparing the costs of joinder to proposed class members' potential recovery, Judge Miller afforded the appropriate weight to the reality that some of the proposed class members will not join the suit if certification is denied.

DPPs next note that "the R&R recognizes that data from prior, similar cases about the class members that did not join following denial of class certification is 'useful'. . . ." Objs. at 30. However, they argue that the Magistrate Judge erred in his assessment of this earlier-case evidence by minimizing its usefulness in two respects: first, by finding it helpful only in assessing how a party present in at least one of the earlier cases and the instant case might behave; second, by affording only

"limited" value to evidence of proposed class members' decisions not to join as plaintiffs in the earlier cases. See id. DPPs apparently believe that the R&R should have found a stronger inference that the claimants' decision not to join in the earlier cases was driven by "impracticab[ility]," within the meaning of Rule 23(a)(1), and therefore that it is similarly impracticable for proposed class members to join as plaintiffs in this case, whether they were involved in one of the earlier cases or not. See id.

First, other than being "of comparable size and resources" and sharing generally similar business concerns, DPPs do not point to evidence demonstrating how and why other litigants' characteristics and behavior in entirely different cases bear on the ultimate question before the court: whether the proposed class in this case is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While it may be impracticable for a particular litigant to join one antitrust suit, it does not necessarily follow that it will be impracticable for other entities to join later antitrust suits. Though the court recognizes that the earlier cases discussed are close "analogues" to the instant litigation, Objs. at 30, such evidence still does "not provide any insight" as to whether the proposed class members will pursue their claims in this case. See R&R at 21; id. at 57 (noting that the earlier cases "provide no information (and are

therefore neutral)" as to the thirteen (13) putative class members who were not present).

It was likewise proper to afford "limited" probative value to evidence concerning putative class members' decision not to pursue their claims in the earlier cases without some evidence of the size of the claims they abandoned. See R&R at 58. As Judge Miller points out, "any inference that joinder was impracticable in those cases is insupportable as other factors may have contributed to their decision." Id.

Finally, DPPs take issue with the R&R's suggestion "that declarations from class members with smaller claims than Caribe or PBA about their ability and motivation to join would be relevant." Objs. at 30. They argue that "asking absent class members that fear retaliation from their suppliers or have no interest in being plaintiffs in antitrust litigation for economic or other reasons to submit declarations in a federal lawsuit and subject themselves to depositions is not reasonable." Id. at 30-31.

Though DPPs have not identified the specific passage that contains the purportedly problematic suggestion, no aspect of the R&R's analysis erects an unattainable or unreasonable standard. While absent class members may "fear retaliation" or "have no interest in being plaintiffs in antitrust litigation for economic or other reasons," Objs. at 30, this does not discharge a certification movant's burden to demonstrate, with evidence,

compliance with Rule 23(a)(1). Here, where DPPs provided no evidence of Defendants retaliating against similarly situated entities, or a comparison of the value of putative members' claims to "the pro rata share of costs in a joined action," additional declarations explaining why joinder would be impracticable for other potential class members – even those with small claims – absolutely would have been useful, though not essential. See R&R at 44-47 (noting lack of retaliation evidence); id. at 49-54 (noting lack of cost comparison evidence). There is no suggestion in the R&R that such declarations were a required aspect of the evidentiary threshold DPPs needed to cross in this totality-of-the-circumstances assessment. See Zetia III, 7 F.4th at 234 (for cases between twenty (20) and forty (40) members "'all the circumstances of the case should be taken into consideration' in evaluating the impracticability of joinder" (quoting Ballard, 543 F.2d at 1080)).

In sum, no aspect of the R&R established an unreasonable or unattainable standard for DPPs to satisfy.

### E. Burden on Judicial Resources

Finally, DPPs take issue with multiple aspects of the R&R's analysis of the relevant judicial economy considerations. Objs. at 30-35. The court will briefly note why each protestation misses the mark.

DPPs first argue that, from a docket management perspective, joinder would place "an unacceptable burden on the Court, particularly for trial." Objs. at 32. They submit that "the effective management of these complex proceedings by lead counsel (and the class committee) in cooperation with the retailers and end-payor plaintiffs" does not support joinder, but instead "demonstrates the judicial economy attendant to having court-appointed counsel for a class of purchasers." See id. However, Judge Miller was correct to conclude that the coordination among litigants thus far bodes well for efficient progression to trial with joined parties. See R&R at 31 (discussing court-appointed DPP executive committee); id. at 31-32 (discussing coordination among retailer plaintiffs' counsel); id. at 32-33 (noting potential for shared counsel). Denying class certification would not erase the efficiencies developed through years of litigation. Accordingly, the court agrees that "any extra burden on the docket threatened by joinder here is incremental" compared to the already very complex nature of the case. See R&R at 29.

Of particular importance to the court is "the history of shared counsel in other cases after class certification was denied." R&R at 32-33 (discussing multiple cases). Despite this history, DPPs argue that counsel "have not represented those with small claims (and little or no lawsuit experience)," foreshadowing "the likely prospect of many more." Objs. at 33. Yet, they offer

no evidence that counsel currently involved in the matter, or new counsel willing to represent multiple proposed class members, would decline to take on joined parties with smaller claims whose recovery would turn on theories mirroring those of the larger ones. The court, therefore, agrees that "an unmanageable influx of new attorneys" is "unlikely" following denial of certification. R&R at 32.

For similar reasons, Judge Miller did not "take[] . . . too far" the availability of remote proceedings when assessing courtroom space and staffing. Objs. at 33. The court recognizes that the ultimate jury trial "of this matter will be in person," that COVID-19 restrictions may require using additional courtrooms, and that, absent stipulations, additional damages evidence may be required in a joined action. See Objs. at 33-35. However, DPPs have offered little to quantify the additional burden of a traditional trial with joined parties, many of whom will likely be represented by shared counsel.

DPPs "also object to the R&R's treatment of the geographic dispersion of the class members because it ignores the fact that trial in this case will be in person in Norfolk, Virginia," arguing specifically that the "R&R should have given more weight to [Emmanuelli's] testimony that the remote forum was a reason it was unlikely that Caribe would join the case." Objs. at 34. The court does not find that the R&R ignored this aspect of the

impracticability-of-joinder analysis. Indeed, Judge Miller recognizes that "the putative class members are spread throughout the United States and Puerto Rico, which includes four time zones." R&R at 41.

As noted below, use of remote depositions could alleviate some of the burdens attendant to live, in-person testimony at trial. And in any event, the R&R's discussion of the availability of remote proceedings to handle pretrial matters does not display an ignorance of the obvious reality that the trial will be held in person. See R&R at 42-43. It simply reflects consideration of an important aspect of the mechanics of these ongoing proceedings, and one the court agrees supports the conclusion that requiring joinder of the multiple, geographically dispersed potential plaintiffs in this case will not prove impracticable under Rule 23(a)(1).

Further, the R&R properly considered Emmanuelli's statement, affording it the appropriate weight. See R&R at 42-43 (discussing statement and noting Emmanuelli's ability to attend his deposition remotely). At the time he signed his declaration, Emmanuelli had done no investigation into how much it would cost Caribe to pursue its claim through joinder, and therefore whether travel to Virginia, or absence from his other business duties, would be justified. See supra Part IV.D.2.

31

Finally, DPPs argue that increased discovery burdens warrant class certification. Objs. at 34-45. Some additional discovery will surely occur. Still, the court agrees that extensive new discovery is unlikely because many of the pertinent issues have already been litigated by the retailer plaintiffs group, "the merits of the case are fully discovered on both sides," and the proposed class members "are similarly situated . . . ." R&R at 35-36. On the other hand, the court does recognize that some plaintiffs may "need to be deposed and/or testify at trial" on the issue of damages. Objs. at 35.

Nevertheless, video conferencing could be effectively employed by the parties to minimize this potential burden through remote depositions. Federal Rule of Civil Procedure 32 specifically provides that testimony from properly noticed depositions may generally be admitted at "a hearing or trial," and "for any purpose," when "the witness is more than 100 miles from the place of hearing or trial or is outside the United States . . . ." Fed. R. Civ. P. 32(a)(4)(B) (emphasis added). Moreover, district courts are "afforded broad discretion to admit or exclude any deposition testimony by applying the rules of evidence." Tatman v. Collins, 938 F.2d 509, 511 (4th Cir. 1991); see also Fed. R. Civ. P. 32 (a)(1)(B) (where other prerequisites are satisfied deposition testimony may be "used to the extent it would be admissible under the Federal Rules of Evidence if the

deponent were present and testifying"); Fed. R. Evid. 802 (advisory committee's note identifying Federal Rule of Civil Procedure 32 as an exception to the general rule barring hearsay). Accordingly, the court may consider on a case-by-case basis whether deposition testimony should be admitted in lieu of demanding a distant proposed class member's physical presence at any hearing or, ultimately, at trial, if traveling to Virginia would work a substantial hardship on the party.

At bottom, the court concludes, as the Magistrate Judge did, that DPPs failed to adduce evidence sufficient to show that judicial economy concerns merit class certification. See R&R at 27.

### IV. CONCLUSION

Following a de novo review of the record and the Objections to the R&R, the court **ADOPTS IN FULL** the findings and recommendations set forth in the Magistrate Judge's thorough and well-reasoned Report and Recommendation filed on January 25, 2022. ECF No. 1480. Therefore, the court **OVERRULES** DPPs' Objections, ECF No. 1494, and **DENIES** the Motion, ECF No. 1354. The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for all parties.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Senior United States District Judge

REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

April 13, 2022

33