**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| IN RE: ZETIA (EZETIMIBE) ANTITRUST LITIGATION | MDL No. 2:18-md-2836 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS IN LIMINE NOS. 1–10**

# TABLE OF CONTENTS

I.      Plaintiffs' MIL No. 1 Should Be Denied Because It Is Plaintiffs' Burden To Establish Antitrust Injury By Proving Their Assignments Are Valid. .......................................... 1

II.     Plaintiffs' MIL No. 2 Should Be Denied Because It Improperly Expands The Scope Of Any Pass-On Rule. ...................................................................................... 6

III.    Plaintiffs' MIL No. 3 Should Be Denied Because Plaintiffs Fail To Identify The Evidence They Seek To Exclude Or Demonstrate Why It Is Excludable......................10

IV.     Plaintiffs' MIL No. 4 Should Be Denied Because Defendants Are Entitled To Explain To The Jury The Differences Between Brand And Generic Drugs, Their Business Structures, And The Industry In Which They Operate.................................................12

        A.      Plaintiffs Improperly Seek To Exclude Evidence And Argument That Will Educate The Jury On Relevant Differences Between Brand And Generic Drugs And The Companies That Develop Them. ............................................13

        B.      Evidence Of Defendants' Business Structures And Activities, And The Industry In Which They Operate, Is Not Impermissible Character Evidence. ...16

V.      Plaintiffs' MIL No. 5 Should Be Denied Because Requiring Defendants To Produce In The Purchasers' Case-in-Chief The Witnesses That Defendants Intend To Present Live At Trial Prejudices Defendants' Ability To Present Their Own Case..........................17

VI.     Plaintiffs' MIL No. 6 Should Be Denied Because It Is Premature And Does Not Identify Any Evidence Or Argument To Exclude.........................................................23

VII.    Plaintiffs' MIL No. 7 Should Be Denied To The Extent It Seeks To Preclude Defendants From Offering Relevant Evidence For Proper Purposes Such As Rebutting Plaintiffs' Assertions Regarding Impact Of Damages Award Or To Challenge Plaintiffs' Claimed Damages......................................................................................26

VIII.   Plaintiffs' MIL No. 8 Should Be Denied To The Extent It Would Limit Cross-Examination Of Plaintiffs' Experts.............................................................................27

IX.     Plaintiffs' MIL No. 9 Should Be Denied Because It Seeks To Preclude Mention Of Relevant Evidence Regarding Purchasers' Size Or Financial Condition. ....................28

X.      Defendants Do Not Intend To Argue To The Jury Regarding Treble Or Enhanced Damages, Attorneys' Fees, Or Costs. .........................................................................30

# TABLE OF AUTHORITIES

Page

CASES

*A. Hak Indus. Servs. BV v. A. Hak Intank Servs. LLC*,
  2014 WL 12591696 (N.D. W. Va. Dec. 18, 2014) ..................................................... 16, 24

*A.Hak Indus. Servs. BV v. Techcorr USA, LLC*,
  2014 WL 12591895 (N.D.W. Va. Dec. 18, 2014) ............................................................. 10

*Agrigenetics, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
  2011 WL 52451 (S.D. Ind. Jan. 6, 2011) ........................................................................... 22

*Air Turbine Tech., Inc., v. Atlas Copco AB*,
  217 F.R.D. 545 (S.D. Fla. 2003), *aff'd*, 410 F.3d 701 (Fed. Cir. 2005) ......................... 19, 21

*Apple v. Pepper*,
  139 S. Ct. 1514 (2019) ......................................................................................................... 2

*Armenian Assembly of Am., Inc. v. Cafesjian*,
  746 F. Supp. 2d 55 (D.D.C. 2010) ................................................................................ 19, 20

*In re Asacol Antitrust Litig.*,
  No. 15-cv-12730 (D. Mass. Jan. 2, 2018), Dkt. 671 ......................................................... 28

*Bellew v. Ethicon, Inc.*,
  2014 WL 6680356 (S.D. W. Va. Nov. 25, 2014) ............................................................... 24

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946) ........................................................................................................... 27

*Biotechnology Indus. Org. v. D.C.*,
  505 F.3d 1343 (Fed. Cir. 2007) ......................................................................................... 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................................................. 1

*Burlington Ins. Co. v. Shipp*,
  2000 WL 620307 (4th Cir. May 15, 2000) ......................................................................... 23

*In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
  2013 WL 3367715 (S.D. W. Va. July 5, 2013) .................................................................. 18

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ...................................................................................... 8

# TABLE OF AUTHORITIES
*(continued)*

<u>Page</u>

*Dennis v. Progressive N. Ins. Co.*,
   2018 WL 4871039 (W.D. Okla. Apr. 9, 2018) ..................................................25

*Dial Corp. v. News Corp.*,
   2016 WL 690868 (S.D.N.Y. Feb. 17, 2016) .....................................................30

*DNAML Pty, Ltd. v. Apple Inc.*,
   2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015) ............................................ 2, 3, 4

*Elgabri v. Lekas*,
   964 F.2d 1255 (1st Cir. 1992) ............................................................... 18, 19, 23

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
   2021 WL 2822535 (D. Kan. July 7, 2021) .......................................................22

*In re Ethylene Propylene Diene (EPDM) Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009) .........................................................................30

*Food Lion, LLC v. Dean Foods Co.*,
   2017 WL 11681053 (E.D. Tenn. Feb. 23, 2017) ...............................................19

*Green v. Ford Motor Co.*,
   2001 WL 1530254 (W.D. Va. Nov. 19, 2001) ..................................................28

*Gulfstream III Assoc., Inc. v. Gulfstream Aerospace Corp.*,
   995 F.2d 425 (3d Cir. 1993) ................................................................................4

*Hana Fin., Inc. v. Hana Bank*,
   735 F.3d 1158 (9th Cir. 2013) ..........................................................................12

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ............................................................................................6

*Hartig Drug Co. v. Senju Pharm. Co.*,
   836 F.3d 261 (3d Cir. 2016) ................................................................................3

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ............................................................................................2

*Jones Lang LaSalle Ams., Inc. v. Hoffman Fam., LLC*,
   2014 WL 11515839 (E.D. Va. Feb. 26, 2014) .................................................25

*King Drug Co. of Florence v. Smithkline Beecham Corp.*,
   791 F.3d 388 (3d Cir. 2015) ..............................................................................27

**TABLE OF AUTHORITIES**
*(continued)*

Page

*Law v. Nat'l Collegiate Athletic Ass'n,*
134 F.3d 1010 (10th Cir. 1998)...................................................................................27

*Lea v. Wyeth LLC,*
2011 WL 13195950 (E.D. Tex. Nov. 22, 2011) .........................................................22

*In re Lidoderm Antitrust Litigation,*
2018 WL 7814761 (N.D. Cal. 2018) .............................................................................7

*In re Loestrin 24 Fe Antitrust Litig.,*
No. 13-md-2472 (D.R.I. Dec. 6, 2019), Dkt. 1362.............................5, 15, 17, 28

*Life for Relief & Dev. v. Bank of Am., N.A.,*
2017 WL 3616498 (E.D. Mich. Aug. 23, 2017)..........................................................22

*Louzon v. Ford Motor Co.,*
718 F.3d 556 (6th Cir. 2013).......................................................................................12

*Morgan v. Mississippi,*
2009 WL 3259233 (S.D. Miss. Oct. 8, 2009).............................................................12

*Morningstar v. Circleville Fire & EMS Department,*
2018 WL 3721077 (S.D. Ohio 2018) ..........................................................................12

*Munoz v. PHH Mortg. Corp.,*
2022 WL 123713 (E.D. Cal. Jan. 6, 2022)............................................................ 21, 22

*In re Namenda Direct Purchaser Antitrust Litig.,*
2019 WL 6242128 (S.D.N.Y. Aug. 2, 2019) ..............................................................30

*In re Nexium Antitrust Litig.,*
777 F.3d 9 (1st Cir. 2015)............................................................................................13

*In re Nexium (Esomeprazole) Antitrust Litig.,*
296 F.R.D. 47 (D. Mass. 2013) .....................................................................................8

*In re Nexium (Esomeprazole) Antitrust Litig.,*
42 F. Supp. 3d 231 (D. Mass. 2014).............................................................................11

*Norris v. PNC Bank, N.A.,*
2022 WL 5054099 (D. Md. Oct. 4, 2022).....................................................................10

*Novell, Inc. v. Microsoft Corp.,*
505 F.3d 302 (4th Cir. 2007)..........................................................................................1

**TABLE OF AUTHORITIES**
*(continued)*

Page

*One Source Env't, LLC v. M + W Zander, Inc.*,
  2015 WL 13505360 (D. Vt. Dec. 8, 2015).........................................................25

*In re Opana ER Antitrust Litig.*,
  No. 14 C 10150 (N.D. Ill. June 6, 2022), Dkt. 937 .........................................28

*Palmetto Pharmaceuticals LLC v. AstraZeneca Pharmaceuticals LP*,
  2012 WL 12896232 (D.S.C. June 29, 2012).....................................................25

*Petersen v. DaimlerChrysler Corp.*,
  2011 WL 2604819 (D. Utah June 30, 2011).....................................................24

*Provident Life & Acc. Ins. Co. v. Adie*,
  176 F.R.D. 246 (E.D. Mich. 1997)...................................................................12

*Smith v. Summers*,
  334 F. Supp. 3d 339 (D.D.C. 2018)....................................................................5

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  2010 WL 10086747 (N.D. Cal. Dec. 16, 2010).................................................30

*Thompson Everett, Inc. v. National Cable Advertising, L.P.*,
  57 F.3d 1317 (4th Cir. 1995).............................................................................11

*United States v. Collins*,
  78 F.3d 1021 (6th Cir. 1996).............................................................................14

*United States v. Konicov*,
  49 F. App'x 607 (6th Cir. 2002)........................................................................14

*United States v. Ray*,
  2022 WL 558146 (S.D.N.Y. Feb. 24, 2022) .....................................................25

*United States v. Simmons*,
  2018 WL 1882827 (E.D. Va. Jan. 12, 2018), *report and recommendation adopted*, 2018 WL
  658693 (E.D. Va. Feb. 1, 2018) ........................................................................28

*United States v. Williams*,
  478 F.2d 369 (4th Cir. 1973)......................................................................25, 26

*In re Welding Fume Prod. Liab. Litig.*,
  2010 WL 7699456 (N.D. Ohio June 4, 2010) ...................................................18

TABLE OF AUTHORITIES

*(continued)*

Page

*In re Wellbutrin XL Antitrust Litig.*,
868 F.3d 132 (3d Cir. 2017)...............................................................................................1

*Wells Fargo Bank, N.A. v. Siegel*,
2007 WL 1118442 (N.D. Ill. Apr. 16, 2007).....................................................................10

OTHER AUTHORITIES

U.S. Department of Justice, "Assistant Attorney General Makan Delrahim Delivers Final
Address," (Jan. 19, 2021), www.justice.gov/opa/speech/assistant-attorney-general-makan-
delrahim-delivers-final-address"A Whole New World": An Antitrust Entreaty for a Digital
Age, Remarks by Assistant Attorney General Makan Delrahim,
www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-final-
address .................................................................................................................................6

FDA, Fact Sheet, What's Involved in Reviewing and Approving Generic Drug Applications?,
https://fda.report/media/99163/FDA-Fact-Sheet--What%27s-Involved-in-Reviewing-and-
Approving-Generic-Drug-Applications--%28PDF%29.pdf...................................................15

FDA, Generic Drugs: Overview & Basics, https://www.fda.gov/drugs/generic-drugs/overview-
basics ................................................................................................................................15

FDA, What Is the Approval Process for Generic Drugs?, https://www.fda.gov/drugs/generic-
drugs/what-approval-process-generic-drugs .......................................................................15

FDA, Abbreviated New Drug Application, https://www.fda.gov/drugs/types-
applications/abbreviated-new-drug-application-anda ..........................................................15

H.R. Rep. No. 98-857, at 15 (1984), U.S. Code Cong. & Admin. News 1984 ..........................14

RULES

Fed. R. Evid. 404(b)(2) .........................................................................................................17

Fed. R. Evid. 611(a)..............................................................................................................22

Defendants Merck & Co., Inc., Merck Sharp & Dohme LLC (f/k/a Merck Sharp & Dohme Corp.), Schering-Plough Corp., Schering Corp., and MSP Singapore Co. LLC (collectively "Merck"), and Glenmark Pharmaceuticals Limited and Glenmark Pharmaceuticals Inc., USA, incorrectly identified as Glenmark Generics Inc., USA (collectively, "Glenmark") (together with Merck, "Defendants"), oppose Plaintiffs' Motions in Limine Numbers 1–10.

## I. Plaintiffs' MIL No. 1 Should Be Denied Because It Is Plaintiffs' Burden To Establish Antitrust Injury By Proving Their Assignments Are Valid.

A subset of plaintiffs in this case—specifically, middlemen in the pharmaceutical industry, who did not purchase Zetia directly from Merck but are proceeding on assignment from wholesalers that did ("Assignee Plaintiffs")—ask the Court to preclude Defendants from challenging their assignments, apparently based on nothing more than Assignee Plaintiffs' assurances that the assignments are valid. Dkt. 1805, Purchasers' Mem. in Support of Mot. in Limine 1 to 10 ("Mot.") at 1–2. They proffer no support for this proposition, which is a transparent attempt to obfuscate the fact that they are proceeding on assignment. This motion should be denied for several reasons.

*First*, the assignments are necessary for establishing one of the elements of Assignee Plaintiffs' claims, and Plaintiffs must therefore prove their validity. In this private antitrust action, Plaintiffs must prove they suffered an "antitrust injury"—i.e., an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007). Plaintiffs bear the burden of proving they suffered an antitrust injury. *Brunswick*, 429 U.S. at 489; *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 166 (3d Cir. 2017). Only direct purchasers can demonstrate they suffered an

antitrust injury and therefore have standing to sue under the federal antitrust laws. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728–29 (1977); *Apple v. Pepper*, 139 S. Ct. 1514, 1520 (2019).

The Assignee Plaintiffs here did not purchase Zetia from Merck. Thus, to establish antitrust injury, they must demonstrate that they hold valid assignments of antitrust claims accrued by entities that *did* make direct purchases. *DNAML Pty, Ltd. v. Apple Inc.*, 2015 WL 9077075, at *2 (S.D.N.Y. Dec. 16, 2015) (noting that an entity without an alleged antitrust injury "lacks standing to sue absent an assignment of antitrust claims from" an entity with antitrust injuries); *see also Pepper*, 139 S. Ct. at 1520 (describing "a bright-line rule that authorizes *direct* purchasers to sue but bars *indirect* purchasers from suing").

Plaintiffs that are actually direct purchasers (i.e., the major wholesalers McKesson, AmerisourceBergen, and Cardinal Health) will attempt to show antitrust injury by presenting evidence that they purchased Zetia from Merck and were overcharged for those purchases. Assignee Plaintiffs will have no evidence that they themselves purchased Zetia, so they must present evidence that an assigning entity made a purchase *and* assigned its antitrust claims arising from that purchase to the relevant assignee. This is why Assignee Plaintiffs pleaded their assignments.[1] If they had not, they would not have established antitrust standing and their claims

---

[1] *See, e.g.*, Dkt. 1645, Direct Purchaser Plaintiffs' Second Amended Consol. Compl. and Demand for Jury Trial at ¶ 10(l) ("Wegmans is an assignee of McKesson, which purchased brand Zetia directly from Merck at supracompetitive prices during the relevant period and therefore suffered antitrust injury as a result of the anticompetitive conduct alleged herein."), *Id.* at ¶ 10(k) ("SUPERVALU is an assignee of McKesson, which purchased Zetia directly from Merck at supracompetitive prices during the relevant period and therefore suffered antitrust injury as a result of the anticompetitive conduct alleged herein."); Dkt. 330-2, CVS Amended Compl. and Demand for Jury Trial at ¶ 5 ("Plaintiff brings this action on its own behalf and as the assignee of Cardinal Health, Inc., which during the relevant period purchased Zetia directly from Merck for resale to Plaintiff, and which has assigned its claims arising out of those purchases to Plaintiff. In addition, CVS intends to pursue damages as the assignee of McKesson Corporation ("McKesson"), another pharmaceutical wholesaler, which during the

would have been dismissed.  *See DNAML*, 2015 WL 9077075, at *5–6 (S.D.N.Y. Dec. 16, 2015) (granting summary judgment to defendant because plaintiff's purported assignment of antitrust claims was invalid); *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 269–71 (3d Cir. 2016) (explaining that invalidity of an assignment implicates the *Illinois Brick* rule that only direct purchasers have antitrust standing); *see also, e.g.*, Dkt. 1682, Merck's Answer to Direct Purchaser Plaintiffs' Second Amended Consolidated Complaint, at 55 (asserting as an affirmative defense that Plaintiffs "lack antitrust or Article III standing to assert a claim against Merck").  Having pleaded that they hold valid assignments of antitrust claims, Assignee Plaintiffs now must prove as much by demonstrating that their assignors "expressly assign[ed] the right to bring that cause of action, either by making specific reference to the antitrust claim or by making an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim." *DNAML*, 2015 WL 9077075, at *3.  Notably, Assignee Plaintiffs have included their assignments on their exhibit lists.  *See, e.g.*, Ex. 1, Plaintiffs' Exhibit List (Updated January 9, 2023) at 24.[2]

*Second*, Assignee Plaintiffs have failed to take any of the procedural steps necessary to obtain a pretrial ruling that their assignments are valid.  They assert that their assignments are "valid as a matter of law" because they "expressly transfer the right to bring antitrust claims from the wholesaler to the assignee."  Dkt. 1805, Mot. at 2.  But even if an assignment of antitrust claims need only be express to be valid, the unsupported assertion in a motion in limine that the assignments are express cannot be enough to render them impervious to challenge.  If Assignee Plaintiffs wanted to approach trial with a ruling that their assignments were "valid as a matter of

---

relevant period purchased Zetia directly from Merck for resale to Plaintiff and has agreed to assign claims arising out of those purchases to Plaintiff.").

[2]   All exhibits cited herein are attached to the Declaration of Samuel G. Liversidge ("Liversidge Decl."), filed in support of Defendants' Opposition to Plaintiffs' Motions in Limine.

law," they should have asked Defendants to stipulate to their validity or moved for summary judgment on the validity of the assignments. They did neither.

To the extent MIL No. 1 is itself a back-door motion for summary judgment asking this Court to decide the validity of Plaintiffs' assignments, the Court should not entertain it. The summary judgment deadline has long since passed. And Plaintiffs have not presented the Court with the evidence necessary to rule on the validity of the assignments. To effectively transfer federal antitrust claims, assignments must expressly transfer the assignor's legal claims to the assignee. *Gulfstream III Assoc., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 437–38 (3d Cir. 1993); *DNAML*, 2015 WL 9077075 at *3. Plaintiffs baldly assert that their "assignments expressly transfer the right to bring antitrust claims from the wholesaler to the assignee." Dkt. 1805, Mot. at 1. But they did not submit the assignments to the Court. They did not even submit a declaration attesting to the content of the assignments. And they cite no authority for the proposition that an assignment is presumed valid on the assignee's say-so.

Plaintiffs assert that "Defendants have never given the Court any reason to question the validity of these assignments," implying that it would be somehow improper for Defendants to challenge them at this juncture. *Id.* at 2. But the trial has not started. Defendants are under no obligation to have *already* challenged Plaintiffs' assignments. Further, Plaintiffs *are still producing, and apparently still executing, assignments.* As recently as January 13, 2023, Plaintiffs produced three assignments, one from Cardinal to CVS, one from McKesson to CVS, and one from McKesson to Rite Aid. Liversidge Decl. ¶ 2. Two of those assignments were executed on January 4, 2023. *Id.* Defendants cannot be precluded from challenging the validity of assignments they are just seeing for the first time.

*Third*, Assignee Plaintiffs should not be permitted to obscure their identity, or the nature of their alleged injury, from the jury. Their motion is an obvious attempt to avoid acknowledging before the jury that more than a dozen plaintiffs never purchased Zetia from Merck, and many of them are proceeding by assignment from one of the Big Three wholesalers, who are also plaintiffs in the case. But the jury is entitled to know who the parties are. Depriving the jury of basic facts regarding the parties and the pharmaceutical industry—including how retailers and wholesalers operate, and where the Assignee Plaintiffs got their claims—would be confusing to the jury and prejudicial to the Defendants. *See Smith v. Summers*, 334 F. Supp. 3d 339, 344 (D.D.C. 2018) ("[P]recluding evidence of the parties' contractual relationship is likely to distract or confuse the jury as to who Defendant is and why it is presenting the defense in the case. Jurors should not be left to speculate about [relationships between the parties]. Rather, the jury and the public should know who the parties appearing in a trial are and what their relationship is to each other.").

Courts have previously rejected similar attempts by assignees to hide their identifies from the jury. In *Loestrin*, another reverse-payment case, Plaintiffs brought a virtually identical motion in limine to "preclude defendants from challenging the validity of direct purchasers' or retailers' assignments." Memorandum in Support of Purchasers' Omnibus Motion in Limine at 3, *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-md-2472 (D.R.I. Nov. 8, 2019), Dkt. 1301. The court denied the motion "to the extent Plaintiffs attempt to hide their identities," noting that it "intend[ed] to explain to the jury the identity of the parties and that the various retailers are litigating pursuant to assignments." Order on Pending Motions in Limine, at 1, *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-md-2472 (D.R.I. Dec. 6, 2019), Dkt. 1362 ("*Loestrin* Order"). The same reasoning applies here; Plaintiffs should not be permitted to hide their identities from the jury.

## II.     Plaintiffs' MIL No. 2 Should Be Denied Because It Improperly Expands The Scope Of Any Pass-On Rule.

Direct Purchaser Plaintiffs' ("DPPs") and Retailer Plaintiffs' Motion in Limine No. 2 seeks to preclude Defendants from offering evidence or argument before the jury that Plaintiffs' damages should be reduced to account for any overcharges passed on to their customers, or regarding generic bypass. For purposes of the upcoming trial, Defendants will not introduce evidence *solely* for the purposes of contending that the DPP and Retailer damages should be reduced due to the fact that the overcharges at issue were not actually suffered by direct purchasers but were instead fully passed on to their customers. However, Defendants object to this rule as outdated, profoundly unfair, and particularly inappropriate in the pharmaceutical industry and in the context of this action, where End Payor Plaintiffs ("EPPs") are seeking full recovery for the same overcharges that are being claimed by the DPPs and Retailer Plaintiffs. While Defendants do not plan to ask the jury to reduce DPPs' and Retailers' damages by amounts claimed by EPPs, Defendants reserve the right to make a post-trial motion asking the Court to do so. While Defendants understand the Court is bound by existing precedent, including the Supreme Court's decision in *Hanover Shoe*, Defendants maintain that precedent should not apply in the current case, and/or should be overruled or limited given the potential for an unjust and unconstitutional impact in this case.[3]

---

[3] Under *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 494 (1968), Defendants typically may not avoid direct purchasers' supposed damages in the form of overcharges on the basis that those overcharges were passed on to other parties. But as stated by the prior chief of the Antitrust Division of the U.S. Department of Justice, the "*Illinois Brick* & *Hanover Shoe* Supreme Court decisions" should be "repeal[ed]" because these decisions "work together to confuse antitrust damages doctrine and to handcuff most victims of anticompetitive conduct with no path for recovery, while providing other plaintiffs with an unfair windfall." *See* U.S. Department of Justice, Assistant Attorney General Makan Delrahim Delivers Final Address, JUSTICE NEWS (Jan. 19, 2021), www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-final-address. The Supreme Court's professed intent in limiting federal claims to direct purchasers and prohibiting a pass-on defense under federal law was to simplify antitrust cases and prevent duplicative recoveries. The rule has instead had the opposite result. The proliferation of state laws permitting state damages claims by downstream purchasers

Although Defendants will not argue before the jury that DPP and Retailer damages should be reduced due to pass-on, evidence of pass-on (and generic bypass) is still likely to be relevant to the case and admissible at trial for several reasons. Accordingly, such evidence should be admitted, and the Court may avoid any prejudice to the moving Plaintiffs with curative instructions. *See In re Lidoderm Antitrust Litig.*, 2018 WL 7814761, at *3 (N.D. Cal. Feb. 7, 2018) (holding Defendants could not introduce evidence "solely for the purpose of showing that DPPs pass-on damages or that DPP damages should be reduced," but providing that where such evidence was otherwise relevant, an "instruction that DPP damages are not impacted by pass-on should suffice").

First, given the claims made by the EPPs, evidence as to overcharges being "passed-on" by the DPPs and Retailers will be relevant and admissible at trial. EPPs did not purchase Zetia directly from Merck, and instead contend that higher prices and overcharges on branded Zetia paid by the DPPs (and Retailers' wholesaler assignors) were passed on to the EPP class members— health plans and insurance companies—when those class members reimbursed pharmacies for the cost of branded and generic Zetia. *See* Dkt. 130, EPPs' Consolidated Compl. ¶¶ 87, 298, 300. As part of their state law claims, EPPs must prove at trial the extent that DPPs and Retailers passed

---

on the very same transactions and overcharges that are pursued by direct purchasers under federal law has dramatically complicated antitrust enforcement, and resulted in an unfair and unconstitutional situation whereby Plaintiffs now contend that Defendants are liable for *sixfold* damages on their transactions across all federal and state law claims (treble damages under federal law, and treble damages under state law). As explained in more detail in Defendants' concurrently filed opposition to Plaintiffs' MIL No. 20, this situation violates the federal policy against duplicative recoveries as well as the Due Process Clause and the Eighth Amendment's prohibition on excessive fines. Although Defendants recognize this Court is bound by governing precedent, Defendants respectfully (1) maintain that *Hanover Shoe* should not apply in this case, where EPPs have actually brought suit for the same purported losses as the direct purchasers, and/or (2) reserve the right on appeal to argue that *Hanover Shoe* should be overruled and a pass-on defense to direct purchasers' damages claims allowed, at least in the context of the circumstances of this case.

on those overcharges, and such evidence will therefore be admissible.  The court may address any concerns of DPPs and Retailers with a jury instruction.

Second, Defendants reserve the right to introduce evidence that is important to understanding the general context in which Zetia and ezetimibe were prescribed and distributed, including providing information to educate the jury about the pharmaceutical distribution chain. Such evidence is relevant to a number of issues, including the jury's understanding of the manufacturing and distribution processes required to bring a prescription drug to market, and how pricing works in the pharmaceutical industry.  To the extent that DPPs and Retailer Plaintiffs object to Defendants educating the jury about this industry background, the motion should be denied and, again, the Court may address these Plaintiffs' concerns with an instruction.

Third, the issue of "generic bypass" is likely to arise in a number of contexts and will need to be presented to the jury, at least to some extent.  Even Plaintiffs' own expert accounts for and addresses this phenomenon—i.e., that sales volume is lost by wholesalers when generic drugs enter and purchasers acquire those drugs directly from the manufacturers—when calculating damages. Dkt. 823-1, Leitzinger Rpt. at ¶¶ 56–58.  Plaintiffs' expert claims that generic bypass may result in the DPP wholesaler plaintiffs' damages being understated because their sales history reflects a slower uptake of generic drugs than the market more generally.  *Id.*   Defendants are entitled to respond to these arguments, which will require an explanation of what generic bypass is, why it happens, and how it may impact damages.  *See In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 56 (D. Mass. 2013) ("[T]he issue of generic bypass primarily affects the measure of damages, a matter exclusively reserved to jury determination at trial."); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 317 (E.D. Mich. 2001) ("Defendants' by-pass and offsetting benefits arguments relate to the quantum of damages").

Indeed, Defendants should be permitted to respond to DPPs' argument that generic bypass increases their damages with evidence that in fact the phenomenon decreases their damages, not because of any "pass on," but rather because generic bypass leads to a decrease in the volume of brand purchases by the DPPs.  Put another way, it is simply not correct to suggest as Plaintiffs' experts do that the DPPs would replace every unit of brand purchases in the actual world with a unit of generic purchased in the but-for world.  Evidence regarding generic bypass will therefore come up at trial and the jury may consider it in assessing damages.

Fourth, Defendants also reserve the right to present evidence regarding pass-on or generic bypass if DPPs or Retailers argue or suggest at trial that they or their assignors "lost" money or were otherwise financially harmed as a result of the Merck-Glenmark settlement agreement. Defendants' Motion in Limine No. 10 is meant to address the improper introduction of such evidence by plaintiffs.  *See* Dkt. 1823 at 24.  Specifically, Defendants have asked the Court to preclude Plaintiffs from referring to their financial injury or harm as a result of the settlement agreement.

Testimony or argument that Plaintiffs have been actually financially harmed by the challenged conduct would be untrue (and unverifiable given DPPs' and Retailers' refusal to provide so-called "downstream" discovery).  If this argument were made to the jury, it should entitle Defendants to respond by explaining that DPPs (and the Retailers' assignors) did not actually lose profits as a result of any purported delayed generic entry, because they passed on any alleged overcharges to their customers—and in fact would have lost significant sales volume (and the resulting profits) if generic Zetia had entered the market earlier than it did.  Defendants are entitled to make these arguments if Plaintiffs step over the line and argue not simply that Merck benefited from purported "overcharges" but also that they suffered financial injury as a result of

alleged delayed entry for generic Zetia.  For similar reasons, the Court should grant Defendants' Motion in Limine No. 10, Dkt. 1823 at 24.

Finally, Defendants dispute that it is impermissible to expose the jury to the fact that Plaintiffs seek duplicative damages awards.  This issue is addressed in more detail in Defendants' concurrently filed opposition to Purchasers' MIL No. 20.

## III. Plaintiffs' MIL No. 3 Should Be Denied Because Plaintiffs Fail To Identify The Evidence They Seek To Exclude Or Demonstrate Why It Is Excludable.

Plaintiffs ask the Court to bar Defendants from presenting "evidence or argument ... that the purchasers failed to mitigate damages."  Dkt. 1805, Mot. at 4.  Plaintiffs do not identify any particular evidence that they seek to exclude through their motion.  As it lacks the necessary specificity required for a motion in limine, Plaintiffs' motion should be denied on that basis alone. *See Norris v. PNC Bank, N.A.*, 2022 WL 5054099, at *3 (D. Md. Oct. 4, 2022) (denying motion in limine where "the Motion in Limine lacks the necessary specificity with respect to the evidence sought to be excluded"); *A.Hak Indus. Servs. BV v. Techcorr USA, LLC*, 2014 WL 12591895, at *1 (N.D. W. Va. Dec. 18, 2014)  ("when a motion in limine seeks to exclude a general category of evidence, the best course of action is to deny the motion and see how the case unfolds because a blanket exclusion could likely preclude a party from introducing evidence that a court finds admissible with the benefit of knowing the particular evidence and relevant context"); *see also Wells Fargo Bank, N.A. v. Siegel*, 2007 WL 1118442, at *3 (N.D. Ill. Apr. 16, 2007) (denying motion in limine that did not identify specific evidence because "[s]uch a vague and generalized request" was "not appropriate for a motion in limine").

Defendants have served expert reports from two experts on damages issues, Dr. Bruce Strombom and Dr. Lauren Stiroh.  Neither of those reports was the subject of a *Daubert* challenge or separate motions in limine by Plaintiffs.  Accordingly, as Plaintiffs have not challenged any

opinion in those reports, Defendants reserve the right to present at trial all of the opinions of Drs. Strombom and Stiroh that they disclose in their reports.

While Plaintiffs do not identify what they may or may not characterize themselves as "mitigation" evidence, Defendants will argue, and must be permitted to argue, that Plaintiffs and their damages experts greatly overstate damages and include in their damages calculations amounts that are not in fact overcharges, properly defined, caused by Defendants' challenged conduct. Such evidence is relevant to numerous issues beyond just the estimation of damages, including causation. *See Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (antitrust plaintiff must prove harm was caused by anticompetitive conduct); *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 265 (D. Mass. 2014) (central to the antitrust analysis "is a determination as to whether the Plaintiffs can establish a causal link between any alleged reverse payment and their antitrust injuries, as required under the federal antitrust laws").

Plaintiffs' motion is also an untimely and improper attempt to use a motion in limine as a vehicle to try to obtain summary judgment on Defendants' defense that "Plaintiffs have failed to mitigate their damages, if any, and recovery should be reduced or denied accordingly." Dkt. 1682, Merck's Answer to Compl. and Demand for Jury Trial at 50; *see* Dkt. 1683, Answer and Affirmative Defenses of the Glenmark Defendants at 62. Plaintiffs had an opportunity to move for summary judgment on that defense but they chose not to. Now they ask the Court to decide that defense as a matter of law in the context of a motion in limine nominally intended to exclude certain evidence. It is well-settled that motions in limine are limited to evidentiary issues and may not be used as a dispositive motion. *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 563 (6th Cir. 2013) ("Where, as here, the motion in limine is no more than a rephrased summary-judgment

motion, the motion should not be considered."); *Morningstar v. Circleville Fire & EMS Department*, 2018 WL 3721077, at *7 (S.D. Ohio 2018) (denying motion in limine that was essentially "an untimely motion for summary judgment"); *Morgan v. Mississippi*, 2009 WL 3259233, at *1 (S.D. Miss. Oct. 8, 2009) (denying motions in limine because "a motion in limine cannot be a substitute for a motion for summary judgment, a motion to dismiss, or a motion for directed verdict"); *cf. Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1162 n.4 (9th Cir. 2013) ("A motion in limine is not the proper vehicle for seeking a dispositive ruling on a claim, particularly after the deadline for filing such motions has passed.")  As one district court stated, "If plaintiff wanted to preclude [defendant] from raising these defenses at trial . . . then he should not have filed a motion in limine on the eve of trial, but should instead have filed a summary judgment motion pursuant to Federal Rule of Civil Procedure 56." *Provident Life & Acc. Ins. Co. v. Adie*, 176 F.R.D. 246, 250 (E.D. Mich. 1997).

 Plaintiffs' vague and untimely motion should be denied.

**IV.     Plaintiffs' MIL No. 4 Should Be Denied Because Defendants Are Entitled To Explain To The Jury The Differences Between Brand And Generic Drugs, Their Business Structures, And The Industry In Which They Operate.**

In MIL No. 4, Plaintiffs seek an order precluding Defendants from introducing evidence or argument: (A) "denigrating generic drugs and generic drug makers, including by using pejoratives such as 'me too' drugs or 'piggy-backing' or 'free riders,'" and "touting the quality or benefits of brand versions of drugs, including by using . . . descriptors such as 'innovator'"; (B) "addressing Defendants['] supposed good character or reputation;" and (C) "discussing any opioids-related issues."  Dkt. 1805, Mot. at 5.  Plaintiffs' motion asks this Court to exclude numerous categories and specific types of relevant evidence that will unquestionably aid the jury in resolving the issues in dispute.  It should therefore be denied.

A. **Plaintiffs Improperly Seek To Exclude Evidence And Argument That Will Educate The Jury On Relevant Differences Between Brand And Generic Drugs And The Companies That Develop Them.**

This case centers around the legality of a patent settlement, yet Plaintiffs seek to exclude evidence and argument required for the jury to understand the relevant differences between brand and generic drugs and the companies that develop them.  In fact, the differences between brand and generic drugs (and brand and generic companies), including differences in how each type of drug is developed, priced, and regulated by the FDA, are *highly* relevant to numerous issues in this case, including liability and damages.  For example, Defendants must be free to explain to the jury why some doctors and patients prefer brand drugs over generic drugs to help the jury understand why some customers continue to purchase the brand drug after generic entry and why brand companies do not always find it necessary to match generic pricing.  *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 20 (1st Cir. 2015) (discussing the relevance of "brand-loyalist consumers," who insist on taking brand drugs even after generics become available, in this type of antitrust case).  Similarly, Merck should be free to explain the benefits of brand Zetia since it competed aggressively, and successfully, with generic ezetimibe by discounting its branded product.

In fact, Plaintiffs' own experts opine at length in their reports about the differences between brand and generic drugs, including with respect to pricing.  For example, Dr. Rosenthal's report in this case includes an "overview of the economics of prescription drugs," including differences in brand and generic pricing.  *See* Dkt. 1130-12, Rosenthal Rpt. ¶¶ 2, 8–23; *see also* Dkt. 1130-06 Leitzinger Rpt. ¶¶ 26–27 (discussing the "substantially lower prices" that "generic products enter the market at" as compared to their "branded counterparts").  Defendants must be able to explain to the jury why it makes sense, as a matter of basic economics, that such a pricing discrepancy exists: A patentholder, unlike a generic company, invests billions of dollars every year researching and developing new drugs.  A generic company, by contrast, can often work from a patentholder's

13

blueprint. Defendants should not be denied the opportunity to elucidate these important differences at trial, including by referring to generic manufacturers' processes with accurate descriptors, such as "piggy-backing." *United States v. Konicov*, 49 F. App'x 607, 609 (6th Cir. 2002) (holding that parties must be given leeway to describe reasonable inferences that can be drawn from the evidence); *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996) (same). Nor should Defendants be denied the opportunity to describe the differences between brand and generic companies through similarly accurate descriptors, such as "innovator" and "free rider." Plaintiffs' contention that these terms "denigrate" generic drugs or impermissibly "tout" the quality of brand drugs is wrong.

As an initial matter, a patentholder *is*, indisputably, an "innovator." As one House Report analyzing the Hatch-Waxman Act put it: "Patents are designed to promote innovation by providing the right to exclude others from making, using, or selling *an invention*. They enable *innovators* to obtain greater profits than could have been obtained if direct competition existed." *Biotechnology Indus. Org. v. D.C.*, 505 F.3d 1343, 1346 (Fed. Cir. 2007) (emphases added) (quoting H.R. Rep. No. 98-857, at 15 (1984), U.S. Code Cong. & Admin. News 1984, pp. 2647, 2650). The term "innovators" therefore simply accurately captures what brand companies do. Indeed, Plaintiffs' own patent expert agrees. *See* Dkt. 1083-18, Hrubiec Rpt. ¶ 249 ("A Patent Term Extension provides an opportunity for *the innovator* to recoup temporal exclusivity for its invention for some of the time that was expended during the FDA review of its NDA.") (emphasis added).[4]

---

[4]  Relatedly, the FDA often uses the term "innovator drug" to refer to a branded drug. *See, e.g.*, FDA, Abbreviated New Drug Application (ANDA), https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda ("A generic drug product is one that is comparable to an innovator drug product . . . ."); FDA, Generic Drugs: Overview & Basics, https://www.fda.gov/drugs/generic-drugs/overview-basics (outlining the steps that the Office of Generic Drugs follows to evaluate the bioequivalence of "proposed generic medications" to "the brand-name (or innovator) medications").

Similarly, a generic drug company *is*, indisputably, a "free rider" (or "piggy-backer"), as Dr. Rosenthal acknowledges in her report.  There, she notes that under the Hatch-Waxman Act, a generic company "*can rely on the brand-name drug's clinical effectiveness and safety evidence*" because it need only demonstrate "bioequivalence . . . between the proposed generic and the original product."  Dkt. 1130-12, Rosenthal Rpt. ¶ 9 (emphasis added).  There is therefore no question that generic drugs can and do "free ride" (or "piggyback") on the enormous investments that brand companies have made in developing and testing new drugs, and there is no corresponding need to preclude Defendants from using the term at trial.

Lastly, the term "copy" accurately describes what a generic drug is.  For instance, the FDA frequently describes generic drugs as "copies" of branded drugs.  *See, e.g.*, FDA, What Is the Approval Process for Generic Drugs?, https://www.fda.gov/drugs/generic-drugs/what-approval-process-generic-drugs ("Generic drugs are copies that one company makes of a brand-name drug that was developed by another company."); FDA, Fact Sheet, What's Involved in Reviewing and Approving Generic Drug Applications?, https://fda.report/media/99163/FDA-Fact-Sheet--What%27s-Involved-in-Reviewing-and-Approving-Generic-Drug-Applications--%28PDF%29.pdf ("Generic drug companies must provide evidence that shows that their active ingredient is the same as that of the brand-name drug they copy, and FDA must review that evidence.").

In light of the foregoing, Plaintiffs are wrong to suggest that these terms are irrelevant, inflammatory, derogatory, or otherwise improper.  In fact, Defendants are not aware of a *single case* that has precluded the use of similar terms.  Rather, courts presiding over antitrust cases involving similar allegations and theories regularly refuse to exclude such references at trial.  *See, e.g.*, *Loestrin* Order at 3 (denying substantively identical motion in limine in part because "use of

15

terms like 'innovation' and 'copycat' are not problematic in the proper context"); *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-2409 (D. Mass. Oct. 20, 2014), Dkt. 1100 ("*Nexium Tr.*") at 40:5–15 (refusing to preclude defendants from referring to generic drugs as "copycat" or "me-too" drugs and declining to "forbid AstraZeneca from calling itself an 'innovator'" because AstraZeneca "had patents, that's what's at issue here").

Lastly, to the extent Plaintiffs intend for their motion to extend beyond the specifically identified terms to include evidence that is, in their view, derogatory toward generic drugs or touts brand drugs, Plaintiffs' motion should be denied as premature because they have not identified *any* particular evidence to which they object. *See A. Hak Indus. Servs. BV v. A. Hak Intank Servs. LLC*, 2014 WL 12591696, at *1 (N.D. W. Va. Dec. 18, 2014) (observing that "[d]istrict courts routinely deny," or reserve any ruling on, "a motion in limine that does not specify the evidence or argument to be excluded because such a motion is premature").

**B.    Evidence Of Defendants' Business Structures And Activities, And The Industry In Which They Operate, Is Not Impermissible Character Evidence.**

Contrary to the suggestion in Plaintiffs' motion, Dkt. 1805, Mot. at 7, Defendants do not intend to violate Federal Rule of Evidence 404(b) at trial by introducing evidence of unrelated good acts to prove their good character.  But in seeking to bar Defendants from offering *any* evidence or argument regarding their "supposed good character or reputation," Plaintiffs ask this Court to issue an order that would prevent Defendants from educating the jury about their businesses and the industry in which they operate—evidence that will provide important context for the jury.  Defendants are pharmaceutical companies dedicated to the socially desirable activity of developing and marketing drugs to treat and cure illnesses.  But the fact this evidence might indirectly suggest good character is not a basis for its exclusion, where, as here, it will not be offered for an impermissible purpose.  *See* Fed. R. Evid. 404(b)(2) ("This evidence may be

admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

Accordingly, this Court should follow the courts presiding over antitrust cases involving similar allegations and theories that have denied similar motions in limine. *See, e.g., Loestrin* Order at 3 (denying substantively identical motion in limine "to the extent that Defendants intend to introduce evidence regarding the general business and structure of the company and industry to provide context to the jury"); *cf. In re Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-2409 (D Mass. Oct. 20, 2014), Dkt. 1100 at 44:7–9 (court refusing to grant a similar motion in limine and stating that it would "follow the rules" on "good character or reputation" at trial).[5]

## V.   Plaintiffs' MIL No. 5 Should Be Denied Because Requiring Defendants To Produce In The Purchasers' Case-in-Chief The Witnesses That Defendants Intend To Present Live At Trial Prejudices Defendants' Ability To Present Their Own Case.

Plaintiffs' MIL No. 5 seeks to preclude Defendants from offering live testimony from any witness Defendants do not produce to testify live in Plaintiffs' case-in-chief. Dkt. 1805, Mot. at 8–9. Plaintiffs have not met their burden to establish that the Court should force Defendants to produce witnesses in Plaintiffs' case or otherwise alter the normal presentation of witnesses in this case. Plaintiffs' motion ignores the strictures of Rule 45, which governs the right of a party to compel a witness's attendance at trial. Moreover, the motion places Defendants in the unfairly prejudicial position of making a final determination of which witnesses they would call in their case-in-chief *before* even seeing how Plaintiffs present their case. Accelerating that determination

---

[5]   Defendants do not currently intend to refer to the role of certain of the Plaintiffs in the opioid crisis. However, Defendants reserve the right to do so should Plaintiffs open the door by, for example, introducing irrelevant evidence of their own good character or arguing to the jury that they and their businesses "play by the rules" or make greater and more positive contributions to society than pharmaceutical companies. Any prohibition on presenting such evidence should therefore be expressly conditioned on the possibility that the Court may revisit its ruling depending on the arguments Plaintiffs advance to the jury.

invites a *less efficient, dramatically more burdensome* process because Defendants may be forced to prophylactically "bring" a witness during Plaintiffs' case-in-chief who otherwise may never be called live or face the punishment (not found in the rules) that such a witness may be barred from testifying at all.

A party does not have an "unfettered right to call" its opponent's witnesses. *See Elgabri v. Lekas*, 964 F.2d 1255, 1259 (1st Cir. 1992). Contrary to Plaintiffs' one-sided presentation of the law, there is no uniform rule requiring a party to make available to its opponent witnesses that it may call live in its own case.[6]  Many courts have held just the opposite: that a plaintiff must "play in its case-in-chief portions of a videotaped deposition," and the defendant may "present testimony from that witness (whether by videotape or live) in its own case-in-chief."  *In re Welding Fume Prod. Liab. Litig.*, 2010 WL 7699456, at *125 (N.D. Ohio June 4, 2010); *see also Elgabri*, 964 F.2d at 1259–60; *Armenian Assembly of Am., Inc. v. Cafesjian*, 746 F. Supp. 2d 55, 60–63 (D.D.C. 2010).[7]  In fact, it "occurs all the time" that a party is "left to read a deposition of a witness who [its opponent] then call[s] in [its] own case."  *Air Turbine Tech., Inc., v. Atlas Copco AB*, 217 F.R.D. 545, 546 (S.D. Fla. 2003), *aff'd*, 410 F.3d 701, 712–14 (Fed. Cir. 2005).

A party seeking to disturb the normal presentation of witnesses bears the burden of demonstrating some genuine and blameless need for live, rather than deposition, testimony. *See Elgabri*, 964 F.2d at 1259 (rejecting forced appearance except where the "subject matter" of

---

[6]  Even in *In re C.R. Bard*, cited by Plaintiffs, the court recognized that it must operate "within the confines of Rule 45" and thus did ***not*** require the defendants to bring their witnesses to testify live during plaintiffs' case-in-chief. *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2013 WL 3367715, at *2 (S.D. W. Va. July 5, 2013).

[7]  *Food Lion, LLC v. Dean Foods Co.*, 2017 WL 11681053, at *2 (E.D. Tenn. Feb. 23, 2017) (explaining that, absent agreement by parties, "plaintiff will then be required to present the testimony through depositions and would have the opportunity to cross-examine the live witness later in the trial").

witness's testimony "could not be obtained in any other fashion"); *Armenian Assembly*, 746 F. Supp. 2d at 63 (rejecting forced appearance where plaintiff never explained "what additional questions they would ask [witness during its case-in-chief] that could not be admitted through his deposition"); *Air Turbine*, 217 F.R.D. at 546 (rejecting forced appearances where there was "no indication that Defendants have misled Plaintiff into believing that they would produce these witnesses for Plaintiff during its case in chief").

Plaintiffs have not met—and cannot meet—their burden. During discovery, Plaintiffs did not face any material limits on their ability to secure deposition testimony. Thus, even if a single fact witness does not attend the trial live, Plaintiffs will be able to choose testimony from the over 40 witnesses from whom they have designated deposition testimony. Plaintiffs' motion does not mention a single one of these depositions, much less identify any gaps in the record that Plaintiffs believe might be filled by live testimony. And despite pressing now for the option, although not the obligation, to call "any" witness identified by the defense, Dkt. 1805, Mot. at 8, Plaintiffs' pretrial disclosures tell a different story about their need to seek this remarkable modification in normal trial procedure. In their trial witness list, Plaintiffs identify *only three* witnesses listed by Defendants whom they "expect to or may call"—but make no commitment to call—live.[8] Ex. 2, Plfs.' Oct. 28, 2022, Am. Trial Witness List at 2. Even as to those witnesses, Plaintiffs warn: "This list is not a commitment that the purchasers will in fact call any particular witness at trial." *Id.* at 1. Giving one example, Plaintiffs say that their "need for Mr. Matukaitis's testimony at trial, either live or by deposition testimony designations, is contingent on the evidentiary developments at trial[.]" *Id.* at 2 n.1. So, Plaintiffs want the flexibility to present evidence based on what happens

---

[8]   These witnesses are Tim Hester, Paul Matukaitis, and David Pakula, none of whom are current employees of the Defendants.

at trial. That is reasonable. What is not reasonable is the one-sided rule they are attempting to craft for themselves—found nowhere in the Federal or Local Rules—to force Defendants to make witnesses who are not subject to the Court's subpoena power available during Plaintiffs' case-in-chief or forever waive the right to present their testimony live at trial. The Court should find that Plaintiffs can present their case without conscripting Defendants and their potential witnesses to Plaintiffs' case. *See Armenian Assembly*, 746 F. Supp. 2d at 63 (court assumed all relevant testimony could "be admitted through [the witness's] deposition").

Moreover, Plaintiffs have been well aware since the discovery phase of this case that many of the witnesses, including all three witnesses they now "expect to or may call live" that appear on both the Defendants' and Plaintiffs' live witness list, are Defendants' former employees or third parties outside the subpoena power of the Court.  For example, Plaintiffs learned either before, or very early into, the depositions of Tim Hester (Merck's outside counsel involved in drafting settlement agreement), Paul Matukaitis (Merck's former in-house counsel involved in settlement negotiations), and David Pakula (former Merck business development director with knowledge of authorized generics) that these individuals are no longer (or never were) employed by Defendants. At no time before, during, or after these depositions did Defendants suggest to Plaintiffs that they could or would make these or any other witnesses available during Plaintiffs' case-in-chief. And Plaintiffs were given ample time during these depositions to preserve for trial any relevant and admissible evidence these witnesses could offer. Plaintiffs' motion thus does not establish any prejudice to them that would justify altering the normal presentation of witnesses. *See Air Turbine*, 217 F.R.D. at 546 (plaintiff cannot assume defendant will "produce . . . witnesses for Plaintiff during its case in chief").

Granting Plaintiffs' requested relief would be profoundly unfair to Defendants. Numerous factors influence a defendant's decisions about which witnesses to call at trial and in which order. The Court already has seen through the multitude of motions filed that there are many issues Plaintiffs could attempt to present at trial. Due to that uncertainty, "Defendants are not required to reach a definite decision, either in advance of trial or even during Plaintiffs' case-in-chief, which witnesses they will call[.]" *Munoz v. PHH Mortg. Corp.*, 2022 WL 123713, at *1 (E.D. Cal. Jan. 6, 2022). Instead, "that decision is a strategic matter Defendants are entitled to make in response to the evidence Plaintiffs introduce during their case-in-chief." *Id.* This is particularly so in a complex trial, such as this one, for which the Court has imposed strict time limits. Defendants will be making crucial decisions about how to allocate their finite trial time based in large measure on the evidence Plaintiffs present in their case-in-chief. If the Court adopts Plaintiffs' request, Defendants would be forced into "the problematic scenario" in which "Defendants *might* want to call a witness, are therefore forced to produce that witness for Plaintiffs to call, yet then determine that they did not need to call that witness after all." *Id.* Nothing in Plaintiffs' motion justifies adopting such an unfair process.

In sharp contrast, Plaintiffs will ***not*** be prejudiced if the Court denies their request. Multiple courts have considered, and rejected, the same unfairness arguments Plaintiffs raise here. Dkt. 1805, Mot. at 9. Indeed, any supposed prejudice is "cured" through Plaintiffs' ability to "cross-examin[e] . . . these witnesses" during Defendants' case-in-chief. *See Life for Relief & Dev. v. Bank of Am., N.A.*, 2017 WL 3616498, at *7 (E.D. Mich. Aug. 23, 2017); *see also In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 2822535, at *5 (D. Kan. July 7, 2021) (rejecting argument that defendants gain any "tactical advantage" from plaintiffs' "inability to present live testimony from [defendants'] witnesses during their case-in-chief"); *Lea v. Wyeth LLC*, 2011 WL

13195950, at *2 (E.D. Tex. Nov. 22, 2011) ("[Plaintiff's] contention that she will be disadvantaged by presenting the deposition testimony of a witness whom Defendants may later call to the stand in their own case lacks merit. . . . If such a situation transpires, [Plaintiff] may cross-examine these individuals live in front of the jury.").

Finally, if the Court were to entertain any of Plaintiffs' requested relief, at the very least, it should be subject to two important conditions.  First, Defendants should be permitted to question their own witnesses first, followed by cross examination by Plaintiffs. The "normal" order of examinations makes the presentation "effective for determining the truth" by the jury and avoids "wasting time." Fed. R. Evid. 611(a); *see also Agrigenetics, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 2011 WL 52451, at *1 (S.D. Ind. Jan. 6, 2011) (holding open plaintiff's case-in-chief for live testimony of defendants' witnesses but allowing plaintiff to examine defense witness only after "the initial direct examination performed by [defendant]"). If Plaintiffs question adverse witnesses first on cross-examination, the jury is likely to be confused by such disjointed presentations. This would invariably make the presentations less effective in permitting the jury to ascertain the truth—and may require Defendants to spend time cleaning up testimony that would be unnecessary were the testimony to start with Defendants' direct examinations. Second, any relief should be strictly limited to the three defense witnesses Plaintiffs have disclosed any supposed "expect[ation]" of calling: Tim Hester, Paul Matukaitis, and David Pakula. Requiring Defendants to have ***all*** potential witnesses at the ready—or risk losing the right to present those witnesses at all—would turn Rule 45 on its head and improperly grant Plaintiffs an unprecedented and "unfettered right to call" Defendants' witnesses. [9] *See Elgabri*, 964 F.2d at 1259–60.  There is no

---

[9]   If Plaintiffs try to call a witness not on their trial list (or later supplement that list), the Court has discretion to preclude the witness from testifying, particularly when it would "disrupt the trial." *See Burlington Ins. Co. v. Shipp*, 2000 WL 620307, at *4 (4th Cir. May 15, 2000) (per

justification, and Plaintiffs cite no authority, for requiring Defendants to make available defense witnesses whom Plaintiffs did not even disclose on their trial witness list.

In sum, Plaintiffs' MIL No. 5 is a transparent attempt to interfere with Defendants' trial presentation. Plaintiffs ask the Court to reach beyond its subpoena power and ignore the weight of the case law. For their part, Plaintiffs make no commitment as to which witnesses they will call or even whether they will forgo using a witness's deposition testimony. Plaintiffs' vague and unsupported request should be denied in full or, at a bare minimum, strictly confined to the three individuals who are former employees and outside counsel for Defendants that Plaintiffs identify in their witness list.

## VI. Plaintiffs' MIL No. 6 Should Be Denied Because It Is Premature And Does Not Identify Any Evidence Or Argument To Exclude.

The Court should deny Plaintiffs' hypothetical and misguided request to bar Defendants from playing unspecified deposition clips during Plaintiffs' case-in-chief. Dkt. 1805, Mot. at 10. Plaintiffs concede Defendants may introduce deposition testimony on certain subjects during Plaintiffs' case-in-chief, including for "cross-examination" and "completeness" of testimony on direct examination. *Id.* at 10–11. Plaintiffs identify nothing that, in their view, crosses this supposed line of permissibility. *See id.* Indeed, in their motion, Plaintiffs fail to identify *any* particular testimony to which they object.

"District courts routinely deny," or reserve any ruling on, "a motion in limine that does not specify the evidence or argument to be excluded because such a motion is premature." *A. Hak*, 2014 WL 12591696, at *1 (collecting authorities). That is particularly true for hypothetical objections to deposition clips. In *Bellew v. Ethicon, Inc.*, for example, another MDL court reserved

_____

curiam). A blanket, prospective ruling forcing Defendants to make "any witness" available to testify live in Plaintiffs' case-in-chief, Dkt. 1805, Mot. at 8, would be illogical and disruptive when Plaintiffs, *by their own pretrial conduct*, have already jeopardized this option.

ruling on a motion to preclude defendants from "counter-designating deposition testimony, unless narrowly limited to testimony necessary for completeness and context of the plaintiff's affirmative designations." 2014 WL 6680356, at *6 (S.D. W. Va. Nov. 25, 2014). The court waited to address this issue until subsequent pretrial hearings where it reviewed disputed designations. *See* November 26, 2014 Dep. Designation Hr'g Tr., *Bellew*, 2:13-CV-22473, Dkt. 294; December 2, 2014 Dep. Designation Hr'g Tr., *id.* at Dkt. 310. Similarly, in *Petersen v. DaimlerChrysler Corp.*, the court denied as premature a request to "ensure that [defendant's] responsive designations . . . are strictly limited to the substance of Plaintiffs' designations." 2011 WL 2604819, at *1 (D. Utah June 30, 2011). That court ordered the parties to raise their disputes "at the appropriate time during trial." *Id.*

The same result follows here. MIL No. 6 presents an abstract, unsupported request to exclude unidentified testimony. It would be "premature for the Court to decide whether any deposition testimony is admissible at trial and for what purpose until such time as it is offered and the grounds for its admission are asserted." *Jones Lang LaSalle Ams., Inc. v. Hoffman Fam., LLC*, 2014 WL 11515839, at *1 (E.D. Va. Feb. 26, 2014).[10] The Court's Scheduling Order already lays out just such a path for identifying and resolving these disputes. *See* Dkt. 1760, Pretrial Order No. 11 at 2–3. The parties have been following the Court's prescribed process of exchanging

---

[10] Other courts have reaffirmed this uncontroversial practice. *See, e.g.*, *United States v. Ray*, 2022 WL 558146, at *15 (S.D.N.Y. Feb. 24, 2022) ("Until the Court sees the statement and the portions that the Government seeks to offer as well as the portions that the defense seeks to offer, the Court cannot make a ruling as to the offer under the rule of completeness."); *Dennis v. Progressive N. Ins. Co.*, 2018 WL 4871039, at *14 (W.D. Okla. Apr. 9, 2018) ("To the extent [Plaintiff] moves to exclude any specific trial deposition testimony, any objections are best addressed by separate rulings on the parties' designations of testimony."); *One Source Env't, LLC v. M + W Zander, Inc.*, 2015 WL 13505360, at *2 (D. Vt. Dec. 8, 2015) ("[The Court] will reserve ruling on the admissibility of particular portions of . . . deposition testimony until it reviews the deposition designations and objections of the parties.").

deposition designations and objections. *See id.* Through that process, the parties will be able to identify—and potentially narrow—disputes over particular testimony for the Court to consider. No dispute is properly teed up for the Court's resolution through this motion.

Moreover, Plaintiffs identify no authority supporting their request to upend the ordinary process for meeting and conferring to narrow and present for resolution actual deposition designation disputes. Instead, they cite cases resolving disputes over concrete, specific portions of testimony, which underscores that Plaintiffs' own non-specific request is premature and should be denied. *See* Dkt. 1805, Mot. at 10–11. For instance, in *Palmetto Pharmaceuticals LLC v. AstraZeneca Pharmaceuticals LP*, the court addressed whether an expert's testimony about sixteen publications should be stricken. 2012 WL 12896232, at *5 (D.S.C. June 29, 2012). And in *United States v. Williams*, the court considered whether to admit testimony regarding a witness's memory of "the physical layout" of a bank. 478 F.2d 369, 371–72 (4th Cir. 1973). Plaintiffs' MIL No. 6 presents no testimony at all—much less the kind of particular testimony considered in *Palmetto* or *Williams*, or any basis for excluding such testimony.

Lastly, even if Plaintiffs had identified specific testimony over which they object—and Plaintiffs have not—Plaintiffs' proposed framework should still be rejected, because adopting it would lead to needless motion practice and waste limited court resources. Plaintiffs' Motion invites needless squabbles between the parties concerning whether certain testimony is, in Plaintiffs' own words, "necessary for completeness" or if it "constitute[s] cross-examination." *See* Dkt. 1805, Mot. at 10. And Plaintiffs' motion would waste valuable courtroom time by insisting that each deposition video witness "appear" twice instead of only once. Allowing for fulsome testimony from each deposition video witness would streamline the process for all parties.

Because Plaintiffs' request does not identify any actual evidence or argument sought to be excluded and because, even if it did, Plaintiffs' request would cause only needless motion practice and inefficiencies, MIL No. 6 should be denied.

## VII. Plaintiffs' MIL No. 7 Should Be Denied To The Extent It Seeks To Preclude Defendants From Offering Relevant Evidence For Proper Purposes Such As Rebutting Plaintiffs' Assertions Regarding The Impact Of A Damages Award Or To Challenge Plaintiffs' Claimed Damages.

Unless necessitated by argument or evidence from Plaintiffs, Defendants do not anticipate presenting evidence that a damages award would have an adverse impact on Defendants, the pharmaceutical industry, or drug prices. Nevertheless, if Plaintiffs open the door to such evidence, Defendants are entitled to respond with evidence that falls within the scope of this motion in limine. For example, if Plaintiffs suggest that Defendants could absorb or afford to pay (or are insured against) a damages award or that the financial condition of the pharmaceutical industry is such that a damages award is warranted, Defendants are entitled to respond to those statements.

Defendants are permitted to present evidence and argument that the damages Plaintiffs seek are unproven, unreasonable, or too high. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("the jury may not render a verdict based on speculation or guesswork," but "may make a just and reasonable estimate of the damage based on relevant data"). Similarly, Defendants are entitled to argue that any benefits to competition from precluding pro-competitive settlements like the Merck-Glenmark settlement agreement are outweighed by the benefit of such early entry settlements and by the harm caused by chilling those settlements. *See Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998) ("the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable"). Defendants should be free to point out that imposing liability or damages based on "reasonable" conduct would harm the pharmaceutical industry, by, for example, discouraging innovation by

depriving companies of the protections of their patents.  *Cf. King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388, 394 (3d Cir. 2015) ("Patent law ... serves the interests of consumers by protecting invention against prompt imitation in order to encourage more innovation than would otherwise occur.") (internal citations omitted).  To the extent Plaintiffs' MIL No. 7 would preclude any of this evidence, it should be denied.

## VIII.   Plaintiffs' MIL No. 8 Should Be Denied To The Extent It Would Limit Cross-Examination Of Plaintiffs' Experts.

Plaintiffs move to exclude "[e]vidence about the involvement of any purchaser or its counsel in prior litigation," asserting that such information will not aid the jury in analyzing any claim or defense in this case and may be prejudicial under Fed. R. Evid. 403.  Dkt. 1805, Mot. at 12–13.  Defendants do not intend to introduce evidence for the purpose of proving that the purchaser or its counsel have been involved in prior litigation and agree that introducing the specific allegations or agreements at issue in other antitrust cases would be improper.[11]  However, in an abundance of caution, to the extent Plaintiffs' requested relief could be construed to limit Defendants' ability to cross-examine Plaintiffs' expert witnesses about their work in previous litigation—including the extent to which that work was performed for Plaintiffs' counsel—Defendants do oppose that relief.  Such evidence goes to the question of "weight and credibility" of the expert's testimony and is probative of bias; it is therefore relevant and admissible.  *United States v. Simmons*, 2018 WL 1882827, at *8 (E.D. Va. Jan. 12, 2018), *report and recommendation adopted*, 2018 WL 658693 (E.D. Va. Feb. 1, 2018) (finding that "consideration of [the expert's] alleged pro-Government bias rests squarely within the purview of the jury, as a question of weight and credibility."); *see also Green v. Ford Motor Co*., 2001 WL 1530254, at *7 (W.D. Va. Nov.

---

[11]   It would likewise be improper for Plaintiffs to reference the involvement of Defendants or their counsel in prior litigation.  The Court should therefore grant Defendants' Motion in Limine No. 3 on the same topic.  *See* Dkt. 1823 at 6–10.

19, 2001) (permitting plaintiff to cross-examine expert with regard to expert's potential bias in the case, including evidence of his pre-existing professional relationship with the defendant).

IX.     **Plaintiffs' MIL No. 9 Should Be Denied Because It Seeks To Preclude Mention Of Relevant Evidence Regarding Purchasers' Size Or Financial Condition.**

Plaintiffs seek to "preclude Defendants from offering evidence about the size or financial condition of any of the purchasers, including referring to the National Wholesalers, McKesson, Cardinal[,] and AmerisourceBergen, as the 'Big 3.'" *See* Dkt. 1805, Mot. at 13.  The Court should deny this sweeping request because the evidence Plaintiffs' motion targets is not only probative of Plaintiffs' identity, but also highly relevant to liability and damages.

Courts routinely deny motions in limine that, like this one, seek to exclude evidence of a party's size or financial condition because such evidence is probative of the plaintiff's identity, including in antitrust cases challenging so-called "reverse payment" settlements.  *See, e.g.*, *Loestrin* Order at 1 (denying substantively identical motion in limine "to the extent Plaintiffs attempt to hide their identities" and clarifying that "[t]he Court intends to explain to the jury who the parties are, and some evidence of the structure of the pharmaceutical industry may necessarily involve discussion of who the large wholesalers are"); Electronic Order, *In re Asacol Antitrust Litig.*, No. 15-cv-12730 (D. Mass. Jan. 2, 2018), Dkt. 671 (denying motion in limine "to preclude Defendants from referring to the composition of the class as insurance companies when many of the class members are, in fact, insurance companies"); *In re Opana ER Antitrust Litig.*, No. 14 C 10150, Dkt. 937 (N.D. Ill. June 6, 2022) (denying "Part[] A" of Plaintiffs' Motion in Limine no. 6 filed at Dkt. 811); *In re Opana*, No. 14 CV 10150, Dkt. 811 (N.D. Ill. May 3, 2022) (Plaintiffs' Motion in Limine No. 6 to exclude "argument or evidence regarding the parties' relative size or financial condition").  Plaintiffs should not be allowed to use a motion in limine to conceal their

true identities from the jury, or to pretend to be smaller or less sophisticated than they are.[12]

Additionally, a party's size, financial condition, and resulting sophistication can be relevant to that party's bargaining power and ability to influence prices or other aspects of competition, which bears on whether the party suffered an injury that was caused by the defendants' conduct—a key liability inquiry—and the extent of the party's damages that were caused by the defendants' conduct. With respect to liability, Plaintiffs' theory is that the settlement caused them to suffer antitrust injury because it forced them to pay "overcharges" for Zetia. But the price paid by a particular Plaintiff or class member will often depend on its size and bargaining power, as this Court has already recognized. *See* Dkt. 1101, Memorandum Order at 15 (this Court stating that Defendants' evidence "does tend to show that several aspects of the pricing and purchasing process for Zetia were different for each plaintiff"). For instance, larger purchasers with greater financial strength may have used their relatively larger size to negotiate lower prices for brand and generic Zetia than smaller purchasers, which is relevant to how much, if at all, each individual Plaintiff was allegedly "overcharged" for their purchases. *See In re Ethylene Propylene Diene (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88–89 (D. Conn. 2009) (observing that "it is possible for a plaintiff to suffer antitrust injury-in-fact and yet have no damages because it has taken steps to mitigate the actual price paid through rebates, discounts, and other non-price factors such as lowered shipping costs, technical services, or any other type of purchase incentive").

---

[12] Respectfully, Defendants submit that Plaintiffs will make the jury aware of Merck and Glenmark's size and financial condition (at least indirectly) as a result of introducing theoretical or actual sales evidence. It accordingly defies common sense to suggest that the parties' respective size and financial condition will not be before the jury. The jury inevitably will get the impression that Merck and Glenmark are large pharmaceutical companies, and to ensure fairness, Plaintiffs should not be able to hide from the jury that they consist of large drug wholesalers, nationwide retailers, and union health insurance plans—in some cases, entities that are significantly larger than Merck and Glenmark.

Not surprisingly, then, courts have repeatedly denied motions in limine similar to Plaintiffs' on the theory that the evidence is probative of bargaining power, and therefore relevant to injury and damages.  *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 2019 WL 6242128, at *11 (S.D.N.Y. Aug. 2, 2019) (denying substantively identical motion in limine in part and finding that "bargaining power . . . is relevant to damages"); *Dial Corp. v. News Corp.*, 2016 WL 690868, at *2 (S.D.N.Y. Feb. 17, 2016) (denying a motion in limine to exclude "evidence of the size, financial condition, or profitability of class members" because such "evidence may be relevant to the parties' relative bargaining power"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 10086747, at *2 (N.D. Cal. Dec. 16, 2010) (allowing evidence of class representative's financial condition in an antitrust case "to the extent that it is relevant to their bargaining power").  Plaintiffs ignore the above line of cases and fail to explain why Defendants should be precluded from introducing evidence relevant to bargaining power.  *See, e.g.*, Mot. at 14 n.38 (citing *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 06-cv-1797, Dkt. 1192 (E.D. Pa. Sept. 26, 2018) as support for their motion, but the court in that case actually *allowed* for the introduction of evidence or argument regarding Plaintiffs' financial worth to the extent it was relevant and responsive to arguments concerning Plaintiffs' power in the marketplace).  This Court should follow the authority discussed above and deny this motion in limine.

## X.  Defendants Do Not Intend To Argue To The Jury Regarding Treble Or Enhanced Damages, Attorneys' Fees, Or Costs.

While preserving all due process and other defenses to the trebling or enhancement of damages, unless Plaintiffs open the door, such as by misleading the jury regarding treble or enhanced damages, attorneys' fees, or costs, Defendants do not presently intend to make any argument to the jury highlighting the possibility of treble or enhanced damages, attorneys' fees, or costs.

Dated:  January 30, 2023                    Respectfully submitted,

/s/ Stephen E. Noona
Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Telephone:  (757) 624-3239
Facsimile:  (888) 360-9092
senoona@kaufcan.com

Samuel G. Liversidge (*pro hac vice*)
Christopher D. Dusseault (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  (213) 229-7855
Facsimile:  (213) 229-6855
SLiversidge@gibsondunn.com
CDusseault@gibsondunn.com

Ashley Johnson (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-6912
Telephone:  (214) 698-3320
Facsimile:  (214) 571-2936
AJohnson@gibsondunn.com

Eric J. Stock (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone:  (212) 351-2301
Facsimile:  (212) 716-0801
estock@gibsondunn.com

Tarek Ismail (*pro hac vice*)
Jennifer L. Greenblatt (*pro hac vice*)
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM
LLP
200 South Wacker Drive, 22nd Floor
Chicago, IL  60606
Telephone:  (312) 681-6000
Facsimile:  (312) 881-5191

31

tismail@goldmanismail.com
jgreenblatt@goldmanismail.com

*Counsel for Defendants Merck & Co., Inc.; Merck Sharp & Dohme Corp., now known as Merck Sharp & Dohme LLC; Schering-Plough Corp.; Schering Corp. and MSP Singapore Co. LLC*

*/s/ Richard H. Ottinger*
Richard H. Ottinger (VSB No.: 38842)
Dustin M. Paul (VSB No.: 75287)
Edward J. Powers (VSB No. 32146)
WOODS ROGERS VANDEVENTER BLACK
101 West Main Street, Suite 500
Norfolk, VA 23510
Telephone:  (757) 446-8600
Facsimile:  (757) 446-8670
rottinger@vanblacklaw.com
dpaul@vanblacklaw.com
epowers@vanblacklaw.com

Jay Philip Lefkowitz (*pro hac vice*)
Devora Whitman Allon (*pro hac vice*)
Kevin Michael Neylan, Jr. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 390-4092
Facsimile:  (212) 446-4900
lefkowitz@kirkland.com
devora.allon@kirkland.com
kevin.neylan@kirkland.com

*Counsel for Defendants*
*Glenmark Pharmaceuticals Ltd. and*
*Glenmark Pharmaceuticals Inc., USA, incorrectly*
*identified as Glenmark Generics Inc., US*

32

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically email notification of such filing to all counsel of record.

DATED:  January 30, 2023          _/s/          Stephen          E.          Noona_

Stephen E. Noona
Virginia State Bar No. 25367
Kaufman & Canoles, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Telephone:  (757) 624-3239
Facsimile:  (888) 360-9092
senoona@kaufcan.com

*Counsel for Defendants Merck & Co., Inc.; Merck Sharp & Dohme Corp., now known as Merck Sharp & Dohme LLC; Schering-Plough Corp.; Schering Corp. and MSP Singapore Co. LLC*