```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4
    - - - - - - - - - - - - - - - - - -
 5                                      )
      IN RE:                            )
 6                                      )
              ZETIA (EZETIMIBE)         )    CIVIL ACTION NO.
 7            ANTITRUST LITIGATION      )    2:18md2836
                                        )
 8                                      )
                                        )
 9  - - - - - - - - - - - - - - - - - -

10

11                   TRANSCRIPT OF PROCEEDINGS

12

13                     Norfolk, Virginia

14                      April 14, 2023

15

16  BEFORE:   THE HONORABLE REBECCA BEACH SMITH
              United States District Judge

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2              GLASSER & GLASSER PLC
              By:  William H. Monroe, Jr.
 3                      And
              HAGENS BERMAN SOBOL SHAPIRO, LLP
 4              By:  Thomas M. Sobol
                  Kristen A. Johnson
 5                  Erin C. Burns
                  Kristen A. Johnson
 6                  Rachel Downey
                      And
 7              KESSLER TOPAZ MELTZER & CHECK LLP
              By:  Terence S. Ziegler
 8                      And
              BERGER & MONTAGUE PC
 9              By:  Ellen Noteware
                      And
10              FARUQI & FARUQI, LLP
              By:  Bradley J. Demuth
11                  Joseph T. Lukens
                  Neill W. Clark
12                      And
              RADICE LAW FIRM, P.C.
13              By:  John D. Radice
                  Counsel for FWK Holdings, LLC, Cesar Castillo,
14                  Inc., Rochester Drug Cooperative, Inc.

15
              KENNY NACHWALTER, P.A.
16              By:  Scott E. Perwin
                  Anna T. Neill
17                  Lauren C. Ravkind
                      And
18              WOLCOTT RIVERS GATES P.C.
              By:  John Sawyer
19                      And
              HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
20              By:  Eric L. Bloom
                  Barry L. Refsin
21                  Counsel for Walgreen Co., The Kroger Co.,
                  Albertsons Companies, Inc., HEB Grocery
22                  Company, L.P., and Rite Aid Corp.

23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2           FURNISS DAVIS RASHKIND & SAUNDERS PC
             By:  James A Cales, III
 3                     And
             MOTLEY RICE LLC
 4           By:  Michael M. Buchman
                       And
 5           MILLER LAW LLC
             By:  Marvin A. Miller
 6                Matthew E. Van Tine
                  Kathleen Boychuck
 7                Counsel for City of Providence, Rhode Island,
                  Painters District Council No. 30, The
 8                Uniformed Firefighters' Association of Greater
                  New York Security Benefit Fund, The Retired
 9                Firefighters' Security Benefit Fund

10

             KAUFMAN & CANOLES, P.C.
11           By:  Stephen E. Noona
                       And
12           GIBSON DUNN & CRUTCHER LLP
             By:  Samuel G. Liversidge
13                Christopher D. Dusseault
                  Meredith S. Simons
14                Jillian London
                  Courtney L. Spears
15                Chris Whittaker
                       And
16           GOLDMAN ISMAIL TOMASELLI BREENAN & BAUM LLP
             By:  Jennifer L. Greenblatt
17                Tarek Ismail
                  Counsel for Defendants Merck & Co., Inc.;
18                Merck Sharp & Dohme Corp., now known as Merck
                  Sharp & Dohme LLC, Schering-Plough Corp.;
19                Schering Corp. and MSP Singapore Co., LLC

20

21

22

23

24

25
```

```
 1
      APPEARANCES CONTINUED:
 2
              KIRKLAND & ELLIS, LLP
 3            By:  Kevin M. Neylan, Jr.
                   Devora W. Allon
 4                 Patrick J. Gallagher
                   James R.P. Hileman
 5                      And
              WOODS ROGERS VANDEVENTER BLACK
 6            By:  Richard H. Ottinger
                   Jennifer L. Eaton
 7                 Counsel for Glenmark Pharmaceuticals, Ltd.,
                   and Glenmark Pharmaceuticals Inc., USA
 8                 incorrectly identified as Glenmark Generics,
                   Inc., USA
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Hearing commenced at 1:03 p.m.)

 2              THE CLERK:  In Re:  Zetia Antitrust Litigation,

 3    Case Number 2:18md2836.

 4              Are the parties ready to proceed?

 5              MR. MONROE:  Your Honor, Bill Monroe representing

 6    the direct purchasers.  We are ready to proceed.

 7              THE COURT:  The direct purchasers are ready to

 8    proceed?

 9              MR. MONROE:  Yes.  Thank you.

10              MR. CALES:  Your Honor, Jim Cales on behalf of the

11    end payor purchasers.  We are ready to proceed.

12              MR. SAWYER:  Your Honor, John Sawyer on behalf of

13    the retail plaintiffs Giant Eagle and Burlington plaintiffs.

14    We are ready to proceed.

15              THE COURT:  Good afternoon, Counsel.

16              MR. SAWYER:  Thank you, Your Honor.

17              MR. CALES:  Thank you, Your Honor.

18              MR. NOONA:  Good afternoon, Your Honor.  Stephen

19    Noona on behalf of Merck.  We are ready to proceed.

20              MR. OTTINGER:  Good afternoon, Your Honor.  Richard

21    Ottinger on behalf of the Glenmark defendants.  We are ready

22    to proceed.

23              THE COURT:  Good afternoon, Counsel, as well as all

24    of the other counsel who are present today.

25              We will start the hearing, I'll just make a couple
```

```
 1   of brief remarks, and then we will proceed into some
 2   substance.  The purpose of our hearing today is to hear
 3   evidence to enable the Court to decide whether the Mylan
 4   case and its result is admissible.  That's a very simple
 5   statement, but to what point the evidence is admissible
 6   pursuant to motion in limine number 19, which I'm just going
 7   to say is plaintiffs' motion in this case.
 8             Judge Miller did issue a ruling in this matter and,
 9   "Conclude that evidence related to the re-issued Zetia
10   patent and its assertion against Mylan is relevant to
11   disputed issues of fact in this case, including plaintiffs'
12   alternative settlement causation theory and defendants'
13   defense that the settlement had procompetitive effects."
14   That's from his memorandum order, which is 2000 at 2.
15             Judge Miller also found that the Mylan evidence,
16   "Poses a serious risk of misleading and confusing the jury."
17   That's in the same place.
18             Ultimately, Judge Miller ruled that the Mylan
19   evidence was admissible but that the Court would need to
20   carefully scrutinize how it should be used during trial.
21   Again, that is from his opinion.
22             Subsequent to that, the defendants responded to the
23   Court.  The Court issued a notice order.  That was notice
24   order number 1.  I believe it was issued on April 23rd.  I
25   have it here in the packet.  But, in any event, it was
```

1    issued, and in that order the Court indicated it would take

2    this issue under advisement and would give you a ruling

3    before the evidence was presented, that you would not be

4    able to mention it in opening statements.  So that was what

5    resulted in this defendants' response to the notice order

6    restrictions on the discussion of *Mylan* evidence and

7    requested this pretrial hearing under Federal Rule of

8    Evidence 104.

9         I would note that if you read 104, basically the

10   first two reasons for having a Rule 104 evidence hearing are

11   criminal.  They only pertain to a criminal case.  There is a

12   caveat there which says, "Or justice so requires."  I'm

13   going to be asking questions about why "justice so

14   requires."

15        So at this juncture, I want to start the hearing.

16   Mr. Noona, you can come forward to the podium.

17             MR. NOONA:  Yes, ma'am.

18             THE COURT:  Mr. Noona, you are local counsel for

19   the Merck defendants, and you are the individual who signed

20   this motion; is that correct?

21             MR. NOONA:  It is.  I am.

22             THE COURT:  Consequently, the Court holds you

23   responsible for this motion, as you know.  Under our local

24   rules, the Court at any time, and I say this, and I want

25   counsel to pay close attention to this statement by the

1   Court.  If you're not familiar with the rules, you need to

2   go read that rule because that's who the Court looks to, is

3   local counsel.  Local counsel is required to sign pleadings,

4   and the Court can hold local counsel responsible for that

5   filing and responsible for any part of the case.

6        So all the local counsel at any time, on the

7   Court's direction, have to be willing to step in and take

8   over.  That means examining witnesses, that means arguing,

9   and I will set the ground rules before trial, but I'm just

10  telling you this in advance.  There is going to be notices

11  and warnings if conduct is not under control, and I'll

12  explain it in great detail before we start the trial.

13       Basically, you get one warning, you get two

14  warnings, and on the third warning, you're at a flagrant

15  one.  That flagrant one will then prohibit you from

16  continuing with whatever examination you were doing, and

17  local counsel will take over for that examination or that

18  witness.  You can still come back into trial for

19  examination.

20       After that, there will be warning one, warning two,

21  flagrant two.  If you get a flagrant two, then what is going

22  to occur is you may certainly be at trial, you may

23  participate with your counsel, but you may not examine

24  witnesses or cross-examine witnesses or argue, because this

25  is going to be an orderly process.  I have looked at the

JODY A. STEWART, Official Court Reporter

```
 1    transcripts, and it's been very disappointing to the Court
 2    to see the lack of civility that has occurred at least in
 3    pretrial hearings.
 4            As I've said in my notice order, you will not talk
 5    over each other, you will not talk over the Court, and you
 6    will not talk over witnesses.  There are ways to conduct
 7    yourself in a trial, no matter how large it is, no matter
 8    how much money is involved, and no matter how zealous you
 9    are for your clients.
10            So I just add that on now, but I wanted to call
11    Mr. Noona up to the podium so I could ask him about this
12    pleading he filed because I've got questions about it.
13            Do you have it in front of you, Mr. Noona?
14            MR. NOONA:  Your Honor, I'll get it.
15            THE COURT:  This is not directed at you, Mr. Noona.
16    I know that you filed the pleadings and you signed the
17    pleadings, so this is not a statement in any way directed at
18    you either personally or as local counsel for Merck in this
19    matter.  This is something directed at both sides.
20            The Court, in going through these pleadings, has
21    become weary of the misconception of the Court's orders, and
22    this applies equally to both sides.  I'm going to go through
23    this, and I'm going to ask you what's the purpose of this
24    statement, because you signed the pleading.
25            On Page 1, it says, "It will be extremely
```

1   prejudicial to defendants if plaintiffs are allowed to

2   present all of their arguments, both pre- and

3   post-settlement, many of which the *Mylan* evidence is

4   directly relevant to rebut.  While defendants are barred

5   from telling the jury about the *Mylan* evidence, such a

6   one-sided presentation of the claims and defenses in this

7   case will give plaintiff an unfair advantage right out of

8   the starting gate.

9          "Defendants expect that plaintiffs will tell the

10  jury in their opening statements that prior to the

11  settlement of Glenmark, Merck would have thought its patent

12  was weak and vulnerable to Glenmark's inventorship argument;

13  i.e., the claim that Dr. Afonso should have been named as an

14  inventor on Merck's Ezetimibe patent because Afonso was the

15  first to conceive the operative method used to make

16  compounds 4E and 4F, and it was afraid to go to trial on

17  that issue.  Yet, the Court's notice order, defendants

18  cannot respond in their opening by pointing to the fact that

19  Merck actually took issue with Afonso, whether Afonso was

20  the first to conceive the operative method of making

21  compounds 4E and 4F."

22         Now, what leads you to believe and make a statement

23  that the Court is going to allow the plaintiffs to present

24  evidence post-settlement?  The Court's order said no

25  evidence.  It said your evidence, opening statements need to

```
1    be restricted to the settlement and pre-settlement, no
2    post-settlement evidence.  I could point you to ten places,
3    and I will continue to.  Why is that implication in a
4    pleading on the record?
5           MR. NOONA:  I think that the plaintiffs' theory is
6    that we settled the case because we thought we had a weak
7    patent and that we paid the generic in order not to have to
8    go forward with that case.  That's all pre-settlement -- I
9    mean, pre-Mylan case at the settlement time.
10          I think the arguments that are made here throughout
11   the lawsuit have been strung together, that they certainly
12   are going to argue that we settled this case in order to
13   avoid losing our patent.  There is a dispute over whether
14   there is a consistent argument concerning causation and
15   damages, and there is two different theories for that.  We
16   had a whole hearing on that, Your Honor.
17          But they have never parsed that argument and made
18   the argument that solely based on the information that was
19   in front of the plaintiffs at that exact moment -- or Merck
20   at that moment, did they think it was weak.  They have
21   always, and their expert who testified about this, has
22   always said that they settled because they thought the
23   patent was weak and that part of that was an invalidity
24   challenge.  The only challenge that was left was this
25   inventorship.  And the theory in all of the hearings has
```

1    been that they did that to buy time to fix things.  Whether

2    they get into what they did or they didn't, they are still

3    going to make that argument.

4         I know Mr. Sobol.  He's said this many times in all

5    of the hearings.  They are going to say that we settled the

6    case in order to buy off a weak patent.

7         THE COURT:  Excuse me for a minute.  I'm not saying

8    he may not ultimately say that.  Maybe you did, because you

9    had the patent re-issued.  The patent that you settled on is

10   not the patent that you won on.

11        MR. NOONA:  I'm happy to explain that.

12        THE COURT:  No.  I don't want that explained.  I'm

13   not so much talking about the merits at this point, which we

14   will get into, but the implication that the Court would

15   allow one side to present evidence -- or it's not evidence.

16   That's the whole point of an opening statement.  It is not

17   evidence.  It is not argument.  Opening statements

18   oftentimes are restricted until courts have made rulings.

19        The implication of this order was that the Court

20   was somehow going to allow plaintiffs' counsel to talk about

21   all of their evidence post-settlement and not the

22   defendants', and I don't know where in the order you come up

23   with that.  It's like you're saying, we don't trust the

24   plaintiffs' counsel, they're not going to obey your order.

25   If they didn't, I would call them down without hesitation

```
 1    during an opening statement to say, you know the Court's
 2    order does not allow you to go into that in opening
 3    statement.  It will be decided at the appropriate time
 4    whether you can use it as evidence.
 5            MR. NOONA:  But with respect, Your Honor, if I
 6    stand in front of the jury as the plaintiff and I say,
 7    "Merck was afraid to go to trial, they were absolutely
 8    afraid to go to trial, and what they did was they bought off
 9    that lawsuit."
10            THE COURT:  Well, isn't that a good argument?
11            MR. NOONA:  They are going to make that argument.
12            THE COURT:  Well, they were afraid to go to trial,
13    weren't they?
14            MR. NOONA:  I don't believe so.
15            THE COURT:  Then why won't you have your Merck
16    attorneys in here?  You're complaining about these
17    percentages that Dr. Hrubiec has put forward, and yet you
18    have claimed attorney-client privilege and will not explain.
19    Who can explain Merck's position better than their
20    attorneys?  You're not waiving your attorney-client.  You
21    want to open the door for all of this evidence that you want
22    to put in, but you're not willing to put your attorneys on.
23    So my assessment is, and it may be the jury's assessment is,
24    that you probably had legal advice.  Big companies don't
25    settle cases without legal advice.
```

1            You all have refused to allow the Merck attorneys
2    at that time to come before this Court, and the jury is
3    what's important.  Somebody has got to make this clear to
4    the jury, and this is as clear as mud in some areas.  As far
5    as I'm concerned, if you're not willing to have your
6    attorneys come in and say, no, we didn't settle it for that
7    reason.  I've read all this.  I've been reading the
8    transcripts and keeping up with things.  So why?
9            MR. NOONA:  It is my understanding, Your Honor,
10   that Merck made a decision, which is their right, not to
11   waive attorney-client privilege.  That causes the issue that
12   you are talking about, but that does not mean that Merck
13   will not come to trial with fulsome evidence that it did not
14   settle this case from an objective point of view because it
15   was afraid of losing its patent.
16           They have an expert, Mr. Armitage, who will come
17   forward and who will explain in great detail, as he did in
18   his report, that based on several objective facts, that
19   clearly they did not settle this case for fear of losing at
20   a 65 percent chance that Mr. Hrubiec says, that they had a
21   good case, that, in fact, this patent was a patent that was
22   the type of patent that had never been broken on a generic
23   type of challenge.
24           The re-issue that you mentioned earlier, one thing,
25   Your Honor --

```
 1              THE COURT:  That's going to come in, I can tell
 2     you.  I am not going to allow a jury to be confused and
 3     misled.
 4              MR. NOONA:  Let me tell you something.
 5              THE COURT:  Wait just a minute.
 6              MR. NOONA:  Yes, ma'am.  Yes, ma'am.
 7              THE COURT:  I won't give you warning one.
 8              But that is going to come in.  You're not going to
 9     stand in here and say, well, we won the Mylan litigation.
10     There are so many differences, and once you start down that
11     road and into that rabbit hole, it's all going to come out,
12     and at some point the Court is going to have to explain the
13     purpose of the evidence and what exactly occurred, because
14     what you all did was you went in and got it re-issued.  So
15     if you were so convinced that that patent was so good, why
16     did you get it re-issued before you proceeded with the Mylan
17     case?
18              MR. NOONA:  Your Honor, one of the fundamental
19     problems in this case is having a clear understanding of and
20     not broad-brushing the re-issue of the patent.  When I go
21     back to the Patent Office, and I ask to re-issue a patent, I
22     can go in and ask that certain claims be changed, not the
23     whole patent, and, in fact, what was at issue in Glenmark
24     was not changed, and very importantly, from a patent
25     perspective, you cannot get rid of invalidity.  You cannot
```

1    expunge the invalidity if it happened in the original

2    patent.

3           That is why, when you look at the decision that

4    Linares made, Judge Linares had to look at both the

5    re-issued patent and the original patent because the

6    inventorship issue is live.  The Patent and Trademark Office

7    has to look at it, the Judge has to look at it.  You can't

8    just bypass it because you've re-issued the patent.

9           Now, in particular, the issue of inventorship was

10   live in both of these cases, and the issue of whether or not

11   Mr. Afonso was an inventor was at issue in these two cases.

12   Were there other differences?  Perhaps.  And certainly they

13   did go back into the office and change part of the patent.

14   That was what they do.  You have to do that.

15           THE COURT:  Excuse me, but I want to say something.

16   First of all, I'm familiar with patent law.

17           MR. NOONA:  Yes, ma'am.

18           THE COURT:  I have been hearing patent cases for

19   over 30 years, or about 30 years now.  Actually, over.  I

20   know about patents and getting them re-issued, so I don't

21   need that explained.

22           I can't imagine that that kind of explanation is

23   going to go before a jury in an antitrust case.  This is an

24   antitrust case.  It's not a patent case.  Yes, it revolves

25   around certain patents, but this jury is not going to be

1    diverted by patent law.  This is an antitrust case.  The

2    patents ultimately were different in the Glenmark case and

3    that settlement and in the *Mylan* case.

4          That's why patent lawyers do what they do.  When

5    they see a weakness, yeah, go in and get it re-issued and

6    get that aspect of it changed.  So I think we should end our

7    discussion of patent law because patent law is not going to

8    go before this jury.  They are simply going to be told that

9    there are certain procedures that can be taken to change and

10   correct things in patents.  That's what patent law is a lot

11   about and *Markman* hearings.

12         In any event, I was just concerned, Mr. Noona, by

13   this continuous in here that somehow the Court was going to

14   allow this one-sided presentation.  I mean, on Page 4 you've

15   got an argument that said that there was an implication

16   through this whole matter that all of this would go in

17   somehow by plaintiffs, and the Court never said that.

18         If they even open the door in their opening

19   statements, if I rule in their favor, and I don't know how

20   I'm going to rule, that's why I took it under advisement, if

21   they open that door in their opening statement, the door is

22   opened, and then I'll open it wide up.  As soon as you open

23   a door, you can't close it, so you have to be very careful.

24   I'm not saying both, but I have noticed in this, if you are

25   given an inch, you try to open it to a foot.  I'm going to

1   tell you that you open the door, and it just was replete

2   throughout this.  Like Page 6, the conclusion, Mr. Noona.  I

3   know you signed this.  You signed it as local counsel.  "The

4   claim is based on post-settlement evidence, and it would be

5   profoundly unfair to allow plaintiffs to make this claim

6   without allowing Merck to explain that despite the re-issue,

7   it, in fact, went to trial in *Mylan* on the same inventorship

8   claim that was at issue in Glenmark."

9          That didn't affect the opening statement because I

10  said that neither party could mention all of this.  I didn't

11  say that only the defendants were precluded.  I just said

12  that no one would issue it, no one would mention it in

13  opening statement, and that includes what's in here.

14         Finally, and we will end this because I'm not going

15  to hold you to it, I'm not trying to argue with you.  I'm

16  just trying to make it clear.

17         MR. NOONA:  Your Honor, I am before you, and I am

18  ready, willing, and able to argue this.  I appreciate your

19  comments.  Nothing in this paper was meant to suggest that

20  the Court was going to do anything wrong.  We were just

21  trying to explain that we didn't want to be in front of a

22  jury and not be able to tell our side of the story.

23         THE COURT:  Well, that would not happen because you

24  said in here if they were allowed to present their evidence

25  during the first week of trial, that would be inherently

```
 1   unfair, and if they called any witnesses until I've made a
 2   ruling on this, then they've opened it up, and I'm letting
 3   everybody know that right now.  You open the door, and I
 4   will hold you to it.  You all are experienced civil
 5   attorneys, and you know the rules, and you know what opening
 6   the door means.  So I do have to consider the probative
 7   value of all of this vis-à-vis the confusion to the jury,
 8   and that's an important matter.
 9          Finally, I would say on Page 7, you say,
10   "Plaintiffs' claim.  By settling the litigation with
11   Glenmark, Merck believed that it bought itself exclusivity
12   and eliminated generic competition until December 2016."
13   Well, that's what this case is about.  That's exactly what
14   the case is about.  Then you say that the claim is
15   demonstrably false, and the jury might not agree with that.
16   So, I mean, I know that's argument, and I accept that is
17   argument, and I know that this is an issue, and I know it's
18   an important issue.
19          So I just don't want it to be left that somehow
20   that the Court opened the door for the plaintiffs and closed
21   it for the defendants.  So I don't understand.  I know it's
22   argument, but I just would tell you that there was some of
23   this that was just over-the-top argument, as far as I was
24   concerned.  I know it would have been better to focus on
25   this as an important issue, and it would help both sides for
```

1  it to be decided before trial, and I'm well aware of that.

2          MR. NOONA:  We appreciate the guidance, Your Honor.

3          THE COURT:  The final thing I would say, and this

4  is something we are going to hear about today, but you're

5  making Dr. Hrubiec's testimony of the 65/75 percent chance

6  of winning, that patent counsel would have advised Merck.

7          Well, you can rebut that simply by bringing on your

8  attorneys.  What did they advise?  You can waive an

9  attorney-client privilege.  So that's something that you can

10  waive, and you don't waive it, and that raises red flags.

11  I'm just telling you, I don't know how that's going to be

12  handled, but you're supposed to present the best evidence on

13  an issue.  So the best evidence, in my opinion, would be

14  whoever was advising at that time, but I'm not there yet.

15          MR. NOONA:  Thank you, Your Honor.

16          THE COURT:  Mr. Noona, I thank you.  I know how

17  diligent you are, and I appreciate your rising to the

18  occasion.

19          MR. NOONA:  I am more than happy, always to stand

20  up, maybe not as prepared as you would have liked me to be,

21  but I do check and read everything that I sign, Your Honor.

22          THE COURT:  I know you do, and I don't doubt the

23  competence of any of the local counsel nor any competence of

24  counsel.  It's local counsel that I look to.

25          MR. NOONA:  Thank you, Your Honor.

```
 1              THE COURT:  Thank you.
 2              I'm going to call upon plaintiffs to argue their
 3    position first since it's their motion in limine.
 4              Mr. Sobol, I understand you are going to argue.
 5    Mr. Sobol?
 6              MR. SOBOL:  Yes.
 7              THE COURT:  You are going to argue that?
 8              MR. SOBOL:  Yes, Your Honor.  Good afternoon.  May
 9    it please the Court.  Tom Sobol, Hagens Berman Sobol
10    Shapiro, for the direct purchasers and arguing for all the
11    plaintiffs.
12              What I would like to first do, Your Honor, is we
13    have some handouts, and if I could approach to have those
14    handed up, please.
15              Have to get it to the important person.
16              THE COURT:  Were you a law clerk at one point, Mr.
17    Sobol?
18              MR. SOBOL:  I was, Your Honor, to the former Chief
19    Justice Allan Hale in his retirement year up in
20    Massachusetts.
21              THE COURT:  So you, like all other law clerks,
22    thought you knew more than the judge?
23              MR. SOBOL:  I was one of the rare exceptions.  He
24    was quite something.  But I learned an awful lot.  I hope
25    that your clerk learns as much as I learned in my year.
```

 1          So, Your Honor, first I just want to put in context

 2   what the arguable relevance is of the *Mylan* patent merits to

 3   the case so that we know what the legal issue is under which

 4   these factual issues are being addressed.

 5          If I understand it, there are two possible legal

 6   hooks, if you will, under which the probabilities of the

 7   *Mylan* litigation are arguably relevant.  One is assessing

 8   the anticompetitive effects of the reverse payoff, reverse

 9   payment in exchange for the avoidance of a competitively

10   balanced agreed entry date.  That's one of their relevance

11   issues.  But, however, when we are looking at the

12   anticompetitive effects of any agreement, we evaluate it at

13   the time of the agreement.

14          This is stated in our briefs, but if you go to our

15   slide 3, please, you will see that -- and these are cases

16   that were cited in Judge Miller and I think in some of your

17   rulings in this case.  But the competitive effects of an

18   agreement or of a challenged restraint are assessed at the

19   time that the agreement is entered into.

20          Then if you go to the next slide, which is slide 4,

21   these cases on slide 4 and slide 5 also indicate that what

22   you do when you are looking at an anticompetitive restraint,

23   here, again, the anticompetitive restraint being a reverse

24   payment to avoid the potential for earlier risk under a

25   competitively balanced agreed entry date, avoiding that risk

```
 1   is you assess it at the time of the agreement.  Why does
 2   that make sense?  Because we are trying to hold antitrust,
 3   potential antitrust wrongdoers accountable for their actions
 4   at the time of their agreement rather than letting them have
 5   it be assessed later on down the road to determine whether
 6   or not what kind of effects it ended up having.  That's at
 7   least how you look at the violation issue.
 8            In this case, if I understand it correctly, the
 9   Mylan case, the Mylan situation is only relevant, if it's
10   relevant at all -- and the plaintiffs don't think it is --
11   the Mylan situation is only relevant to the agreement to the
12   extent that the victory in the Mylan case would have allowed
13   Glenmark onto the market earlier.  That's the only way that
14   it ends up being relevant.  But our position on that is,
15   that's talking about why the acceleration clauses in the
16   agreement are procompetitive.  It is not explaining why
17   you've done a reverse payment to avoid an earlier entry
18   date.
19            The second legal reason, and probably far more
20   germane to this case, is that when looking at and trying to
21   determine a competitively balanced agreed entry date, I
22   think Your Honor can see that I'm using the language from
23   your summary judgment decision, which I thought it was,
24   frankly, very precise in trying to define the kind of risks
25   that was avoided, allegedly avoided in this case.  So a
```

1      competitively balanced agreed entry date is determined by

2      the facts as existed at the time of the agreement, May 2010.

3              And one looks to -- one would have expected that

4      Glenmark and Merck's lawyers, although they haven't

5      testified, would have looked at the facts that had been

6      developed during the course of that two-year or three-year

7      litigation to be able to assess where they were going to go

8      at that point in time.

9              The defendants then say, well, we would like to

10     look at what the result was in *Mylan* two years later as

11     predictive of what people would have known in May of 2010.

12     Obviously, our first position on that is that can't be the

13     case.  No one knew in May of 2010, at the time that Glenmark

14     and Merck settled that case, what would happen in the Merck

15     versus *Mylan* case.  You could not know what was going to

16     happen then.  You make predictions in May of 2010, like a

17     forecaster forecasts the weather in May of 2010, and the

18     legitimacy or lack of legitimacy of your forecast in May of

19     2010 is based upon the facts and circumstances and the

20     science, or here the law, as it existed at that time, and

21     you are held accountable for the reasonableness of that

22     forecast.  It can't be the case that you look at something

23     that happened much later on down the road.

24              Now, assuming then that a Court were to entertain

25     then.  Well, okay, but we are still going to look at what

1    happened with the *Mylan* case, because it turns out that the

2    forecast was only 30 percent rain, but it did rain, you

3    know, later on down the road, so now we're going to look at

4    the fact that it rained, and now you're going to try to

5    figure out was the forecast wrong or not, even though the

6    forecast was probably solid at the time.

7          So what happened after Glenmark settled?  And I'll

8    do this as very quickly and as in a summary fashion as I

9    can.  Four weeks after Glenmark settled, the chief person at

10   Schering, Merck's company they bought, the chief patent

11   person at Schering swore under oath to the patent office

12   that the '721 patent was invalid in whole or in part by

13   reason of that fact that that patent claimed more than the

14   patentee was entitled to, swore to that under oath

15   unequivocally.

16         Now, there are other parts of the submission that

17   was made that day four weeks after the Glenmark case

18   settled, when seeking the re-issue, where the patentee,

19   where Merck tried to waffle or hedge its bets by saying,

20   well, allegedly this was said or we might have done that,

21   but the oath was unequivocal, our patent, in whole or in

22   part, is invalid.

23         Subsequently, when the patent office re-issued that

24   patent under the re-issue statute, the patent office, as a

25   matter of law, had to also have concluded that the '721

1   patent was invalid, in whole or in part, in order to allow

2   re-issue.  And then once Merck was willing to surrender,

3   which is required under the law under '721 -- under the

4   patent re-issue statute, they had to surrender the '721 and

5   get a brand-new patent.

6           Now, we don't know why Merck sought re-issue.  They

7   haven't put witnesses up to testify about why.  So we can

8   only have what objectively one would reasonably infer.

9   What's the first thing one would reasonably infer?  You're

10  trying to improve your chances.  You're trying to improve

11  your patent.  There can't be any other explanation for it.

12  You have left in the patent, that's now being re-issued,

13  bullet claims to Ezetimibe, the active ingredient of Zetia,

14  and the only explanation that has to be that you went

15  through this process of re-issue, which was in no way

16  guaranteed, and brushed it so clearly, right in the

17  aftermath of Glenmark, to be able to improve your chances.

18          Now, why is that even relevant, in part, to this

19  motion is this.  There is no one who can be able to educate

20  the jury about what -- how much those chances were improved

21  by the re-issue.  How would the jury even begin to

22  understand that on this rabbit hole or this sideshow, and

23  none of even the experts for either side have said, well, a

24  re-issue, when you do this under the circumstances, it

25  increases your chances X amount.  So even though *Mylan* won

1  in the end, you've got to discount that by X amount, because

2  nobody knows.  But, in any event, they re-issued it.

3        Then what's the next thing that they do?  So when

4  Merck was before the *Mylan* -- in the Glenmark case, excuse

5  me, Merck took the position that a gentleman by the name of

6  Mr. Rosenblum had conceived of these two compounds, 4E and

7  4F.  That was their position.  They had him -- that he was

8  the one who had conceived it.

9        In that case, in Glenmark also, Mr. Rosenblum said

10 that he had a method by which he could make these two

11 compounds, and there was a dispute as to whether he could

12 make this, these two compounds.  So Merck also had another

13 gentleman, a man by the name of Mr. Brisbois, a scientist,

14 who came in and said, I looked at Mr. Rosenblum's method,

15 and I can recreate it, and that was their position in

16 Glenmark.

17       After getting the re-issue, Merck, in their

18 findings of fact, and we have this in the slides, changed

19 their position, and they said, no, the earlier inventors of

20 these beta-lactam compounds, and Mr. Burnett and then

21 Mr. Clader, they conceived of these two compounds.  They, in

22 the course of their more fundamental research and prior

23 patents, they are the ones who came up with these two

24 compounds, and not only that, but it was they who had the

25 ways to make these two compounds.

1    And Merck even pointed out to the Court in the

2    *Mylan* case that Mr. Rosenblum, and this other gentleman,

3    Mr. Afonso, but Mr. Rosenblum hadn't even gotten onto the

4    project until Mr. Burnett and Mr. Clader had conceived of

5    these two compounds and hadn't disclosed methods to make

6    them.  So it was different as to who made the key compounds

7    that were being disputed.  It changes.

8    Again, now, how is that going to be explained to

9    our antitrust jury about that kind of a difference, about

10   what happens when you change your theory about who made the

11   compounds?  But another difference is this.  In the Glenmark

12   case, Glenmark was pursuing three different challenges to

13   the patent.  In *Mylan*, *Mylan* only chose one.  How do we

14   balance those?

15   In the Glenmark case, Glenmark was only saying that

16   this gentleman thought he was the inventor, Mr. Afonso.

17   They were only saying Mr. Afonso made compounds 4E and 4F,

18   he was the inventor of 4E and 4F.

19   But in the *Mylan* case, *Mylan* decided to say

20   that Afonso, not only did he make 4E and 4F, he also made

21   Ezetimibe.  He was an inventor of Ezetimibe itself, the

22   fundamental difference.

23   So, and then there is one other thing, too, the

24   kind of thing that would be presented to the jury.

25   THE COURT:  You are talking about now in your case

1  in chief?

2       MR. SOBOL:  Well, if this comes up, if the

3  defendants are entitled to say, we are going to put on the

4  *Mylan* results, right, in our case, then I think it's

5  appropriate for me to start out at the gate and say, well,

6  I'm not going to let the jury to think that we are hiding

7  from this issue.  I want to be able to put on my own

8  evidence directly to say, you know why Glenmark was a weak

9  case?  Because now I'm going to show you why they did all

10  this stuff, you know, colloquially, but they did all these

11  things in a later case in order to improve their chances,

12  that from which you, jury, you can infer that they must have

13  had a weak case to begin with.

14       I don't want to have to be going down any of this.

15  I do think the whole thing is a distraction, but my point is

16  it's like your allusion to a door, Your Honor.  If the *Mylan*

17  result door gets opened, it gets opened all the way, and

18  then the plaintiffs take the position that we are going to

19  thrust all of this in front of the jury because we want to

20  show the jury not that this case inevitably would have lost

21  but that they were doing things to clean up their act.

22       THE COURT:  Well, if you were so concerned with the

23  admissibility of the *Mylan* evidence at trial, why did you

24  not bring it up at summary judgment or an earlier time, and

25  you waited until the 11th hour to file the motion *in limine*?

```
 1              MR. SOBOL:  So it was not clear to us early on what
 2    our position should be with respect to this evidence at all.
 3    And what we thought was more important was to fight each
 4    fight as it came along, meaning there were two times that it
 5    came up:  One was at Daubert against Dr. Hrubiec, Robert
 6    Hrubiec, and the other time was at summary judgment.
 7              We indicated that we didn't think it was relevant,
 8    but, you're right, our primary argument was it does not get
 9    rid of the case as a whole, and we thought that that was the
10    appropriate way to proceed.  And when it did come time to
11    file our motions in limine, these were timely filed months
12    ago.
13              THE COURT:  Well, let me ask you this question.  Is
14    your position that all this Mylan evidence should be
15    excluded or just which post-dates the Merck-Glenmark?
16              MR. SOBOL:  Just what post-dates the Merck-Glenmark
17    settlement, Your Honor.
18              THE COURT:  Okay.  Do you propose any type of a
19    limiting instruction being given to the jury about all of
20    the post-settlement evidence?  Have you come up with
21    anything?  Because, certainly, we are not going to
22    re-litigate the Mylan case here.
23              MR. SOBOL:  Right.  So if I understand what the
24    Court is asking, our position with respect to the
25    post-Merck-Glenmark settlement Mylan evidence is that all of
```

1    that should come out, and if all that evidence comes out,

2    I'm not aware of something that would end up being before

3    the jury for which we would have to give them a limiting

4    instruction.

5         Now, I do want to -- just so that I'm completely

6    transparent -- I want to be clear, there are other kinds of

7    things that happened in this case, not about *Mylan*.  There

8    are other things that happened in this case after the

9    settlement, obviously, which would be coming in, but that

10   doesn't have anything to do with *Mylan*.

11        THE COURT:  I understand.  I'm saying this

12   basically to both parties, if it comes in, I'm talking about

13   the post-settlement, it's got to be, if the Court let's it

14   in, some type of a limiting instruction or something that

15   would have to go to the jury to put into context why this

16   evidence in another case in another patent is coming in

17   before them.

18        I'll mention some things later at the conclusion of

19   the hearing, a couple of suggestions I have, but in any

20   event, I just wanted you all to be thinking of, if the

21   evidence does come in, some type of limiting instruction.

22        Go ahead.  I basically just wanted to mention those

23   while you were talking about it.  It sounds like all the

24   *Mylan* evidence, and I don't know why you all can't agree

25   about some stipulation that, okay, we all know that the

 1    patent was changed.  I don't understand.  Both sides, and
 2    I'm going to mention this in the end, are inviting error.
 3    As far as I'm concerned, if it is let in, that you would be
 4    wise to come up with some kind of stipulation or agreement.
 5    I mean, there are certain things, facts are facts, and the
 6    fact is you went in and you got the patent re-issued.  The
 7    fact is, you can maybe talk about the similarities, but
 8    ultimately you are talking about different patents,
 9    different cases.  I mean, there are certain things that are
10    fact that could be in a stipulation that would reduce the
11    confusion to the jury.
12            MR. SOBOL:  Sure.
13            THE COURT:  Anyway, you were giving me such a
14    history of the *Mylan* litigation, and I read a lot about it.
15    I certainly hope all of that wouldn't come in for a jury.
16    Wouldn't propose for the whole scenario of what occurred
17    from the Glenmark settlement to the conclusion of the *Mylan*
18    litigation, but go ahead.
19            MR. SOBOL:  Thank you, Your Honor.  Yes, so I think
20    a large part of our position, our point in terms of that,
21    going through the whole background, is that -- and I've made
22    my way about halfway, maybe a little bit more than halfway
23    through the differences between the Glenmark case and the
24    *Mylan* case, is that in order for the jury, if the jury gets
25    any suggestion that the *Mylan* case prevailed, they will need

1    to have before them evidence about each of these various

2    changes and when they happened, and they won't be told why

3    the defendant did it, but they would have to make estimates

4    about why they did it, and our point then is you end up in

5    this situation where you are just so far down the road that

6    you end up in a truly situation where you're very much

7    confusing the jury.

8            Let me go through a couple of the final points and

9    I'll move on with the argument.  So in the Glenmark case,

10   you recall that I indicated that the Merck position there

11   was that this Mr. Rosenblum had been the inventor.  He had

12   tried to make the compounds 4E and 4F.  There was a dispute

13   whether he could.  And then Merck came up with a scientist

14   by the name of Mr. Brisbois who said that he could do and

15   tried to do it.  Then there was a dispute about whether he

16   could do it.

17           That same evidence was also presented in the *Mylan*

18   case.  We have a similarity there.  However, when the *Mylan*

19   court in New Jersey made its decision, it observed that this

20   Brisbois, this Mr. Brisbois had testified but did not rely

21   upon that evidence at all in its decision.

22           So you have the reality that the *Mylan* court

23   actually rejected one of the arguments that had been made in

24   Glenmark, adding some more confusion to more differences.

25           Well, we also know about what the *Mylan* court did,

1    was that the *Mylan* court said, you know, regarding this 4E

2    and 4F, I agree with you, Merck, on your new position as to

3    who conceived it.  It's Mr. Burnett and Mr. Clader, right,

4    and that's who they said who had first conceived it, and

5    they said that those gentlemen had had methods that were in

6    place before.  So you have all of these various differences

7    between the two cases that would end up with very

8    significant juror confusion.

9          There is another issue that overlaps this, and this

10   deals with a little bit, I think, Your Honor, of -- let me

11   take a step back.  I have given a lot of thought also to

12   Judge Miller's decision on this issue and how would a court

13   go about trying to police appropriately, you know, shifting

14   sands on what it is that people do here with respect to

15   this.

16         There are some subsidiary facts.  I'm not sure if

17   the parties could agree with what they are with the

18   stipulations, and, you're right, frankly, we have not been

19   very successful in reaching an awful lot of stipulations of

20   fact in this case, but what I will say is this.  There are

21   many issues also of characterizations of patent law, patent

22   principles, and characterizations like it's the same patent.

23   Well, it's not the same patent.  They are saying it's the

24   same law, but it's not the same law as it was in *Therasense*.

25         They say it was the same issue of inventorship, but

 1    that's misleading because it is not really the same issue of

 2    inventorship if you are saying in one case the one group

 3    conceived of it, and then you're saying in the other case

 4    somebody else conceived of it, it's not the same issue.

 5           And if you tell the jury, well, it's the same issue

 6    of inventorship, you have an expert who is -- their expert

 7    is as adamant and 100 percent characteristic about these

 8    issues as counsel's advocacy about it's the same this, it's

 9    the same that.  Now the plaintiffs are in the position of

10    saying, well, it's not really the same way, it's not the

11    same way this.  And, frankly, at some point, the plaintiffs

12    would call upon the Court, with all respect, to say, well,

13    wait a second, Your Honor, they're mischaracterizing an

14    issue of law.  And this Court knows -- or we would

15    advocate -- because I'm not going to suggest what the Court

16    knows, but advocate that this Court can't let either the

17    counsel or their witness mischaracterize comparison of these

18    two cases if it is incorrect as a matter of law.

19           THE COURT:  Well, I will tell you in my opinion

20    it's not the same patent.  Now, how you qualify that, I'm

21    not speaking to that, but it is not the same.  Ultimately,

22    it is not the same patent.  I know it, and all of you all

23    know it.  So that would have to be qualified for the jury

24    that it was changed.  It's not the same patent as at the

25    time the Glenmark settlement went forward, which has

1     resulted in all of this antitrust litigation.

2              Excuse me for a minute.

3              Go ahead.

4              MR. SOBOL:  Finally, Your Honor, I want to end up

5     on another point of law.  If you can turn to our slide 29,

6     please.

7              This issue, as you can imagine, Your Honor, in some

8     of these reverse payment cases, this issue or issues like

9     this arise from time to time.  In our briefing, we have

10    cited this case.  We also replicate it here.  In the *Namenda*

11    court, there was a similar kind of issue that arose

12    regarding a confidential memorandum, and Judge McMahon was

13    of the opinion to exclude that evidence because it did not

14    come to light to the parties until after they settled the

15    Paragraph 4 litigation.  And so, again, you have this issue

16    where if you've got things that are cropping up after the

17    parties settle, then it ought not be influencing the jury's

18    analysis in terms of assessing the anticompetitive

19    agreement.

20             Also, in the *Apotex* case, our slide 31, we think

21    that Judge Goldberg did a very good way of navigating these

22    waters.  In that case what Judge Goldberg did was realized

23    that a later invalidation of the patent would be unduly

24    prejudicial to the defendants, even though the defendants'

25    patent was found to be procured by inequitable conduct.  On

 1    the issue of violation, he said as a matter of law it should

 2    not come in, so he bifurcated this trial and made sure it

 3    did not come in that for that reason.

 4           THE COURT:  As an aside, so you all know, I have

 5    not only reviewed the *Apotex* opinion, but I've read all the

 6    jury instructions.

 7           MR. SOBOL:  Okay.  Thank you.

 8           THE COURT:  I have reviewed all of the jury

 9    instructions in *Apotex*, and I would also tell you that I'm

10    aware that the *Mylan* litigation was a bench trial and not a

11    jury trial.  Jury trials are somewhat different from the

12    standpoint that the judge is charged with knowing the law in

13    a bench trial and sorting through the evidence.  In a jury

14    trial, you all have to educate that jury as to the facts

15    that will then lead to the instructions of law from the

16    Court.

17           You all have a tremendous duty.  It's not up to the

18    Court to straighten this all out for the jury.  It's up to

19    you all.  I'm not going to give any legal instructions upon

20    which you have not offered sufficient evidence to support

21    the jury instruction.  So I've reviewed the *Apotex*

22    instructions, and they were very good.

23           MR. SOBOL:  I won't make any further remarks, then.

24    I do think that Judge Goldberg navigated that quite well.

25    He did find that for the causation theory that was involved

1    in that case to allow in some later patent evidence, but

2    this Court has already read those decisions so I don't need

3    to tell you about it.

4           What I will say, this is my final remark with

5    respect to this motion, if I may, Your Honor, is this.  This

6    Court and these lawyers, for both the plaintiffs and the

7    defendants, we all have legal education, we all have

8    experience in the law, we all have some background in patent

9    issues, and we can ourselves try to parse these issues apart

10   even in this antitrust case.

11          The plaintiffs' position is that given the fact

12   that this is something that happened two years after the

13   fact, and given the numerosity of the issues and how

14   different it is, it's completely well within your

15   discretion, under 403, and we would seek the Court to

16   exercise it, and we do not think it would be error in you

17   exercising your discretion under Rule 403 to say, you know

18   what, this is just too much to expect the jury to do.  It

19   would be unduly prejudicial, far too confusing for the jury.

20   It would weigh your trial down because it is going to

21   require massive amounts of more testimony from witnesses,

22   documents, as you can see, because all of the things, the

23   differences I've indicated here obviously would have to be

24   paraded before the jury, and counsel fighting and struggling

25   to be able to have the jury in what I would suggest would be

```
 1    a hopelessly confused mess of trying to figure out why we've
 2    got literally a trial within a trial within a trial, because
 3    we are supposed to be trying an antitrust case, and then we
 4    will look a little bit at the merits of the Glenmark case,
 5    in terms of looking at what the possibilities were of
 6    Glenmark winning, but then we also, inside that second
 7    trial, are now having a third trial, which is the trial of
 8    the Mylan case, and we are not even trying the Mylan case.
 9              Now we are putting the jury in a situation where
10    they are trying to compare two cases.  I just think it is
11    too much, Your Honor.  Thank you.
12              THE COURT:  Thank you, Mr. Sobol.
13              Who is arguing for Merck?
14              MR. LIVERSIDGE:  Your Honor, Sam Liversidge for the
15    Merck defendants.
16              THE COURT:  You are arguing it, not Mr. Ismail?
17              MR. LIVERSIDGE:  Correct, Your Honor.  I have some
18    slides as well, if I can hand those up.
19              THE COURT:  Certainly.
20              MR. LIVERSIDGE:  Your Honor, good afternoon.  Sam
21    Liversidge on behalf of the Merck defendants and arguing for
22    the defendants here today.
23              We appreciate the Court's time on this issue.  This
24    is obviously an important issue for us.  We appreciate the
25    opportunity to explain some of the background here and some
```

 1   of the background around the evidence on the *Mylan* case.

 2          I'd like to, if I could, just walk you through

 3   quickly plaintiffs' basic claim on the inventorship issue in

 4   the case because I think it helps the Court understand how

 5   this evidence fits in.

 6          If we can go to slide 3, I know you have already

 7   seen this probably many times.  This is the basic opinion

 8   that Dr. Hrubiec is offering, which is that Merck was highly

 9   likely to lose the case, and Glenmark was highly likely to

10   win.  This is the foundational opinion for their case, and

11   this is used as a proxy for what Merck was thinking at the

12   time of the settlement.  So they take an expert opinion

13   after the fact and use it as a proxy for what we would have

14   been thinking and expecting at the time of the settlement.

15          We go to slide 4, the entire basis for that opinion

16   is the inventorship claim, the improper inventorship

17   challenge, and they chose to make that the claim that forms

18   the basis of the 65 to 75 percent opinion that Dr. Hrubiec

19   is offering, of course, knowing that we went to trial on the

20   inventorship issue in the *Mylan* case.

21          And if I can go to slide 5, just so that the Court

22   understands because I'm not sure this has been briefed at

23   length, the inventorship claim in the Glenmark case was that

24   in the patent application, the original patent application,

25   Merck named five scientists as inventors.  It named five.

1   And the claim was you failed to name a sixth inventor,

2   Dr. Afonso.  That was the basic claim in the Glenmark case,

3   and that was the basic claim in the *Mylan* case; you should

4   have named Dr. Afonso.

5          THE COURT:  That issue then predates the

6   settlement, so that would not be improper because that issue

7   then would predate the settlement; is that correct?

8          MR. LIVERSIDGE:  That would predate the settlement.

9   All of the facts around these inventorship issues took place

10  in the 1990s, actually in the early '90s, so long before the

11  Glenmark case and the *Mylan* case.

12         THE COURT:  But you can do a stipulation on

13  something like that.  You don't need to present all this

14  evidence to the jury about inventorship patents.  Just come

15  to an agreement and stipulate it to the jury.  I mean, the

16  jury is just going to be confused by, you've got Stuart

17  Rosenblum, you've got Sundeep Dugar, you have got Duane A.

18  Burnett, you've got John W. Clader, you've got Brian A.

19  McKittrick, you've got Dr. Afonso, and just come to some

20  agreement over what the jury should know that was the issue

21  in the Glenmark case.

22         MR. LIVERSIDGE:  Understood, Your Honor.

23         THE COURT:  I'm not telling you you have to, but

24  I'm saying from my way of thinking that's the way you would

25  do something like that as opposed to spending your valuable

```
 1    trial time and trying to educate a jury that probably you're
 2    not going to have anybody on that jury that knows anything,
 3    probably, I don't know.  I don't know who the jury panel
 4    even is, but I doubt you're going to have an antitrust
 5    expert.  If you do, you all will have stricken the person.
 6    You're not going to have a patent expert on there or an
 7    attorney.  You will have that information, so the odds are
 8    you're not going to have that kind of person on the jury.
 9              I think all of this is just so much for a jury to
10    absorb, but go ahead.
11              MR. LIVERSIDGE:  Thank you, Your Honor.
12              If we look at slide 6, speaking of the Glenmark
13    case, on slide 6 we see a description of what the
14    inventorship claim was in Glenmark, and this is
15    Dr. Hrubiec's testimony.  The claim in Glenmark was that Dr.
16    Afonso should have been named an inventor on the '721 patent
17    because he possessed the operative method of making the
18    claimed compounds 4E and 4F.  That was the inventorship
19    claim in Glenmark.  He should have been named an inventor
20    because he came up with a way to make these compounds 4E and
21    4F.
22              If we go to slide 7, that is the issue that Judge
23    Linares decided in the *Mylan* case.  Judge Linares determined
24    that Afonso did not contribute to the operative method of
25    making compounds 4E and 4F and that Afonso was not an
```

1    inventor of the compounds 4E and 4F.

2           Dr. Hrubiec's 65 to 75 percent opinion is premised

3    on the chances that Glenmark or Merck was going to win on

4    this issue.

5           THE COURT:  But you didn't know at the time.

6           MR. LIVERSIDGE:  We didn't know.  But Judge

7    Linares' opinion is another opinion about how a reasonable

8    and competent patent lawyer would view these issues, and he

9    reached a very different conclusion than Dr. Hrubiec.

10          THE COURT:  Why don't you just tell us?  You've got

11   the reasonable and competent patent lawyers that were

12   involved in this.  So why don't you just get up and tell

13   them?  Why don't you just tell them to tell the story, if

14   the story is compelling?  You've got those attorneys or

15   you've got those records, and you're claiming

16   attorney-client privilege.  Mr. Hrubiec is an attorney,

17   isn't he, patent attorney?

18          MR. LIVERSIDGE:  He is.

19          THE COURT:  So what else are you going to do?  In

20   other words, you've got the key to the evidence.  You were

21   in the case.  They had legal advice.  They had your

22   attorneys, so you hold the key to it.

23          MR. LIVERSIDGE:  Those attorneys are going to

24   testify, Your Honor, and they are going to testify to all of

25   the objective facts in the case that we believe show why we

1    would have won the Glenmark case.

2            THE COURT:  The attorneys that were in the *Mylan*

3    case?

4            MR. LIVERSIDGE:  The attorneys from Merck that were

5    involved in *Mylan* and in Glenmark, they are going to

6    testify.

7            THE COURT:  Who are they?

8            MR. LIVERSIDGE:  Paul Matukaitis is one.

9            THE COURT:  Can you spell the last name?

10           MR. LIVERSIDGE:  I think so.  M-a-t-u-k-a-i-t-i-s.

11           THE COURT:  All right.

12           MR. LIVERSIDGE:  I think I got that right.  And

13   then Lisa Jakob is the other one, J-a-k-o-b.  Those two

14   attorneys are going to testify.

15           THE COURT:  What cases were they involved in?

16           MR. LIVERSIDGE:  They were both involved in the

17   Glenmark case and the *Mylan* case.

18           THE COURT:  They represented Merck?

19           MR. LIVERSIDGE:  Correct.

20           THE COURT:  I've seen Ms. Jakob's name, but has the

21   other name been in anything?  Maybe he just hasn't been in

22   something that I read.

23           MR. LIVERSIDGE:  The other name was in the briefing

24   on summary judgment because he was involved in negotiating

25   the settlement, Mr. Matukaitis.  Ms. Jakob was the lead

1    attorney overseeing the day-to-day litigations, and she is

2    scheduled to testify the first week of trial, perhaps it's

3    the beginning of the second week.  The plaintiffs told us

4    they intended to call her on Thursday.

5            THE COURT:  You are talking about the plaintiffs

6    presenting this person?

7            MR. LIVERSIDGE:  They are calling our witness in

8    their case.  They are calling Ms. Jakob in their case.

9            THE COURT:  We will see if they open the door.  Go

10   ahead.

11           MR. LIVERSIDGE:  Your Honor, I'm giving you this

12   background on the claim, and I guess let me just skip ahead

13   on the slides.  I've got a number to cover.

14           If we go to slide 11, it's not just that we believe

15   Judge Linares resolved the inventorship, the underlying

16   inventorship that was also in play in the Glenmark case,

17   it's that Dr. Hrubiec intends to make findings based on the

18   evidence and tell the jury that it is his opinion that a

19   reasonable and competent lawyer would have reached the

20   following conclusions about the evidence when a lot of the

21   things he's saying, a lot of the opinions he has are

22   directly contrary to the opinions of Judge Linares.  They

23   are more specific findings than just the patent was upheld

24   as valid and enforceable.

25           THE COURT:  I'm not going to let you put in a

1    judge's, that's highly prejudicial to tell a jury that a

2    federal judge found this in another case, and they haven't

3    heard that case.  I haven't heard that case.  I certainly

4    haven't read all of the transcripts for it.  So that would

5    be so prejudicial as to tell a jury, by the way, that's like

6    saying this is the law of this case.  The judge determines

7    the law of this case.

8              MR. LIVERSIDGE:  We certainly are not proposing to

9    have it presented as the law of the case, Your Honor.  But

10   Dr. Hrubiec intends to say things like, reaching the

11   conclusion that Dr. Afonso was the first scientist who had

12   an operative method of making compounds 4E and 4F, when

13   Judge Linares determined that Dr. Afonso did not first

14   conceive of the operative method of making these compounds.

15             THE COURT:  I'm not going to be bound by Judge

16   Linares.  He is a fine judge, but one Court is not going to

17   be bound by the findings of a judge on something like that

18   that involved all of these different facts and a change in

19   the patent, a re-issue of the patent.  You've got a re-issue

20   of the patent, and that is something that you cannot get

21   around.

22             MR. LIVERSIDGE:  Okay.  Well, Your Honor, we are

23   not talking about being bound as much as it is an opinion of

24   another reasonable and competent lawyer.

25             THE COURT:  He is not a lawyer.  Judge Linares is

 1    no longer a lawyer.  Judges can't practice law.  They are no

 2    longer lawyers.  I have no idea what his background was in

 3    the practice of law.  Just simply not going to allow it.

 4    You can count on that right now, that I'm not going to let

 5    that come in, and I would call down the attorney, strike the

 6    evidence, and instruct the jury that it was improper

 7    evidence, contrary to the Court's rulings, and they are not

 8    to be bound by it, they are to totally ignore that evidence

 9    in deciding the issues proposed in the case.  You're not

10    going to issue another judge's opinion in this case.

11         MR. LIVERSIDGE:  Understood.

12         THE COURT:  A finding like that.  You are just not

13    going to do that.  I hope you weren't planning it.

14         MR. LIVERSIDGE:  Understood, Your Honor.

15         Let me skip to the re-issue since we spent time on

16    that.  If we go to slide 16, and Mr. Noona mentioned this

17    point.  One of the reasons why we don't think the re-issue

18    changed the inventorship challenge here is because you can't

19    undo a claim for inequitable conduct by re-issuing the

20    patent, and that's why it was necessary for Judge Linares to

21    rule on the claim that Dr. Afonso contributed to the methods

22    of making 4E and 4F, even though the plaintiffs say those

23    compounds were dropped.  And that's why it was necessary for

24    him to determine whether Dr. Afonso was an inventor on the

25    patents that were at issue in Glenmark even though the

1    patent had been re-issued and changed.

2              So if I skip to my next slide, the very basic

3    slide, slide 17, these are the Zetia patents.  The Court has

4    probably seen this, but the original patent was the '115

5    patent issued back in 1998.  That patent then got re-issued,

6    and in 2002 it became the '721.  And the '115 and the '721

7    patents were the patents that were at issue in the Glenmark

8    case.  Those were the patents at issue in that case.

9              Then before the *Mylan* trial, the patent got

10   re-issued and became the '461.  But the claim about

11   inventorship is that Dr. Afonso should have been named an

12   inventor on the original patent, the '115.  Dr. Afonso was

13   gone from the company for almost a decade before the

14   re-issue patent became the '461.

15             The question was should he have been named an

16   inventor on that original patent, the '115?  And that's why

17   when you go to slide 18, you see that this is the testimony

18   of Dr. Hrubiec.  You understand that Judge Linares made a

19   finding that Dr. Afonso was not a co-inventor of the '115

20   and its subsequent '721 patents.

21             Those are the same patents that were at issue in

22   the Glenmark case because he had to make that determination

23   to resolve the inventorship challenge.  The patent did

24   change in the re-issue.  We are not contesting that.  We

25   acknowledge that there were some changes in the patent.

1          THE COURT:  Well, enter into a stipulation, then.

2          MR. LIVERSIDGE:  Understood, Your Honor.

3          THE COURT:  That's the way I would see resolving

4     this, is that there was a court finding that he was not a

5     co-inventor, and something like that, whatever you all can

6     agree.  I'd have to look at it, but enter into a

7     stipulation.  There are certain things that are facts here,

8     and you can enter into a stipulation.

9          MR. LIVERSIDGE:  We can propose a stipulation that

10    has the findings like you see here on slide 18.  He made a

11    finding that Dr. Afonso was not a co-inventor of the '115

12    and '721 patents, and Dr. Hrubiec agrees with that.

13         THE COURT:  You don't have to say Judge Linares.

14    You can say a finding was made in such litigation.  You

15    don't have to refer to the judge.  A finding was made in the

16    *Mylan* litigation and when it was made.  As a result of that

17    finding, you all would have to write the stipulation, but

18    you can say a finding was made in a case without saying a

19    judge.  It's one thing to argue that to a judge.  In other

20    words, a lot of times somebody will come into your court and

21    say, Judge Davis did so and so, or the Fourth Circuit with

22    Chief Judge Gregory writing the opinion did.  That's

23    permissible before a Court.  But the prejudicial value of

24    that, when a judge is sitting in a federal courtroom with a

25    federal jury, it gives it some inherent status that it

1    shouldn't have in another case.

2         Anyway, there are ways to get around it.  You can

3    say "in that case," and I would certainly consider that as a

4    stipulation from the parties without saying Judge Linares.

5         MR. LIVERSIDGE:  Certainly.  We will undertake the

6    initiative to prepare a proposed stipulation on those facts

7    and those rulings in *Mylan*.

8         THE COURT:  I think that was one of the words of

9    advice I was going to give to both parties at the end of

10   this, that maybe a little bit of time you all have left

11   might be well spent trying to reach some resolution on this

12   stipulation that would resolve, if not all of it, at least

13   part of it.  Go ahead.

14        MR. LIVERSIDGE:  Thank you.  Your Honor, if I

15   could, I spent a little bit of time talking about the

16   likelihood of success opinion and why we think this evidence

17   is relevant.  I just want to mention a couple of other areas

18   where we think this evidence comes into play in an important

19   way in the case.

20        THE COURT:  All right.

21        MR. LIVERSIDGE:  If I can move to slide 32.  I have

22   a lot of slides.  It's not just Dr. Hrubiec that we need to

23   cross-examine with this evidence.  We are dealing with

24   economist models that they are presenting in the case that

25   drive the alternative entry dates and the damages in the

1    case, and they make a number of fundamental assumptions in

2    those models that drive damages and that drive the

3    alternative entry dates, and some of them bring into play in

4    a significant way the *Mylan* evidence and the *Mylan* case.

5            For example, this is Dr. McGuire, the chief

6    economist that the direct purchasers are going to bring, and

7    he has an economic model that he is going to present, and he

8    assumes in that model that when Merck settled the case with

9    Glenmark, when it settled the case, that it expected that it

10   was going to maintain exclusivity all the way to December of

11   2016.  That's a fundamental assumption in his model, and you

12   can see his deposition testimony here.

13           In other words, Merck thought it was buying itself

14   exclusivity all the way to December of 2016, and they valued

15   the settlement to Merck based on that assumption.  They say

16   that the settlement was worth $2.8 billion to Merck because

17   Merck thought, when it settled with Glenmark, it was going

18   to have exclusivity without any generic competition all the

19   way to December of 2016.

20           But, of course, Merck had to win the *Mylan* case in

21   order for that to be true.  If Merck lost the *Mylan* case,

22   not only was *Mylan* going to be able to enter the market but

23   Glenmark was going to be able to enter as well, and so this

24   is not a correct assumption.  You cannot assume, based on

25   the settlement, that Merck was going to maintain

1   exclusivity.  That only happens if Merck wins the *Mylan*

2   case, because this was the Ezetimibe patent that was at

3   issue in *Mylan*, and it's undisputed that if Merck lost that

4   case, Glenmark was going to come in.

5           We can see the testimony on slide 34 from

6   Dr. McGuire.  "Do you understand that Glenmark would have

7   been entitled to enter the market with its generic version

8   of Zetia if *Mylan* had prevailed in its litigation against

9   Merck and invalidated Merck's patent covering Zetia?"

10          "That's my understanding."

11          So they are going to go in front of the jury and

12  assume we had zero risk of having generic competition

13  between the time of the settlement and December of 2016.  We

14  have to be able to counter that by pointing out that we

15  actually went to trial in the *Mylan* case on the Ezetimibe

16  patent.  Whatever you want to say about the differences in

17  the patent, it was the patent covering Ezetimibe, it would

18  have allowed Glenmark to enter the market.

19          How does Dr. McGuire deal with this issue of the

20  *Mylan* litigation?  On slide 33, we can see.  "How did they

21  know there was not going to be any generic entry after the

22  settlement with Glenmark?"

23          "Answer:  Because they had an entry date of

24  December 12, 2016."

25          "And they had ongoing litigation with other

1    generics, including *Mylan*, on the same patent, right?"

2         "That's true.  They must have thought they had a

3    very high chance of success."

4         "Okay.

5         "In the *Mylan* litigation."

6         THE COURT:  But isn't that what settlement is all

7    about?  You roll the dice?  In other words, settlement,

8    whenever parties settle, there is not certainty.  You settle

9    based upon your assessment, whether you're in an antitrust

10   case, a patent case, a slip and fall case.  You settle a

11   case, you settle it based upon your assessment of the

12   strength of your case and the weaknesses of your case at the

13   time.  You can't control what happens after the settlement.

14        Yes, a post-settlement might then, in hindsight, it

15   is like looking back at something you've done.  You

16   certainly wish you could change it, but you can't.  You

17   don't get do-overs.  So the problem here is that you settle

18   it, and that something that happens in the future occurs,

19   you don't know that at the time you're settling it.  That is

20   what settlement is all about, and I guess you call it

21   hornbook law in law school where you can't talk about

22   certain issues of settlement in cases.

23        You can look at the reverse.  You can't talk about

24   certain issues after a case had settled.  But, in any event,

25   that's what settlement is.  All of us as lawyers knew it,

```
 1    you as lawyers know it, and that's why you settle.  Things
 2    may not go in your favor.
 3              MR. LIVERSIDGE:  Understood, Your Honor.
 4              This is more a point about countering the
 5    fundamental assumptions that their experts are making in
 6    order to value the settlement.  If we look at slide 35, we
 7    see that as of the time of the settlement, they are saying,
 8    when you settled with Glenmark, you had no threat of
 9    exclusivity, zero risk to you until December of 2016, and
10    that's how they valued the settlement.  And we want to be
11    able to point out to this expert, the only reason that's
12    true is because we actually went to trial against Mylan and
13    won it.  If we'd lost, there would have been generic
14    competition years earlier.  It is after the settlement
15    evidence, but it is fundamental to countering an assumption
16    that they are using to come up with their damage estimates.
17              It's also the case that they have these
18    contradictory assumptions that do not hold together.  If we
19    look at slide 36, they're basically saying that we thought
20    we had a hundred percent chance of winning Mylan but only 25
21    to 35 percent chance of winning Glenmark.
22              THE COURT:  They are going to say that because you
23    got your patent changed or you got it re-issued.  That would
24    be my immediate reaction without having heard the testimony.
25              MR. LIVERSIDGE:  I think you are correct.  I think
```

1    they are going to say that.  But it's also the case that if

2    we had lost that case, that there would have been generic

3    competition, including from Glenmark.  We think it's

4    important for us to be able to raise that issue to counter

5    these assumptions.

6             I would point out on the same subject, if we go to

7    slide 41.

8             THE COURT:  I think that's motion *in limine* number

9    15 that Judge Miller just ruled on.  I don't think that this

10   hearing was scheduled for that, and, in fact, if I were you,

11   and I was looking at my time, I might not spend a lot of

12   time between now and the trial on that.  I thought, to both

13   sides, I thought it was a very good opinion.  I wouldn't

14   spend a lot of time on it between now and trial.  But if you

15   want to use your time today talking about it, you can.

16            MR. LIVERSIDGE:  I'll just make one final point on

17   this, Your Honor.  If we look at slide 41, it is the case

18   that this settlement agreement had an acceleration clause,

19   which we believe is one of the procompetitive aspects of the

20   settlement.  It gave an entry date of December 12th, 2016,

21   or an earlier date if Merck's patent is invalidated.

22            So if *Mylan* had won that litigation against Merck

23   under the terms of the settlement between Merck and

24   Glenmark, Glenmark would have been able to enter the market

25   pursuant to the terms of the agreement.  And so you cannot

    1    arrive at the entry date under the terms of the settlement
    2    agreement at issue without understanding whether Merck won
    3    the *Mylan* litigation or not.
    4            So we think it's going to be important to explain
    5    at some level to the jury that we did have another
    6    litigation.  If we'd lost that litigation, Glenmark would
    7    have been able to enter even earlier than they did, and the
    8    only reason they didn't is because we went to trial and won
    9    against them.  So we think this is another area where it's
   10    important that we be able to tell the jury something about
   11    *Mylan*, what happened in that case and the result, because
   12    it's fundamental to understanding what the entry date was
   13    under the settlement.
   14            Your Honor, thank you very much for the time.
   15            THE COURT:  Let me look at my notes and see if I
   16    have anything else I want to ask you before we start into
   17    any evidence.  That's all.
   18            MR. LIVERSIDGE:  Thank you, Your Honor.
   19            THE COURT:  Then, Mr. Sobol, you're going to call
   20    Dr. Hrubiec?
   21            MS. KRISTEN JOHNSON:  I am, Your Honor.
   22    Dr. Hrubiec can take the stand, with your permission.
   23            THE COURT:  Can you come up and identify yourself,
   24    please.
   25            I'm talking about the attorney.

1          MS. KRISTEN JOHNSON:  Apologies, Your Honor,

2    Kristen Johnson for the plaintiffs.

3          THE COURT:  All right.

4          (Witness was sworn.)

5          MS. KRISTEN JOHNSON:  If I may, Your Honor, I have

6    copies for the Court and for the witness as well.

7          THE COURT:  I think I had instructed four copies.

8          MS. KRISTEN JOHNSON:  Yes, Your Honor.

9          I apologize.  We apparently passed up the wrong

10   binders, Your Honor.  I apologize.

11         THE COURT:  Give these back.

12         MS. KRISTEN JOHNSON:  Thank you, Your Honor, and I

13   believe the witness' has been corrected.

14         ROBERT HRUBIEC, called by the Plaintiff, having

15   been first duly sworn, was examined and testified as

16   follows:

17                    DIRECT EXAMINATION

18   BY MS. KRISTEN JOHNSON:

19   Q.  Good afternoon, Dr. Hrubiec.

20   A.  Good afternoon.

21   Q.  Please state your name.

22   A.  My name is Robert Hrubiec.

23   Q.  Can you spell that.

24   A.  H-r-u-b-i-e-c.

25   Q.  Please briefly describe your professional background as

1   it relates to the opinions you're offering in this case.

2   A.  I have a Ph.D. in synthetic organic chemistry.  I did

3   post-doctoral work in synthesizing organic compounds for use

4   as pharmaceuticals.  I then moved on to industry, worked for

5   a biotech company, again, synthesizing more compounds for --

6   to be used as pharmaceuticals.  Did that for about five or

7   seven years.

8           After that I moved on to a large pharmaceutical

9   company in North Carolina, which is now GSK, and started my

10  patent career there, first as a patent agent, and then I went

11  to law school at night, and once I received my JD, I became a

12  patent lawyer.

13          I worked for the company initially drafting and

14  prosecuting patent applications in front of the patent

15  office.  I also did a lot of work evaluating third-party

16  patents for -- to determine their strengths and weaknesses.

17  And after that I moved on.  I did that for about ten years

18  and then moved on to a company in Pennsylvania, Cephalon, and

19  headed up their patent department there, where besides being

20  responsible for the company's patent portfolio

21  prosecution-wise, I continued to advise the company on the

22  strengths and weaknesses of third-party patents as well as

23  advising upper management of that company as to the

24  likelihood of success in their patent litigation cases.

25          After that I left Cephalon and started my consulting

Hrubiec, R. - Direct                                          59

```
 1   business about ten years ago or so, consulting with clients
 2   on various patent matters.
 3   Q.  Who hired you in this litigation?
 4   A.  I was hired by, I believe it was your firm.
 5   Q.  On behalf of which parties?
 6   A.  On behalf of the plaintiffs.
 7   Q.  What were you asked to do with respect to the outcome of
 8   the Glenmark litigation?
 9   A.  I was asked to review the Glenmark record from both
10   parties, including expert testimony, depositions, expert
11   reports, transcripts, court orders, and other materials, as
12   well as reviewing the '721 patent, the specification, the
13   claims of the '721 patent, as well as its progeny, starting
14   from the -- what was called the '440 patent application,
15   including the '115 patent and the '721 patent, re-issue
16   patent.
17   Q.  Having reviewed those materials, were you asked to do
18   anything else?
19   A.  Having reviewed those materials, I was asked to provide
20   my opinions.
21   Q.  If you turn to Paragraph 23 in your report, it should be
22   the first tab in the binder provided.
23   A.  23?
24   Q.  Yes, sir.
25   A.  I'm there.
```

Hrubiec, R. - Direct                                                    60

```
 1              THE COURT:  Just a minute.  You said tab 23?

 2              MS. KRISTEN JOHNSON:  Paragraph 23 in Dr. Hrubiec's

 3   report.  It should be the first tab, Your Honor.

 4              THE COURT:  Yes.

 5   BY MS. KRISTEN JOHNSON:

 6   Q.  What were you asked to do with respect to advising a

 7   client?

 8   A.  I was asked to provide an opinion from the perspective of

 9   reasonable and competent patent counsel as to how I would

10   have advised the client at the time in May of 2010 as to the

11   likelihood of Schering prevailing -- prevailing in a lawsuit

12   and showing that their '721 patent -- I'm sorry -- showing

13   that Glenmark infringed one or more claims of a Schering

14   valid and enforceable patent.

15   Q.  When you say a lawsuit, do you understand that to be the

16   Glenmark litigation?

17   A.  Yes, that was in the Glenmark litigation.

18   Q.  And when you say Schering, who's Schering?

19              THE COURT:  I know.  Before the jury, you would

20   have to present that Schering is now part of Merck.

21              MS. KRISTEN JOHNSON:  Thank you, Your Honor.  I

22   will move it along.

23              THE COURT:  You can skip that.

24   BY MS. KRISTEN JOHNSON:

25   Q.  Do Paragraph 23 and Paragraph 23.1 accurately describe
```

 1    your assignment with respect to the outcome of the Glenmark

 2    litigation?

 3    A.   Yes, they do.

 4    Q.   Were the views of Merck's counsel, as of May 2010,

 5    available to you in doing your work?

 6    A.   I'm sorry.  Can you repeat that?

 7    Q.   Sure.  In doing your work in this case, did you have

 8    available to you what Merck's lawyers thought about the

 9    merits of the Glenmark litigation as of May of 2010?

10    A.   No, I didn't.

11    Q.   Did you have available to you the views of Glenmark's

12    lawyers, as to what they thought about the likelihood of

13    succeeding in the Glenmark litigation as of May of 2010?

14    A.   No, I did not have those either.

15    Q.   Were you able to form opinions about how reasonable and

16    competent patent counsel would have advised a client about

17    the likelihood of Schering succeeding as of May of 2010?

18    A.   Yes.

19    Q.   What was your opinion?

20    A.   My opinion was that reasonable and competent patent

21    counsel advising Schering and Glenmark as of May 2010 would

22    have advised the party that Glenmark had a 65 to 75 percent

23    likelihood of prevailing against -- I'm sorry, 65 to 75

24    percent likelihood of prevailing in that case.

25    Q.   In forming those opinions, that opinion, did you rely on

1    any post-May 2010 facts about the *Mylan* litigation?

2    A.  No, I did not rely on any post-May 2010 facts or

3    information.

4    Q.  How are post-May 2010 facts about the *Mylan* litigation

5    relevant to your opinion about how reasonable and competent

6    patent counsel would have advised the client about the

7    likelihood of Schering succeeding in May of 2010?

8    A.  They're not relevant at all.

9    Q.  Why not?

10   A.  First, they didn't exist as of May 2010.  Second, and

11   perhaps even more importantly, there were several important

12   and significant differences between the Glenmark case and the

13   *Mylan* case.

14   Q.  Like what?

15   A.  First, it was a different patent, as we've heard.  The

16   inventors were different in the two cases.  The experts were

17   different in the two cases.  The testimony that the experts

18   provided was different.  The lawyers were different in the

19   two cases.  The law was different in the two cases.  The

20   defense was different in the two cases.

21   Q.  So I want to break --

22   A.  Go ahead.

23   Q.  Had you finished your answer, sir?  I apologize.

24   A.  Yes, I did.

25   Q.  I want to break that down a little.  How is the patent

Hrubiec, R. - Direct                                                 63

```
 1   different, from your perspective?
 2   A.  Well, the re-issue patent in Mylan no longer contained
 3   claims covering the compounds 4E and 4F.
 4   Q.  Why does that matter?
 5   A.  Well, that matters because now they had to prove, for
 6   inventorship purposes, that Dr. Afonso was an inventor of
 7   Ezetimibe.
 8   Q.  Was that an argument that Glenmark had made, that
 9   Dr. Afonso was an inventor of Ezetimibe?
10   A.  In the Glenmark case?  No, not at all.  They were arguing
11   that he was an inventor of the compounds 4E and 4F only.
12   Q.  What did Merck cite as the reason that it sought
13   re-issue?
14   A.  They cited an issue that was presented in the
15   underlying -- in the earlier Glenmark case.
16   Q.  You said that the inventors were different as between
17   Glenmark and Mylan cases?
18   A.  Totally.
19   Q.  What did you mean?
20   A.  Well, in Glenmark, Merck was putting forth Dr. Rosenblum
21   as the inventor of the compounds 4E and 4F; whereas,
22   subsequently in Mylan, Merck was now putting on Drs. Clader
23   and Burnett as the ones who invented 4E and 4F.
24   Q.  You said the experts in Mylan were different than the
25   experts in Glenmark.  What did you mean?
```

Hrubiec, R. - Direct                                          64

1    A.  I did, yes.  Well, I meant in Glenmark, the experts, the

2    expert on inventorship, on the inventorship issue, was a

3    Dr. Brisbois.  In the subsequent *Mylan* case, Merck had

4    switched and changed and now were providing a Dr. Myers,

5    Dr. Rosenblum, and Dr. Roush as experts and, in fact,

6    witnesses for the inventorship issue.  So they went from one

7    expert in Glenmark to three in *Mylan*.

8    Q.  And I think you may have misspoken, so let me clarify.

9    So who were the three experts in *Mylan*?  If I've got it

10   right, it's Dr. Brisbois, Dr. Roush, and Dr. Myers?

11   A.  Correct.

12   Q.  Okay.  Why would it matter if they changed the experts in

13   *Mylan*?

14   A.  It matters because those experts would be providing

15   different testimony in different fashions in *Mylan* than they

16   would in Glenmark.

17   Q.  And, in fact, did Dr. Roush in *Mylan* provide different

18   additional testimony to what Dr. Brisbois had provided in

19   Glenmark?

20   A.  Yes, he did.  Do you want me to continue?

21   Q.  Please.  Thank you.

22   A.  Dr. -- I've got to keep all the players and the parties

23   straight.  Dr. Roush in Glenmark, he provided expert

24   testimony as to Dr. Burnett being able to make another

25   compound, 8F, and if Dr. Burnett was able to make that

1    compound, then Dr. Burnett would be able to make the

2    compounds 4E and 4F.  That was the basis of Dr. Roush's

3    testimony, which Judge Linares and the Court in *Mylan* heavily

4    relied on and actually specifically referenced their

5    testimony.

6    Q.  So if I've got it right, then, in the *Mylan* case,

7    Dr. Roush offered an opinion that if one could make compound

8    8F, as Dr. Burnett had done, one could make compounds 4E and

9    4F that was in *Mylan*, correct?

10   A.  That was Dr. Roush's testimony -- testimony in *Mylan*,

11   correct.

12   Q.  In the Glenmark case, Dr. Roush also put in an expert

13   opinion?

14   A.  Yes, he did.

15   Q.  Did it address inventorship?

16   A.  No, it did not.  Dr. Roush was providing expert testimony

17   in Glenmark to a different issue.

18   Q.  I take it, then, that Dr. Roush's Glenmark reports did

19   not offer the argument that if one could make compound 8F,

20   one could make compounds 4E and 4F?

21   A.  He did not provide that testimony.

22   Q.  You said that there were different lawyers in *Mylan* than

23   in Glenmark?

24   A.  Correct.

25   Q.  How did the lawyers differ?

1   A.  Well, certainly my understanding was that the Merck

2   lawyers were the same.  However, in Glenmark, Glenmark had

3   their lawyers, and in *Mylan*, *Mylan* had their own different

4   lawyers.

5   Q.  Did *Mylan* lawyers offer any different theories about the

6   case --

7   A.  Yes.

8   Q.  -- as Glenmark's lawyers?

9   A.  They did, yes.

10  Q.  How so?

11  A.  In *Mylan*, because of the change in the patent, *Mylan* had

12  to argue that Dr. Afonso was not only an inventor on the 4E

13  and 4F compounds, as they did in Glenmark, they had to also

14  argue that Dr. Afonso was also an inventor of the other

15  compound Ezetimibe in that *Mylan* patent.

16  Q.  And Ezetimibe is the generic name for the active

17  ingredient in the drug Zetia, right?

18  A.  That's correct.

19  Q.  How did the defenses differ, if at all, as between

20  Glenmark and *Mylan*?

21  A.  The defenses in *Mylan* -- I'm sorry, the defenses in

22  Glenmark -- Glenmark is on my left, *Mylan* is on my right.

23  The defenses in Glenmark were threefold:  Glenmark was

24  defending on patent term extension, obviousness-type double

25  patenting, and also inventorship; whereas, in *Mylan*, *Mylan*'s

1    defenses were only inventorship.

2    Q.  Am I understanding, then, that in Glenmark, the generic

3    had three paths to victory, potential paths to victory?

4    A.  Sure, yes.  They had three defenses, so they had three

5    shots on goal, if you will.

6    Q.  And in *Mylan*, there were how many shots on goal

7    available?

8    A.  They had one defense and one shot.

9    Q.  Now, by the way, how do you know what Glenmark's defenses

10   were in the Glenmark litigation?

11   A.  Because I reviewed the pretrial briefs of both Glenmark

12   and Merck in the Glenmark case.

13   Q.  Did you review similar briefing from the *Mylan* case?

14   A.  Yes, I reviewed those pretrial briefs as well.

15   Q.  In your report, you analyzed each of Glenmark's defenses

16   and assigned each a probability of success?

17   A.  I did, correct.

18   Q.  Which of the defenses did you ascribe your overall

19   opinion of success -- terrible question.  I can do better.

20        Which of those defenses did your overall opinion

21   about the chance of success as to how reasonable and

22   competent patent counsel would have advised a client in May

23   of 2010 as to Merck's chance of succeeding and proving its

24   case in Glenmark?

25   A.  I based my opinion on the overall chance of success based

1    on the opinion regarding inventorship.

2    Q.  Dr. Hrubiec, if facts about what happened in the *Mylan*

3    litigation are not relevant to your opinion about what

4    reasonable and competent patent counsel would have advised in

5    May of 2010, why do you sometimes refer to such facts in your

6    opening report?

7    A.  Well, I wanted to be complete.  My marching instructions

8    were to provide an opinion based on the record as it existed

9    in 2010, but I was made aware of the later-occurring *Mylan*

10   case and Judge Linares' decision in that case and opinion.

11        So I just felt compelled to make -- to look at that

12   case and to make sure that there was nothing in that case

13   that would cause me to change my opinions with regard to the

14   Glenmark defenses.  I wanted to make sure no stone was

15   unturned so I could feel confident that my opinions and my

16   conclusions were rock solid.

17   Q.  What was it that you expected to find in the *Mylan* case

18   that could have changed your opinions?

19   A.  I didn't expect to find anything when I started.  I just

20   went in with an open mind and read all the relevant documents

21   and concluded that the *Mylan* case was -- there were so many

22   differences, and so many significant differences that it

23   wouldn't apply to what was happening in Glenmark.

24   Q.  If I could direct you to Paragraph 26 of your report,

25   Doctor.

Hrubiec, R. - Direct                                              69

```
 1   A.  Okay.
 2   Q.  You state in Paragraph 26, in part, "I sometimes address
 3   subsequent events and precedent (including, but not limited
 4   to, developments in the caselaw and the Schering/Mylan
 5   litigation) but do not consider them when opining on the
 6   advice reasonable and competent patent counsel would have
 7   offered prior to the settlement in May 2010 because such
 8   developments would not have been reasonably foreseeable by
 9   the parties or their counsel in May 2010."
10           Is that an accurate statement, sir?
11   A.  Yes, it is.
12   Q.  If I can direct you to Paragraph 202 -- I'm sorry, 244.
13   Well, it's a little tricky.  I apologize.  Let's do 202, and
14   it's footnote 156 that should be on that page.
15           THE COURT:  Page 202, Paragraph 202?
16           MS. KRISTEN JOHNSON:  Paragraph 202, Your Honor.
17           THE WITNESS:  Page 202?
18   BY MS. KRISTEN JOHNSON:
19   Q.  Paragraph 202, footnote 156.
20   A.  Paragraph 202, footnote 156.  My footnote 156 is on Page
21   103.
22   Q.  Let's try Paragraph 244.
23           THE COURT:  First of all, what footnote are we
24   looking at?  Let's start it that way.
25           MS. KRISTEN JOHNSON:  156, Your Honor.
```

```
 1            THE WITNESS:  Bottom of Page 103.
 2            THE COURT:  All right.  Go ahead.
 3  BY MS. KRISTEN JOHNSON:
 4  Q.  Would you read Paragraph 244 for me, sir.
 5  A.  Certainly.  "As such, in my opinion, around the time of
 6  settlement a reasonable patent counsel would find there was a
 7  high likelihood that:  One, inventorship would not be
 8  corrected -- could not be corrected because Afonso
 9  intentionally deceived the PTO, and, therefore, RE '721
10  patent was invalid; and, two, Rosenblum's breach of his duty
11  of good faith and candor constituted inequitable conduct and
12  rendered the entire patent unenforceable."
13  Q.  In that paragraph, sir, are you making a finding as to
14  whether Dr. Afonso is, in fact, an inventor or not?
15  A.  No, I'm not.
16  Q.  What are you doing?
17  A.  I am simply saying that a factfinder -- this is what a
18  factfinder could find, could determine.  It wasn't my job to
19  make that determination.
20  Q.  If the analysis that you took in forming that opinion --
21  I'm sorry, strike the question.  I forgot why we were here
22  for a minute.  I apologize.
23            Footnote 156, do you have that?
24  A.  Yes.
25  Q.  What does it state?
```

1    A.   Do you want me to read it?

2    Q.   Yes, please.

3    A.   "The subsequent *Mylan* opinion and the upheld decision on

4    appeal do not change my analysis because the later findings

5    of a court on the same or similar issues would not have

6    impacted what the parties knew and considered at time of

7    settlement."

8            THE COURT:  Let me just interject something here

9    that causes some confusion to the Court.  First of all, an

10   expert's opinion doesn't go before the jury, only the

11   expert's testimony.  There has been all of this drama

12   created over the statements in the report, and there is

13   nothing to indicate that they would be part of the

14   testimony.

15           So until they're part of the testimony, Merck and

16   the defendants are claiming, oh, we can't defend.  I don't

17   understand that because there is nothing here that indicates

18   he would say this on the stand.  Until he says this -- and

19   this was part of their case -- why would the *Mylan*

20   litigation come in after the fact?  Because you are putting

21   the position that they are going to get on the stand first

22   and try to make distinctions between the Glenmark litigation

23   and the *Mylan* litigation.

24           There is nothing here that I've heard so far that

25   would indicate that that's the case.  I've repeatedly said

1    if the door is opened, then that's a different story.  But

2    you defend upon the case presented by the plaintiffs.  The

3    plaintiffs rebut upon the defense presented by the

4    defendants.  There is nothing here that would tell me that

5    he's going to get on the stand, and, in the case in chief,

6    talk about all of this with the *Mylan* litigation that

7    happened after the settlement when he's repeatedly saying

8    here, it doesn't affect my opinion.  That's point one.

9         Point two is that you're basing a lot of this on

10   his percentages of success at the time of the settlement and

11   what a reasonable patent attorney would say.  Then you're

12   going to, I imagine, cross him pretty strenuously on, how do

13   you know what a reasonable patent attorney would say, and

14   you know because you have that evidence.

15        I don't know, but I may be inclined to instruct the

16   jury that Merck is the same party ultimately in both cases

17   and that they have the records for what was being advised,

18   that there is better evidence to rebut this.  Because you

19   are going to attack him on percentages that he's had to make

20   because you refuse to produce the evidence.

21        I'm just saying that as an observation.  I'm not

22   saying I'll give that instruction.  But certainly a jury

23   would be scratching their head and saying, well, he's making

24   a prediction this was going on, and what were the attorneys

25   doing?  That would be the natural commonsense reaction of a

Hrubiec, R. - Direct                                                    73

```
 1   jury, and a jury is instructed that they can use their
 2   common sense in judging any evidence.
 3         It's 3:00.  We have been in here over two hours.
 4   We are going to take a 15-minute recess, and we will resume
 5   with Dr. Hrubiec's testimony.
 6         (Recess from 3:03 p.m. to 3:21 p.m.)
 7         THE COURT:  You may resume your examination.
 8         MS. KRISTEN JOHNSON:  Thank you, Your Honor.
 9   BY MS. KRISTEN JOHNSON:
10   Q.  Dr. Hrubiec, does any part of the opinion that you intend
11   to present to the jury about how a reasonable and patent
12   counsel -- let me correct my question.
13         Is there any part of the opinion that you intend to
14   give to the jury about how reasonable and competent patent
15   counsel would have advised the client about Glenmark that
16   requires you to rely on or discuss anything post-May 2010
17   about the Mylan litigation?
18   A.  Nothing whatsoever.
19   Q.  So I take it, then, that in offering an opinion about how
20   reasonable and patent counsel would have advised about
21   Glenmark, in your view, you don't need to talk about what
22   happened in the Mylan litigation?
23   A.  Not at all.
24   Q.  And so if you're not asked anything about the Mylan
25   litigation, including post-2010 facts about the Mylan
```

 1    litigation, you're not going to testify about the *Mylan*
 2    litigation?
 3    A.  No, I won't.
 4              MS. KRISTEN JOHNSON:  Thank you.
 5              THE COURT:  Mr. Liversidge.
 6              MR. LIVERSIDGE:  Thank you, Your Honor.  We have
 7    some of our own binders, I hate to say.
 8              THE COURT:  That's okay.  There are two separate
 9    binders, and the witness should have two, the courtroom
10    deputy, the law clerk, and the Court.
11              MR. LIVERSIDGE:  Hopefully, everybody has it.  It's
12    a report and deposition and then a separate binder with some
13    documents.  It's a lot of documents for not a lot of
14    questions, so, hopefully, I can move pretty quickly.
15              May I proceed, Your Honor?
16              THE COURT:  Certainly.
17                          CROSS-EXAMINATION
18    BY MR. LIVERSIDGE:
19    Q.  Good afternoon, Dr. Hrubiec.
20    A.  Good afternoon.
21    Q.  The patent at issue in the Glenmark case was the '721
22    patent, correct?
23    A.  That's correct.
24    Q.  And the '721 was a re-issue of the '115 patent, correct?
25    A.  That's correct, it was a re-issue.

```
 1              THE COURT:  Excuse me for a minute.  There are
 2   actually three.  You've done a binder, and then I don't know
 3   what you call these with it.
 4              MR. LIVERSIDGE:  Spiral-bound, correct.  There are
 5   three separate.
 6              THE COURT:  I just want to be sure everybody is on
 7   the same page and has them.
 8              All right.  That's fine.
 9   BY MR. LIVERSIDGE:
10   Q.  Just to re-set, Dr. Hrubiec, the patent at issue in the
11   Glenmark case was the '721 patent, correct?
12   A.  That's correct.
13   Q.  And that patent was a re-issue of the '115 patent,
14   correct?
15   A.  Yes.
16   Q.  And you understand that the Court in the Mylan case found
17   that Dr. Afonso was not a co-inventor of those '115 and '721
18   patents, correct?
19   A.  While the Court did make that conclusion, it was based on
20   a very different record and facts.
21   Q.  Well, I understand that you think it was different, but
22   the finding was that Dr. Afonso was not an inventor of the
23   patents that were at issue in the Glenmark case, right?
24   A.  Again, based on a different set of facts, yes.
25   Q.  And you don't actually know if the factual record
```

1    relating to whether Dr. Afonso should have been named an

2    inventor was any different between the Glenmark and the *Mylan*

3    case, correct?

4    A.  You're asking me if I don't know that?

5    Q.  Right.  You don't know --

6    A.  I reviewed -- I reviewed the record in Glenmark with

7    regard to inventorship and Dr. Afonso, and I reviewed the

8    record in *Mylan* with regard to Afonso as well.  So --

9    Q.  And you don't know if there was actually any difference

10   in the factual record with respect to whether Dr. Afonso

11   should have been named an inventor between the Glenmark case

12   and the *Mylan* case, correct?

13   A.  My view is that there was a difference.

14   Q.  Okay.  Well, could we turn to your deposition.  It should

15   be one of the spiral-bound binders you have in front of you.

16   A.  Yes.

17   Q.  You have it?

18   A.  Yes.

19   Q.  If you will take a look at Page 126 of your deposition

20   starting at line 24 and go to 127, line 17.  So 126 starting

21   at line 24.  Are you there?

22   A.  Yes, I am.

23   Q.  Okay.  And the question was asked to you, And you don't

24   know if the factual record relating to whether Dr. Afonso

25   should have been named -- should have been an inventor was

Hrubiec, R. - Cross                                              77

```
 1   any different between the Glenmark and Mylan cases, right?
 2   I'm sorry.
 3   A.   Where is that?
 4   Q.   I'm sorry.  Let me start again.  126, 24.
 5                        "And I'm talking about the factual
 6            record.  Was there any difference in the factual
 7            record relating to whether Dr. Afonso should have
 8            been named an inventor of Compounds 4E and 4F
 9            between the Glenmark case and the Mylan case?"
10                        "Answer:  I don't -- I don't recall
11            addressing that in my report.  I haven't really
12            thought about it, if there was -- if there were
13            factual differences with the two cases with regard
14            to what Dr. Afonso did.  So I'm not comfortable
15            providing a definitive answer sitting here today."
16            That was your testimony at the time, correct?
17   A.   Yes, that was my testimony.
18            THE COURT:  What was the date of the deposition?
19            MR. LIVERSIDGE:  The date of the deposition was
20   July 1st, 2020, after he had issued all of his opinions in
21   the case.
22            THE COURT:  That's almost three years ago?
23            MR. LIVERSIDGE:  (Nods head.)
24            THE COURT:  Go ahead.
25   BY MR. LIVERSIDGE:
```

Hrubiec, R. - Cross                                            78

```
 1   Q.  Dr. Afonso -- Dr. Hrubiec, all of the events related to
 2   Dr. Afonso's work on compounds 4E and 4F were from the 1990s,
 3   correct?
 4   A.  Are we looking at my deposition?
 5   Q.  No, I'm just asking you.
 6   A.  Can you repeat the question?
 7   Q.  Sure.  All of the events related to Dr. Afonso's work on
 8   Compounds 4E and 4F were from the 1990s, right?
 9   A.  No, I don't believe that's correct.
10   Q.  Okay.  Let's turn in your deposition to Page 121, line
11   13, going through 16.
12          THE COURT:  If you're trying to impeach him, which
13   it appears that you are, the proper way to do it is to have
14   him look at it, read it, and then ask if that's his
15   testimony.
16          MR. LIVERSIDGE:  Thank you, Your Honor.
17          THE COURT:  But not for you to read it all into the
18   record.
19          MR. LIVERSIDGE:  Just ask if that's what he said?
20          THE COURT:  Where are you right now?
21          MR. LIVERSIDGE:  I'm at Page 121, line 13.
22          THE COURT:  So we are going to go back to 121, line
23   13.  How far do you want him to read?
24          MR. LIVERSIDGE:  Just 13 to 16.
25          THE COURT:  Okay.
```

```
 1           MR. LIVERSIDGE:  So, Your Honor, to be clear, you

 2      do not want me to read it into the record?

 3           THE COURT:  You can.  It's just before the Court.

 4      So that's fine.  Go ahead.

 5      BY MR. LIVERSIDGE:

 6      Q.  "Question:  Well, the events related to Dr. Afonso's work

 7      on Compounds 4E and 4F took place in the 1990s, correct?

 8           "Answer:  Correct."

 9           That was your testimony, Dr. Hrubiec?

10      A.  That's what is written here.

11      Q.  Okay.  And so the relevant facts on the invention of

12      Compounds 4E and 4F would have occurred before 1994 when the

13      patent application was filed, correct?

14      A.  Before 1994, did you say?

15      Q.  Yes.

16      A.  The relevant facts of the invention, 4E and 4F in this

17      case, would have occurred before the filing in 19 -- I

18      believe it was 1994, yes.

19      Q.  Okay.  Thank you.  You testified a little bit about the

20      re-issue proceedings.  Do you recall that?

21      A.  No, I don't recall that.  Earlier today?

22      Q.  Yes, sorry.

23      A.  I thought we were in my deposition still.  Yes, I recall

24      that.

25      Q.  You testified that in the re-issue process, Merck dropped
```

Hrubiec, R. - Cross                                          80

```
 1  compounds 4E and 4F from the patent.  Do you recall that?
 2  A.  Yes.
 3  Q.  Now, you understand that in the Glenmark case, Glenmark
 4  had an inequitable conduct claim related to Dr. Afonso's
 5  claim of inventorship, correct?
 6  A.  That was one of their claims, correct.
 7            THE COURT:  And that was one of your claims in
 8  where?
 9            THE WITNESS:  Sorry, ma'am?
10            THE COURT:  I'm asking you, Mr. Liversidge.
11            MR. LIVERSIDGE:  In the Glenmark case.
12            THE COURT:  All right.
13  BY MR. LIVERSIDGE:
14  Q.  And also in the Mylan case, Mylan also had an inequitable
15  conduct claim based on Dr. Afonso's claim of inventorship,
16  correct?
17  A.  That was part of their claim, correct.
18  Q.  Would you agree, Dr. Afonso (sic), that a re-issue
19  proceeding cannot cure inequitable conduct that occurred in
20  obtaining the patent originally?
21  A.  Are you asking Dr. Afonso?
22            MR. LIVERSIDGE:  I'm sorry.
23  BY MR. LIVERSIDGE:
24  Q.  Dr. Hrubiec, you would agree that a re-issue proceeding
25  cannot cure inequitable conduct that occurred in obtaining
```

 1   the patent originally, correct?

 2   A.  It cannot cure if there was deceptive intent.

 3           THE COURT:  The problem I have with this line of

 4   questioning, let me just tell you, is that there was a claim

 5   of inequitable conduct in the Glenmark litigation, but that

 6   claim was never litigated in that litigation because it was

 7   settled.  Then after it was settled, you got a re-issue,

 8   and, yes, the re-issue couldn't cure that, I know that, all

 9   right, but you did that because you were coming along with

10   the *Mylan* litigation with the same claim.

11           So I don't understand what connection.  Now you

12   want to litigate patent law about re-issue of patents and

13   whether unethical conduct, and maybe later on before Judge

14   Linares it was, but, again, what you're doing here is saying

15   it was a claim in Glenmark.  It wasn't litigated.  We

16   settled it.  You don't know how that claim might have turned

17   out in Glenmark.  Then weeks or a short time afterwards, you

18   go in and you apply for a re-issue, and, yes, if it's

19   inequitable conduct, it is not cured by the re-issue.

20           Again, you are trying to use belts and suspenders

21   here that I just am having difficulty seeing the value of

22   the relevance *vis-à-vis* the potential confusion because I

23   have to weigh under Rule 403 the prejudicial effect of the

24   evidence and the confusion that can result versus its

25   potential value and relevance.

Hrubiec, R. - Cross                                                      82

1          Again, it's not convincing me, Mr. Liversidge, that
2     because it was later re-issued, that that takes care of what
3     occurred in the Glenmark case.  It was never litigated in
4     the Glenmark case.  It's after-the-fact action.
5          MR. LIVERSIDGE:  Understood, Your Honor.  I think
6     the point we are trying to make is that the re-issue didn't
7     change the nature of the inquiry on inventorship for the
8     Court in *Mylan*.  It still had to make a determination on
9     whether Dr. Afonso was an inventor of 4E and 4F and had to
10    decide whether he should be named an inventor on the earlier
11    patents.  He had to decide all those same issues even though
12    there was a re-issue.
13         THE COURT:  They may have been decided differently
14    in the Glenmark case, because you don't know.  You didn't
15    complete the litigation.  Again, it's an after-the-fact
16    finding that was never determined in the Glenmark litigation
17    when you settled, and that's very important, when you
18    settled it.  It was an issue, but it was never determined.
19    I don't know what risk you felt.  You must have felt some
20    because you went in and got the patent re-issued.
21         I'm just telling you that it wasn't litigated in
22    the Glenmark case, and now you're trying to go in and say,
23    well, look at what happened after the fact, so that means
24    that everything's okay with us.  I'm just having trouble
25    with the logic.  I'm not saying ultimately I will, but right

1   now I'm having trouble with the logic here.  Go ahead.

2          THE WITNESS:  Me, too.

3   BY MR. LIVERSIDGE:

4   Q.  Dr. Hrubiec, you testified that there was a change in

5   Merck's expert lineup between the Glenmark and the *Mylan*

6   case, correct?

7   A.  Yes, I did.

8   Q.  And is it fair to say that you did no assessment of

9   Merck's likelihood of success in the *Mylan* case based on its

10  revised expert lineup?

11  A.  I did not provide that opinion, no.  I wasn't asked to.

12  Q.  You didn't do any assessment of Merck's chances of

13  success in the *Mylan* case, right?

14  A.  I did not, no.

15  Q.  So you made no assessment to what extent any of the

16  changes that occurred, whether it was experts or counsel or

17  anything, affected Merck's ability to win the *Mylan* case,

18  correct?

19  A.  Well, I don't think I needed to assess it.  It was

20  already decided on, and Merck won.

21  Q.  Right.  But you undertook no analysis to assess how any

22  of these changes, among the experts or counsel or anything

23  else, actually impacted Merck's chances of success in *Mylan*,

24  right?

25  A.  I looked at it from the standpoint of comparing it to

1    what happened or what was going to happen in the Glenmark

2    case as of 2010, so I could confirm, and confirm to myself,

3    that my opinions in the Glenmark case were solid and didn't

4    need to be changed in any way.

5    Q.  Just so I'm clear on your answer, you did not attempt to

6    determine how any of these changes in Merck's case between

7    Glenmark or *Mylan* may have improved or not improved Merck's

8    chances of success in the *Mylan* case, correct?

9    A.  I was not looking at the *Mylan* case for that purpose.

10   Q.  Okay.  You mentioned a change in the law between Glenmark

11   and *Mylan*.  Do you recall that?

12   A.  Yes, I do.

13   Q.  And were you referring to the *Therasense* case?

14   A.  At least the *Therasense* case, yes.

15   Q.  Do you agree that the *Therasense* decision was irrelevant

16   to an inventorship determination?

17   A.  I don't know if I would say it was irrelevant.  Perhaps I

18   would put it as perhaps not pertinent to an inventorship

19   determination.  The focus of their case, as you know, was

20   with regard to the level of proof needed to show inequitable

21   conduct.

22   Q.  Dr. Hrubiec, Dr. Afonso never claimed that he invented

23   the structures of 4E and 4F, correct?

24   A.  He did not claim he conceived of the structures of 4E and

25   4F, correct.

 1            MR. LIVERSIDGE:  Thank you, Dr. Hrubiec.

 2            Thank you, Your Honor.

 3            MS. KRISTEN JOHNSON:  No redirect, Your Honor.

 4   Thank you.

 5            THE COURT:  Thank you.

 6            Thank you, Dr. Hrubiec.  You may step down.

 7            THE WITNESS:  Thank you.

 8            (Witness excused.)

 9            THE COURT:  Mr. Liversidge, are you going to

10   examine?

11            Mr. Ismail.

12            MR. ISMAIL:  Good afternoon, Your Honor.  Tarek

13   Ismail on behalf of the defendants, and we are going to have

14   some binders.  Well, just to make sure I have the right

15   stuff here.

16            THE COURT:  Got a lot of weekend reading, don't I?

17            MR. ISMAIL:  Given the hour I was trying to

18   streamline the presentation.  With the Court's permission,

19   Merck would call Mr. Robert Armitage to the stand.

20            THE COURT:  That's fine.

21            (Witness was sworn.)

22            MR. ISMAIL:  Your Honor, just to give a quick

23   overview of materials provided, we have provided the Court

24   some slides that are some documents that we are going to

25   refer to.  We also included the underlying exhibits, to the

1    extent the Court would like to refer to the more fulsome

2    documents in the course of the examination, but to keep

3    things moving, we have the slides so we don't have to flip

4    through as many pages.

5               THE COURT:  Thank you.

6               MR. ISMAIL:  May I proceed?

7               THE COURT:  Yes.

8               MR. ISMAIL:  Thank you.

9               ROBERT ARMITAGE, called by the Defendant, having

10   been first duly sworn, was examined and testified as

11   follows:

12                          DIRECT EXAMINATION

13   BY MR. ISMAIL:

14   Q.  Good afternoon, Mr. Armitage.  Can you please state and

15   spell your name for the record.

16   A.  Yes.  My name is Robert Armitage.  The last name is

17   spelled A-r-m-i-t-a-g-e.

18   Q.  And, Mr. Armitage, have you been retained by Merck to

19   serve as an expert witness in this matter?

20   A.  Yes, I have.

21   Q.  And can you please tell the Court on what subjects you

22   were asked to form an opinion?

23   A.  I was asked to form an opinion on the prospects for

24   success in the Glenmark litigation we have been discussing

25   and also provide opinions on what a reasonable and competent

Armitage, R. - Direct                                              87

```
 1   patent counsel advising either Merck or Glenmark might have
 2   advised with respect to the prospects for success in the
 3   Glenmark patent challenge, the '721 patent.
 4   Q.  In the course of your work were you also asked to
 5   consider Dr. Hrubiec's opinions and to provide a rebuttal to
 6   his stated opinions?
 7   A.  Yes, I was.
 8   Q.  Briefly, if you would, Mr. Armitage, would you provide
 9   the Court a summary of your educational and professional
10   background?
11   A.  Yes.  After completing law school, I was -- became a
12   patent trainee for a pharmaceutical company, the Upjohn
13   Company, in Kalamazoo, Michigan where I worked for 20 years.
14   I eventually led the patent group at the Upjohn Company for
15   the last ten years.  I was a lawyer in private practice for a
16   half-dozen years.  I was a partner in a law firm in
17   Washington, D.C., where I mostly advised pharmaceutical
18   clients on all matter of patent issues, transactional issues,
19   and the like.
20           Ultimately, I concluded my full-time career at Eli
21   Lilly and Company where I was their chief patent counsel for
22   three years, and the last ten years I was at Lilly, I was
23   general counsel and had oversight of the legal group at
24   Lilly, including its global patent operations.
25           For the last ten years, I've served as a consultant
```

1   in IP strategy and policy matters, and, again, most of the

2   clients I advised are biotechnology or pharmaceutical

3   clients, and my experience ranges from drafting patent

4   applications to prosecuting them to providing advice on

5   patent strategy.

6           Obviously, when I was at Lilly, I was involved in

7   numerous Hatch-Waxman litigations where I was advising

8   management on issues such as prospect for success and

9   opportunities for settlement.

10  Q.   In the course of your work to form the opinions that you

11  have disclosed in this case, did you consider and review the

12  underlying patent documents themselves for the '721 patent,

13  the biowrapper as part of your work?

14  A.   Yes.

15  Q.   Did you also, in the course of your work, consider the

16  materials submitted during the Glenmark patent litigation,

17  including the contentions and arguments of the parties?

18  A.   Yes.

19  Q.   Did you familiarize yourself with the contentions of the

20  parties in the *Mylan* litigation as well?

21  A.   Yes.

22  Q.   And you reviewed Dr. Hrubiec's report and his deposition

23  testimony?

24  A.   Both his reports and his deposition testimony, yes.

25  Q.   Thank you.  And you were in court this afternoon

1    listening to Dr. Hrubiec's testimony?

2    A.   Yes.

3    Q.   Okay.  Now, Mr. Armitage, in forming your opinions

4    regarding the strength of Merck's patent and what a

5    reasonable patent lawyer would have advised a client in May

6    of 2010, did you consider the findings made in the *Mylan*

7    litigation?

8    A.   Yes.

9    Q.   And can you tell the Court, what was the purpose of you

10   looking to the *Mylan* litigation and how that relates to the

11   opinions that you formed in this case?

12   A.   Yes.  In reviewing the *Mylan* litigation, in my view,

13   there was a common underlying legal issue; namely, the issue

14   of whether Dr. Afonso met the standard for being a joint

15   inventor of the '721 patent, specifically, the joint inventor

16   of claims to compounds E and F as they appeared in that

17   patent.

18          Also, it appeared to me from my review that there

19   were two common underlying factual issues that needed to be

20   determined to assess that common underlying legal issue.  In

21   addition, I looked at the role that the judge played in the

22   *Mylan* litigation as in some respects similar to the role I

23   was asked to play; namely, considering all of the evidence

24   that was available to me to reach a determination as to how

25   those factual issues might have been determined and also what

Armitage, R. - Direct                                                90

1   the legal consequence was.

2        So ultimately, in my view, because the decision in

3   the *Mylan* case was consistent with the conclusions that I had

4   reached, I found they were confirmatory, at least in my view,

5   of the reliability of the analysis I had made.

6   Q.  And we are going to show the Court this afternoon the

7   factual findings that the Court made in the *Mylan* litigation

8   that you found confirmatory of your analysis of the strength

9   of Merck's patents in the Glenmark litigation.  Are you

10  prepared to do that this afternoon?

11  A.  Yes.

12        THE COURT:  Okay.  Can you wait just a minute.  I

13  want to check something before you go forward.  There is a

14  bit of a distinction here because an expert is not a judge.

15  An expert gives an opinion, and a jury is instructed that

16  they are no more bound by the opinion of an expert than any

17  other witness except they must consider the expert's

18  training, background, expertise, and the basis of the

19  opinion.

20        But he is not a judge, and so he's saying that if

21  he were a judge, he would have reached the same conclusion.

22  I think it's more appropriate for an expert to say, this is

23  what I relied upon, and I don't know if what he relies upon

24  is appropriate since there were findings of fact in another

25  case, unless he can say they were the same facts in this

1    case.

2            In other words, he's using the findings of fact of

3    a judge in another case, and experts are not judges, and

4    they can't determine relevance.  The Court would determine

5    relevance at a threshold level, and the jury or the trier of

6    fact in the case would then find facts.

7            So I'm not going to nit-pick it at this point, but

8    I would tell you there are problems and certain messages to

9    roles of an expert and roles of finders of the fact, whether

10   it be the judge or the jury and the role of the judge.

11           MR. ISMAIL:  Thank you, Your Honor.  We will make

12   sure that distinction, if not clear in the question,

13   Mr. Armitage will make clear in his answer.

14           THE COURT:  Okay.

15   BY MR. ISMAIL:

16   Q.  And just to address the Court's comment, Mr. Armitage,

17   did you view your remit as an expert in this case to give an

18   assessment as to what a reasonable and competent patent

19   lawyer would have advised the parties at the time?

20   A.  Yes.  Based on my experience doing that over the course

21   of decades, working as a patent attorney and as an executive

22   in-house.

23   Q.  And was the *Mylan* record and the outcome of that case

24   part of the materials that you considered in forming your

25   opinions?

1    A.   No.

2    Q.   Was the conclusions reached in the *Mylan* litigation part

3    of the materials you reviewed?

4    A.   Yes, it was.

5    Q.   Okay.  So let's address a couple of topics that

6    Dr. Hrubiec raised for the Court as distinctions between the

7    *Mylan* case and the Glenmark case, okay.  So the first

8    question is that of the re-issue of the '721 patent.  You

9    were here to hear Dr. Hrubiec's testimony on that issue?

10   A.   Yes.

11   Q.   Okay.  So how does the '461 patent relate to the '721

12   patent?

13   A.   Well, I think as we have been discussing all day, it is,

14   in effect, the replacement for the '721 patent.  The '721

15   patent needed to be surrendered for the re-issue patent to

16   issue, and the re-issue patent itself issued with fewer

17   claims and at least one claim that was narrowed.

18   Q.   So as the Court has observed in the Glenmark case, the

19   patent at issue was the '721?

20   A.   Correct.

21   Q.   And in the *Mylan* case, the patent at issue was the

22   reissue '461 patent?

23   A.   That's correct.

24   Q.   Now, in the Glenmark case did Glenmark make, as one of

25   its defenses, inequitable conduct for improper joint

Armitage, R. - Direct                                      93

1    inventorship in that case?

2    A.  In the Glenmark case, they -- that is correct.  They made

3    an enforceable argument based on inequitable conduct based on

4    improper inventorship.

5    Q.  And was that issue presented in the *Mylan* case?

6    A.  Yes.

7    Q.  And I think, as the Court has observed, by putting the

8    patent into re-issue, did Merck cure the inequitable conduct

9    challenge through the re-issue?

10   A.  No.  A finding of inequitable conduct in the '721 patent

11   would have had the consequence of being a finding of

12   inequitable conduct in the re-issue.

13   Q.  So what did Glenmark and *Mylan* have to prove in order to

14   prevail on its defense that failing to name Dr. Afonso as a

15   joint inventor constituted inequitable conduct?

16   A.  Whether -- at least two elements to an inequitable

17   conduct defense.  The first is what is known as materiality.

18   In other words, there needs to be an error or omission that

19   was material, and in order for there to be a material error

20   or omission, there would have been a necessary fact finding

21   that Dr. Afonso, in fact, invented Compounds 4E and 4F.  And

22   the second prong of inequitable conduct is that error or

23   omission must have been made with the intent to deceive or

24   mislead the patent office.

25   Q.  And did Glenmark contend that Dr. Afonso came up with the

1    structures of 4E and 4F?

2    A.  No, they did not.

3    Q.  Did *Mylan* make that contention?

4    A.  No, *Mylan* did not.

5    Q.  If Glenmark was not claiming that Dr. Afonso came up with

6    the structures of 4E and 4F, what did Glenmark claim was his

7    contribution?

8    A.  Glenmark's contention was that without Dr. Afonso's

9    contribution of an operable method for manufacturing

10   Compounds 4E and 4F, the invention couldn't be completed.  In

11   other words, the named inventors otherwise wouldn't have had

12   available to them any operable process for making these two

13   compounds.

14   Q.  What argument was *Mylan* making with respect to Dr. Afonso

15   and 4E and 4F?

16   A.  *Mylan* was making the identical argument.

17   Q.  So let's focus on the first prong that you mentioned,

18   this question about inventorship.  Did *Mylan* and Glenmark

19   have the same threshold burden on that question?

20   A.  Yes.

21   Q.  What are the criteria for being included as a joint

22   inventor on a patent?

23   A.  To be included as a joint inventor, you have to make a,

24   what can be called an invented contribution to the conception

25   or the idea of the completed invention, and because these

Armitage, R. - Direct                                              95

1   were chemical compounds, you had to visualize or write out on

2   a piece of paper the chemical structure, how the atoms are

3   arranged, and then you need to be able to explain to the

4   public or at least the skilled part of the public how those

5   compounds can be made and used.

6           So you need at least some operable method to exist

7   by which those compounds can actually be made so they can

8   actually be put to some use.

9   Q.  And as you mentioned there was no contention in either

10  case that Dr. Afonso conceived of the structures initially

11  and they were focused on the synthesis of 4E and 4F; is that

12  correct?

13  A.  Correct.

14  Q.  So as to that question that was common between the two

15  cases, what did Glenmark and *Mylan* have to prove in order to

16  show Dr. Afonso invented a compound claimed by Merck's active

17  ingredient patent on Zetia?

18  A.  To show Dr. Afonso actually contributed to the conception

19  of Compounds 4E and 4F, you first need to prove that without

20  Dr. Afonso's involvement, the remaining joint inventors would

21  not have had any operable method for making these compounds.

22          The second thing you would need to prove is that the

23  contribution of Dr. Afonso was not just contributing

24  knowledge about the prior art.  In other words, he

25  contributed something inventive, over the prior art, such as

Armitage, R. - Direct                                        96

```
 1    an inventive process that absent which the remaining
 2    inventors would not have been able to explain how the
 3    invention could be made.
 4    Q.  If Dr. Afonso was the first to make 4E and 4F, would that
 5    have decided the question about his alleged joint
 6    inventorship?
 7    A.  No, it would not.
 8    Q.  Was there evidence in -- that you have seen on whether
 9    there was known chemistry that could have been used to make
10    Compounds 4E and 4F without the need for undue
11    experimentation?
12    A.  There was evidence that without respect to any
13    involvement by Dr. Afonso, the remaining inventors had
14    multiple processes by which known chemistry could have been
15    used to make compounds 4E and 4F.
16    Q.  Now, did it matter whether the joint inventors named in
17    the patents actually made Compounds 4E and 4F to the ultimate
18    determination of whether Dr. Afonso should have been named as
19    a joint inventor?
20    A.  It doesn't matter whether the compounds were ever made or
21    not.
22    Q.  Now, do you recall seeing in the record that Glenmark
23    made the argument that Dr. Rosenblum tried and failed to make
24    4E and 4F?
25    A.  I recall that argument.
```

1  Q.  Did *Mylan* make the same argument?

2  A.  Yes.

3  Q.  Whether or not Dr. Rosenblum made 4E and 4F, does that

4  affect the conclusions you've reached about on the alleged

5  joint inventorship issue?

6  A.  It did not.

7  Q.  Now let's walk through a couple of places from the

8  Court's opinion.

9        And, Your Honor, I will be referring to the slide

10  deck that have been provided in your binder.  But the

11  underlying exhibits are also in your binder as well.

12        So, and do you have a binder up there as well,

13  Mr. Armitage?

14  A.  (Nods head.)

15  Q.  So let's turn to slide 3, which I think is the second one

16  in your binder.  And it says, "Both Glenmark and Mylan

17  challenge the '721 patent."  Do you see that?

18  A.  Yes, I see that.

19  Q.  Now, for the Court's benefit, what we are showing here on

20  slide 3 is a portion of the *Mylan* opinion; is that correct?

21  A.  Yes.

22  Q.  And this is Merck Exhibit 639, Your Honor, also tabbed in

23  the binder.  Now earlier you've told us about the fact that

24  there was a second re-issue, that the inventorship challenge

25  was still before the Court in the *Mylan* litigation.  Do you

Armitage, R. - Direct                                                98

1   recall that testimony?

2   A.  Correct.

3   Q.  Does the Court's opinion here set forth what patents

4   Judge Linares considered in the *Mylan* case as to the question

5   of Dr. Afonso's alleged inventorship?

6   A.  As to the issue of alleged inventorship and, obviously,

7   the issue of inequitable conduct based on that, he's dealing

8   with the predecessor patents, specifically including the '721

9   patent from Glenmark.

10  Q.  Okay.  So the Exhibit 689 reads, "*Mylan* contends that

11  Dr. Afonso contributed to the conception of four compounds

12  that were named in the '115 and '721 predecessor patents."

13  Are those the patents that were at issue in the Glenmark

14  case?

15  A.  Yes.  The '721 patent was the patent that Glenmark

16  conceded it infringed.

17  Q.  Did Judge Linares make a conclusion as to whether

18  Dr. Afonso was a joint inventor of Compounds 4E and 4F?

19  A.  Yes.

20  Q.  And I would ask you to turn to slide 4.  Is this a

21  portion of the opinion that you reviewed in this case?

22  A.  Yes.

23  Q.  And did the exhibit -- does it read, "Based on the

24  credible evidence presented at trial, the Court finds that

25  Mylan has failed to establish that Dr. Afonso was an inventor

Armitage, R. - Direct                                          99

```
 1   of the four compounds at issue that were claimed in the
 2   predecessor patents"?
 3   A.  That's correct.
 4   Q.  Again, for the benefit of the record, the predecessor
 5   patents are which ones?
 6   A.  They would refer to the '115 and the '721 patents.
 7           THE COURT:  What was the credible evidence
 8   presented at trial?  The judge is basing his opinion on the
 9   credible evidence presented at trial.  Do you know exactly
10   what that evidence is he is basing his opinion on?
11           THE WITNESS:  I have not been asked to have
12   rendered any opinion on the admissibility or credibility of
13   evidence at trial.
14   BY MR. ISMAIL:
15   Q.  So does the Court set forth the factual determinations
16   that inform the analysis as to whether Dr. Afonso should have
17   been an inventor?
18   A.  Yes, he does.
19   Q.  And you mention that there were at least two challenges
20   that were facing *Mylan*.  Were there other ways to make 4E and
21   4F, and was the method Afonso used inventive, in shorthand,
22   correct?
23   A.  Correct.
24   Q.  Now, so let's turn, if we could, to the first one of
25   those questions, and that is slide 5.  This is Page 27 of
```

1   Exhibit 739.  Again, if you look at the highlighted section,

2   does the exhibit read, "Indeed, it is clear that as of

3   December 1993, the named inventors could have used multiple

4   methods named in this application to synthesize 4E and 4F

5   with routine experimentation.  Therefore, Dr. Afonso did not

6   contribute the operative method of making Compounds 4E and 4F

7   to their invention."  Did I read that correctly?

8   A.  Yes.

9   Q.  What is the application being referred to here, in the

10  highlighted section of this opinion?

11  A.  This would be the '440 application, which was the

12  immediate predecessor patent to the '721, the immediate

13  predecessor application to the '721 patent -- to the '115

14  patent, sorry.

15  Q.  Would this application have been before Judge Linares in

16  the Glenmark case as well?

17          THE COURT:  Before Judge Linares in the Glenmark

18  case?

19          MR. ISMAIL:  Yes.

20          THE COURT:  Judge Linares wasn't trying the

21  Glenmark case.

22          MR. ISMAIL:  I'll rephrase.  Thank you, Your Honor.

23  BY MR. ISMAIL:

24  Q.  Was the '440 application part of the file history for the

25  '721 patent?

1   A.  It was part of the overall prosecution history for that

2   patent family, yes.

3   Q.  Okay.  So the second factual hurdle that you've talked to

4   the Court about is whether the method that Dr. Afonso used to

5   synthesize 4E and 4F, whether that method itself did anything

6   other than apply known chemistry.  Do you recall that

7   testimony a moment ago?

8   A.  Yes.

9   Q.  Was that issue also addressed in the course of the

10  opinion in the *Mylan* case?

11  A.  Yes, it was.

12  Q.  So I ask you to turn to slide six in your binder.  This

13  is Page 23 of Merck Exhibit 639.  Does the opinion read,

14  "Even if Dr. Afonso's process was the first operative way to

15  make Compounds 4E and 4F, his process was not novel as it was

16  described in a 1986 paper published in the *Journal of*

17  *Medicinal Chemistry*."  Did I read that correctly?

18  A.  Yes.  Although, it was actually a 1976 paper.  That is a

19  typographical error.

20  Q.  So what is the significance of this factual determination

21  here that what Dr. Afonso used in the synthesis of these

22  compounds was not novel because it was previously published?

23  A.  Yeah.  Because in the course of my analysis and also the

24  analysis that was undertaken in the *Mylan* case, this was

25  known chemistry that was used, in effect, that doesn't

1    provide the inventive contribution that one would need to

2    qualify Dr. Afonso to be a joint inventor, even if there

3    weren't multiple other methods that were available for the

4    synthesis of a compound.  In other words, there are two

5    hurdles that needed to be met.  You had to jump successfully

6    over both hurdles.  If you tripped on one, you could not be

7    named as a joint inventor.

8            THE COURT:  But you can testify to that

9    independently, can't you?  If you are familiar with this

10   paper, then before the testimony goes forward, you just tell

11   a jury, These are the materials that I read, and I

12   determined, this is my expert opinion, and your expert

13   opinion is based upon the underlying documents, not the

14   findings of a finder of fact in an entirely different case

15   that we don't know all of the evidence that was presented.

16           If this is what the judge relied on, and you've

17   reviewed it, then you don't have to say you relied on a

18   judge's finding.  You relied on the underlying document.  In

19   other words, you even knew that the date was wrong.  Isn't

20   that correct?

21           THE WITNESS:  Yeah.  Just to be very clear, from my

22   point of view, the fact that Judge Linares came to the same

23   conclusion on these two common underlying factual issues

24   actually just confirms the reliability of the opinions that

25   I reached after looking at the evidence that was available

1    in the Glenmark case and that Glenmark had available to

2    submit at trial.  I did not rely on this to reach my

3    conclusion as to how a reasonable and competent patent

4    counsel ought to have been advised on the eve of the

5    Glenmark trial.

6              MR. ISMAIL:  Thank you.

7              THE COURT:  That's very helpful.

8              MR. ISMAIL:  Thank you, Your Honor.

9    BY MR. ISMAIL:

10   Q.  So just to close the loop on this question about this

11   prior art article cited in the *Mylan* opinion as being an

12   indication that Dr. Afonso didn't do anything inventive in

13   synthesizing the compounds, based on your review of

14   Dr. Brisbois' report in the Glenmark case, was that same

15   article put forth?

16   A.  The same article was put forth in the Glenmark case, yes.

17   Q.  And was slide 7 in your binder there, which is Merck

18   Exhibit 328, Paragraph 37, is this a portion of

19   Dr. Brisbois's report in the Glenmark patent litigation?

20   A.  Yes, with the correct date.

21   Q.  Okay.  Now, let's just quickly address a couple of other

22   things that Dr. Hrubiec said distinguishes the *Mylan*

23   litigation from the Glenmark litigation, if we could.

24              Did you hear Dr. Hrubiec cite the change in expert

25   lineup between the *Mylan* case and the Glenmark case as a

1    reason to -- that he did not look to the *Mylan* outcome in his

2    opinion?

3    A.   I remember -- I obviously heard the testimony, yes.

4    Q.   Now, does that argument change your testimony as to how

5    the *Mylan* conclusion is confirmatory of the reliability of

6    your opinions?

7    A.   No.

8    Q.   And why not?

9    A.   Fundamentally, Merck in this case, on this issue of

10   Afonso joint inventorship, had nothing to prove.  The burden

11   was entirely on Glenmark to prove that Dr. Afonso made an

12   inventive contribution through clear and convincing evidence,

13   and so the fundamental focus in both cases would have been

14   what evidence did Glenmark have, and, in fact, to some degree

15   Glenmark -- *Mylan* had the advantage of knowing much of what

16   Glenmark might have had in the way of evidence.

17           So from my vantage point, the real reason why there

18   was not a realistic prospect that at trial this issue would

19   succeed is because of the lack of evidence on the part of

20   Glenmark and also the lack of evidence on the part of *Mylan*

21   to meet that evidentiary burden.

22           THE COURT:  Where do you get the clear and

23   convincing burden?  You are talking about the inequitable

24   conduct burden?

25           THE WITNESS:  No.  I got the clear and convincing

Armitage, R. - Direct                                          105

1    burden because whenever you raise an invalidity defense to a

2    patent, and the Supreme Court recently confirmed that the

3    evidentiary burden is each claim is independently presumed

4    to be valid, and to overcome that presumption of validity

5    for each claim, you require clear and convincing evidence on

6    the factual predicates that would lead to a finding of

7    invalidity.

8            So it's these two factual predicates that needed to

9    be established through clear and convincing evidence.

10           THE COURT:  Where does the preponderance of the

11   evidence standard come in?

12           THE WITNESS:  On infringement.  So, for example,

13   Merck would have had the burden by a preponderance of the

14   evidence to prove that the patent had been infringed.

15           THE COURT:  Now we are going to get into burden of

16   proofs in another case.  That's really being clear for the

17   jury.  I'm being facetious.

18           Go ahead.  I mean, to have an expert talking about

19   burdens of clear and convincing and preponderance, that's

20   something that a Court would instruct a jury on based upon

21   the evidence presented and what type of issue, whether

22   you're looking at invalidity, infringement, or whatever.

23           In other words, it's the issue involved, infringing

24   under invalidity, and then it is up to the Court to instruct

25   the jury.  Obviously, the Court is a finder of fact knows

 1   those burdens, but a jury would have to be instructed on it

 2   and understand those burdens and then sort that burden with

 3   what their burden was in this case.  Is that correct?

 4            MR. ISMAIL:  So my answer to the question on the

 5   burden of proof is the burden of proof on Glenmark to defend

 6   the patent litigation in 2010 is relevant to how a

 7   reasonable and competent patent lawyer would have advised

 8   his or her client at the time.

 9            THE COURT:  Okay.

10            MR. ISMAIL:  And so the heightened burden of proof

11   that faced Glenmark is relevant to their prospects, "their"

12   being Glenmark's prospects of succeeding on their defense.

13   And I believe Mr. Armitage is indicating, it's the same

14   burden that faced both generic companies, *Mylan* and

15   Glenmark.  They both had the same burden.  So there is not

16   an inconsistency between the two on this question of

17   underlying factual determinations that were being made.

18            THE COURT:  What I'm trying to say, the answer

19   would be yes for me.  Is that correct?

20            THE WITNESS:  Yeah, it -- again, if you go back to

21   what I was asked to do, and if I understood Dr. Hrubiec's

22   testimony, what he was asked to do, this evidentiary burden

23   is inherent in that task of how you would have advised Merck

24   or Glenmark on the prospects for success because any advice

25   would need to account for the clear and convincing evidence

 1    burden to succeed on invalidity.  And it does help inform

 2    the probabilities that you might assign to whether you could

 3    successfully meet that burden.

 4           THE COURT:  Well, Dr. Hrubiec came up with his

 5    projections because when the actual information is there

 6    from the attorneys that were assessing it, did you have

 7    access to the actual lawyers' assessment?  In other words,

 8    they're Merck's lawyers, and I know it was Schering, so

 9    whether they were using that burden or not and what their

10    assessment was, have you seen the attorneys' advice here?

11           THE WITNESS:  Yes.

12           THE COURT:  You have seen it?

13           THE WITNESS:  So from our vantage point, I have no

14    knowledge of any attorney-client privilege communications of

15    Merck involving any aspect of this matter.  I was asked to

16    perform what I described mainly, how would I and how would a

17    reasonable and competent patent counsel have advised Merck

18    or Glenmark with the ability to review the materials that

19    I've reviewed, which did not include attorney-client

20    privilege communications.

21           THE COURT:  So you would be using this expert to

22    rebut that testimony of Dr. Hrubiec if he testified to that?

23           MR. ISMAIL:  Correct.  And the construct of the way

24    this question has been framed, there was an early

25    sword/shield privilege challenge, and the way Judge Miller

 1    has set the parameters of this is that objective indicia of

 2    the strength of the patent and the likelihood of success

 3    would be admissible and reliable for the witnesses to refer

 4    to.

 5             And in Judge Miller's decision on this motion *in*

 6    *limine*, he pointed to that same question, is that the

 7    conclusions of this fact finder on the same factual

 8    predicate questions is objective evidence of how a client

 9    would be advised about the prospects of success.  So it's

10    specifically relevant to the inquiry and the reliability of

11    Dr. Hrubiec's opinion that -- there is an objective

12    determination that Dr. Afonso did not contribute inventive

13    efforts to 4E and 4F, which was an issue in the Glenmark

14    litigation and was an issue in the *Mylan* litigation.

15             And so that's what we believe to be one of the

16    reasons why the *Mylan* outcome is relevant, in addition to

17    the many other reasons Mr. Liversidge outlined this

18    afternoon.  I hope that answered the Court's question, and

19    then some probably.

20             THE COURT:  Go ahead.

21             MR. ISMAIL:  Thank you, Your Honor.

22    BY MR. ISMAIL:

23    Q.  Just a couple of other quick points, Mr. Armitage, if I

24    could.  So were you here when counsel for the plaintiffs and

25    Dr. Hrubiec were talking about a supposed change in Merck's

1    theory as to the inventors of 4E and 4F?

2    A.  Yes.

3    Q.  Okay.  So does the distinction about who conceived of the

4    structures 4E and 4F change your opinion as to whether

5    Dr. Afonso should have been an inventor on the predecessor

6    patents?

7    A.  So long as the named joint inventors were responsible for

8    that part of the conception, whoever they were of the

9    structures, it doesn't matter at all to the analysis of

10   Dr. Afonso's joint inventorship.  It's simply irrelevant.

11   Q.  So if Dr. Rosenblum conceived of the structures 4E and

12   4F, is that a fact whether Dr. Afonso would be considered a

13   joint inventor?

14   A.  As opposed to Dr. Burnett and Dr. Clader, no.

15   Q.  And did -- on this question about whether Dr. Afonso was

16   the first to synthesize 4E and 4F, was that issue addressed

17   in Judge Linares' opinion?

18   A.  Yes.

19   Q.  And if we go to slide 8, and would this be Page 27 of

20   Merck Exhibit 639, does it read, "Whether Dr. Afonso was the

21   first or second person to actually synthesize Compounds 4E

22   and 4F makes no difference because reducing the compound to

23   practice does not make a person an inventor."  Is that

24   consistent with your analysis in this case?

25   A.  In this case it is consistent.

1          THE COURT:  Would it be inconsistent in another

2     case?

3          THE WITNESS:  There is a bizarre doctrine that

4     applies to some obscure types of invention called

5     simultaneously conception and reduction to practice, but

6     that has no conceivable relevance here.

7          THE COURT:  All right.

8     BY MR. ISMAIL:

9     Q.  Okay.  So let's just wrap this up, Mr. Armitage, and late

10    on a Friday afternoon.  So in the final analysis, did

11    Glenmark and *Mylan* face similar factual hurdles to establish

12    an inequitable conduct defense based on joint inventorship?

13    A.  They based what I would say would be common factual

14    hurdles.

15    Q.  And did you reach an opinion as to the likelihood or how

16    you would have advised a client in 2010 as to Glenmark's

17    prospects of overcoming those factual hurdles?

18    A.  Yes.

19    Q.  And in Judge Linares's opinion in the *Mylan* case, did he

20    assess whether *Mylan* was able to overcome those common

21    factual hurdles?

22          THE COURT:  Are you asking him how he would assess

23    Glenmark's, is that the question?

24          MR. ISMAIL:  I'll rephrase to make it clear.

25    BY MR. ISMAIL:

 1   Q.  Were you asked to assess how you would advise a client as

 2   to the prospects of Glenmark successfully clearing the

 3   hurdles necessary to establish the inequitable conduct

 4   defense on joint inventorship?

 5   A.  Yes.

 6   Q.  And did the *Mylan* opinion have an analysis of whether

 7   *Mylan* was able to clear those common factual questions?

 8   A.  Yes.

 9   Q.  And do you, Mr. Hrubiec, find -- and I think you

10   indicated that the opinion and findings in the *Mylan* case

11   were confirmatory of the work that you did to arrive at the

12   opinions that you've provided the Court today?

13   A.  In my view, they confirm the reliability of the analysis

14   and the conclusions.

15              MR. ISMAIL:  Thank you, Your Honor.  Pass the

16   witness.

17              THE COURT:  Cross-examination, Mr. Sobol.

18              MR. SOBOL:  May I inquire, Your Honor?

19              THE COURT:  Yes.

20                         CROSS-EXAMINATION

21   BY MR. SOBOL:

22   Q.  Good afternoon, sir.

23   A.  Good afternoon.

24   Q.  We haven't met before, so I'm Tom Sobol.  I'll be asking

25   you some questions this afternoon, okay?  You just gave some

1    testimony -- used this word "confirmatory."  I take it that

2    your testimony is that the *Mylan* result is confirmatory of

3    your findings, I think you testified; is that correct?

4    A.  I think I said confirmatory of the reliability of the

5    conclusions I reached.

6    Q.  Okay.  So it confirms your conclusions, correct?

7    A.  In both cases the same ultimate conclusions were reached,

8    yes.

9    Q.  Right.  But what I'm trying to understand is you reached

10   your conclusions independently of relying upon the *Mylan*

11   results, correct?

12   A.  Correct.

13   Q.  And so you don't need the *Mylan* result in order to reach

14   your opinion, correct?

15   A.  Correct.

16   Q.  The only thing you need to do is get your opinion

17   confirmed with *Mylan*, correct?

18   A.  No, that wasn't my testimony.  I think I said confirm the

19   reliability of the opinion that I reached.

20   Q.  Okay.  So the underlying opinion that you reached, it is

21   reliable independent of *Mylan*, isn't it, in your view?

22   A.  If my view it's the type of opinion that if I provided to

23   the board of directors of the CEO of a company, they should

24   rely on it, yes.

25   Q.  So be the kind of opinion that reasonable and competent

1    count -- strike that.  Let me make sure it's clear.  Putting

2    aside any utility, any use of the *Mylan* result, it's your

3    view that your underlying conclusions about the likelihood in

4    the Merck-Glenmark case are adequate for the purposes of

5    advising people in the position of Merck or Glenmark, right?

6    A.  I think they are at least adequate, yes.

7    Q.  So you don't need to get into *Mylan* in order to testify

8    to the jury about your opinion on the strengths and

9    weaknesses of the Glenmark case?

10   A.  Well, I would disagree to the extent that *Mylan* is

11   available.  I would be able to testify to the jury as to the

12   outcome in *Mylan*, the common factual issues in *Mylan* in a

13   manner in which *Mylan* was confirmatory of the reliability of

14   my opinion --

15   Q.  Sure.

16   A.  -- if permitted.

17   Q.  I'm sorry.  I didn't mean to interrupt.

18          THE COURT:  Excuse me for a minute.  But ultimately

19   you make the opinion, and then the jury determines whether

20   it's reliable or not.  In other words, an expert makes an

21   opinion and says the reasons for it, but you don't testify

22   that your opinion is confirmed by someone else's opinion, a

23   judge's?  In other words, you make an opinion based upon

24   certain sources, and you're saying that you can make those

25   opinions separate from *Mylan*, and then you give those to a

1    jury, and the jury determines its reliability or whoever's

2    the trier of fact?  So why would you need the *Mylan* opinion?

3              THE WITNESS:  When you say why would I need the

4    *Mylan* opinion, I did not need the *Mylan* opinion to reach the

5    conclusions that I reached, and I don't want to keep

6    repeating myself, but having reviewed the *Mylan* opinion, the

7    common underlying legal issue, the common underlying factual

8    issues, the *Mylan* opinion is, in fact, confirmatory of what

9    I regard as the reliability -- I might even use the word

10   credibility, of my opinion.

11             In other words, it is my opinion, but -- well, it

12   is my opinion without the *Mylan* opinion ever having been

13   rendered.  With the *Mylan* opinion having been rendered, at

14   least my view is that it does confirm its reliability.

15   BY MR. SOBOL:

16   Q.  So if I understand the answer you just gave then, you'd

17   like to bolster your credibility in front of the jury by

18   putting before the jury the full decision of a federal court

19   judge from the *Mylan* case as confirming your opinion?  That's

20   what you want to do?

21   A.  No, that's not what I said and not what I want to do.

22   It's not my credibility.  It's not my reliability.  It's the

23   reliability of the conclusions that I reached.

24   Q.  But in order to affirm the reliability of your opinion,

25   it's your expectation that you would be put before -- when

1   you testify before the jury, that Merck's trial Exhibit

2   MDX639, the decision of Judge Linares in the *Mylan* case,

3   would go in evidence in order to confirm your opinions?

4           THE COURT:  Who says that's going to be a trial

5   exhibit?

6           MR. SOBOL:  It's marked as Merck's trial exhibit.

7           THE COURT:  There is an objection to it, isn't it?

8           MR. SOBOL:  Absolutely, yes.

9           THE COURT:  So it's not determined yet that it's

10  going to be an exhibit because I haven't ruled on the

11  objection, but you can say assuming it's an exhibit.  I just

12  want this record to be clear that I have not agreed, and I

13  have not ruled on that objection.  I have reviewed the final

14  pretrial order, which was just entered this morning in that

15  regard, but, in any event, it's not in evidence, but you can

16  assume it for purposes of your examination.

17          MR. SOBOL:  That's correct.  I should have said

18  proposed Merck Exhibit 639.

19  BY MR. SOBOL:

20  Q.  It's your understanding that proposed -- Merck proposes

21  to put in evidence the full decision of the *Mylan* court?  You

22  understand that, correct?

23  A.  If you represent that to me, I certainly understand it,

24  yes.

25  Q.  Now, I also understand that you did not have access to

```
 1    any of the attorney-client privileged communications that
 2    Glenmark had with its lawyers in the Glenmark case and that
 3    Merck had with Merck's lawyers in the Glenmark case, correct?
 4    A.  Correct.
 5    Q.  Okay.  If I understand it correctly, you've been -- I
 6    tried to add up the years that you have been doing patent
 7    law.  You have been doing patent law for a long period of
 8    time, correct?
 9    A.  Yes.
10    Q.  And, by the way, I didn't mean any offense by that.  I
11    did not.
12         THE COURT:  Age is an advantage to wisdom.
13    BY MR. SOBOL:
14    Q.  And if I understand it, you've had the handicap what's
15    going to happen in litigation before?
16    A.  I have done that before on numerous occasions.
17    Q.  Right.  And when -- in litigation, if one side is saying
18    something like Afonso was the inventor, sometimes in
19    litigation you might want to say Afonso didn't do it, this
20    other person did, just in terms of trying to make sure that
21    you can persuade the finder of fact that Afonso is not the
22    inventor, this other person is?  You would expect somebody to
23    do that, right?
24    A.  I respectfully don't understand the question.  I
25    apologize.
```

1    Q.   Okay.  Well, let me put it in the context of this case.

2    In the Glenmark case, for whatever reason, the Glenmark

3    lawyers were arguing that Afonso didn't invent 4E and 4F,

4    Rosenblum did.  You understand that?

5    A.   No.  Technically, no, I do not understand that.

6    Q.   Sorry, had a method to make -- I misspoke somewhere

7    there.  Let me put this again.  Okay.  In the Glenmark case,

8    Glenmark took the position that Rosenblum -- no.

9            MR. SOBOL:  I've got this wrong.  Now I understand

10   what I'm doing wrong.  It has been a long afternoon.  What I

11   should be doing is my left hand and my right hand.

12   BY MR. SOBOL:

13   Q.   In the Glenmark case, Merck took the position -- I have

14   to start this again.

15           THE COURT:  What you're asking is in the Glenmark

16   case, what the position of Merck was in regard to --

17   BY MR. SOBOL:

18   Q.   Right.  In regard to who made 4E and 4F, do you know?

19   Let me go to the documents to help me out here.  Let me take

20   a step back from that, okay.  So we know that Merck sought

21   re-issue four weeks or so after it settled the Glenmark case,

22   right?

23   A.   Correct.

24   Q.   Companies usually seek re-issue in order to improve their

25   position, not make their position worse, correct?

1    A.  That can be one reason, yes.

2    Q.  Right.  We don't know the reasons exactly why Merck did

3    so here because it has claimed attorney-client privilege even

4    as to the re-issue also, you understand that?

5    A.  Yes.

6    Q.  Okay.  But for whatever reason, presumably in order to

7    advantage Merck's position, it sought re-issue, correct?

8    A.  Well, when you say presumably, that's certainly a

9    possibility.  It's not a presumption I've made one way or the

10   other.

11   Q.  All right.  And then when it surrendered that patent and

12   the patent that ends up being litigated is now the '641,

13   correct, rather than the prior patent, right?

14   A.  That's correct.  The number changes.

15   Q.  Okay.  And do we know in any way how Merck thought it had

16   improved its position by doing that?

17   A.  The only thing I know is what Merck stated in the

18   re-issue papers.

19   Q.  Right.  And what Merck stated in the re-issue papers was

20   that the patent wasn't -- the '721 patent was invalid in

21   whole or in part because it had -- because the patentee had

22   claimed more than it was entitled to, correct?

23   A.   If I recall correctly, what Merck claimed is that it was

24   removing certain subject matter of the claims to avoid an

25   issue of potential inherent anticipation, which is another

1    exotic doctrine of patent law, and, therefore, in order to do

2    that they needed to file a re-issue oath which made an

3    admission to that effect in order to allow the patent office

4    then to grant the narrow claims, the claims they canceled and

5    the claims they amended to narrow them.

6    Q.  Okay.  Now, I can go back to where I was before.  If you

7    can turn to Tab 6, please.  This is a photocopy of Merck's,

8    Schering's pretrial brief in Glenmark, correct?

9    A.  That is certainly what it appears to be.

10   Q.  Okay.  And please turn to Page 9.

11   A.  I'm there.

12   Q.  On Page 9 Merck takes the position that the structure for

13   both compounds, meaning 4E and 4F, the structure for both

14   compounds was first conceived by inventor Rosenblum, that's

15   what position that they took, correct?

16   A.  I'm sorry.  I'm on the wrong 9.  I see that line is

17   highlighted there.

18   Q.  Right.  You knew about that before here today, right?

19   You knew that in Glenmark Merck took the position that it was

20   Rosenblum who conceived of 4E and 4F?

21   A.  My understanding is actually that in the trial order that

22   came after this, that there was no contention by Merck that

23   Rosenblum had conceived Compounds 4E and 4F, so had the case

24   gone to trial, it wouldn't have gone to trial with any

25   contention that it was Rosenblum who had done that.

1    Q.  I see.  And so Merck had to shift its position during the

2    litigation?

3    A.  I'm not so sure that there was a shift in position here.

4    I actually don't know exactly what happened.  But in

5    reviewing all of the documents, it appears to me that, as I

6    testified earlier, it didn't make any difference which of the

7    main joint inventors did from the standpoint of trying to

8    prove Afonso was necessarily a joint inventor.

9    Q.  Sure.  I understand that your testimony is you want to

10   focus only on the Afonso side of this discussion, but for

11   whatever reasons, Merck thought it important in its pretrial

12   brief to say that it was Rosenblum who first conceived of 4E

13   and 4F?

14   A.  Well, as far as I know, and basically I have no insight

15   into any attorney-client privilege communications, this just

16   looks like it could possibly be an error that wasn't

17   uncovered when this trial brief was filed, which is why the

18   pretrial order is different.

19   Q.  Okay.  And then if you turn to tab 7, do you know what

20   position Merck took in the *Mylan* case regarding who conceived

21   of 4E and 4F?

22            THE COURT:  Where are we now?

23            MR. SOBOL:  If you turn to tab 7.

24            THE COURT:  I'm sorry tab, 7.

25   BY MR. SOBOL:

1    Q.   Tab 7 is the joint submission of the parties in the *Mylan*

2    case of proposed findings of fact.  Are you with that tab,

3    sir?

4    A.   Yes.

5    Q.   And is this something that you reviewed in connection

6    with your report and testimony?

7    A.   This is probably something I reviewed in the year 2020,

8    but, yes.

9    Q.   And then if you turn to Page 37 of these proposed

10   findings, you will see there a heading A, "Conception of

11   synthesis of compounds 4E and 4F."

12   A.   Yes.

13   Q.   And then there is over -- so the way this is set up is on

14   the left side is *Mylan*'s proposed findings and on the

15   right-hand side is Merck's proposed findings.  That's the way

16   they set this up here, okay?

17            THE COURT:  I'm in tab 7 and what page?

18            MR. SOBOL:  37, Your Honor.

19            THE COURT:  Is there a Bates number at the bottom?

20            MR. SOBOL:  Yes.  It ends in 096.

21            THE COURT:  That helps me.  It's a thick document.

22   I'm there.

23   BY MR. SOBOL:

24   Q.   So if we turn to this page, this is in the *Mylan* case,

25   the *Mylan*'s proposed findings are on the left and Merck's on

Armitage, R. - Cross                                                         122

1    the right, correct?

2    A.  Correct.

3    Q.  Okay.  And then this is under the heading of "Conception

4    and synthesis of Compounds 4E and 4F," correct?

5    A.  Correct.

6    Q.  Okay.  Now, then if you look at Paragraph 122, now Merck

7    is taking the following position:  "The structure of

8    Compounds 4E and 4F was conceived by Clader and Burnett.  The

9    structure is shown on Schering documents."  And then it says,

10   "At the time neither Rosenblum nor Afonso was yet involved in

11   the project."  That's the position they took then, right?

12   A.  Yes.  That would appear to be the position consistent

13   with the documents I reviewed in connection with the Glenmark

14   litigation.

15   Q.  And then if you also go back to the Glenmark litigation

16   for a moment, it was the method that Afonso -- excuse me,

17   that Rosenblum said that he had that Merck put forward as the

18   basis of invention, correct?  If you turn back to tab 6, Page

19   9 -- excuse me, tab 6, Page 10.

20   A.  I'm sorry.  You're on tab?

21   Q.  Tab 6, going back to Glenmark.  See how easy this will be

22   for the jury, too.  Turn back to Tab 6, Page 10, please.

23   A.  Yes.

24   Q.  Okay.  At the paragraph that begins, "Glenmark's

25   argument."  Then it says, "To start with, when Rosenblum

1   conceived of the structure of Compounds 4E and 4F, he had a

2   method in mind to make them.  He described the method in his

3   lab book and carried it out.  His method works."  Then the

4   last sentence -- second to last sentence here, "Under the

5   law, so long as Rosenblum had an operative method to make

6   Compounds 4E and 4F, he was the sole inventor of those

7   compounds."  That was the position taken by Merck at this

8   time, correct?

9   A.  That's correct.

10  Q.  So it wasn't a typo or a mistake on the prior page when

11  they had attributed conception to Rosenblum.  Here they are

12  saying now he is the sole inventor of 4E and 4F?  Right?

13  A.  Again, I don't want to get into exotic areas of patent

14  law but --

15  Q.  Nor do I.

16  A.  -- it's possible that this could be true and irrelevant

17  at the same time.  But, in any case, I would not disagree

18  with you.  There is a slight difference.  The first

19  contention on Page 9 was that it was first conceived by

20  Rosenblum.  That's clearly wrong.  However, if Rosenblum

21  conceived of the structure and operable way to make it, he

22  could be the sole inventor.  He would not be the first

23  inventor, and, therefore, under the applicable patent law at

24  the time, you would not name him as the sole inventor, but

25  it's all irrelevant since he would have been, in any event, a

Armitage, R. - Cross                                          124

1    joint inventor with other joint inventors on the patent.

2    Q.  Okay.  Thank you.  Now, I take it if we -- take a step

3    back from this comparison for a moment.  The Glenmark settles

4    the -- the Glenmark case settles in May of 2010, correct?

5    A.  Correct.

6    Q.  And then the Glenmark -- excuse me, the Mylan case is now

7    continuing on for a year or more to trial, correct?

8    A.  Correct.

9    Q.  Now, during that period of time, what do you think a

10   reasonable and competent patent counsel at Merck were doing

11   with respect to the *Mylan* case?  Shall I reframe?

12          THE COURT:  He didn't say he didn't understand it.

13   I understood the question.  Did you understand it,

14   Mr. Armitage?

15          THE WITNESS:  Yes, I did.  Again, I don't know at

16   what point it became clear that *Mylan* would focus solely on

17   the issue of the inventorship of Dr. Afonso.  But as I

18   explained in my expert report, by the time the Glenmark

19   trial, Merck's lawyers would have been ready to go with the

20   entire case.  And so the only possibility is they would

21   continue to do some additional work.  Dr. Hrubiec suggests

22   they may have changed experts, et cetera, and they would

23   have continued on on the assumption that the war is not over

24   until the *Mylan* case finally is decided.

25          THE COURT:  Wait.  Now I'm not clear on that

1    answer.  The Glenmark case, they had gotten all the way up

2    to a final pretrial order.

3          THE WITNESS:  The Glenmark case was settled as the

4    case was about to go to trial.

5          THE COURT:  Exactly.

6          THE WITNESS:  So at that time the trial

7    preparations for Merck, to do whatever it needed to do to

8    defend its patents, would have been complete, and, you

9    know -- you asked me what a reasonable and competent patent

10   counsel could have done.  One is, we will just wait and try

11   the same case as *Mylan*.  The other is, as Dr. Hrubiec

12   suggested, make some changes in the expert lineup.

13         THE COURT:  But the Glenmark case, when it settled,

14   was basically ready to go, the discovery was over, and you

15   are saying that then they settled on the basis of keeping

16   *Mylan* going?

17         THE WITNESS:  So having been involved in many of

18   these, when you have multiple Hatch-Waxman litigations, and

19   I had this when I was at Lilly, you do not win until you've

20   won against each of the generics bringing the challenge.  So

21   settling with Glenmark did nothing to eliminate the risk of

22   early generic competition because there was going to be a

23   trial in *Mylan*, and that would determine the outcome of

24   exclusivity for the Ezetimibe products.

25         THE COURT:  Go ahead.

BY MR. SOBOL:

Q.  One hypothesis might be that reasonable and competent patent counsel, after settling Glenmark, wouldn't just sit on their hands, but they would try to improve the case as they go ahead with *Mylan*, correct?

A.  Yes.

Q.  Okay.  And so, for instance, we know from the patent record that Mr. Roush, he originally had a 111-page report, and then he changed to had a new report at about 140 pages in it.  You know that, right?

A.  I've not done the page counting, but I will take your representation.

Q.  Right.  And then there was also another new expert that came into a part of the picture, this Dr. Myers, correct?

A.  As I understand Dr. Hrubiec's testimony, we agree on that.

Q.  In the Glenmark case, what did Glenmark say Afonso invented?

A.  In the Glenmark case, as in the *Mylan* case, the allegation was that Afonso contributed to the conception of Compounds E and F.

Q.  Right.  What did *Mylan* say that Afonso invented in the *Mylan* case?

A.  The identical 4E and 4F contributed to the conception of the invention, and then *Mylan* additionally tried to prove

1    that Dr. Afonso contributed to other subject matter which

2    wouldn't have been relevant to the Glenmark case.

3    Q.   Well, in *Mylan*, *Mylan* took the position that Afonso

4    invented Zetia, Ezetimibe, in addition to the two compounds

5    that they had said they invented in Glenmark, correct?

6    That's the new subject matter you are talking about?

7    A.   Yes, but that wasn't actually of any relevance to the

8    cast I had in Glenmark.  In other words, because they were

9    seeking a common underlying issue of Compounds 4E and 4F, it

10   wasn't necessary for me to look at the merits in the *Mylan*

11   case of the rest of the allegations that *Mylan*'s attempting

12   to prove.

13   Q.   But you do know that the *Mylan* court, Judge Linares,

14   has -- a large part of his decision is knocking down the

15   notion that Afonso was the inventor of Ezetimibe, correct?

16   A.   Correct.

17   Q.   So let's just look to -- if you go to tab 15, please.

18   Tab 15 is a photocopy of the decision of the *Mylan* District

19   Court, right?

20   A.   It appears to be, yes.

21   Q.   You turn to -- stay with tab 15 but go to Page 15,

22   please.  During the course of the *Mylan* Court's decision, the

23   Court observed that Schering -- Ms. Russell -- it says here

24   the following, "According to Schering, Russell's" -- that

25   is the IP head at Schering at the time, correct, the senior

Armitage, R. - Cross                                          128

1   IP lawyer at Schering, Russell?

2   A.  He was legal director of patents.

3   Q.  Okay.  "According to Schering, Russell's concerns about

4   the potential invalidity of the '721 patent claims were based

5   on earlier litigation with Glenmark.  Glenmark argued that

6   certain claims were invalid due to inherent anticipation."

7         That's what the Court wrote, correct?

8   A.  Yes.

9   Q.  So that's part of the background.  Then also the Court

10  provides -- if you turn to the next page, please -- provides

11  more remarks regarding what the re-issue was and how the

12  re-issue was arose because of things that were learned during

13  the Glenmark litigation, correct?

14  A.  Correct.

15  Q.  Okay.  Then on Page 17, Judge Linares makes some

16  observation that there was testimony before him about this

17  experiment that this guy, Mr. Brisbois made, in order to

18  confirm Rosenblum's ability to synthesize 4E and 4F, makes

19  some observations about it, correct?

20  A.  Correct.

21  Q.  And then there is a section that begins at Page 21, it's

22  a discussion, and then there is a discussion -- see III on

23  Page 21, sir?

24  A.  Yes.

25  Q.  Then A, and then the discussion that the Court has here

1  on these pages reaches the conclusion, if you will, that

2  Afonso did not invent Ezetimibe?

3       (Pause)

4       So this section here, the section under inventorship,

5  I thought you were looking over this, Mr. Armitage.  This

6  section reaches the conclusion that Dr. Afonso did not invent

7  Ezetimibe also, is it fair to say?

8  A.  I believe that's correct, yes.

9  Q.  Sorry, everybody.

10 A.  I apologize for the silence.  I was waiting for the

11 question.

12 Q.  I was trying to be polite, so I'm sorry.  I'm going to

13 move this along.  So now there on Page 25 we finally get to

14 the inequitable conduct section of the decision, correct?

15 A.  The heading is labeled "Inequitable conduct," but the

16 inventorship predicate we have been talking about is actually

17 the materiality aspect of inequitable conduct.

18 Q.  Buried in here, yes.  If we turn to Page 27, please.

19 Further, it says, the following, "Further, with respect to

20 Compounds 4E and 4F, *Mylan* failed to prove that Dr. Afonso

21 made a contribution to invention of this compounds beyond

22 their first synthesis."  So that's the conclusion that the

23 Court makes, correct?

24 A.  Correct.

25 Q.  Now we are going to get the reasons for that conclusion.

1    "Rather, the evidence at trial suggests that these compounds

2    were first conceived by Drs. Burnett and Clader as

3    demonstrated by the '440 application."  That's the first

4    reason he gives, correct?

5    A.  It's the first reason stated here, yes.

6    Q.  Yes.  And then he -- and that was, by the way, as I

7    showed you before, one of the findings of fact that Merck had

8    put forward, that it was Burnett and Clader who had first

9    conceived of Compounds 4E and 4F?

10   A.  That's correct.

11   Q.  And then the next sentence says, "In fact, according to

12   Professor Roush, if a chemist had been able to make Compound

13   8F, as Dr. Burnett had done, that chemist would have also

14   been able to make Compounds 4E and 4F after routine

15   experimentation."  That was also his reason, correct?

16   A.  That's correct.

17   Q.  Not, by the way, that Rosenblum had a method of his own

18   to make it and was successful in doing that, that's not the

19   reasons being given here?

20   A.  Well, this is, as I understand compound 8F, this compound

21   was made in a prior patent that was prior art, which was also

22   prior art considered in Glenmark.

23   Q.  Right.  And here, though, there is no rational -- so, by

24   the way, here the Court does not rely at all, the Court, the

25   *Mylan* court, does not rely at all upon the evidence of

1    Brisbois's experimentation to confirm Rosenblum's ability to

2    make 4E and 4F, correct?  There is no reliance by the Court

3    at all?

4    A.   That is not correct.  There is another portion of this

5    decision that references -- in fact, it says it is clear

6    there were multiple methods that could have been used to make

7    these compounds, and one of the multiple methods was the

8    Brisbois method.  Other methods were actually methods

9    described in Glenmark's own expert's report.  So it is sort

10   of the full answer to that question requires that context.

11          THE COURT:  So, in other words, a jury would have

12   to understand prior art, and these are all patent concepts,

13   not antitrust concepts.  So a jury would have to understand

14   prior art.  I understand prior art.  Number of patent cases.

15   And they would have to understand methods, and the

16   particular meaning that method has in patent law.

17          So they would have to have pretty much an education

18   in patent law in order to understand some of the reasonings

19   here that Judge Linares, since it was a patent case before

20   him, would have to have understand as a judge and as a bench

21   trial?

22          THE WITNESS:  All of that they would need to

23   understand in order to evaluate either Dr. Hrubiec's

24   opinions or my opinions because we are both basing our

25   opinions on facts in evidence that was available at the time

Armitage, R. - Cross                                              132

1    the Glenmark case was prepared to go to trial, which

2    included all of this information, and the reference here is

3    to the '440 application.

4           There is also a reference here to Compound 8F,

5    which was a compound that could be made by a prior art

6    method, which means that if that method was useful for

7    making Compounds 4E and 4F, it automatically would have

8    disqualified Dr. -- I'm sorry Dr. Afonso from being a joint

9    inventor.

10          So irrespective of what's in the *Mylan* opinion,

11   these are all the issues the jury is going to have to tackle

12   if it's going to assess what a reasonable and competent

13   patent counsel would have advised Merck and Glenmark as to

14   the likelihood of success.

15          THE COURT:  So even though it's an antitrust case,

16   and it centers around the settlement of the case, where

17   these issues didn't finally resolve itself, you are saying

18   we would have to have a mini patent trial here and then move

19   into an antitrust case?

20          THE WITNESS:  Is that a question for me?

21          THE COURT:  It is a question for you, sir.

22          THE WITNESS:  In -- I've only had limited

23   involvement, but I have had some involvement in antitrust

24   trials based on patent issues, and that's fundamentally

25   exactly how the trial proceeds.

1              In other words, the jury hears evidence typically

2     from patent experts about the legal issues, and here the

3     legal issues is going to relate to the -- what a reasonable

4     and competent patent counsel would have advised its

5     likelihood of success, and in order to get into that issue,

6     you have to understand the law in inventorship, what you

7     need to prove to be a joint -- be a joint inventor, which

8     would require understanding, you know, this idea of what

9     conception is and the relevance of a way to make it, and

10    basically go through the analysis that I certainly did in my

11    expert report.

12             It's the type of analysis that was actually done in

13    Judge Linares's decision in *Mylan*, and that's how you reach

14    a conclusion about the likelihood that that type of defense

15    would be able to prevail.  And obviously Dr. Hrubiec and I

16    have different views on that.  I stated in my expert report

17    the basis for my views.

18             THE COURT:  All right.  But you don't have to go

19    through all of that if you have the attorneys, if you have

20    what the attorneys were advising at the time?  I mean, they

21    settled it.  They settled the case.  They settled it on

22    attorney advice.  Nobody is going to settle a case that big

23    except on attorney advice.  You've got the attorney advice,

24    it's just we can't get to it.  I'm just making a comment on

25    the record.  So perhaps the jury is going to need to know

1    that while you have an attorney-client privilege, and you're

2    entitled to assert it, that you have asserted it, so,

3    consequently, that's why we have these projections and all

4    of this testimony, because you've got a privilege, and

5    you're certainly entitled to assert it, and the jury would

6    know that, but they may wonder why they are hearing all of

7    this testimony about another case.  Just a comment, not a

8    ruling.

9              Okay.  Go ahead.

10   BY MR. SOBOL:

11   Q.  So to whatever extent in the antitrust trial we get into

12   the issues of handicapping a Merck versus Glenmark

13   litigation, which is I think in part what you are telling me

14   about it, you are saying we will have to get in some notion

15   of patent issues with respect to Merck versus Glenmark, is

16   that fair to say, what you were answering to the Court a few

17   moments ago?

18   A.  When you say, "Some notion," at least as I understand the

19   pleadings in this case, you need more than some notion.

20   Q.  Well, fair enough.  To the extent that we get into patent

21   issues with Merck and Glenmark -- let me put the question

22   this way.  To the extent that we get into issues with respect

23   to handicapping the Merck versus Glenmark case, if we get

24   into this *Mylan* issue, then we have to also start getting

25   into issues of handicapping that case, too, correct?

```
 1   A.  No.  Because that case was decided, and as I say, and I

 2   said several times, I did not rely on that except to confirm

 3   the reliability of the opinion I reached based on the

 4   underlying work that I had done.

 5   Q.  Sure.  Thank you.  Let me wrap up with this couple of

 6   questions, sir.  You have been practicing patent law for

 7   decades, fair to say?

 8   A.  Yes.

 9   Q.  Okay.  And you've got hundreds of hours into this case or

10   at least more than a hundred hours into this case, correct?

11   A.  Undoubtedly.

12   Q.  And preparing for your testimony for today, what would

13   you give as a ballpark of the amount of time you've spent

14   preparing?

15   A.  I spent two days in Florida before I came up here and

16   last evening and sometime this morning.

17   Q.  And the only issue that we were talking about for all of

18   that preparation was how you were going to answer questions

19   here today on the comparison of Glenmark case to the *Mylan*

20   case?

21   A.  Well, if the issue is the only preparation that I did

22   related to the subject matter of this hearing, the answer is

23   yes.

24           MR. SOBOL:  Nothing further, Your Honor.

25           THE COURT:  All right.  Redirect.
```

1          MR. ISMAIL:  No, Your Honor.  Thank you.

2          THE COURT:  Mr. Ismail, if you can come to the

3     podium, I have a couple of questions.

4          Thank you very much, Mr. Armitage.  You are

5     excused.

6          (Witness excused.)

7          THE COURT:  Mr. Ismail, it would be helpful to the

8     Court if you can identify the witnesses that you intend to

9     introduce evidence of the *Mylan* case through and for what

10    purposes.  I want to know the ones that you plan on for

11    impeachment and the ones that you plan on for substantive.

12    Depending upon how I rule, unless the door is opened, you're

13    only looking at impeachment witnesses.

14         MR. ISMAIL:  Correct.  So just so I'm clear with

15    the Court's question, plaintiffs' witnesses, for whom we

16    believe the *Mylan* evidence is relevant, is that part of your

17    question, our witnesses?

18         THE COURT:  It would be helpful to the Court.  What

19    are your intending to do?  If a witness is impeachment,

20    that's one thing.  If a witness is substantive, then you're

21    creating a whole additional issue if they haven't opened the

22    door.  So what I'm asking you for is, which witnesses that

23    you've listed are you planning to call to impeach anything

24    that is presented on this issue by the plaintiffs, and if

25    you're planning on calling any as to start a new substantive

1    issue by the defendants when you don't have any cross-claims

2    or anything like that?

3         MR. ISMAIL:  So the testimony of Ms. Jakob and

4    Mr. Matukaitis.

5         THE COURT:  They are the plaintiffs witnesses?

6         MR. ISMAIL:  They are Merck's witnesses.

7         THE COURT:  I'm sorry.

8         MR. ISMAIL:  I think part of that confusion arises

9    from the following.  Ms. Jakob is a witness for Merck, and

10   Judge Miller has ruled that we should bring Ms. Jakob in

11   plaintiffs' case in chief so they can ask her first.  So

12   it's our witness but she is appearing in the plaintiffs'

13   case in chief.

14        THE COURT:  If they choose to call her.

15        MR. ISMAIL:  They told us they do intend to call

16   her.  In fact, I think she is the first or second witness in

17   the trial.  And so Ms. Jakob was the in-house counsel at

18   Merck who was responsible for the Glenmark litigation and

19   the *Mylan* litigation.  And her factual testimony would, I

20   think, bear on both as matters of impeachment to the

21   plaintiffs' theory of the case and also be supportive of

22   Merck's theory of the case.

23        THE COURT:  But if they call her, then you would be

24   calling her to impeach her?

25        MR. ISMAIL:  No, sorry.  If the plaintiffs call

1    her, they will conduct their examination, and then we will

2    conduct our examination of Ms. Jakob, and there has already

3    been a ruling, in fact, an agreement with plaintiffs that

4    the examination by Merck of Ms. Jakob can go beyond the

5    scope of the subject matter that plaintiffs examine her on.

6          THE COURT:  I haven't seen an agreement.

7          MR. ISMAIL:  We can tender that to the Court.  It

8    was in the context of, at the pretrial conference, and we

9    are happy to provide that to the Court.

10         THE COURT:  I'm not understanding how you all are

11   calling witnesses.  I mean, why would they be calling a

12   witness in their case in chief that's basically your

13   witness, unless they're calling her as an adverse witness?

14         MR. ISMAIL:  They are calling her as an adverse

15   witness.

16         THE COURT:  In their case in chief?

17         MR. ISMAIL:  Correct.  We did oppose this

18   procedure.  We were ordered to bring Ms. Jakob in

19   plaintiffs' case in chief over objection, and we are

20   complying with that order.

21         THE COURT:  But there is still an objection?

22         MR. ISMAIL:  There is.

23         THE COURT:  All right.

24         MR. ISMAIL:  So Ms. Jakob, I believe, would fall in

25   both categories to Your Honor's question.

1          THE COURT:  I understand.

2          MR. ISMAIL:  As would Mr. Matukaitis.  You've heard

3     from Mr. Armitage, who will be offered affirmatively on the

4     question of what a reasonable and competent patent lawyer

5     would advise.

6          THE COURT:  That would be impeachment.  You can't

7     offer that unless you're impeaching something that has been

8     presented.

9          MR. ISMAIL:  Yes.

10         THE COURT:  Depending upon my ruling.  In other

11    words, Mr. Armitage would be in defense of what Dr. Hrubiec

12    testifies to?

13         MR. ISMAIL:  That does include part of the subject

14    matter of Mr. Armitage.

15         THE COURT:  Don't count on just being able to

16    launch off into whatever you want to launch off in because

17    there are rules that set the contours of what can be

18    presented.  In other words, if the issue isn't there, you

19    can't present evidence on it.

20         MR. ISMAIL:  Yes.  And there are -- Mr. Armitage

21    has a very long report that's part of those binders that are

22    before the Court.  So there are other subject matters that

23    Mr. Armitage does give opinions on that have not been

24    challenged by plaintiffs and -- but we take the Court's

25    point.

1          THE COURT:  The report doesn't come in.

2          MR. ISMAIL:  Of course.  Of course.  I'm just

3    talking about the disclosure of the opinions.  But going

4    back to your question, Your Honor, Mr. Armitage does offer

5    opinions for which *Mylan* would be, we believe, of relevance

6    and -- according to reference in support of opinions he

7    wants to offer that are similar to what you heard today,

8    which is what a reasonable and competent patent lawyer would

9    advise his or her client regarding the prospects of Glenmark

10   succeeding on this inventorship challenge.

11         In addition to that, I believe there will be

12   reference to the *Mylan* litigation by Dr. Addanki.

13         THE COURT:  You can pass that.

14         MR. ISMAIL:  So Dr. Addanki makes reference to

15   *Mylan* litigation, and if you recall from Judge Miller's

16   articulation of the relevance of *Mylan*, in part relates to

17   the procompetitive aspects of the settlement agreement in

18   toto.  Dr. Addanki is an expert who addresses that issue and

19   makes references therein.  Dr. Burnett, whom you've heard

20   referenced several times today as a joint inventor of the

21   patents at issue, he testified in the underlying patent

22   litigation.  He is going to be a witness in this case, will

23   be called by Merck.

24         There are additional counsel -- I'm sorry,

25   additional experts who have been designated on issues of

1    patents, Mr. Figg and Ms. Linck, who's opinions, depending

2    on what the Court allows and what issues the Court deems to

3    be fair game, do reference the *Mylan* procedure -- I'm sorry,

4    the outcome and the reports.  I think I've got them all.

5         THE COURT:  I'm just trying to get an idea.  I'm

6    not going to say because you didn't mention it, if some

7    ruling goes in your favor or if it's appropriate evidence

8    and they have been listed, I'm not going to say because you

9    didn't mention it here.  I'm just trying to get some idea.

10        MR. ISMAIL:  I appreciate that.  I hope that was

11   helpful in at least in qualitatively if not exactly

12   quantitatively.

13        THE COURT:  It was helpful.

14        MR. ISMAIL:  Thank you.

15        THE COURT:  Thank you.  The next thing that the

16   Court wants to take up just a couple of administrative

17   matters and comments, and I will be addressing Mr. Noona on

18   the first one.

19        MR. NOONA:  Yes, ma'am.

20        THE COURT:  Mr. Noona, you've presented on, it's

21   dated 4-10.  It came to the Court on 4-12, is forwarded to

22   me on 4-12.  *Pro hac vice* admission at this late date, and

23   you're going to have to justify it.  I'm not admitting one

24   more attorney into this case.

25        MR. NOONA:  Is that Mr. Whittaker, Your Honor?

 1          THE COURT:  So if he's so important, why haven't
 2     you done that before?
 3          MR. NOONA:  Your Honor, my understanding is
 4     Mr. Whittaker will be working on the case.  I don't believe
 5     he is going to be presenting in the case.  But as a
 6     precaution, we didn't want him showing up in the court or
 7     taking part at all unless he filed a *pro hac vice*.  He is
 8     part of the Gibson Dunn team.  He is in the courtroom today,
 9     seated in the corner over here.  He is taking a supportive
10     role in the case.  But it was out of formality and caution
11     that we filed that, and typically not every lawyer that
12     works on a case files a pro vac.  He is not, my
13     understanding -- subject to Mr. Liversidge, he is not going
14     to be presenting witnesses or cross-examining or whatnot.
15          THE COURT:  I'll take it under advisement, and I'll
16     decide whether I'm going to enter it.  It just seems like to
17     me to be excess, but everything is already excessive, so
18     this is like a grain of sand.
19          MR. NOONA:  We wanted to be sure rather to find out
20     that there was a problem, Your Honor.  That's all.
21          THE COURT:  I'll go ahead and enter it and give it
22     to the clerk tonight so that he won't waste his weekend here
23     when he could be out in California.
24          MR. NOONA:  Thank you, Your Honor.
25          MR. WHITTAKER:  Thank you, Your Honor.

```
 1              THE COURT:  You can't get away that quickly,
 2    Mr. Noona.
 3              MR. NOONA:  I'm sorry.  It hopeful.
 4              THE COURT:  Maybe all I have for you at the moment.
 5    That's all I had specifically for you.
 6              MR. NOONA:  Thank you, Your Honor.  Happy to appear
 7    again anytime.
 8              THE COURT:  All right.  Counsel, each group, in
 9    other words, the five sets that have been identified, you
10    have to identify a party representative, and that party
11    representative has to be here throughout the trial.  I have
12    not had a designation yet, but the direct purchasers, the
13    retailer plaintiffs, the end payor plaintiffs, you all have
14    to designate, Merck has to designate someone, and Glenmark.
15    It has to be somebody with authority, and we are going to
16    have a case.  This case has been pending for five years
17    before this Court, and could go up to five to six weeks, is
18    going to be a party representative.  That party
19    representative is going to be here every day.
20              So you need to check with your client and find out
21    who they are going to designate, and you need to let the
22    courtroom deputy know that on Monday by 3:00 so that we will
23    have knowledge of who is going to be here starting on
24    Tuesday.
25              The next matter is any outstanding motion *in*
```

JODY A. STEWART, Official Court Reporter

1   *limine*s that have not been ruled upon by the Court may not

2   be mentioned in opening statement.  I am going to endeavor

3   to get rulings out, but if it hasn't been ruled on, you

4   cannot mention it.  Opening statements are by law, they are

5   not evidence.  They are opening statements.  They can be

6   restricted, they can be limited, and the jury is told it's

7   just an attorney's way of giving you some idea of what this

8   case is about.  They are told repeatedly it is not evidence,

9   and you may not argue in opening statement, and you may only

10  make an opening statement, and you've got your restricted

11  time.

12          If a Court hasn't ruled upon an issue, and it's

13  outstanding, don't mention it, because I will call you down

14  in front of the jury.  I will tell you that you are going

15  past the Court rules, if it is something that the Court has

16  not ruled upon.  I would also tell you that a motion *in*

17  *limine* is exactly that, to limit the evidence.  There is a

18  ruling required on it before the evidence comes before the

19  jury, and as I tried to make clear earlier today, what I was

20  saying was I certainly wasn't going to let evidence come

21  before the jury that I hadn't completed a motion *in limine*

22  ruling on, and that's all that was about.  That is not

23  mentioned in opening statements, doesn't mean it can't be

24  evidence in the case.  Juries are told this is just a

25  summary, this is just to get you started, and they're told

1    in preliminary instructions, and they are told in their

2    final instructions, that opening statements are not

3    evidence, closing arguments are not evidence, but closing

4    argument is the opportunity for the attorneys to vigorously

5    try to convince you that they are correct based upon the

6    evidence in the case.

7         So if the Court hasn't made a ruling, you should go

8    through, let's see, 44 total, as I have the motions *in*

9    *limine*, I could be wrong, but my last count was 20 from the

10   plaintiffs and 24 from the defendants for a total of 45 that

11   have been ruled upon.  I have a short list of what has not

12   been ruled upon, but you know those.  It's only a few.  So I

13   would tell you that now.

14        The next bit of advice I have is that you spend

15   your time working on, if you can, some type of stipulation

16   in regard to this *Mylan* litigation, and I would also

17   suggest, and I have mentioned this to Judge Miller,

18   technically you still haven't finished your final pretrial

19   conference, shocking to the Court, because part of getting a

20   case ready for trial, this case has been pending before the

21   Court five years in June, I believe it's June.  I know it

22   was June of 2018.  So it will be five years in June.  You're

23   supposed to have your deposition designations made and ruled

24   upon before trial, and you all are still at that.  So I

25   would suggest that you use Monday, that you now have, to do

JODY A. STEWART, Official Court Reporter

 1    some productive things for trial, such as completing

 2    deposition designations, working on some stipulations, and

 3    thinking now about how you present a case to a jury, not

 4    just arguing and bickering between attorneys in front of the

 5    Court, but how you present a case to a jury.  You all are

 6    experienced.

 7            The jury has to understand the forest.  They don't

 8    care about all the trees.  They want to know the forest, and

 9    you all have got to think about, this is not a bench trial

10    where a judge can sort through those kinds of things.  This

11    is a jury trial.  It is your job.  It's not the Court's job,

12    it's your job to educate them.  I think I made the analogy

13    before it's like assume you are a freshman in college, and

14    you're starting a foreign language course, and you've never

15    spoken that language and don't know a thing about it.

16            It's the job of that teacher to bring you in and

17    start you on that language course, and by the end of the

18    semester, you understand it, at least to make a passing

19    grade.  So that's what you're dealing with here.  You are

20    not dealing with patent experts, you're not dealing with

21    antitrust experts, and it's my job to instruct them on the

22    law in the end of the case when they've heard the evidence

23    and for them to apply the evidence they have to the law to

24    make their finding of fact.  You all are the ones who have

25    to make that possible.  Juries are very smart and very savvy

1     in my experience through the years.  They favor parties who

2     make their cases clear, not who try to obfuscate and stir it

3     all up and take their time in doing it.  So those are just a

4     few words that I wanted to say to you in terms of

5     administrative matters.

6              The final is, I'll give it, if you want it, each of

7     you, Mr. Sobol, Mr. Liversidge.  I have trouble with your

8     name.  I'm sorry.

9              MR. LIVERSIDGE:  Liversidge.

10             THE COURT:  Mr. Liversidge and Mr. Ismail, one, not

11    both, 10 to 15 minutes for any wrap-up, you can have it.  If

12    you don't, that's fine, too.

13             Mr. Sobol, is there anything further you want to

14    say?

15             MR. SOBOL:  I think the plaintiffs are content,

16    Your Honor.

17             THE COURT:  All right.

18             MR. LIVERSIDGE:  Same for us, Your Honor.  Nothing

19    further.

20             THE COURT:  Thank you.  Counsel, I wish you, I

21    wouldn't say happy, but I wish you a safe weekend, and so I

22    will see you next at 11:00 a.m. on Tuesday morning.  So the

23    Court stands in recess until then.

24             (Hearing adjourned at 5:27 p.m.)

25



```
 1                        CERTIFICATION

 2

 3        I certify that the foregoing is a correct transcript

 4   from the record of proceedings in the above-entitled matter.

 5

 6

 7           X_____/s/_____x

 8                     Jody A. Stewart

 9                     X_____4-17-2023 _____x

10                           Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JODY A. STEWART, Official Court Reporter