UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

In re:
ZETIA (EZETIMIBE) ANTITRUST
LITIGATION

MDL NO. 2:18md2836

## OPINION

This matter comes before the court upon the End Payor Plaintiffs' ("EPPs") Motion for Final Approval of the parties' proposed Settlement Agreement and Motion for Award of Attorneys' Fees. ECF Nos. 2158 and 2160.[1]

### I. BACKGROUND

The court will briefly review the facts and procedural history relevant to the EPP Settlement Agreement. The EPPs filed this case under state competition and unjust enrichment laws against Merck and Glenmark (collectively "Defendants").[2] The EPPs alleged that

---

[1] The Class Representative EPPs are the City of Providence, Rhode Island; International Union of Operating Engineers Local 49 Health and Welfare Fund; Painters District Council No. 30 Health & Welfare Fund; Philadelphia Federation of Teachers Health & Welfare Fund; Sergeants Benevolent Association Health & Welfare Fund; The Uniformed Firefighters' Association of Greater New York Security Benefit Fund; The Retired Firefighters' Security Benefit Fund of the Uniformed Firefighters' Association; and United Food and Commercial Workers Local 1500 Welfare Fund.

[2] The Merck Defendants ("Merck") consist of Merck & Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC. The Glenmark Defendants ("Glenmark") consist of Glenmark Pharmaceuticals, Ltd. and Glenmark Pharmaceuticals Inc., USA.

Defendants entered into an unlawful agreement to delay the introduction of a less expensive generic version of Merck's cholesterol-lowering medication, Zetia, which resulted in artificially inflated prices for branded Zetia (Ezetimibe) and its generic equivalents. The alleged unlawful agreement is a 2010 settlement agreement resolving a patent infringement litigation Merck brought against Glenmark after Glenmark filed an Abbreviated New Drug Application ("ANDA") seeking to manufacture, market, and sell a less expensive, generic form of Zetia. As a result, the EPPs alleged that they paid more for Zetia and/or its generic equivalents than they would have paid absent Defendants' unlawful conduct. Defendants denied: (1) the EPPs' allegations of unlawful or wrongful conduct; and (2) that any of the alleged conduct caused any damage.

The court previously certified the EPP Class on August 20, 2021, after full briefing and hearing on the EPPs' class certification motion. See ECF Nos. 1094 (Report & Recommendation), 1316 (Order Adopting Report & Recommendation). The EPP Class is defined therein.

> All Third-Party Payor entities ("TPPs") within the Brand
> Subclass or the Generic Subclass defined herein that,
> for consumption by their members, employees, insureds,
> participants, or beneficiaries, and not for resale,
> indirectly purchased, paid and/or provided reimbursement
> for some or all of the purchase price of Zetia or its
> AB-rated generic equivalents in any form, that was sold
> through a retail pharmacy, including mail-order
> pharmacies and long-term care pharmacies, in Alabama,

Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia[,] West Virginia and Wisconsin from November 15, 2014 (the "but-for generic entry date") through November 18, 2019.

Brand Subclass: TPPs that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of brand Zetia purchased between the but for generic entry date and December 11, 2016, inclusive. Excluded from the Brand Subclass are Opturn Health Part D Plans, Silverscript Part D Plans, Emblem Health Part D, Humana Part D Plans, Optum Health Managed Care Plans, and any TPPs that used one of these plans or OptumRx as its pharmacy benefits manager ("PBM") during this subclass period.

Generic Subclass: TPPs that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic ezetimibe purchased between the generic entry date (December 12, 2016) and November 18, 2019, inclusive.

General Exclusions: The following entities are excluded from both subclasses:

  a. Defendants and their subsidiaries and affiliates;

  b. All federal and state governmental entities except for cities, towns, municipalities or counties with self-funded prescription drug plans;

  c. All entities who purchased Zetia or generic Zetia for purposes of resale or directly from Defendants or their affiliates;

  d. Fully-insured health plans (i.e., health plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members); and

  e. Pharmacy benefit managers.

3

See ECF No. 1094 at 4-5.

After class certification, the EPPs then implemented and effectuated the court-approved Notice Plan, giving members of the Class the opportunity to exclude themselves from the Class. See ECF No. 1497. Sixteen (16) members of the Class requested exclusion at that time. See ECF No. 1637 at 3, 24.[3]

The EPPs proceeded to a consolidated trial with two other sets of plaintiffs: the Direct Purchaser Plaintiffs ("DPPs") and the Retailer Plaintiffs. The court resolved extensive pretrial matters, including motions to dismiss, exhaustive discovery disputes, Daubert motions, and motions for summary judgment. The court entered its final pre-trial order on April 14, 2023. See ECF No. 2086. The consolidated trial began on April 19, 2023. See ECF No. 2106. During jury selection, but before a jury was impaneled, all Plaintiffs participating in the consolidated trial agreed to settle their disputes with Defendants. Thereafter, the court entered dismissal orders for the DPPs and the Retailer Plaintiffs, ECF Nos. 2139, 2142; and preliminarily approved settlement for the EPPs, ECF No. 2151. Pursuant to the court's preliminary approval order, the EPPs submitted a Motion for Final Approval of the Settlement and documentation in support on September 13, 2023. ECF Nos. 2158 (Motion for Final Approval), 2159 (Memorandum in Support

_____

[3] The list of sixteen (16) excluded members is attached hereto as Exhibit A and made a part hereof.

of Motion for Final Approval). The EPPs also submitted a Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for the Class Representative Plaintiffs, with documentation in support, on September 13, 2023. ECF Nos. 2160 (Motion for Attorneys' Fees), 2161 (Memorandum in Support of Motion for Attorneys' Fees). On September 21, 2023, the court held a fairness hearing on the proposed Settlement Agreement and the Motion for Attorneys' Fees. ECF No. 2166.

Pursuant to the terms of the Settlement Agreement, the EPPs have agreed to dismiss their claims against Defendants in exchange for a $70,000,000.00 payment, which Defendants will deposit into a Settlement Fund. See ECF No. 2134-1 at 7-8 (Settlement Agreement). The parties have agreed that the attorneys' fees, reimbursement for litigation costs and expenses, and incentive awards for the Class Representatives will be withdrawn from the Settlement Fund. Id. at 11. The remainder of the Settlement Fund will be distributed to members of the Class on a pro rata basis, in accordance with the Plan of Allocation. ECF No. 2134-4 at 3-4 (Plan of Allocation). The Settlement Agreement is binding on all Class members and completely resolves all claims of the EPP Class. ECF No. 2134-1 at 13-15.

## II. APPROVAL OF THE SETTLEMENT AGREEMENT

### A. Legal Standard

Settlement of a class action that would bind absent Class members requires the court's approval. Fed. R. Civ. P. 23(e). After the parties have provided notice to all members of the Class, "[t]he approval of a proposed settlement agreement is in the sound discretion of the Court." Strang v. JHM Mortg. Sec. Ltd. P'ship, 890 F. Supp. 499, 501 (E.D. Va. 1995). The court must then conduct a fairness hearing at which Class members may appear to object or support the proposed settlement. See Fed. R. Civ. P. 23(e)(2). The court may finally approve the Settlement Agreement, only after the fairness hearing and a determination that the Settlement Agreement is "fair, reasonable, and adequate." Id.

Rule 23(e)(2) provides factors for courts to consider when determining the fairness, reasonableness, and adequacy of the Settlement Agreement. These factors include whether:

(A)  the class representatives and class counsel have adequately represented the class;

(B)  the proposal was negotiated at arm's length;

(C)  the relief provided for the class is adequate, taking into account:

(i)  the costs, risks, and delay of trial and appeal;

(ii)  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

             (iv)    any agreement required to be identified under Rule 23(e)(3); and

     (D)   the proposal treats class members equitably relative to each other.

Id.

The Fourth Circuit has developed "multifactor standards for assessing whether a class-action settlement is 'fair, reasonable, and adequate' under Rule 23(e)(2)." In re: Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig., 952 F.3d 471, 484 (4th Cir. 2020) (citing In re Jiffy Lube Sec. Litig., 927 F.2d 155, 159 (4th Cir. 1991)). Consideration of these factors ensures "the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." Jiffy Lube, 927 F.2d at 158. The court now assesses the fairness and adequacy of the proposed Settlement Agreement by applying the factors set forth in Jiffy Lube.[4]

**B. The Settlement is Fair**

In determining the settlement's fairness, the court must consider:

     (1)   the posture of the case at the time settlement was proposed;

     (2)   the extent of discovery that had been conducted;

     (3)   the circumstances surrounding the negotiations; and

---

[4] The Fourth Circuit's Jiffy Lube factors do not explicitly address the "reasonableness" of a proposed settlement, but "almost completely overlap" with the factors provided in Rule 23(e)(2). Lumber Liquidators, 952 F.3d at 484 n.8. The court's conclusion that the Settlement Agreement is fair, reasonable, and adequate is the same whether analyzed under the Jiffy Lube factors or the factors provided in Rule 23(e)(2).

> (4) the experience of counsel in the area of [the] class action litigation.

Lumber Liquidators, 952 F.3d at 484 (alteration in original) (quoting Jiffy Lube, 927 F.2d at 159).

## 1. Case Posture

"The first factor requires the court to evaluate 'how far the case has come from its inception[,]' since a settlement in an immature case might point towards collusion, while a mature case will point in the opposite direction." Domonoske v. Bank of Am., N.A., 790 F. Supp. 2d 466, 473 (W.D. Va. 2011) (alteration in original) (quoting In re The Mills Corp. Sec. Litig., 265 F.R.D. 246, 254 (E.D. Va. 2009)).

The court finds that the case was mature at the time the parties agreed to settle. Here, the parties agreed to settle only after the trial began, during the jury selection process. At that time, the parties had actively litigated motions to dismiss, exhaustive discovery disputes, Daubert motions, and motions for summary judgment. The parties' extensive litigation over nearly five years prior to trial eliminates concern by the court that the Settlement Agreement was a product of collusion.

## 2. Extent of Discovery

The second factor requires the court to determine whether the case was well-enough developed so that the EPPs were able to "appreciate the full landscape of their case" before agreeing to

8

the settlement. The Mills Corp., 265 F.R.D. at 254. Here, the court finds that the record was sufficiently developed at the time of settlement. The parties completed pretrial discovery prior to settling, which included the production and review of millions of pages of documents and dozens of witness depositions. See ECF No. 2159 at 11. The full record of discovery allowed the EPPs to assess the merits of the proposed Settlement Agreement compared to continued litigation.

### 3. Circumstances Surrounding Negotiations

The third factor requires the court to evaluate "the conditions and circumstances surrounding the settlement negotiations" to ensure that the settlement is the result of an arm's-length negotiation. The Mills Corp., 265 F.R.D. at 255. "The objective of this factor is to ensure that 'counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case.'" Id. (quoting S.C. Nat'l Bank v. Stone, 749 F. Supp. 1419, 1424 (D.S.C. 1990)).

The court is satisfied that the Settlement Agreement is a product of an "arms-length negotiation." Counsel entered negotiations with a thorough understanding of the case after fully preparing to take the case to trial. The settlement negotiations were also guided by an experienced mediator, who is a former federal judge. See ECF No. 2159 at 2. These circumstances support

that the settlement negotiations were not mere cover for collusion between the parties but were a thorough effort to achieve the best result for the Class.

### 4. Experience of Counsel

The fourth factor looks to the experience of the EPPs' counsel in this field of law. See The Mills Corp., 265 F.R.D. at 255. The court has previously found that counsel "have years of experience litigating similar cases across the country and extensive knowledge of the applicable law from that experience." ECF No. 105 at 8. Additionally, the court favorably considers that counsel are affiliated with "well-regarded law firms with strong experience in the relevant field." See Brown v. Transurban USA, Inc., 318 F.R.D. 560, 573 (E.D. Va. 2016) (citation omitted). Given counsels' experience and qualifications, it is "entirely warranted" for the court to pay heed to their assertion that the Settlement Agreement provides the best outcome for the Class. See The Mills Corp., 265 F.R.D. at 255.

### C. The Settlement is Adequate

The court must consider the following factors to assess the settlement's adequacy:

(1) the relative strength of the plaintiffs' case on the merits;
(2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial;
(3) the anticipated duration and expense of additional litigation;

> (4)  the solvency of the defendant[s] and the likelihood of recovery on a litigated judgment; and
>
> (5)  the degree of opposition to the settlement.

Lumber Liquidators, 952 F.3d at 484 (citing Jiffy Lube, 927 F.2d at 159).

### 1. Strength of the Plaintiffs' Case and Potential Difficulties at Trial

The court analyzes the first and second "adequacy" factors together because they are closely intertwined. "The first and second factors addressing the adequacy of the settlement require the court to examine 'how much the class sacrifices in a settling a potentially strong case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case.'" Brown, 318 F.R.D. at 573 (quoting The Mills Corp., 265 F.R.D. at 256). The advanced stage of the litigation suggests that the EPPs had a strong case as the EPPs successfully certified the Class, See ECF No. 1316, and defeated Defendants' motions for summary judgment, See ECF No. 1929. However, as in any trial, EPPs faced significant risk proving liability and establishing damages. Here, an outstanding motion in limine on the admissibility of a piece of Defendants' evidence increased the uncertainty for both sides. The court is satisfied that the Settlement Agreement accounts for the strength of the EPPs' case in light of the risks present in proving their case at trial.

## 2. Duration and Expense of Additional Litigation

The third factor asks the court to "weigh the settlement in consideration of the substantial time and expense litigation of this sort would entail if a settlement was not reached." The Mills Corp., 265 F.R.D. at 256. Absent the Settlement Agreement, the case would have proceeded to a five-week trial. In addition to the substantial expenses of trial, the nearly five-year record in this case suggests that the parties would have continued to vigorously litigate beyond the trial. The trial would have almost certainly been followed by extensive post-trial proceedings and a likely Fourth Circuit appeal by the losing party. See In re MicroStrategy, Inc. Sec. Litig., 148 F. Supp. 2d 654, 667 (E.D. Va. 2001) ("[T]here is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs."). The court is satisfied that the Settlement Agreement saves EPPs substantial time and expense.

## 3. Solvency of the Defendants and Likelihood of Recovery

The fourth factor considers the solvency of the Defendants and assesses whether the Settlement Agreement provides for a better outcome for the Class than if the Plaintiffs were to try to collect a litigated judgment from an insolvent defendant. The court does not find that the Defendants are at risk of insolvency and the

EPPs do not question the Defendants' solvency or their ability to pay a litigated judgment. See ECF No. 2159 at 17. However, given the other factors weighing in favor of the adequacy of the Settlement Agreement, this factor alone "should not preclude final approval of the proposed Settlement." Brown, 318 F.R.D. at 573 (citing Henley v. FMC Corp., 207 F. Supp. 2d 489, 494 (S.D.W. Va. 2002)).

### 4. Degree of Opposition to the Settlement

The final factor "looks to the reaction of the Class to the proposed settlement." The Mills Corp., 265 F.R.D. at 257. The court finds that EPPs fully complied with the court's order establishing a Notice Plan to inform Class members of the proposed Settlement Agreement. See ECF No. 2151. The Claims Administrator's execution of this Notice Plan included 42,006 postcards, 1,258 emails, digital advertising, a news release, and maintenance of a website and toll-free telephone number. See ECF No. 2157-1 at 1-3. This Notice Plan informed Class members of their right to object to the proposed Settlement Agreement. Id. at 4. Despite being fully informed of the proposed Settlement Agreement and the right to object to it, no member of the Class submitted an objection to the Claims Administrator or objected to the Settlement Agreement at

the fairness hearing.[5] The lack of any objection to the Settlement Agreement strongly supports a finding that it is adequate.

### D. Equity of Distribution

While the Fourth Circuit's _Jiffy Lube_ factors "almost completely overlap" with the factors set forth in Rule 23(e)(2), they do not address whether the Settlement Agreement treats Class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). The court finds that the _pro rata_ distribution of the

---

[5] The Claims Administrator reported that fourteen (14) members of the Class attempted to exclude themselves from the Class upon notice of the proposed Settlement Agreement. ECF No. 2157-1 at 3-4 (reporting untimely exclusion requests from: Anesthesia Physician Solutions of South Florida; Arizona EM-I Medical Services, P.C.; Emergency Medical Associates of NJ; Envision Healthcare Corp.; Envision Physician Services, LLC; Florida EM-I Medical Services, P.A.; HCA-Emcare Holdings, LLC; Infinity Healthcare Physicians, S.C; Nevada EM-I Silver/Homansky Medical; New Jersey Healthcare Specialists, P.C.; Northside Emergency Associates, P.C.; Radadvantage, A Professional Corp.; Sheridan Anesthesia Services of Georgia; and Wabash EM-I Medical Services, P.C.).

Class members were previously provided notice of Class certification and had an opportunity to opt out of the Class at that time. See ECF No. 637. Instead, these Class members waited over fourteen months, after the Class Representatives had negotiated a Settlement Agreement, to seek exclusion from the Class. These Class members cannot wait and see whether they like the result the Class Representatives achieve before deciding whether they want to be members of the Class. Thus, the court does not consider these untimely requests for exclusion. The proper avenue for expressing dissatisfaction with the proposed Settlement Agreement would have been to submit an objection. These Class members did not submit any objections nor provide any reason for their untimely exclusion requests, so the court does not interpret these exclusion requests as objections. The court further notes that sixteen (16) members of the Class made timely exclusion requests. See supra note 3 and accompanying text.

Settlement Fund provided in the Plan of Allocation satisfies this requirement.[6]

### E. Conclusion

For the foregoing reasons, the court finds that the Settlement Agreement is fair, reasonable, and adequate. Accordingly, the court **GRANTS** EPPs' Motion for Final Approval of the Settlement Agreement, ECF No. 2158.

### III. ATTORNEYS' FEES, COSTS, AND EXPENSES

Counsel for the EPPs have also filed a Motion for Award of Attorneys' Fees, Reimbursement of Costs and Expenses, and Incentive Awards for the Class Representative Plaintiffs. ECF Nos. 2160, 2161. Counsel request one-third (1/3) of the Settlement Fund in attorneys' fees, which results in an award of $23,333,333.33. ECF No. 2161 at 2. Counsel seek $3,905,175.85 to reimburse reasonable costs and expenses and $300,000 for incentive awards to be divided among the seven Class Representative Plaintiffs.[7] Id.

---

[6] See supra note 4.

[7] The incentive award is to be divided among the Class Representative Plaintiffs as follows: (i) Painters District Council No. 30 Health & Welfare Fund - $75,000; (ii) The City of Providence, Rhode Island -$75,000; (iii) Sergeants Benevolent Association - $30,000; (iv) Uniformed Firefighters' Association of Greater New York Security Benefit Fund and Retired Firefighters' Security Benefit Fund of the Uniformed Firefighters' Association - $30,000; (v) United Food and Commercial Workers Local 1500 Welfare Fund - $ 30,000; (vi) Philadelphia Federation of Teachers Health & Welfare Fund - $30,000; (vii) International Union of Operating Engineers Local 49 Health and Welfare Fund - $30,000.

No Class members have filed an objection to the amount of attorneys' fees, expenses, or incentive awards.

### A. Attorneys' Fees

#### 1. Legal Standard

"[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). Federal Rile of Civil Procedure 23(h) provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Here, the parties' agreement states that attorneys' fees, expenses, and incentive awards will be deducted from the Settlement Fund. ECF No. 2134-1 at 11-13. Thus, the only question for the court is whether the requested attorneys' fees are reasonable.

There are two primary methods for calculating the reasonableness of attorneys' fees: (1) the "percentage-of-recovery" (or "percentage-of-the-fund") method; and (2) the lodestar method. See The Mills Corp., 265 F.R.D. at 260. As its name suggests, the percentage-of-recovery method calculates an award based on a percentage of the recovery for the Class. Id. The court then applies a seven-factor test to determine whether the requested percentage is reasonable. Id. at 261. The

lodestar method calculates reasonable fees "by multiplying the number of reasonable hours expended times a reasonable rate." McAfee v. Boczar, 738 F.3d 81, 88 (4th Cir. 2013) (citation omitted). The Fourth Circuit has not adopted either method for calculating attorneys' fees, but the "current trend among the courts of appeal favors the use of a percentage method . . . in common fund cases." Brown, 318 F.R.D. at 575 (citation omitted); see also The Mills Corp., 265 F.R.D. at 260 ("While the Fourth Circuit has not definitively answered this debate, other districts within this Circuit, and the vast majority of courts in other jurisdictions consistently apply a percentage of the fund method for calculating attorneys' fees in common fund cases.").

A benefit of the percentage-of-recovery method is that it "better aligns the interests of class counsel and class members because it ties to the attorneys' award to the overall result achieved rather than the hours expended by the attorneys." Kay Co. v. Equitable Prod. Co., 749 F. Supp. 2d 455, 462 (S.D.W. Va. 2010). However, the lodestar method can still be used as a comparison tool to check the reasonableness of the percentage-of-recovery award. This "lodestar cross-check" compares "(1) a calculation of attorney's fees using the percentage-of-recovery method to (2) a rough or imprecise lodestar calculation." Lumber Liquidators, 952 F.3d at 482 n.7 (citing In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305-06 (3d Cir. 2005)). The court will "take advantage of the

benefits of both methods," and apply the lodestar cross-check to further evaluate the reasonableness of the proposed award. Domonoske, 790 F. Supp. 2d at 475 (citation omitted); see Kay Co., 749 F. Supp. 2d at 464 (applying the percentage-of-recovery method and using the lodestar cross-check as an "element of objectivity in [the] analysis").

### 2. Reasonable Fees under the Percentage-of-Recovery Method

To determine whether the requested percentage of recovery is reasonable, the court considers the following factors: (1) the results obtained for the Class; (2) objections by members of the Class to the settlement terms and/or fees requested by counsel; (3) the quality, skill, and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) public policy; and (7) awards in similar cases. The Mills Corp., 265 F.R.D. at 261.

The court has already addressed the first five factors in assessing the fairness and adequacy of the Settlement Agreement. The court finds: (1) the $70 million settlement is a favorable result for the Class; (2) there were no objections to the Settlement Agreement or the attorneys' fees request; (3) counsel for EPPs are experienced and highly skilled in pharmaceutical antitrust class action cases; (4) this case was litigated for nearly five years and involved numerous complex issues of fact and

law; and (5) EPPs faced significant risks in proving their case at trial, so there was a significant risk that counsel would not receive any compensation for their efforts. Each of these factors supports the reasonableness of the requested fee.

In considering public policy of the proposed fee award, the court must balance two competing policy goals. Class action litigation often requires attorneys to front costs at significant risk of nonpayment, so an attorneys' fee award should provide sufficient incentive for competent attorneys to pursue meritorious cases. The Mills Corp., 265 F.R.D. at 263. However, an oversized fee award could serve to undermine public trust in class action litigation. See id.; Kay Co., 749 F. Supp. 2d at 469 ("Because of the damage caused by the perception of overcompensation of attorneys in class action suits, lawyers requesting attorneys' fees and judges reviewing those requests must exercise heightened vigilance to ensure the fees are in fact reasonable beyond reproach and worthy of our justice system.").

The court is satisfied that the requested attorneys' fees of one-third of the Settlement Fund properly balances these policy goals. A significant award is appropriate for the attorneys because they litigated the case vigorously for nearly five years, managed the interests of the EPP Class, and fronted significant costs. The court finds that the one-third percentage of the fund is not

excessive so as to undermine public trust in class action litigation.

The requested fee award also falls within the typical range of awards in pharmaceutical antitrust cases. District courts in the Fourth Circuit have frequently found that a percentage award of one-third of the Settlement Fund is within the range of reasonable percentage of recovery, and one-third of the fund is a common award in antitrust class actions. See In re Peanut Farmers Antitrust Litig., 2021 WL 9494033, at *5-6 (E.D. Va. Aug. 10, 2021) (collecting cases). Additionally, courts often award higher percentage rates of attorneys' fees after discovery is completed. Id. at *6 (citation omitted). The court finds that the requested fee is in line with awards in similar cases and the parties' settlement after completion of discovery further supports the one-third fee.

### 3. Lodestar Cross-Check

When using the lodestar method only for the purpose of cross-checking the reasonableness of the percentage-of-recovery method, the court need not exhaustively scrutinize counsels' documented hours as it would if the lodestar method were used as the primary determiner of reasonableness. The Mills Corp., 265 F.R.D. at 264 (citation omitted). Instead, the court will use counsels' documented hours to calculate the lodestar cross-check.

See Jones v. Dominion Res. Servs., Inc., 601 F. Supp. 2d 756, 765-66 (S.D.W. Va. 2009).

Counsel for the EPPs report that they worked a total of 31,710.2 hours. ECF No. 2161-1 at 5. This work was not duplicative and was overseen by co-lead counsel. Counsel provided the court with extensive documentation on the number of hours worked by each attorney and the historical hourly rate of each attorney throughout the litigation. See ECF No. 2161-2. Multiplying the number of hours each attorney worked times the historical rate for that attorney, the lodestar value equals $18,999,856.30. ECF No. 2161-1 at 5. Dividing the requested fee award of $23,333,333.33 by the lodestar value of $18,999,856.30 provides a lodestar multiplier of 1.23.

The court finds that the lodestar multiplier supports the reasonableness of the requested fee award. The lodestar multiplier is less than multipliers that courts in this Circuit have found reasonable in similar cases. See, e.g., Peanut Farmers, 2021 WL 9494033, at *7 (finding that a lodestar multiplier of 2.92 would be reasonable where counsel requested an award of $34,250,000 and collecting cases); In re Genworth Fin. Sec. Litig., 210 F. Supp. 3d 837, 845 (E.D. Va. 2016) ("District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2-3 times lodestar multipliers.").

## B. Request for Costs and Expenses

Counsel request reimbursement of reasonable costs and expenses in the amount of $3,905,175.85. ECF No. 2161 at 2. The court may award nontaxable costs that are authorized by law or the parties' agreement. Fed. R. Civ. P. 23(h). Here, the Settlement Agreement states that reasonable costs and expenses will be paid from the Settlement Fund. ECF No. 2134-1 at 11.

"It is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award." Singleton v. Domino's Pizza, LLC, 976 F. Supp. 2d 665, 689 (D. Md. 2013) (citation omitted). These expenses include the types of normal expenses that would be charged to a fee-paying client in the course of litigation, such as necessary travel, depositions and transcripts, postage, court costs, and photocopying. See id. (citations omitted).

Counsel have provided extensive documentation on the costs and expenses they incurred relating to this litigation, including expenses for transportation, document production, postage, and other typical litigation expenses. See ECF No. 2161-2. The court notes that the reimbursement request of $3,905,175.85 is high, but the court is satisfied that this request is reasonable given the duration of the proceedings, the complex questions of facts and law present in this case, and the advanced stage of proceedings

when the parties reached settlement. Moreover, the requested expenses are consistent with expenses courts have awarded in cases of comparable size. See, e.g., In re Lidoderm Antitrust Litig., 2018 WL 4620695, at *4 (N.D. Cal. Sept. 20, 2018) (awarding reimbursement of $3,948,118 in expenses where counsel achieved a $104.75 million settlement); In re Loestrin 24 Fe Antitrust Litig., 2020 WL 5201275, at *5 (D.R.I. Sept. 1, 2020) (awarding reimbursement of $3,993,996.58 in expenses where counsel achieved a $63.5 million settlement).

### C. Incentive Awards

Counsel request an incentive award totaling $300,000 for the Class Representatives. ECF No. 2161 at 26. Five of the Class Representative Plaintiffs would receive $30,000 each, while two Class Representative Plaintiffs, (Painters District Council No. 30 Health & Welfare Fund and The City of Providence, Rhode Island), would receive $75,000 each. Id. The Settlement Agreement states that the incentive awards will be paid out of the Settlement Fund. ECF No. 2134-1 at 11. Such awards are "fairly typical," and are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." Brown, 318 F.R.D. at 578 (citation omitted).

23

The court finds that the requested incentive award is reasonable. Class Representatives have amply fulfilled their duties in this litigation and provided a valuable service to the Class. Additionally, the extraordinary service of Plaintiffs Painters District Council No. 30 and City of Providence in performing trial-related services warrants the increased award amount of $75,000. The requested incentive award amounts are in line with incentive awards that courts in this Circuit have previously granted. See, e.g., Peanut Farmers, 2021 WL 9494033, at *8 (awarding $40,000 each to six class representatives); In re Celebrex (Celecoxib) Antitrust Litig., 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) (awarding $100,000 each to three class representatives); In re Titanium Dioxide Antitrust Litig., 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding $125,000 to one class representative and $25,000 each to two other class representatives).

### D. Conclusion

For the foregoing reasons, EPPs' Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for the Class Representatives, ECF No. 2160, is **GRANTED.**

### IV. DISMISSAL OF EPP CLAIMS

The court has now approved the Settlement Agreement, which is binding on all EPP Class members' claims. Accordingly, all EPP Class members' claims against Defendants are **DISMISSED WITH**

24

**PREJUDICE.** The court **DIRECTS** the Clerk to enter judgment to this effect, there being no just reason for delay, pursuant to the Final Order and Judgment of Dismissal filed in conjunction with this Opinion.

The Clerk is further **DIRECTED** to forward a copy of this Opinion and the Final Order and Judgment of Dismissal to counsel of record.

IT IS SO **ORDERED.**

                                 *Rebecca Beach Smith*
                                 REBECCA BEACH SMITH
               SENIOR UNITED STATES DISTRICT JUDGE

October 18 , 2023